**Death Penalty**

1
2
3
4
5
6
7
8            UNITED STATES DISTRICT COURT

9            CENTRAL DISTRICT OF CALIFORNIA

10
11
12  JOSEPH WILLIAM HART,            )       CASE NO. CV 05-03633 DSF
                                    )
13          Petitioner,            )       **DEATH PENALTY CASE**
                                    )
14      v.                          )
                                    )       ORDER DENYING HABEAS RELIEF
15  RON BROOMFIELD,[1/] Acting     )
    Warden of California State Prison at )
16  San Quentin,                    )
                                    )
17          Respondent.             )
                                    )
18  _____)

19  **I.    INTRODUCTION**

20          Petitioner is a death row inmate at California's San Quentin State Prison.  A jury

21  convicted him of first degree murder and sex offenses.  On federal habeas review,

22  Petitioner challenges his convictions and sentence.  As the Court discusses below, aside

23  from two claims that are unripe for review, Petitioner fails to meet the stringent standard

24  for relief under the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA),

25  28 U.S.C. §2254.

26  _____

27      [1/]  Ron Broomfield is substituted for his predecessor as Acting Warden of San

28  Quentin State Prison.  Fed. R. Civ. P. 25(d).

1

2    **II.    PROCEDURAL HISTORY**

3          **A.    State Court Proceedings**[2/]

4          Petitioner was convicted in the Riverside County Superior Court of first degree

5    murder (Cal. Penal Code §§ 187(a), 189), rape (Cal. Penal Code § 261(a)(2)), sodomy

6    (Cal. Penal Code § 286(c)), and forcible oral copulation (Cal Penal Code § 288a(c)).

7    The jury found true special circumstance allegations that Petitioner committed the

8    murder during the commission of, attempted commission of – or immediate flight after

9    committing or attempting to commit – rape and sodomy.   (Cal. Penal Code §§

10   190.2(a)(17)(C) & (D).)   (Reporter's Transcript on Appeal, volume 27 ("27RT") at

11   3586-89.)

12         After a bifurcated trial before the same jury to determine the penalty, the jury

13   returned a sentence of death.  (41RT at 5285.)  The trial court formally imposed that

14   sentence on May 27, 1988.  (42RT at 5312-14.)

15         On automatic appeal, the California Supreme Court affirmed the judgment on

16   June 1, 1999. *See People v. Hart*, 20 Cal. 4th 546 (1999).[3/]  The United States Supreme

17   Court denied certiorari on January 10, 2000.  *See Hart v. California*, 528 U.S. 1085

18   (2000).

19         On November 6, 1998, Petitioner filed a state habeas petition in the California

20   Supreme Court.  The court denied that eleven-claim petition on March 1, 2006.  The

21   court rejected the claims on the merits, as well as on multiple procedural grounds. (Dkt.

22   101-1–101-7, 101-13.)

23

24         [2/]  The exhibits and lodgments in this action were filed out of order and are difficult

25   to locate.  For ease of reference, the Court cites to all documents – except for transcripts

26   – using the CM-ECF "Page ID" numbers printed on the upper right corner of each page
     on the electronic docket.

27         [3/]  The court subsequently made four modifications to the opinion, with no effect on

28   the judgment.  (Dkt. 97-54.)

1       On June 22, 2005, Petitioner filed a second habeas petition in the California
2   Supreme Court. (Dkt. 98-1–98-5, 102-1–102-9, 103-1–103-3.) Petitioner included his
3   prior state habeas claims and added several others.  On March 28, 2007, the California
4   Supreme Court denied the second petition, again both on the merits and various
5   procedural grounds. (Dkt. 98-12.)

6       On May 22, 2007, after receiving a stay of this federal action (discussed below),
7   Petitioner filed a third state habeas petition.  (Dkt. 98-13–98-16, 99-1–99-4.)  This
8   "supplemental" exhaustion petition raised three claims.  After receiving informal
9   briefing and multiple exhibits, the California Supreme Court denied the petition on
10  September 28, 2011.  (Dkt. 99-21.)

11  **B.    Pending Proceedings**

12      Petitioner initiated his federal habeas proceedings in a separate action.  In case
13  No. CV 00-1021 MMM, the Court appointed counsel for the limited purpose of
14  determining whether the federal action was time-barred, or whether AEDPA's
15  limitations period should be equitably tolled.  The Court ultimately granted equitable
16  tolling and found the action timely.  The Court then dismissed that limited action and
17  Petitioner commenced the current proceeding on May 16, 2005.  (Dkt. 1.)

18      The original petition was "mixed," containing claims that had been raised in state
19  court, and others that had not.  Petitioner sought and received a stay of the case to
20  complete state habeas review.  (Dkt. 18, 26.)  Petitioner subsequently returned to this
21  Court and filed an amended petition.  (Dkt. 38.)  Soon thereafter, due to defects in the
22  amended petition identified by Petitioner, he successfully sought leave to file the
23  pending Second Amended Petition ("SAP").  (Dkt. 45, 51-53.)  The SAP raises forty-
24  one claims and multiple subclaims.

25      At the Court's direction, Respondent filed an Answer with a memorandum of
26  points and authorities fully briefing all of the claims and subclaims in the SAP, and

27
28

discussing the applicability of 28 U.S.C. § 2254(d).[4/]  (Dkt. 87, 93.)  Subsequently, pursuant to this Court's Order for Briefing, Petitioner filed a "Traverse and § 2254(d) Brief" ("Traverse") responding to Respondent's arguments as to the applicability of 28 U.S.C. § 2254(d).  (Dkt. 106, 130.)  Thereafter, Petitioner filed a Notice of Supplemental Supreme Court Authority that directed the Court to a newly-decided Supreme Court case that ostensibly had a bearing on Claims 6 and 14 of the SAP. (Dkt. 133.)

This Court's Order for Briefing advised the parties that "there is no basis for considering a request for discovery or any other form of evidentiary development until Petitioner has established that he can satisfy the threshold showing" under AEDPA, a standard that is discussed fully below.  The Briefing Order further directed that "[o]nce Petitioner's Traverse has been filed, the Court will not consider any further briefing until such time as it has made a determination of the merits of claims contained in the SAP."  (Dkt. 106 at 3-4.)  Based on the Court's analysis below under AEDPA, no further evidentiary development or briefing is warranted and the matter stands submitted for decision.

## III.   TRIAL FACTS[5/]

The evidence at trial established that shortly before noon on March 24, 1986, the murder victim, Diana (known as Diane) Lynn Harper, and her friend, Amy R., each 15 years of age, decided to leave the Riverside

---

[4/]  Prior to the filing of the Answer, this action was transferred from the calender of the Honorable Margaret M. Morrow, due to her retirement, to this Court's calendar. (Dkt. 88.)

[5/]  The California Supreme Court's opinion on direct appeal contains a reasonable summary of the facts in light of the evidence presented in the State court proceeding. 28 U.S.C § 2254(d).  Therefore, solely for purposes of summarizing the trial evidence, the Court quotes the state court's statement of facts here.  The Court discusses trial evidence in detail below where facts are in dispute or necessary to resolve specific claims.

County high school in which they were enrolled as students, to meet Diane's boyfriend at a local 7-Eleven store.  In the parking lot of the store, Diane began conversing with a stranger, who told her that he had found a marijuana patch and needed someone to watch the road while he harvested the plants.  He offered the girls $1,000 to serve as lookouts.  The girls entered his vehicle, and the man drove them 30 to 40 miles, stopping once to purchase beer, and again to obtain storage bags for carrying the marijuana.  At trial, Amy identified the man as defendant.

The car stopped at a dirt road in a rural area.  Defendant told Amy to wait by the vehicle, and he and Diane walked up the path and out of Amy's view.  Shortly thereafter, defendant returned and asked Amy to help him carry the bags.  Amy went with him and saw Diane's partially clothed body lying facedown on the ground.  Diane appeared to be dead or unconscious.  Amy tried to run away, but defendant caught her, tore her clothes, forced her to orally copulate him, and raped and sodomized her.  Amy testified at trial that defendant explained to her: "I'm really sorry I had to do this, but you know, I had a shitty day. . . ."

Defendant informed Amy that "your friend was an asshole, she called me a few names, and I think she's dead."  He also told Amy that he planned to hit Amy with a rock to render her unconscious.  By misleading defendant into believing that she had been abused as a child, and promising that she would not contact the police, Amy persuaded defendant not to knock her out, and eventually he drove her back to a location near the 7-Eleven store.  He gave her a quarter to phone home, and drove away.  Amy immediately contacted her sister and, shortly thereafter, spoke with law enforcement officers.  Later that evening, Amy directed the officers to the crime scene, where Diane's body was found.  The cause of Diane's

death was identified as massive cerebral contusions and hemorrhage, caused by external trauma to the head.

Law enforcement investigators recovered evidence indicating that Amy and Diane each had been sexually assaulted. A fingerprint matching that of defendant was recovered from a beer bottle found close to Diane's body. Tire impressions found in the vicinity of the murder scene were consistent with those of defendant's vehicle, which Amy also identified as the one she and Diane had entered. Shoeprints were consistent with a partially burned shoe found in a 55-gallon drum outside defendant's residence. Other physical evidence also connected defendant to the crime scene. Defendant was arrested on May 8, 1986 – five days after the murder of his young niece, Shelah McMahan. In a police lineup, Amy was shown five individuals including defendant, and collapsed upon viewing him; immediately thereafter, she identified defendant as the man who had assaulted her. Defendant's time cards indicated that, on the day the crimes were committed, he worked until 11:30 a.m. on a construction job near the 7-Eleven store where the girls were picked up. A few days later, one of defendant's coworkers observed that defendant had a bandaged hand and that his right arm was in a sling; the physician who treated defendant's injury testified that it was commonly known as a "boxer's fracture," because it typically is sustained by striking a closed-fist blow against a fixed or hard object.

I.  GUILT PHASE EVIDENCE

A. *The Prosecution's Case*

1. *Overview*

The prosecution's theory of the case was that defendant's effort to entice the girls into his vehicle and drive them to a remote area was part of a premeditated plan to commit rape, and that the murder of Diane was

1  committed in the course of perpetrating rape.  To establish that theory, the
2  prosecution presented Amy's testimony, and introduced physical and
3  circumstantial evidence linking defendant to the crimes.

4  2. *The Events of March 24, 1986*

5  Amy testified that she and Diane left high school on March 24,
6  1986, stopping first at a nearby Der Wienerschnitzel restaurant for a soda,
7  then at another restaurant, Don Jose's, where Diane submitted an
8  application for employment.  The girls thereafter crossed the street to an
9  area adjacent to a 7-Eleven store to wait for Diane's boyfriend, David
10  Starbuck.

11  A brown Toyota vehicle entered a nearby driveway, and Diane
12  began conversing with its driver.  Amy joined in the conversation.  The
13  driver informed the girls that "he had found a marijuana field and he had
14  a lady that was going to go with him and she couldn't make it, and he
15  couldn't take another day off work and . . . I guess [the marijuana] wasn't
16  his, and so he needed someone to watch the road while he went and
17  chopped down the marijuana. . . . He just wanted one of us."  The man
18  informed the girls that he would pay $1,000 for the assistance he
19  requested, adding that "we would be back in an hour."

20  The girls decided that if one of them were going to accompany the
21  man, they both would do so, and so they entered his vehicle.  Amy noticed
22  an orange towel on the dashboard.  Amy told Diane: "Oh, David is going
23  to kill you for doing this."  The man responded: "Will he kill you for
24  making a thousand dollars in an hour?  Why would he kill you for making
25  a thousand dollars in an hour?"

26  Amy estimated that the three of them thereafter traveled about 30
27  or 40 miles, stopping at a Circle-K store because the driver said he was
28  thirsty.  The man returned to the car with a six-pack of Budweiser beer in

bottles.  The three drank the beer.  The man informed the girls that he would need bags to put the marijuana in "[a]nd that it wouldn't be cool to put it in a white plastic bag."  He sent Amy back into the store to obtain some paper bags.  The trio then drove to a Thrifty store where the girls procured more bags.  Next, they traveled to a hardware store, because the man said "the marijuana was thick and that he needed to get a hatchet to chop it down with."  The man entered the store for the purpose of purchasing a hatchet, emerging shortly thereafter without one, however, informing the girls that the hatchet cost $15, which was too much money for him to pay.  He explained, "It's okay because I have a screwdriver in the trunk."

Diane responded: "I have this knife if you want to use that," and gave the man a small buck knife that she kept in her purse.  Amy expressed her displeasure with this arrangement, and the man returned the knife to Diane.  The trio then drove for awhile on a freeway, exiting near a field.  The man tried to drive the vehicle into the field, but was unable to do so.  He told the girls, "I know another way to get in," and they kept driving.

The car proceeded onto a dirt road near a sign that read, "80 Acres for Sale," passing a Volkswagen car shell.  The vehicle stopped; the occupants emerged from the car, and the man removed the bags from the trunk.  He told Amy to watch the road while he and Diane harvested the marijuana.  Before departing, the man relieved himself; while he was doing so, the girls agreed to call to each other to make sure everything was all right.  But after a few minutes, the man and Diane returned, the man informing the girls that the marijuana patch was not there.  They returned to the car, and drove to where the dirt road stopped at a dead end.  The man put the cap on his beer bottle, placed the bottle in a white plastic bag,

1    and left the bag outside the car.  The man and Diane walked up a dirt path,
2    while Amy stayed by the vehicle.  Diane had her knife with her.

3         Amy waited for about 15 or 20 minutes, picking at the label on her
4    bottle of beer.  She started calling Diane's name, but heard no response.
5    She threw the bottle into a bush.  She noticed a bumper sticker on the
6    man's vehicle.  It read, "Skier."  She also noticed the license plate holder,
7    which exhibited the words, "Have a Nice Day."

8         At some point thereafter, the man returned to the vehicle, alone.  He
9    informed Amy that Diane was cooling her feet in a spring and that he
10   needed Amy's assistance to carry down the bags.  Amy followed the man
11   up the trail.  Informing her that he saw a snake, the man picked up a rock.
12   Amy told him to give it to her.  The man did so, saying, "But I'll have to
13   get another one, you don't want me to get killed, do you?"  Amy gave the
14   rock back to the man.

15        At approximately the same time, Amy saw Diane's body, partially
16   clothed and lying facedown.  Frightened, Amy started to run back down
17   the path.  The man chased her, hitting her in the back with a rock, causing
18   her to fall down.  He started punching Amy in the face, and the two fell
19   into a gully.  Amy pleaded with the man to let her hear Diane say
20   something.  The man repeatedly told her to shut up, that Diane was
21   unconscious and unable to speak.  "You're kind of funny, kid," he added,
22   "I'm about to rape you and all you can do is think about your friend."

23        The man stood behind Amy, tore her blouse, pulled her skirt up, and
24   ripped off her panties.  She noticed that his trousers were down and he was
25   holding his penis, "just slapping it back and forth."  Angrily, the man kept
26   telling her, "Don't look at me."  But Amy continued to glance back at the
27   man.  "It's hard for me to get it up after I just got it on with your friend,"
28   he explained.

The man attempted to sodomize Amy.  Repeatedly unable to achieve penetration, he turned Amy around, asking her, "How are you at giving head, kid?"  He placed Amy on her knees, telling her, "Do it," and shoved his penis into her mouth.  After the man achieved an erection, he turned Amy around, began biting her neck, and sodomized her.

Amy asked the man if he was going to kill her.  He replied, "I've done this in people's houses and I've never killed anyone yet."  He then dragged Amy back up the path toward Diane's body, telling her that she had better shut up or he was going to get his Vaseline.  While he was dragging Amy along, he picked up a small square jar of Vaseline.

The man threw Amy down and forced her to orally copulate him again.  He applied the Vaseline to himself.  Then he raped her.

Amy asked the man again if he was going to kill her.  He said that he was going to render her unconscious by hitting her on the back of the neck with a rock.  Amy suggested that he tie her up instead, dig a hole, and place her in the hole.  The man agreed that it would be a good idea to tie her up, and did so with her blouse and bra.

The man informed Amy that he had to find Diane's knife, but his efforts to locate it were unsuccessful and he returned to Amy, telling her that "your friend was an asshole, she called me a few names, and I think she's dead."  Amy replied that there was no reason he also had to kill her. The man repeated his desire to render her unconscious to allow him time to get away.  Amy pleaded with the man not to hit her, concocting a false story that when she was three years old, her father used to hit and beat her, and that she was afraid of being hit.

Upon hearing Amy's pleas for mercy, the man's attitude began to change.  He said he understood what Amy had gone through "because I

was raped myself by three [B]lack men and I'm really sorry I had to do this, but you know, I had a shitty day. . . ."

Amy continued to promise that she would not tell anybody, so he untied her and took her back down the trail, repeatedly complaining, "You made me hurt my hand, kid."  Amy noticed that his hands were "really dirty" and "permanently stained."  Still fearing for her life, Amy asked the man to hold her hand.  Instead, he put his arm around her and continued to express remorse.  He placed Amy in his vehicle, and the pair drove away. When Amy asked whether she could disclose Diane's whereabouts, the man replied: "I wouldn't do that. . . . This is what you're going to tell them. You're going to tell them it was a [B]lack man, a [B]lack man took you – if you have to tell them anything."

He added: "I'm putting 15 years of my life in your hands, kid." Amy renewed her promise not to discuss the incident, to which the man replied, "But that doesn't matter because by the time they pick me up . . . I can get out before the . . . sentencing. . . . Anyway, I've got two good friends that would do anything for me."

The man dropped Amy off approximately one block from a 7-Eleven store.  As Amy emerged from the car, the man warned her not to call the police.  Then he gave her a quarter to phone home and departed. Amy called her sister, informing her of the incident.  The sheriff's department was contacted, and Amy later accompanied detectives to search for Diane.

### 3. *The Crime Scene Investigation*

Riverside County Sheriff's Department Detective Richard Moker testified that, in the evening of March 24, 1986, he accompanied Amy in an effort to locate Diane's body.  He described the manner in which he and other law enforcement officers attempted to retrace the route the girls had

taken, the officers relying upon Amy's description of the stores the trio had visited, distinctive road signs they had observed, and the crime scene terrain.  At approximately 11:00 p.m., after nearly six hours of searching, the officers located the Volkswagen shell.  Shortly thereafter, the officers found a white plastic sack containing a Budweiser six-pack container. Fearful that the man who assaulted her might be lurking in the area, Amy asked the officers whether they were armed and indicated that she wanted to leave as soon as possible.  She also told them where Diane's body could be found.  Thereafter, one of the officers transported Amy to the hospital to enable her to undergo a rape examination, while investigators searched the crime scene.

On cross-examination, Detective Moker testified that when he first encountered Amy, she informed him that Diane could be found "lying on her back" (thereby conflicting with Amy's testimony that she saw Diane lying facedown).

Riverside County Detective Michael Lackie testified regarding the investigation law enforcement officers conducted at the crime scene in the early morning hours of March 25, 1986, describing the steps he and Detective Moker took to avoid disturbing evidence found at the scene.  In addition to encountering Diane's lifeless and bloodstained body (unclothed below the waist, with panties wrapped around one leg), officers located nearby a buck knife with the blade extended, a shoe impression, a Budweiser beer bottle, and paper grocery bags.  Farther away from Diane's body, officers found four different tire impressions and a shoe impression at the spot where Amy said defendant had parked the vehicle, a white plastic sack containing an empty Budweiser beer bottle with a cap on it, a discarded Budweiser beer bottle with the label partially picked off, and Amy's torn undergarments.  Lackie testified that the shoe impression

found near the spot where the vehicle had been parked appeared to resemble a similar impression found near Diane's body.  He added that officers were unable to locate any marijuana growing in the area.

James Hall, a criminalist employed by the California Department of Justice, assisted in the investigation of the crime scene on March 25, 1986. Hall checked Diane's body for loose hairs and fibers, collecting what appeared to be a loose pubic hair from Diane's thigh.

Michael Renney, a senior evidence technician employed by the Riverside County Sheriff's Department, testified that on March 26, 1986, he tested for the presence of fingerprints several items recovered from the crime scene, obtaining a latent print from the Budweiser beer bottle found in the white plastic sack.

### 4. *The Victims' Injuries*

Dr. Claire McArthur, an emergency room physician employed by Riverside General Hospital, testified that in the early morning of March 25, 1986, she examined Amy, discovering a large bruise on Amy's upper back, abrasions about both knees, and a bruise to Amy's perineum (the area near the vagina and rectum).  Dr. McArthur also found sand-like particles in Amy's vagina, a circumstance that Dr. McArthur testified would be "highly unlikely" in the absence of penetration.  On cross-examination, Dr. McArthur acknowledged that she asked Amy whether she had been sodomized, and that Amy had responded in the negative.  On redirect examination, Dr. McArthur testified that sexual assault victims Amy's age typically are "very reluctant" to discuss a sexual assault, and opined that Amy had been the victim of such an assault.  Criminalist James Hall testified that Amy's slip bore a seminal fluid stain.

13

1      Dr. Dewitt Hunter, a Riverside County pathologist, testified that on
2  March 26, 1986, he performed an autopsy on Diane's body.  The autopsy
3  revealed that the cause of Diane's death was major trauma to her head that
4  led to massive cerebral contusion and hemorrhage; her body also exhibited
5  minor trauma in certain other locations, and exhibited evidence indicating
6  that Diane had been sexually assaulted.  With regard to the head injuries,
7  Dr. Hunter testified that Diane had suffered several "crush-type
8  lacerations" and a skull fracture, most likely caused by a rock or brick-like
9  instrument.  Diane's face also had numerous contusions and abrasions,
10  consistent with her head having been pushed into the dirt.  Her larynx
11  contained foreign vegetable material (such as a leaf or twig) indicating that
12  it had been inhaled shortly before death.  The middle of her back revealed
13  an extensive contusion.  Diane's iliac crest (the front of the pelvic bone)
14  showed abrasions consistent with someone having kneeled or sat on her
15  back.  Diane's knees, elbows, and buttocks also showed abrasions.  There
16  was a reddening of the vaginal area consistent with the application of
17  force, and there were abrasions and "ill-defined" contusions on her inner
18  and upper thighs consistent with an effort to force apart Diane's legs.
19  Although no seminal fluid was discovered on Diane's body or clothing, a
20  Vaseline-like substance was found around her vaginal area and inner
21  thighs.

22          5. *The Brown Toyota With the Message "Have a Nice*
23             *Day"*

24      Riverside County Sheriff's Department Sergeant Ronald Wade
25  testified that on May 4, 1986, approximately six weeks after Diane and
26  Amy were attacked, he observed a vehicle that appeared to be similar to
27  the description of the suspect vehicle involved in the Diane Harper
28  homicide.  The vehicle, a brown Toyota Corolla, was parked next to a

14

mobilehome in the Mead Valley area.  Wade returned the next day and observed that the vehicle bore certain distinctive markings, including decals on the rear bumper and a license plate frame that read, "Have a Nice Day." Wade proceeded to the mobilehome on May 6 and spoke with an individual who identified himself as "Joe Hart." (At trial, Wade identified the individual with whom he spoke as defendant.)  Wade asked defendant where he was working on March 24, 1986.  Defendant replied that he was working in the Riverside/La Sierra area at McKinley and Magnolia Avenues; defendant checked his pocket calendar to verify his recollection.  The location was not far from the spot where Diane and Amy had been picked up that day.  Detective Lackie subsequently testified that the distance between the locations was 1.9 miles and required approximately four minutes of travel time by car.

Upon returning to the Riverside Sheriff's Department headquarters, Wade contacted the California Department of Justice in Sacramento for the purpose of obtaining Hart's criminal history and fingerprints.  Michael Renney testified that he subsequently examined these known fingerprints of defendant and matched that of defendant's right ring finger to the latent print Renney obtained on March 26 from the Budweiser beer bottle found in the white plastic sack at the crime scene.  Joe Sypnicki, a latent print examiner employed by the California Department of Justice, testified that he, too, compared the two prints, concluding "[t]here is absolutely no doubt whatsoever" that the latent impression lifted from the Budweiser beer bottle is that of defendant's right ring finger.  On cross-examination, Sypnicki acknowledged that no known method exists for ascertaining the date a particular fingerprint was made, and he therefore could not render an opinion as to the age of the print found on the beer bottle.

15

Having been informed of Sergeant Wade's observations, Detective Michael Lackie traveled on May 7, 1986, to the Mead Valley address occupied by Hart and obtained consent from Hart's wife, Linda, to examine the brown Toyota parked in the driveway.  Lackie brought photographs of the tire impressions found at the crime scene, and determined that each of the vehicle's tires had a different tread design and that each appeared to match the impressions depicted in the photographs. The license plate frame read "Have a Nice Day."  The vehicle had other distinctive features similar to those Amy had described to law enforcement officers.  A "fairly fresh," torn portion of a bumper sticker depicting the letters, "I E R," lay on the ground; it appeared to partially match the "SKIER" bumper sticker Amy had recalled seeing on the vehicle.  Lackie also observed, strewn about in the yard adjacent to the residence, Budweiser beer bottles similar to the type that Amy described defendant as having purchased on March 24.   Lackie also saw Marlboro 100 cigarette butts in the vicinity; Amy had informed officers that defendant had smoked Marlboro 100's.  Similar beer bottles and cigarette butts had been recovered at the crime scene.  Lackie also saw an orange towel located in a planter attached to the residence.

6. *Defendant's Arrest and the Ensuing Searches*

Detective Lackie testified that after he completed his observations of the brown Toyota and the surrounding yard area, he learned from another investigator that one of defendant's fingerprints on file appeared to match a fingerprint located on a bottle found in the plastic sack at the crime scene.  Lackie thereafter obtained a search warrant, returning to the Hart residence on May 8, 1986, to execute the warrant.  By the time Lackie arrived at the residence, law enforcement officers already had taken defendant into custody.

Detective Moker testified that he placed defendant under arrest on May 8, 1986.  Moker recalled that at the time of defendant's arrest, defendant's hair was "fluffy or wavy or dry looking . . . [with] the part in the middle. . . ."  Detective Lackie testified that at the time of the arrest, defendant wore soiled pants and had "extremely soiled hands."

Detective Lackie further testified that law enforcement officers seized the brown Toyota (and another vehicle) in order to conduct a subsequent search.  In the mobilehome, officers found a jar of Vaseline in the master bedroom, another jar of petroleum jelly in the bathroom, and Marlboro 100 cigarettes.  Outside the residence (crumpled up against the fence at the edge of the property), Lackie found two more pieces of a bumper sticker that appeared to have been torn from the "SKIER" bumper sticker on the brown Toyota.  Lackie found a pair of matched tennis shoes, partially burnt, in a 55-gallon drum that appeared to have served as an incinerator.  The tread design on the shoes appeared to match certain shoe impressions found at the crime scene.  Lackie described the shoes at the time they were discovered in the drum as having been in "pretty good condition. . . . There were no obvious gouges, tears, marks, signs of destruction that I could see other than what was created by the burns – burning."  Lackie also observed Circle-K plastic sacks among trash located at the side of the mobilehome.

Criminalist James Hall testified that on the day of defendant's arrest, he obtained various evidence exemplars from defendant's body, including those taken from defendant's pubic hair.  Hall compared defendant's pubic hair with the specimen recovered from Diane's thigh, concluding that the hairs were "microscopically similar and, therefore, the evidence hair [found on Diane] could have come from Mr. Hart."  Hall also compared the loose pubic hair with an exemplar taken from Diane's

body, noted microscopic differences, and opined that the loose hair had not come from her.

Hall testified that he examined Amy's slip and panties, identifying on the panties human bloodstains of an indeterminable ABO blood type. Hall identified ABO type B blood on Amy's blouse (Diane had ABO type B blood, Amy had type O, and defendant had type A). Hall identified a seminal fluid stain on Amy's slip; on cross-examination, he testified that ABO typing and enzyme typing of the stain were inconclusive, and he was uncertain as to the date the stain was made. On redirect examination, Hall stated that defendant is a "nonsecretor," which means that an examination of defendant's bodily fluids would not disclose his blood type. Hall acknowledged that the inconclusive nature of the tests conducted on the seminal stain could be due to the strength of the stain, the passage of time, or the nonsecretor status of the donor. Hall identified saliva on the Marlboro 100 cigarette butts collected at the crime scene, but tests as to the blood type of the donor did not yield a blood type, a result Hall testified he would expect if the donor were a nonsecretor.

Hall testified that on May 10, 1986, he examined defendant's vehicle, recovering orange cloth fibers from the dashboard area of the car's interior.

### 7. *Amy's Identification of Defendant*

Amy attended a law enforcement lineup on May 12, 1986, in which she observed five individuals through a one-way mirror. Upon recognizing one of the individuals, Amy fell, believing that "the floor would be safer." She noted on the sheriff's form that the individual she picked out had "different hair color, looked younger." In court, she identified that same individual as defendant, and as the man who had picked her up in the brown Toyota.

Riverside County Sheriff's Department Senior Investigator Dennis Harter testified that he was present at the police lineup in which Amy identified defendant as the suspect in her case.  Harter testified that as soon as defendant (who occupied the second position in the lineup) entered the lineup room, Amy gestured in his direction and "immediately grabbed her mouth as if to keep herself from yelling, she began to cry and she ducked down to the Claim" below the one-way viewing glass.  Harter described Amy's emotional state when she viewed defendant as "very distraught"; after the participants in the lineup departed from the room, Amy "began to cry uncontrollably."   Harter added that after she regained some composure, Amy stated, "It's No. 2, he killed Diane, he killed Diane."

Harter recalled that at the lineup, Amy noted that defendant's hairstyle appeared different from what it had been on the day she and Diane encountered him.  Detective Moker testified that at the lineup, defendant's hair "appeared to be wet or oily . . . and it was combed almost straight back. . . ."  When Harter returned to the jail the next day to visit defendant, defendant's hair appeared as it did at the time of defendant's arrest.  Photos depicting defendant's appearance at the lineup, and on the day thereafter, were admitted into evidence.

### 8. *Other Evidence*

Faye Ann Springer, a criminalist employed by the State of California Department of Justice, testified that she attended Diane's autopsy, removing some of the victim's pubic hair that appeared to have a foreign material on it, and concluding that the substance was consistent with petrolatum, found in Vaseline.  Springer found a similar substance on Diane's slip.  Springer also compared a fiber found in Amy's shoe with an exemplar taken from a carpet mat found in defendant's brown Toyota vehicle, concluding that the fibers appeared to be identical.  She examined

photographs of the crime scene tire impressions, concluding that the tread designs for each of the four tires were similar to the exemplar tire impressions (derived from defendant's vehicle).   Springer compared photographs depicting shoe impressions at the crime scene, concluding that they matched the photographs of the exemplars she received.   On cross-examination, Springer acknowledged that none of the foregoing similarities was unique; petrolatum is found in several personal care products, and the carpet fiber and tire and shoe impressions were derived from mass-produced products.

Joan Baker, the office manager for defendant's employer (Joe Verska, General Engineering Contractor), testified that defendant worked for the company from February to May 1986.  She recognized her own handwriting on his weekly time card filled out on March 26 or 27, 1986; she explained that defendant had been unable to fill out the time card, because "he had hurt his hand and it was bandaged and his arm was in a sling."  The time card showed that on March 24, 1986, defendant worked two hours.

Dr. David Fisher, an orthopedic surgeon, testified that on March 28, 1986, he treated defendant for a hand injury sometimes referred to as a "boxer's fracture," because it is incurred by a close-fisted blow against a hard or fixed object, adding that the injury is "very common to occur within an altercation of some kind."  On cross-examination, Dr. Fisher acknowledged that the injury could occur if someone were to fall with a clenched fist.

David Crocker, a field biologist employed by the Metropolitan Water District of Southern California, testified that on April 15, 1986, he was collecting water samples at Lake Mathews (located near La Sierra Boulevard, the street on which the victims' high school was situated).  He

and a colleague spotted a woman's black purse near the lake; upon opening the purse, they discovered personal items and Diane's high school identification card. Crocker and his colleague gave the purse to associates, who recognized the identification as that belonging to the high school student who recently had been murdered. The purse was given to law enforcement officers.

Kenneth Widney, defendant's father-in-law, testified that defendant often wore baseball-type hats, including hats with the letters "C A T" on them. He further testified that at some point prior to defendant's arrest on May 8, 1986, he observed two pieces of plywood placed in front of defendant's vehicle and a third piece of plywood on top, leading Widney to opine that defendant was trying to hide the car. Widney also testified that a yellow sticker that read "Caution Child in Car" was placed in the rear window of the vehicle shortly before defendant was arrested.

Dr. Craig Rath, a clinical psychologist, testified that on many occasions he had studied a type of criminal who, in many ways, was "relatively socialized," but who experiences a buildup of tension preceding the commission of a rape (or series of rapes), which then dissipates the tension. Dr. Rath testified that such an individual informally is known as a "binge rapist." On cross-examination, Dr. Rath acknowledged that he did not examine defendant.

### B. *The Defense Case*

The defense called Amy, the surviving victim, as its initial witness, and questioned her regarding the events of March 24, 1986, and her participation in the ensuing investigation conducted by law enforcement officials. Amy acknowledged that she willingly joined Diane and the driver of the car for the trip to locate the marijuana patch. Amy also acknowledged initially misleading officers, untruthfully informing them

that Diane might have known the perpetrator (because "I didn't want us to get in trouble"), and that the perpetrator was a Black man (because that was what her assailant had instructed her to say). On cross-examination, she confirmed that neither she nor Diane knew the man who assaulted them.

Riverside County Deputy Sheriff James Shannon testified that when he encountered Amy at the 7-Eleven in the late afternoon of March 24, 1986, she told him, "'Diane's dead, I know she is, Diane's dead.'" She also told him that she had seen Diane unclothed, and "laying on her back"; upon seeing Diane's body, Amy "started to scream and . . . the suspect hit her several times on the back with a rock." Amy described her assailant to Shannon as being a "Negro male," shortly thereafter changing her description. On cross-examination, Shannon testified that Amy explained she initially had given a false description of the suspect because she feared retaliation from the man. Amy described the man as a Caucasian male, approximately 35 years old, wearing a baseball-type cap with the letters "C A T" on it. Shannon further testified on cross-examination that Amy might have told him that she had seen Diane's back (rather than Diane lying on her back). During Shannon's questioning of Amy, she was crying, trembling, emotionally upset, and distraught.

Riverside County Detective Dennis Harter testified that during an interview he had with Amy in June 1986, Amy stated that she did not see any blood on Diane's body, or on the hands of the man who assaulted her. Harter reviewed the sequence of events of March 24, 1986, as Amy related them to him during the interview, noting that with regard to the allegation of sodomy, Amy told him that the man "stuck his penis in her butt . . . she said she could feel it moving in and out."

22

Riverside County Detective Richard Moker testified regarding his interview with Amy, conducted on March 26, 1986, noting that at one point Amy indicated the man who assaulted her and Diane had, as an inducement for them to join him in the search for the marijuana patch, offered each one of the girls a pound of marijuana to sell. Moker acknowledged that the report he prepared following the interview paraphrased the substance of his interview and contained certain technical terms not used by Amy to describe what occurred when she was sexually assaulted. In an interview Moker conducted on March 27, 1986, Amy told him that when the man released her following the assault, the man gave her directions to tell her sister as to how to reach the location where he had dropped Amy off, and gave her a quarter for a telephone call.

Riverside County Detective Michael Lackie testified that his report of the autopsy conducted on Diane Harper's body, indicating a lack of trauma in the vaginal and anal areas, was erroneous, "and in checking with Faye Springer and other people who were at the autopsy, they told me they clearly understood Dr. Hunter to have made some statement there was signs of sexual assault and there was quite a big to-do in the office because I had written the report and I guess I had missed it." Lackie also testified that in an interview with Amy, conducted on April 2, 1986, Amy informed him that she (Amy) had used marijuana on a daily basis, but not on March 24, 1986, the date the crimes were committed. In response to a question posed by the prosecution, Lackie testified that on March 26, 1986, he ordered blood testing of Amy and Diane's blood, and that the results indicated there was a small amount of alcohol in each girl's system, and no evidence of marijuana or any other drug.

California Department of Justice Criminalist James Hall testified regarding the analysis performed on the stain found on Amy's slip,

indicating that an electrophoresis test was inconclusive as to whether the stain was from seminal or vaginal fluid.  On cross-examination, Hall testified that a different test, known as the "P-30" test, indicated the presence of a protein that is a component of semen.  On redirect examination, Hall acknowledged that he was unable to determine the age of the stain.

Defendant did not testify, and the prosecution offered no rebuttal.

In his closing argument to the jury, defense counsel conceded that defendant took the girls to the remote area and assaulted them, killing Diane.  He urged the jury to conclude, however, that Diane had been killed in the course of defendant's having committed, or having attempted to commit, sodomy – and not rape – and that the evidence therefore supported no more than a verdict of second degree felony murder.[2]

> [2]  As noted, the crimes were committed in 1986; prior to the enactment of Proposition 115. Under the law at that time, section 189 limited the types of sex offenses that would support a conviction of first degree felony murder to rape (§ 261) and lewd or lascivious acts with a child under the age of 14 years (§ 288).  Although murder committed in the course of a sodomy was a special circumstance which, if found true, would support imposition of the death penalty, a jury at the time could consider the sodomy special circumstance only after finding defendant guilty of having committed first degree murder.  Thus, in arguing at trial that defendant·had·committed sodomy, but not rape, and that defendant had not acted with deliberation or premeditation in killing Diane, defense counsel sought to persuade the jury that defendant was guilty of no more than second degree

24

felony murder, in the hope of sparing defendant from a penalty phase and the possibility that the jury would render a verdict of death. (§§ 190, 190.2.)

Under the current provisions of section 189 (not applicable to the present case), murder committed in the perpetration of, or attempt to perpetrate, sodomy (§ 286) is first degree murder.

At the conclusion of the guilt phase, the jury found defendant guilty of having committed first degree murder, rape, sodomy, and oral copulation, and found true the special circumstance allegations that the murder was committed during the commission of rape and sodomy.

## II.  PENALTY PHASE EVIDENCE

### A.  *The Prosecution's Case*

The prosecution introduced evidence of five prior offenses committed by defendant, in addition to evidence of the subsequent uncharged murder of defendant's eleven-year-old niece.

#### 1.  *Debra B. – February 1973 Assault*

Debra B. testified that in February 1973, when she was 26 years of age, she lived next door to the parents of defendant's first wife, Kathy, in Anaheim.  While Debra was partially dressed one morning, defendant appeared without shoes in her kitchen.  He said that he had locked himself out of the house next door, and asked to use the telephone.  Debra repeatedly asked defendant to leave.  "[T]hen just very suddenly he lunged at me and started choking me," Debra recalled.  The pair fell to the floor. During the ensuing struggle, Debra bit defendant's hand, causing it to bleed.  The struggle ended, and defendant informed her that he could not stop himself from entering people's homes.  Debra arranged for defendant

to speak with one of the ministers at her church.  The minister contacted the local police, who placed defendant under arrest.

During the ensuing search of defendant's person, officers found a knotted piece of rope, 42 inches in length, a pocket knife, a piece of electrical wire, 39.5 inches in length, and a key to Debra's residence.

### 2. *Priscilla N. – February 1973 Assault*

On February 22, 1973, Priscilla N., 18 years of age, was employed as the manager of an apartment complex located in Imperial Beach.  At dusk, a man asked her to show him an apartment.  Once inside, he grabbed her, and the two struggled to the floor.  After she repeatedly screamed, the man ran out of the apartment.  She reported the incident to the police, initially identifying another man as her attacker.  When defendant was questioned by investigating officers with regard to the Valerie T. and Deborah T. incidents, described below, he admitted attacking Priscilla with the intent to rape her.

### 3. *Valerie T. – January 1975 Sexual Assault* (footnote omitted)

On January 19, 1975, at approximately 9:00 p.m., Valerie T. was walking to her residence, located in Imperial Beach, after having had dinner at a local restaurant.  A man grabbed her from behind and placed one hand over her mouth, informing her not to scream.  He pulled Valerie into an alley and removed his hand.  She immediately screamed, and he placed the blade of a knife across her throat.  He ordered her to remove her trousers; when she refused to do so, he did so himself, saying, "Don't look at me."  He also ripped open her blouse and "mounted" her briefly. "[T]hen he got up and he said, 'Thank you, ma'am,' and took off down the street."  Although Valerie could not recall whether the man's penis actually penetrated her, she subsequently detected wetness that "wasn't

26

1  mine," and believed he had ejaculated.  A few months after the incident

2  (approximately the time period when defendant admitted to the police that

3  he had attacked her), Valerie identified her assailant in a police photo

4  lineup as defendant, subsequently identifying him again at the penalty

5  phase of the trial.

6          4.  *Marilyn S. – February 1975 Forcible Oral*

7  *Copulation*

8        On the evening of February 26, 1975, Marilyn S. went dancing,

9  returning to her Imperial Beach apartment at approximately 1:00 a.m. the

10  next morning.  After falling asleep on a couch, she awakened to find a man

11  standing next to her; his hands covered her mouth and neck area.  The man

12  wore a ski mask over his face, with holes for his eyes, nose, and mouth.

13  In one hand, he held an open pocketknife.  He told Marilyn, "No sudden

14  moves, or you'll get hurt."  He taped her mouth shut and told her not to

15  scream.  The man began caressing Marilyn's breasts and attempted to

16  remove her pantyhose.  The tape eventually became loose and, in the hope

17  of preventing a rape, Marilyn informed him that she was menstruating and

18  had an infectious disease.  The man forced her to orally copulate him,

19  eventually ejaculating and forcing her to swallow his semen.  He thereafter

20  asked her for money.  Marilyn replied that she did not have much, and that

21  she had a young son to raise.  The man informed her that he had keys to

22  all of the apartments in the complex, warning her not to contact the police

23  or he would harm her and her son.  Because she did not see the man's face,

24  Marilyn was unable to identify him to the police.  One week later,

25  however, while being questioned by the police in connection with the

26  attempted burglary of Deborah T.'s residence, described below, defendant

27  admitted his sexual assault upon Marilyn S., explaining that he had gone

28

to her apartment complex for the purpose of committing a rape. (Footnote omitted.)

### 5. *Deborah T. – March 1975 Attempted Burglary*

Shortly after midnight on March 5, 1975, the police responded to a telephone call from Deborah T., regarding a possible prowler at the Imperial Beach apartment complex in which she resided. Police officers located defendant, barefoot, 30 to 40 feet from her residence, walking away at a fast pace, and detained him. Although Deborah was unable to identify defendant positively, fingerprints lifted from a window screen at her apartment subsequently were matched to those belonging to defendant. Defendant waived his rights under [*Miranda v. Arizona*, 384 U.S. 436 (1966)], and gave investigating officers a number of varying explanations as to what he was doing at the apartment complex at that hour, initially denying being near Deborah's window. The following day, after being reread his *Miranda* rights, defendant confessed that he had opened the window with the intent of sexually assaulting her. During this interrogation, defendant also described his involvement in certain other offenses that the prosecution offered as evidence in aggravation.

### 6. *Shelah McMahan – May 1986 Murder*

On May 3, 1986, the body of defendant's 11-year-old niece, Shelah McMahan, was found beneath a mattress, trash bags, and a rock overhang at a garbage dump located in Mead Valley. She had been stabbed numerous times in the neck. A thin rubber molding was wrapped loosely around her neck, and her hands had been tied tightly behind her with a plastic cable tie. Her forearms bore marks that appeared to have been made by handcuffs. Her shirt was ripped and pulled away from her chest. A semen stain was found on her pant leg. Shelah had lived next door to defendant, and had been missing since early that morning.

1         In the ensuing few days, defendant was seen using a tractor to grade

2    his backyard.  He told others that he was doing landscaping work.

3         On May 8, 1986, defendant was arrested for the crimes committed

4    against Diane and Amy.  Pursuant to a search warrant, police investigators

5    searched his mobilehome and the surrounding yard, locating cable ties

6    similar to the one found binding Shelah's wrists, as well as two sets of

7    handcuffs buried under freshly turned soil within a shed located behind

8    defendant's residence.  A third set of handcuffs was recovered several

9    weeks later.

10        An acquaintance of defendant's, William Parker, testified that in

11   early 1986, he engaged in a lighthearted discussion with defendant

12   regarding women and bondage, which led defendant to produce three sets

13   of handcuffs from the trunk of a motor vehicle.  Defendant told Parker

14   "something to the effect of, 'this is what you need.'"

15        Criminalist James Hall testified that traces of blood found on one set

16   of the handcuffs recovered from the shed matched Shelah's blood type,

17   shared by approximately 0.8 percent of the population (i.e., approximately

18   eight out of one thousand people).  Criminalist Faye Springer testified that

19   a fiber collected from one pair of handcuffs was similar to the fabric in a

20   black T-shirt worn by Shelah when her body was discovered.  The ligature

21   marks on Shelah's arms resembled those made by the handcuffs.  The

22   cable tie that bound Shelah's wrists had an appearance and trademark

23   similar to a cable tie recovered from defendant's bedroom.  Springer also

24   found a similarity between fibers recovered from Shelah's T-shirt and

25   those collected from the carpet found in one of defendant's vehicles, a

26   Ford Mustang.[5]   Springer stated that animal hairs recovered from

27   Shelah's body and from defendant's Mustang were similar to an exemplar

28   taken from defendant's dog.

29

[5]     Prosecution witness Ronald Wade testified on cross-examination that Shelah's hands were found clutching "some greenish gold type carpet fibers." Wade acknowledged that these particular fibers had not been connected to defendant or to any of his possessions. On cross-examination, Faye Springer and Detective Phillip Sanchez testified similarly.

Dr. Rene Modglin, the coroner who performed the autopsy on Shelah's body, testified that the victim had been stabbed 16 times. The cause of death was a cut to Shelah's right common carotid artery. The victim's body bore other bruises and abrasions. Modglin noted that Shelah's breasts were more fully developed than was typical for a girl of her age. On cross-examination, Modglin testified that he found no evidence of injury to Shelah's vaginal or anal areas. He found no evidence of semen in her mouth or body, noting that the absence of such evidence did not necessarily mean that Shelah had not engaged in sexual intercourse near the time of her death.

Randy Gresham shared a county jail cell with defendant and another prisoner. Gresham testified as part of an agreement specifying that, rather than face exposure to a prison sentence of 15 years for his involvement in offenses unrelated to the present case, he would be sentenced to a maximum of 10 years. Gresham testified that defendant admitted murdering his niece and leaving her body "at a dumping area." According to Gresham, defendant described her as an 11-year-old with "big breasts," and "built a lot sexier . . . than an 11-year-old was." Gresham stated that when defendant discussed killing Shelah, he demonstrated stabbing motions and laughed as he acted out the killing. Defendant informed him that he killed the girl because he was nervous after having talked to her

about his other sexual assaults, had made sexual advances toward her, and was afraid that she would inform her family.  Defendant told Gresham that "he really liked Shelah, and did not want to kill her, adding, 'it['s] easier after you'd [sic] done it.'"  While watching television with Gresham, defendant would compare the breasts of women on television with those of his niece.  Defendant expressed concern to Gresham that sheriff's deputies were searching his backyard, "and he was worried about them searching it. . . . He didn't want them to find evidence out there."[6]

> [6]  On cross-examination, Gresham acknowledged that he had used drugs heavily prior to his arrest, and suffered symptoms of withdrawal during the time that he was incarcerated with defendant.  Gresham testified that he suffered seizures and "blacked out" a number of times.  On one occasion, defendant administered cardiopulmonary resuscitation in order to revive Gresham.

B. *The Defense Case*

At the penalty phase, the defense presented evidence in rebuttal to the prosecution's case against defendant regarding the murder of Shelah. The defense also presented evidence in mitigation describing defendant's troubled upbringing and his personal and professional virtues.

1. *Defense Evidence Contesting the Claim That Defendant Murdered Shelah*

The defense presented evidence highlighting the large number of individuals who had access to the Widney residence (where Shelah lived), and in particular sought to cast suspicion on Bobby Asendorf, the brother of the boyfriend of Shelah's mother.  Asendorf, who lived inside a bus

parked on the property, was not permitted to babysit Shelah, because Shelah had a "crush" on him.

The defense also emphasized the forensic evidence that did not link defendant to Shelah's murder. This evidence included the green and gold carpet fibers found in Shelah's hand, the lack of blood found in defendant's Ford Mustang, the absence of hair matching that of defendant, and the presence of hair that matched neither Shelah nor defendant. A cigarette butt recovered near the body was analyzed for saliva and determined to reflect type A secretor activity; defendant was a nonsecretor. Cable ties found near the body were dissimilar from those found at defendant's residence and upon Shelah's wrists. The molding found wrapped around Shelah's neck did not match moldings seized by investigators. A shoeprint found on a bedsheet with Shelah's body was dissimilar to shoes seized from defendant's residence. The bedsheet, itself, also was dissimilar to those found in the Widney residence and in defendant's residence.

To cast further doubt upon the prosecution's theory that defendant murdered Shelah, the defense presented evidence suggesting that Shelah died within 90 minutes of 10:44 a.m., May 3 – i.e., a time when it was undisputed that defendant already had returned to his residence.

The defense sought to discredit inmate Randy Gresham's testimony by introducing evidence that Gresham had daily access to newspapers while incarcerated and that Gresham's plea agreement with the prosecution depended upon his testifying against defendant.

David Montgomery testified that he worked with defendant for Joe Verska Construction on the night Shelah disappeared. The pair met shortly after midnight to move sprinklers at a jobsite, a task that required approximately 90 minutes. Thereafter, they returned to defendant's

32

vehicle and drank beer.   Montgomery received a telephone call from defendant at approximately 8:00 a.m. that day.

Defendant's wife, Linda Hart, testified that early on the morning of Shelah's disappearance, she awoke at 2:30 a.m., to make sure that defendant had left for work; he already had left, returning shortly before 4:00 a.m.  Linda Hart did not see any blood on defendant's clothing or shoes.  He awakened her later in the morning, when it was light.

Linda Hart further testified that Shelah often went to church and to the grocery store with the Harts in their Ford Mustang.  The Harts' dog also traveled freely between the Widney and Hart residences.  Linda Hart explained that defendant had been grading the backyard on a continual basis, in an effort to produce a level yard.

On cross-examination, Linda Hart testified that although she recalled telling a detective, on May 4, 1986, that her husband was gone the previous day at 2:30 a.m., she did not remember telling the detective that the next time she heard from her husband that day was at 7:00 a.m.  She did not believe that her husband had killed Shelah or Diane.  (Footnote omitted.)

Shelah's mother, Paula McMahan, testified that many individuals visited – and occasionally resided at, or near – the Widney residence where Shelah lived.  Because the Widneys had a washer and dryer, the McMahans and Harts often washed their clothes there, sometimes mixing the families' laundry together.  Paula McMahan corroborated portions of Linda Hart's testimony, explaining that Shelah often played with defendant's daughters and dog, and frequently had been a passenger in the Harts' Ford Mustang.  She added that plastic cable ties could be found in many locations on the Widney property.  On cross-examination, Paula McMahan testified that Shelah was very responsible, and always asked

33

permission to leave the property, even with someone familiar to her such as defendant.

Shelah's uncle, Steve Widney, testified that he used cable ties in his job as an installer of rooftop solar panels, storing the ties at various locations on the Widneys' property.

## 2. *Defense Evidence in Mitigation*

Defendant's father, Robert Hart, testified regarding his own career in the United States Navy, and the adverse impact that his absences and alcoholism had had upon his family. He praised defendant as having been a good child, an excellent husband, and a loving father. Robert Hart forced defendant to enlist in the Navy and, upon returning, defendant discovered that his first wife, Kathy, had been unfaithful. Defendant began using drugs at this time, was committed as a mentally disordered sex offender to Patton State Hospital, and his marriage to Kathy was dissolved.

Defendant's mother, Iris Hart, corroborated and expanded upon her husband's testimony. She also described a serious traffic accident involving defendant when he was four years of age, which led to his suffering a number of chronic problems, including headaches.

Defendant's first wife, Kathy, testified that defendant had been "a very good father." Defendant had attempted to be a good husband to Kathy, and was "devastated" to learn of her extramarital affair. She also described an event, after the couple had divorced, when defendant visited her and saved the lives of some girls who had fallen into a river when their canoe capsized.

Defendant's second wife, Linda, testified regarding an incident involving a distraught neighbor who had slashed her wrists, explaining that defendant broke down a door, stopped the bleeding, and saved his

neighbor's life.  She described defendant as a devoted husband and a "fantastic" father, who, while incarcerated, sought to remain as involved as possible with his family.  On cross-examination, Linda acknowledged (over an objection) that nine months after defendant's arrest, she asked another man to live with her for her protection and that of her children, eventually bearing the other man's child.

Several witnesses testified in praise of defendant's talents as a poet, songwriter, musician, husband, and father.  Defendant was very involved with the local church, sang in the church choir, and taught children in Bible school.  He was a hard worker who sought to provide for his family.  A former employer described defendant as very dependable and honest.

### C. *Prosecution Evidence in Rebuttal*

Detective Sanchez testified that, during an interview with Linda Hart on May 4, 1986 (following the discovery of Shelah's body), she stated that her husband was gone at 2:30 a.m. the previous day, and the next time she heard from him was approximately four and one-half hours later, just before 7:00 a.m., when she heard defendant enter the trailer.

Linda Hart's sister-in-law, Cindy Widney, testified that on four occasions, defendant made overtures toward her, once suggesting lightheartedly that if their respective spouses returned "to mom and dad," the two of them could get married.

*People v. Hart*, 20 Cal. 4th at 567-88.

## IV.   LEGAL STANDARD

### A.   AEDPA Deference

AEDPA precludes federal courts from granting habeas relief to a state prisoner "with respect to any claim that was adjudicated on the merits in State court proceedings" unless that adjudication:

1    (1) resulted in a decision that was contrary to, or involved an
2    unreasonable application of, clearly established Federal law, as
3    determined by the Supreme Court of the United States; or (2)
4    resulted in a decision that was based on an unreasonable
5    determination of the facts in light of the evidence presented in the
6    State court proceeding.

7    28 U.S.C. § 2254(d); *Harrington v. Richter*, 562 U.S. 86, 97-98 (2011).  The above
8    standard "recognizes a foundational principle of our federal system: State courts are
9    adequate forums for the vindication of federal rights." *Burt v. Titlow*, 571 U.S. 12, 19
10   (2013).  "A proper respect for AEDPA's high bar for habeas relief avoids unnecessarily
11   'disturb[ing] the State's significant interest in repose for concluded litigation, den[ying]
12   society the right to punish some admitted offenders, and intrud[ing] on state sovereignty
13   to a degree matched by few exercises of federal judicial authority." *Virginia v.*
14   *LeBlanc*, ___ U.S. ___, 137 S. Ct. 1726, 1729 (2017) (*quoting Richter*, 562 U.S. at 103)
15   (brackets in original).  Although AEDPA "stops short of imposing a complete bar on
16   federal court relitigation of claims already rejected in state proceedings," it nevertheless
17   "reflects the view that habeas corpus is a guard against extreme malfunctions in the
18   state criminal justice systems, not a substitute for ordinary error correction through
19   appeal." *Richter*, 562 U.S. at 102-03 (citation and internal quotation marks omitted).

20   Consequently, § 2254(d) "preserves authority to issue the writ in cases where
21   there is no possibility fairminded jurists could disagree that the state court's decision
22   conflicts with [the Supreme Court's] precedents." *Id.* at 102.  Put another way, in order
23   to obtain federal habeas relief, "a state prisoner must show that the state court's ruling
24   on the claim being presented in federal court was so lacking in justification that there
25   was an error well understood and comprehended in existing law beyond any possibility
26   for fairminded disagreement." *Id.* at 103; *Titlow*, 571 U.S. at 19-20.

27   Clearly established Federal law under § 2254(d)(1) "refers to the holdings, as
28   opposed to the dicta, of [the Supreme Court's] decisions as of the time of the relevant

state-court decision." *Carey v. Musladin*, 549 U.S. 70, 74 (2006) (*quoting Williams v. Taylor*, 529 U.S. 362, 412 (2000)).  Where no decision of the Supreme Court "squarely addresses" an issue or provides a "categorical answer" to the question before the state court, § 2254 (d)(1) bars relief because the state court's adjudication of the issue cannot be contrary to, or an unreasonable application of, Supreme Court law.  *Wright v. Van Patten*, 552 U.S. 120, 125-26 (2008) (per curiam); *see also Moses v. Payne*, 555 F.3d 742, 754, 758-60 (9th Cir. 2009).  The Supreme Court has "emphasized, time and again, that [AEDPA] prohibits the federal courts of appeals from relying on their own precedent to conclude that a particular constitutional principle is 'clearly established.'" *Lopez v. Smith*, 574 U.S. 1, 2 (2014) (per curiam).

A state court decision is "contrary to" governing Supreme Court law if it either applies a rule that contradicts the governing Supreme Court law or "confronts a set of facts that is materially indistinguishable from a decision of [the Supreme Court] but reaches a different result." *Brown v. Payton*, 544 U.S. 133, 141 (2005).  Citation to Supreme Court cases is not required so long as "neither the reasoning nor the result of the state-court decision contradicts them." *Early v. Packer*, 537 U.S. 3, 8 (2002); *Bell v. Cone*, 543 U.S. 447, 455 (2005); *Richter*, 562 U.S. at 98 ("[A]s this Court has observed, a state court need not cite or even be aware of our cases under § 2254(d).").

A state court's decision involves an "unreasonable application" of Supreme Court precedent "if the state court identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case." *Williams v. Taylor*, 529 U.S. at 413.  An "unreasonable" application of federal law is more than an "incorrect" application of federal law.  *Richter*, 562 U.S. at 101; *Wiggins v. Smith*, 539 U.S. 510, 520-21 (2003).  So long as "fairminded jurists could disagree" on the correctness of the state court's decision, federal habeas relief is unavailable.  *Richter*, 562 U.S. at 101; *LeBlanc*, 137 S. Ct. at 1728 ("In order for a state court's decision to be an unreasonable application of this Court's case law, the ruling

1    must be 'objectively unreasonable, not merely wrong; even clear error will not

2    suffice.'") (*quoting Woods v. Donald*, 575 U.S. 312, 316 (2015) (per curiam)).

3        To show that a state court's adjudication of a claim resulted in a decision that was

4    based on an unreasonable determination of the facts in light of the evidence presented

5    in the State court proceeding, the petitioner must show that the state court's decision

6    rested on a finding of fact that is "*objectively* unreasonable." *Hibbler v. Benedetti*, 693

7    F.3d 1140, 1146 (9th Cir. 2012) (emphasis in original, citation omitted). Again, "[t]he

8    question under AEDPA is not whether a federal court believes the state court's

9    determination was incorrect but whether that determination was unreasonable – a

10    substantially higher threshold." *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007). If a

11    petitioner challenges the state court's factual findings, the federal court "must be

12    convinced that an appellate panel, applying the normal standards of appellate review,

13    could not reasonably conclude that the finding is supported by the record." *Hibbler*,

14    693 F.3d at 1146.

15        In performing its 2254(d) analysis, a federal court is limited to the record that was

16    before the state court that adjudicated the claim on the merits. *Pinholster*, 563 U.S. at

17    180-81. In practical effect, this means that when the state court record precludes habeas

18    relief, the district court is not required to hold an evidentiary hearing. *Id.* at 183 (*citing*

19    *Landrigan*, 550 U.S. at 474); *Murray v. Schriro*, 882 F.3d 778, 802 (9th Cir. 2018) ("so

20    long as we are reviewing a petitioner's claim under AEDPA, our review is limited to

21    the facts before the state court and the petitioner is not entitled to an evidentiary hearing

22    in federal court.").

23        "[T]he provisions of AEDPA apply with full force even when reviewing a

24    conviction and sentence imposing the death penalty." *White v. Wheeler*, ___ U.S. ___,

25    136 S. Ct. 456, 462 (2015); *see also Herrera v. Collins*, 506 U.S. 390, 405 (1993) (the

26    Supreme Court has "refused to hold that the fact that a death sentence has been imposed

27    requires a different standard of review on federal habeas corpus.") (citation omitted).

28       **B.**     **AEDPA's Application**

Here, AEDPA's deferential standard applies to all of Petitioner's pending claims. Petitioner raised the majority of those claims on direct appeal. (Dkt. 97-49.) The California Supreme Court rejected those claims and explained its decision in a reasoned opinion. *See People v. Hart*, 20 Cal. 4th at 588-658. In such a circumstance, this Court performs a "straightforward inquiry" by reviewing "the specific reasons given by the state court and defer[ring] to those reasons if they are reasonable." *Wilson v. Sellers*, ___ U.S. ___, 138 S. Ct. 1188, 1192 (2018).

Petitioner raised his remaining claims in three state habeas petitions. (Dkt. 98-13, 101-1–101-2, 102-1–102-2.) The California Supreme Court denied those claims in summary orders after receiving informal briefing. The claims were denied both "on the merits" without explanation, and for various procedural reasons.[6/] (Dkt. 98-12, 99-21, 101-13.) In the absence of a reasoned analysis, AEDPA requires this Court to "determine what arguments or theories . . . could have supported[] the state court's decision." *Richter*, 562 U.S. at 102. If "fairminded jurists could disagree" whether those arguments or theories are inconsistent with a Supreme Court's holding, "the petitioner's claim must be denied." *Sexton v. Beaudreaux*, ___ U.S. ___, 138 S. Ct. 2555, 2558 (2018); *Richter*, 562 U.S. at 98 ("Where a state court's decision is unaccompanied by an explanation, the habeas petitioner's burden still must be met by showing there was no reasonable basis for the state court to deny relief.").

---

[6/] The Court only discusses the procedural claims cited by the state court to the extent necessary and relevant to the federal action. Additionally, Petitioner raised some claims multiple times; in certain instances the California Supreme Court denied the same claim twice on the merits, once with written reasons and once without. In those instances, this Court reviews the earlier reasoned decision on direct appeal. Where the state court denied a claim "on the merits" without explanation the second time around, it suggests that the court relied on its prior reasoning. *Cf. Wilson*, 138 S. Ct. at 1192 (federal courts "look through" unexplained decisions "to the last related state-court decision that does provide a relevant rationale" and "presume[s] that the unexplained decision adopted the same reasoning.").

1    **V.    DISCUSSION**

2        **A.    Juror Bias (Claim 1)**

3        Petitioner raises multiple allegations of jury bias, addressed below.  Petitioner

4    raised some of these allegations in the California Supreme Court on direct appeal, and

5    some on state habeas review.  The Court indicates which decision it reviews for

6    reasonableness in addressing the claims.

7        Petitioner makes three general arguments.  First, he claims the trial court failed

8    to adequately vet (and ultimately dismiss) four jurors who were biased and predisposed

9    to favor guilty and death verdicts.  Second, Petitioner argues that the court failed to

10   excuse jurors whose pretrial exposure to media about the case rendered them biased.

11   Third, Petitioner claims the trial court's failure to dismiss a juror for financial hardship

12   caused him to place undue pressure on other jurors to quickly reach guilt and death

13   verdicts.  (SAP at 29-37; Traverse at 20-27.)

14               **1.    Failure To Root Out Biased Jurors During Voir Dire**

15       Petitioner claims that voir dire questioning was inadequate as to four jurors

16   whose answers suggested they held a bias in favor of the prosecution.

17                    **a.    Legal Standard**

18       "[P]art of the guarantee of a defendant's right to an impartial jury is an adequate

19   voir dire to identify unqualified jurors." *Morgan v. Illinois*, 504 U.S. 719, 729 (1992).

20   The Constitution "does not dictate a catechism for *voir dire*, but only that the defendant

21   be afforded an impartial jury." *Id.*; *see also Skilling v. United States*, 561 U.S. 358, 386

22   (2010) ("No hard-and-fast formula dictates the necessary depth or breadth of voir

23   dire."); *United States v. Wood*, 299 U.S. 123, 145-46 (1936) ("Impartiality is not a

24   technical conception.  It is a state of mind.  For the ascertainment of this mental attitude

25   of appropriate indifference, the Constitution lays down no particular tests and procedure

26   is not chained to any ancient and artificial formula.").

27       "Supreme Court case law in the area of juror bias is sparse."  Consequently, from

28   a constitutional perspective, "we don't know precisely what it means for a juror to be

biased." *Williams v. Johnson*, 840 F.3d 1006, 1010 (9th Cir. 2016) (*citing Wood*, 299 U.S. at 146).  However, "we do know that a juror is biased if he is unwilling to follow the law."  *Id.*  The partiality of an individual juror "is plainly [an issue] of historical fact: did a juror swear that he could set aside any opinion he might hold and decide the case on the evidence, and should the juror's protestation of impartiality have been believed."  *Patton v. Yount*, 467 U.S. 1025, 1036-37 (1984).  Thus, the trial court's determination that a juror was impartial is entitled to a presumption of correctness.  *Id.* at 1038; 28 U.S.C. § 2254(e).

When a prospective juror expressly assures that he or she can set aside any preconceived opinions and render a verdict based on the evidence, a presumption of impartiality attaches.  *Ybarra v. McDaniel*, 656 F.3d 984, 992 (9th Cir. 2011) (*citing Murphy v. Florida*, 421 U.S. 794, 800 (1974)); *Irvin v. Dowd*, 366 U.S. 717, 723 (1961).  The defendant rebuts this presumption by demonstrating that the juror actually held a biased opinion.  *Ybarra*, 656 F.3d at 992.

It is not unusual on voir dire examination for a juror's answers to be "ambiguous and at times contradictory."  This is especially true:

> in a highly publicized criminal case.  It is well to remember that the lay persons on the panel may never have been subjected to the type of leading questions and cross-examination tactics that frequently are employed, . . . . Jurors thus cannot be expected invariably to express themselves carefully or even consistently.  Every trial judge understands this, and under our system it is that judge who is best situated to determine competency to serve impartially.  The trial judge properly may choose to believe those statements that were the most fully articulated or that appeared to have been least influenced by leading.

*Yount*, 467 U.S. at 1038-39.  Where a juror's answers are particularly ambiguous, "[i]t is here that the federal court's deference must operate, for while the cold record arouses some concern, only the trial judge could tell which of these answers was said with the

greatest comprehension and certainty." *Id.* at 1040.  In light of that deference, "the State's obligation to the defendant to impanel an impartial jury generally can be satisfied by less than an inquiry into a specific prejudice feared by the defendant." *Ristaino v. Ross*, 424 U.S. 589, 595 (1976).  More specifically, "to be constitutionally compelled, it is not enough that voir dire questions might have been helpful, rather the failure to ask the questions 'must render the defendant's trial fundamentally unfair.'" *Kemp v. Ryan*, 638 F.3d 1245, 1261 (9th Cir. 2011) (*quoting Mu'Min v. Virginia*, 500 U.S. 415, 425-26 (1991)); *see also Morgan*, 504 U.S. at 729-30 (the trial court's sound discretion in conducting voir dire is "subject to the essential demands of fairness."); *Murphy*, 421 U.S. at 799 (to resolve the issue of juror impartiality, "we must turn, . . . to any indications in the totality of circumstances that petitioner's trial was not fundamentally fair.").

Petitioner has not shown that empaneling any of the four jurors at issue rendered his trial fundamentally unfair.  The Court discusses the particulars of each juror below.

### b.    Relevant Facts and Analysis

### (1)    Juror Deborah Wallen

Wallen was initially given several questions on voir dire by the court and both counsel.  The juror stated several times that she believed she could be fair and impartial. (5RT at 637-51.)  Petitioner's attorney then brought attention to an answer Wallen provided on a written juror questionnaire.  Specifically, Wallen stated on the form that she "testified and was almost [a] victim.  A guy raped a girl and tried to get me." (Clerk's Transcript on Appeal for Juror Questionnaires, volume one of five ("1JCT") at 229.)  On voir dire, Wallen explained that several years earlier, she was pursued in a "car chase" by a man.  Subsequent to that, the man was tried for raping someone else, and Wallen was called to testify about her car chase.  Wallen was not herself a victim of rape, and did not know the outcome of the case in which she testified.  She stated, "I thought I'd better write it down because it did happen.  But, I didn't go through anything, you know."  (5RT at 651-52.)

42

Defense counsel admonished Wallen that at Petitioner's trial "[y]ou're going to hear a girl testify that one girl was raped, and she escaped . . . . Are you going to let that bother you?"  Wallen answered, "No."  Counsel asked, "Are you sure?" and Wallen replied, "It was a long time ago, . . . ."  (5RT at 652-53.)

The prosecutor asked Wallen to provide more detail about the incident.  Wallen explained that she was driving with her two-year-old son in her car, and the man pulled behind her and flashed his headlights.  When Wallen pulled her car over, the man threatened to shoot her if she did not open her car door.  Wallen "floored" the gas pedal and fled.  (5RT at 653.)  Wallen told the prosecutor that "It was quite awhile ago.  It is one of those things you would want to forget."  (5RT at 654.)

On direct appeal, Petitioner raised a claim arguing that the trial court inadequately examined Wallen regarding the "car chase" incident.  The court concluded that further

> examination was unnecessary in view of Wallen's notation of the incident
> on the juror questionnaire, and her responses to questions posed by the
> prosecutor and defense counsel.  In his voir dire of Wallen, defense
> counsel thoroughly inquired as to this matter.  During that inquiry, Wallen
> indicated that she knew little regarding the rape charge that had been filed
> against the man, that the [] incident would not bother her if she sat on the
> jury in the present case, and that the matter had been "a long time ago."
> Defense counsel refrained from challenging Wallen for cause.  In light of
> Wallen's responses, we fail to perceive a deficiency on the part of the trial
> court, or defense counsel, in refraining from asking additional questions.

*People v. Hart*, 20 Cal. 4th at 590.

The California Supreme Court's analysis and conclusion as to Deborah Wallen were not contrary to, or unreasonable applications of, clearly established Supreme Court precedent.  28 U.S.C § 2254(d)(1).  Petitioner has not convincingly argued that this juror held any bias, or that further questioning would have been useful.  The record

1   demonstrates that the prior incident Wallen referred to was not something in the

2   forefront of her mind, or that gave her any particular predisposition.  Instead, Wallen

3   brought up the incident merely in an attempt to be as forthcoming as possible.  Beyond

4   that, she clearly communicated that the incident was long in the past, and that she did

5   not – and preferred not to – remember important details (like the outcome of the trial

6   at which she testified).  Petitioner has failed to rebut the presumption of correctness as

7   to the state court's determination that Wallen was not biased.  *Yount*, 467 U.S. at 1038.

8   There is also nothing to show that, in the absence of further voir dire questioning of

9   Wallen, Petitioner's trial was fundamentally unfair.  *Kemp*, 638 F.3d at 1261; *Morgan*,

10  504 U.S. at 729-30; *Murphy*, 421 U.S. at 799.

11                          **(2)     Jury Foreman Oran Pentz**

12          Pentz was a fire captain who worked with law enforcement on occasion.  His

13  brother-in-law was also a police officer.  (6RT at 795; 2JCT at 285-87.)   When

14  questioned on voir dire, Pentz stated that there was nothing about those relationships

15  that caused him to lean pro-prosecution, or that would cause him to find an officer's

16  testimony inherently more credible than the testimony of others.  (6RT at 795-96.)

17          Pentz recalled reading a newspaper article that familiarized him with the general

18  facts of Petitioner's case.  (2JCT at 286-88.)  On his juror questionnaire, Pentz stated

19  that he could not:

20          remember all of the details.  But what I do . . . remember is that the girls

21          were picked up at the school and taken out to a remote area.  The person

22          that picked them up took one of the girls away from the vehicle to a

23          secluded area and, as stated in the newspaper, raped and killed the girl.  He

24          then came back to the vehicle and the other girl got scared when she

25          started questioning as to the·whereabouts of her friend.  She then talked

26          real nicely to the person that picked them up and he let her go at an

27          unknown location.  I cannot remember if she was sexually attacked or not.

28          This is the bits and pieces·of the incident that I can recall at this time.

(2JCT at 288.)  Pentz had "not heard the whole story" and did "not know if the person in custody did this."  (2JCT at 287.)  When asked about the article by Petitioner's lawyer, Pentz stated that he found it "pretty much convincing," but that he would "have to hear the evidence, . . . ."  (6RT at 774.)  Pentz further explained that the facts he read in the article would be "in [his] mind," but he was suspicious of media narratives.  He ultimately stated that he would base his decision solely on the evidence adduced at trial.  (6RT at 774-75, 811-14.)  Pentz also stated that his friend's wife had been the victim of a freeway shooting, but that did not give him stronger feelings in favor of either the prosecution or the defense.  (6RT at 776; 2JCT at 287.)

Pentz confirmed that he understood the presumption of innocence and could abide by the beyond-a-reasonable-doubt standard of proof.  Pentz also agreed that any prior media reports of the case should have no bearing on the jury.  (6RT at 791-93, 805.)  Pentz characterized himself as neutral on the death penalty; he would not automatically vote either for or against that punishment, but instead "would have to see the evidence."  (6RT at 769.)  Pentz stated that he could make a decision based solely on the evidence and be fair to both sides in the penalty phase.  (6RT at 776, 797.)

On direct appeal, Petitioner raised a claim alleging that the trial court's voir dire questioning of Pentz was inadequate and superficial.  The California Supreme Court found that Petitioner's "assertion is a misleading one, because the prosecutor and defense counsel thoroughly questioned Pentz (who eventually became the jury's foreperson) as to the matters noted."  The court referenced statements Pentz made that he would evaluate a police officer's credibility the same as anyone else's, that the newspaper account did not bias him, and that he agreed he could listen to the facts and be fair to both sides.  The court concluded that, "[i]n light of Pentz's responses, we fail to perceive a deficiency on the part of the trial court in refraining from asking additional questions."  *People v. Hart*, 20 Cal. 4th at 591.

The California Supreme Court's analysis and conclusion as to juror Pentz were also not contrary to, or unreasonable applications of, clearly established Supreme Court

precedent.  Petitioner fails to point to any actual bias on the part of Pentz, but instead only facts that could suggest bias but were otherwise ambiguous.  *Yount*, 467 U.S. at 1038.  The California Supreme Court reasonably found that Pentz was subjected to thorough questioning on those subjects.  28 U.S.C § 2254(d)(2).  Notably, as discussed further below in addressing pretrial publicity, by Petitioner's own account the media coverage of his case was not opinion-based or pushing an agenda that he was guilty.  And, the facts of the case that Pentz read and recited were mostly undisputed.  Aside from that, the juror expressed skepticism toward the media account and stated that he had to hear the evidence to form an opinion.  In fact, the juror repeatedly indicated he did not have an opinion without hearing the evidence, and that he could be fair and impartial.  That raised a presumption of Pentz's impartiality that Petitioner has failed to rebut.  *Ybarra*, 656 F.3d at 992; *Murphy*, 421 U.S. at 800; *Irvin*, 366 U.S. at 723.  There is no clearly established Federal law requiring the court or defense counsel to subject a prospective juror to further questioning to root out bias that Petitioner believes still remained.  *Ristaino*, 424 U.S. at 595.  As was the case with Wallen, there is nothing to show that, in the absence of further voir dire questioning of Pentz, Petitioner's trial was fundamentally unfair.  *Kemp*, 638 F.3d at 1261; *Morgan*, 504 U.S. at 729-30; *Murphy*, 421 U.S. at 799.

### (3)   Juror Michael Bantum

On the juror questionnaire, Bantum stated that he read newspaper coverage of Petitioner's case.  At the time he read it, he "felt that if this person was the one who did it he should be punished to the fullest [extent] of the law."  (3JCT at 596-97.)  Bantum believed the death penalty was a "necessary option" for certain violent crimes "like premeditated murder, etc.," that were proven beyond a reasonable doubt.  He added that imposing a death sentence would require very strong evidence because a person's life is at stake.  (3JCT at 598.)

On voir dire, Bantum stated that he was neutral as to the death penalty.  (13RT at 1818.)  Petitioner's attorney asked Bantum whether his view of the case based on the

newspaper report would affect his decisions as a juror. Bantum answered that it would not because his initial impression of the case was only "based on what [he] had read" and not evidence. (13RT at 1821.) Petitioner's attorney also asked Bantum if he believed in "an eye for an eye and a tooth for a tooth," and Bantum replied that he did "in principle" but not as a practical matter. Bantum stated that he could follow the law and be fair. (13RT at 1822-23.) Before being empaneled, Bantum brought to the court's attention that he was familiar with a prosecution witness, David Starbuck. Bantum was a high school football coach, and he recognized Starbuck as a student or former student at his school. The court asked Bantum if he would be capable of objectively assessing Starbuck's credibility, and Bantum indicated he could. Petitioner's counsel expressly agreed that Bantum could still be a fair juror. (16RT at 2299.)

Petitioner challenged the trial court's questioning of Bantum in a state habeas petition. (Dkt. 102-1 at 119-20.) The court denied the claim "on the merits" without explanation, and on various state procedural grounds. (Dkt. 98-12 at 1 (denial of claim 1).) That conclusion was not unreasonable under AEDPA. *Richter*, 562 U.S. at 102. Much like Petitioner's contentions involving juror Pentz, Petitioner fails to point to any actual bias on the part of Bantum that would rebut the presumption of the juror's impartiality. *Ybarra*, 656 F.3d at 992; *Murphy*, 421 U.S. at 800; *Irvin*, 366 U.S. at 723. And, again, Petitioner cites no Supreme Court precedent requiring more thorough voir dire questioning of Bantum. The only opinion Bantum expressed was that the culprit should be strongly punished; an opinion likely shared by nearly *anyone* before hearing the evidence, the jury instructions, and the defense theory of the case. *See Irvin*, 366 U.S. at 722-23. Most important, Bantum agreed to base his opinion on the trial evidence. Finally, Bantum's connection to David Starbuck, a prosecution witness, proved to be tenuous. Bantum recognized the witness as someone who had attended the school where Bantum worked, nothing more. As with the two other jurors discussed above, Petitioner has failed to rebut the presumption of correctness as to the state

court's determination that Bantum was qualified as a juror and unbiased, *Yount*, 467 U.S. at 1038, and there is nothing to show that, in the absence of further voir dire questioning of Bantum, Petitioner's trial was fundamentally unfair. *Kemp*, 638 F.3d at 1261; *Morgan*, 504 U.S. at 729-30; *Murphy*, 421 U.S. at 799.

### **(4)   Juror Leonard Maslovitz**

Maslovitz indicated on his juror questionnaire that his general feelings toward the death penalty were that "[t]hey don't use it enough." He also indicated that capital punishment, in his view, was applied randomly and improperly. Where the form asked how strongly he held his views on the death penalty, Maslovitz answered, "Not really." (2JCT at 305-06.)

On voir dire, Maslovitz stated that he was neutral on the death penalty. (7RT at 889-90.) When asked about his answers on the questionnaire, Maslovitz clarified that he felt that the death penalty was applied unevenly, and he thought there should be a single, federal standard for imposing it. (7RT at 893.)

Maslovitz had a hearing problem and used a hearing aid. He stated that he was nevertheless not missing any of the words spoken in court. (7RT at 890.) At one point soon after the jury was empaneled and trial started, defense counsel expressed concern that Maslovitz was not hearing the proceedings. The trial judge questioned the juror out of the presence of the others. (17RT at 2445-50.) Maslovitz told the court that he was able to hear the proceedings "just perfect[ly]" with or without his hearing aid. (17RT at 2447-48.) Defense counsel then said that, based on his own observations, Maslovitz appeared to be reading people's lips and perhaps having a harder time following the proceedings when the lights were dimmed. Counsel told the juror that he wanted to "make sure you don't miss a single thing in this, anything that's said." Maslovitz responded that if he missed something, "you're going to know about it." Defense counsel followed that up by asking if Maslovitz would raise his hand if he failed to hear something, and Maslovitz answered, "I sure as hell will." Defense counsel responded, "I'm satisfied." (17RT at 2448-49.)

Later, during trial testimony, the court again checked to make sure all the jurors could hear the proceedings. The court specifically reminded Maslovitz, "If you have a problem hearing, just raise your hand and we'll cover that." Maslovitz responded, "I will." (18RT at 2518; *see also* 33RT at 4275 (the court directed that a microphone be adjusted at the start of a witness's testimony when Maslovitz indicated he could not hear the witness).)

Petitioner challenged the trial court's voir dire questioning of Maslovitz in a state habeas petition. (Dkt. 102-1 at 120-21.) The court denied the claim "on the merits" without explanation, and on various state procedural grounds. (Dkt. 98-12 at 1 (denial of claim 1).) The state court's decision was reasonably supported by clearly established Federal law.

First, the Court addresses Petitioner's contention that Maslovitz was inappropriately seated as a juror because of his hearing aid. Maslovitz stated that he could hear the proceedings and never indicated otherwise. The record shows nothing more than a juror with hearing problems that did not affect his ability to comprehend and consider the evidence. Nothing about Maslovitz's hearing rendered Petitioner's trial fundamentally unfair. *See Lyda v. United States*, 321 F.2d 788, 790-91 (9th Cir. 1963) (deferring to trial judge's discretion and in-court observations in denying constitutional claim based on juror's poor hearing); *see also Anderson v. Terhune*, 409 F. App'x. 175, 179 (9th Cir. 2011) (cited pursuant to 9th Cir. R. 36-3) (trial court's observations of an allegedly sleeping juror entitled to presumption of correctness absent evidence of "significant" problem).

Second, Petitioner mischaracterizes Maslovitz's statement that the death penalty was applied unevenly. The juror expressly disagreed with the notion (posed by defense counsel) that anyone who commits any murder deserves the death penalty. (7RT at 893-95.) Petitioner has made no viable argument that Maslovitz held a bias in favor of capital punishment.

1   Empaneling Maslovitz on Petitioner's jury did not render Petitioner's trial
2   fundamentally unfair. *Kemp*, 638 F.3d at 1261; *Morgan*, 504 U.S. at 729-30; *Murphy*,
3   421 U.S. at 799.

### 2.   Jurors Exposed to Pretrial Media

5   The disturbing crimes against two teenage victims in this case unquestionably
6   received attention in the local Riverside media and community. (*See, e.g.,* Clerk's
7   Transcript, volume one ("1CT") at 76-80.)  Petitioner argues that these media stories
8   improperly influenced four jurors.

9   The Sixth Amendment requires that evidence against a defendant "come from the
10  witness stand." *Turner v. Louisiana*, 379 U.S. 466, 472-73 (1965).  Extraneous
11  influences on a jury can, under some circumstances, require the reversal of a conviction.
12  *Tong Xiong v. Felker*, 681 F.3d 1067, 1075 (9th Cir. 2012).  Improper influences on a
13  jury can also give rise to a presumption of prejudice.  *See generally Mattox v. United*
14  *States*, 146 U.S. 140 (1892); *Remmer v. United States*, 347 U.S. 227 (1954).  However,
15  "[t]he Sixth Amendment entitles a defendant to an 'impartial' jury, not to an ignorant
16  one." *Grotemeyer v. Hickman*, 393 F.3d 871, 879 (9th Cir. 2004).  "It is virtually
17  impossible to shield jurors from every contact or influence that might theoretically
18  affect their vote." *Smith v. Phillips*, 455 U.S. 209, 217 (1982).  As pretrial publicity is
19  concerned, the Supreme Court has held that a prospective juror's preliminary
20  knowledge of the facts of the case – and even early preconception about guilt or
21  innocence – is insufficient, without more, to raise a constitutional concern:

22      It is not required, . . . that the jurors be totally ignorant of the facts
23      and issues involved.  In these days of swift, widespread and diverse
24      methods of communication, an important case can be expected to arouse
25      the interest of the public in the vicinity, and scarcely any of those best
26      qualified to serve as jurors will not have formed some impression or
27      opinion as to the merits of the case.  This is particularly true in criminal
28      cases.  To hold that the mere existence of any preconceived notion as to

50

1          the guilt or innocence of an accused, without more, is sufficient to rebut
2          the presumption of a prospective juror's impartiality would be to establish
3          an impossible standard.   It is sufficient if the juror can lay aside his
4          impression or opinion and render a verdict based on the evidence
5          presented in court.

6   *Irvin*, 366 U.S. at 722-23.

7          Here, Seventy-nine of the 151 prospective jurors on Petitioner's venire had heard

8   something about the case prior to being called for jury duty.  However, none of those

9   potential jurors indicated they knew more than the basic facts of what happened to the

10  two girls, and no one stated that they were exposed to any inflammatory information

11  about Petitioner. (1JCT at 61-62, 69-70, 85-86, 197-98, 237-38, 246-47; 2JCT at 262-

12  63, 270-71, 278-79, 283, 286-88, 311-12, 319-20, 335-36, 344-45, 353-54, 369-70, 377-

13  78, 385-86, 425-26, 433-34, 442-43, 450-51, 458-59, 474-75, 490-91, 514-15, 522-23,

14  531-32, 539-40, 547-48, 563-64; 3JCT at 596-97, 604-05, 610, 645-46, 653-54, 669-70,

15  677-78, 700-01, 708-09, 716-17, 724-25, 732-33, 748-49, 810-11, 818-19, 826-27, 850-

16  51, 858-59; 4JCT at 874-75, 890-91, 906-07, 915, 917, 924-25, 932-33, 940-41, 948-49,

17  956-57, 964-65, 1012-13, 1020-21, 1028-29, 1060-61, 1093, 1100-01, 1116-17, 1124-

18  25; 5JCT at 1140-41, 1148-49, 1156-57, 1164-65, 1172-73, 1188-89, 1204-05, 1212-13,

19  1220-21, 1244-45, 1284-85, 1300-01, 1309, 1311.)

20         Petitioner singles out four of those seventy-nine who were empaneled on his jury.

21  Juror Joann Naleway stated on her juror questionnaire that she heard about the case

22  because she "always listen[s] to tv news."  She further stated that she knew nothing

23  more about the case than the fact that the crime "did happen."  She stated that the

24  information did not make her favor the prosecution or the defense, and that she could

25  refrain from watching tv news during the trial.  (1JCT at 197-98.)  Juror Martha Lee

26  Ferguson learned about the case from television coverage.  But, she also stated she had

27  "not learned much about" anything in the case, and held no biases.  (13RT at 1669-70;

28  2JCT at 522-23.)   Juror Evelyn Yearsley learned about the case from reading the

newspaper.   The only information that Yearsley offered was that she "[j]ust read newspaper articles."  (2JCT at 450-51.)   Finally, juror George Gardner "vaguely remember[ed] news reports" on the case, but recalled "no details," and the information did not make him biased in any direction.  (2JCT at 474-75.)

This aspect of Petitioner's juror bias claim is summarily denied.  Petitioner fails to establish that the jurors exposed to pretrial publicity learned anything but superficial facts about the case.  There is also no evidence that these jurors were affected at all by the information, let alone biased.  The Court addresses this issue further below in discussing Petitioner's change-of-venue claim, but as to the discrete issue of jury bias, he has fallen far short of rebutting the presumption of impartiality based on any juror's exposure to pretrial newspaper coverage of his case.  *Grotemeyer*, 393 F.3d at 879; *Phillips*, 455 U.S. at 217; *Irvin*, 366 U.S. at 722-23.

### 3.   Juror Mike Venable

Petitioner argues that one juror was incapable of serving fairly because of a time conflict with his job.  He claims that the court should have released the juror due to financial hardship.

#### a.   Factual Background

Mike Venable was a pilot who worked for his family's crop dusting business.  On voir dire, Venable characterized his work as "seasonal" and stated that the "summer months are the busiest months."  (2RT at 255-56.)  On December 17, 1987, after Venable was selected as a juror on the case, his seasonal work came up during a discussion about preliminary matters and scheduling.  The court told jurors that the trial would commence on January 11, 1988, and estimated that it would take approximately "two to two and a half months."[7]  (16RT at 2312, 2314.)  Venable stated that "[i]f this

---

[7]  Opening statements commenced on January 11, 1988.  (17RT at 2350, 2378.)  The jury reached its penalty phase verdict and the court discharged the jurors from service on March 31, 1988.  (41RT at 5284-87.)

thing runs in the end part of March and April that would present a – especially the month of April, will present problem for me."  (16RT at 2315-16.)  The court responded, "I don't think that will be a problem.  If it is a problem, both counsel know about it, you've told us about it ahead of time and perhaps they can stipulate to an alternate coming in rather than excusing you, undue hardship."  (16RT at 2316.)

On January 6, 1988, five days prior to opening statements, Venable contacted the court again with concerns over the length of the trial.  This time, Venable indicated that his busy season for crop dusting started a month earlier, the last part of February and the full month of March.  The court and both counsel agreed at that point that Venable's switching of his hardship dates was "too late."  The court stated, "[W]e gave him every chance, and now that he has second thoughts about it, I think it's too late."  (17RT at 2346-47.)

On the morning that trial began, Venable asked to address the court.  (17RT at 2353.) When Venable entered the courtroom, the court immediately told him, "Relating to crop dusting, I might indicate that since you've already been selected on this jury and we gave you the full opportunity to explain beforehand we will not be releasing you from this case."  Venable explained that when he did the math and concluded he had time to sit on the jury, he started counting in December.  "But now I've got a feeling this thing is going to run clear through the end of March when it really should only run through February, and that's without delays."  The court corrected him: "No.  We told you specifically that there would – and I told everybody that we would start evidence on January 11th and the case was estimated to take two and a half months from that date, which takes us to the end of March."  The court continued: "We can't excuse you at this point in time because we only have so many jurors.  We've already spent probably just on picking a jury a considerable amount of money and time.  I can't do it."  The court suggested that Venable schedule crop dusting jobs for the three days court was not in session (Friday through Sunday).  The prosecutor then pointed out that

1    both counsel hoped the trial would not actually take the full two and a half months.  The

2    court stated, "Let's get going and see how it goes."  (17RT at 2353-55.)

3         The jury reached its verdicts in the guilt phase on February 9, 1988.  (27RT at

4    3586.)  After the verdicts were read, Venable again requested to speak with the court.

5    (27RT at 3593.)  He reminded the court that he brought up his time pressure issue with

6    his job twice before, and stated that the trial had already "kind of lingered on longer

7    than I thought I would be here.  I wondered if it would be a good time where maybe you

8    could bring in an alternate in my place to finish this trial, so I could get back to work."

9    With the court's agreement to consider his request, Venable agreed to report to begin

10   the penalty phase on February 22.  (27RT at 3593-94.)

11        After determining that the penalty phase would likely take at least five weeks, the

12   court preliminarily encouraged the lawyers to stipulate to dismissing Venable.  The

13   court reasoned that, although there was likely not good cause to release the juror, the

14   attorneys might prefer to let him go because he might become upset, "might not be the

15   best of jurors," and might blame the court and the parties.  (28RT at 3677-78.)  The

16   prosecutor opposed releasing Venable due to the chance of a "domino effect" from

17   other jurors.  The prosecutor also pointed out that the case was still running within the

18   time frame originally estimated for trial.  Defense counsel argued to release Venable

19   because "it's awfully hard to hold somebody captive here whose . . . livelihood depends

20   on his business, and that's in jeopardy [] at the most crucial time right now."  (28RT at

21   3679-80.)  The court reiterated that Venable had not shown good cause to be released,

22   "[s]o I'll just tell him he'll have to stick it out."  (28RT at 3680-81.)

23        The court subsequently held a conference with Venable off the record.

24   Afterward, the court relayed to the parties that Venable "was very understanding and

25   indicated that he's been able to work his schedule out so far and will continue to try to

26   do so."  In an effort to meet Venable halfway, the court proposed that the penalty phase

27   be suspended during one of the scheduled weeks so that Venable could complete a crop

28   spraying job in Mexico.  The court stated that Venable "wanted me to bring that to both

your attention and if that can be worked around he said he'd be very appreciative of that fact and that other than that he thinks he can continue being a juror." (29RT at 3794.)

On a subsequent court date, Venable again asked for a week suspension of trial, and added:

> I can safely say now the whole month of April I'll be locally available, . . . . The schedule you guys kept here for these last five weeks hasn't been as strenuous as I thought it was going to be. . . . That's why I have been able to sit through as long as I have sat through.

(30RT at 3801.)

Ultimately, Venable was retained as a juror. The court granted his request to suspend the trial for one week, and made other efforts to accommodate Venable's local crop dusting jobs when scheduling issues arose. (30RT at 3803, 3938-39, 31RT at 4015-17; 37RT at 4733-34; 40RT at 5107; 41RT at 5160.) The court allowed Venable two additional days off during deliberations. (41RT at 5279-81.)

On direct appeal, the California Supreme Court denied Petitioner's claim concerning Venable as follows:

> The record indicates that from the time Venable was selected as a juror, he repeatedly expressed concern to the trial court regarding the possibility that his service on defendant's jury might interfere with his crop-dusting duties. Venable assured the court, however, that if a one-week recess were granted in March to accommodate his desire to fulfill a particular crop-dusting job, he could continue serving as a juror. The court granted the recess, and Venable evidently was present in court whenever his attendance as a juror was required. There is no indication that he was unable to discharge his duties as a juror. Under these circumstances, the trial court did not abuse its discretion in declining to discharge Juror Venable.

55

Although it is true that Juror Venable expressed an interest that the proceedings continue apace, the record does not indicate that he lacked the "spiritual contentment and mental detachment that good jurors require," as alleged by defendant.  Nor does the record demonstrate that Venable was unable "to perform the functions of a juror."  Rather, Venable's comments suggest that he was concerned the trial might not conclude within the time period originally estimated by the trial court.  In a lengthy capital trial, such concerns are not unusual; we perceive no abuse of discretion in the manner in which the trial court addressed those concerns. We therefore reject defendant's contention that the trial court erred in refraining from excusing juror Venable.

*People v. Hart*, 20 Cal. 4th at 597 (citations omitted).  On state habeas review, the state court denied the same claim – with the additional supporting affidavit – without substantive comment.

### b.    Analysis

Based on the facts discussed above, there is no evidence supporting the assertion that Venable was incompetent to serve as a juror; it was not unreasonable for the California Supreme Court to affirm the trial court's empaneling and refusing to release him.  The Court separately takes up Petitioner's claim that Venable committed juror misconduct in Claim 3.  But, merely as to the juror's fitness to serve, there is no merit to Petitioner's allegations.  Here, it was by far the "judge who [was] best situated to determine competency."  *Yount*, 467 U.S. at 1039.  Venable's state of mind about his pressing crop dusting obligations was well known to the court.  The judge met privately with the juror about scheduling, and made a number of compromises designed to allow Venable to remain on the jury and temporarily satisfy his job obligations.  Venable not only appeared agreeable to those compromises, but he expressed appreciation, and eventually informed the court that the trial schedule was moving fast enough for him to complete his service.  (29RT at 3794; 30RT at 3801.)

The Court is not presented with a situation where a trial judge simply refused to release a juror for hardship.  The judge surely refused to release Venable, but then bent over backwards to alleviate the hardship, including suspending the capital trial for a week so Venable could take a crop dusting job.  The record reveals that the judge, the parties, Venable, and the other jurors actively engaged in a collective and extensive effort to make the scheduling work.  It does not show a juror so caught between a rock and a hard place that he was unable to make a thoughtful decision based upon the evidence.  There is no indication that Venable's presence on the jury rendered the trial fundamentally unfair, or that deference to the trial judge's decision should be disturbed here.  *Morgan*, 504 U.S. at 729-30.  Petitioner's related habeas claim fails under AEDPA.  *Richter*, 562 U.S. at 102.

In light of the foregoing, Claim 1 is DENIED.

**B.**      **Violation of Fair Cross-Section Jury Requirement Based on Allegedly Underrepresented Hispanics in Jury Pool (Claim 2)**

Petitioner argues his right to be tried by a jury drawn from a fair cross-section of the community was violated because Hispanics and "other cognizable groups" were systematically excluded from the jury pool.  (SAP at 37-41; Traverse at 27-30.) Petitioner estimates the percentage of Hispanics in the population of Riverside County at the time of his 1988 trial using 1980 and 1990 census statistics – which he claims also undercounted Hispanics by an unknown quantity.  He compares that percentage (25.92%) to the number of Hispanic surnames in his jury pool, which he concludes was 7.9%.  He argues that his calculations show the percentage of Hispanics in his jury pool was impermissibly lower than in the surrounding community.  (SAP at 38-39; *see also* Dkt. 10 at 77.)

**1.       Factual and Legal Background**

Petitioner also refers to: (1) a 1986 study addressing problems with the Riverside County jury selection system; and (2) a 1987 order issued by a Riverside County Superior Court judge finding that those problems resulted in unconstitutional

underrepresentation in the jury pool by various groups - Hispanics included.  (SAP at 39-41; *see also* dkt. 10-1 at 90-114.)  The court order was issued in a different criminal case a few months before Petitioner's trial.  Petitioner does not include the relevant order in his exhibits – he only proffers transcripts of a related evidentiary hearing and a separate order in that case.  (Dkt. 10 at 95–144; dkt. 10-1 at 1–88, 116–65; dkt. 11 at 10–253.)  However, subsequent case law adequately identifies and discusses that July 1987 order addressing underrepresentation of various groups in the Riverside County jury pool.  *See People v. Jackson*, 13 Cal. 4th 1164, 1193-95 (1996) (*discussing People v. Neidiffer & Cruz*, Cal. Super. Ct. Riverside Cty., No. CR-24472 (1987)).  In *Jackson*, the California Supreme Court characterized the relevant order as a finding:

> that the process of selecting jury panels in Riverside County resulted in the underselection of people 18 to 24 years old, poor people, and Hispanics. Several causes for the underrepresentation were identified: inconsistent methods for excusing prospective jurors, duplications and dated information used in forming the jury pool, and lack of follow-up with those persons not responding to the jury summons.

*Id.* at 1192-93 (footnote omitted).

As a result of the superior court's findings, Riverside County established a plan to reform its jury selection system.  The county formed a committee, which "made several changes in the procedures for assembling jury venires, . . . ."  *Id.* at 1193.  The committee also implemented a periodic survey to monitor whether the procedural changes were successfully remedying the underrepresentation.  Finally, the committee implemented interim measures while the new procedures were being developed "including allowing additional peremptory challenges, excusing panels that appeared to be imbalanced, and, if the panel appeared to be unrepresentative, permitting a defendant to contact the jury commissioner to verify the ethnic composition of the venire from which the panel was drawn."  *Id.*; *see also In re Seaton*, 34 Cal. 4th 193, 205 (2004) ("[A] superior court ruled in *People v. Neidiffer & Cruz* (citation omitted)

that Riverside County's jury selection was unconstitutional because it systematically underrepresented Hispanics, young adults, and low-income residents.  The court ordered substantial modifications to the county's jury selection process for that case.").

## 2.   Relevant Federal Law and Analysis

A defendant has a constitutional right to be tried by an impartial jury selected from a fair cross section of the community.  *Taylor v. Louisiana*, 419 U.S. 522, 528-29 (1975).  To establish a prima facie violation of the fair-cross-section requirement, a defendant must show:

> (1) that the group alleged to be excluded is a "distinctive" group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process.

*Duren v. Missouri*, 439 U.S. 357, 364 (1979).

However, the fair-cross-section principle "must have much leeway in application."  *Berghuis v. Smith*, 559 U.S. 314, 321 (2010).  "[N]either *Duren* nor any other decision of [the Supreme Court] specifies the method or test courts must use to measure the representation of distinctive groups in jury pools."  *Id.* at 329.

Further, states have "broad discretion" to "prescribe relevant qualifications for their jurors and to provide reasonable exemptions."  *Id.* at 333 (citation omitted).  A showing that a jury venire underrepresents an identifiable group is, without more, an insufficient showing of systematic exclusion under the third prong of the *Duren* test."  *Randolph v. California*, 380 F.3d 1133, 1141 (9th Cir. 2004).  There is no clearly established Supreme Court precedent establishing systematic exclusion "merely by pointing to a host of factors that, individually or in combination, *might* contribute to a group's underrepresentation."  *Berghuis*, 559 U.S. at 332 (emphasis in original).  The Supreme Court has also never clearly decided "whether the impact of social and economic factors can support a fair cross-section claim."  *Id.* at 333 n.6.

The California Supreme Court denied Claim 2 on the merits on state habeas review without comment.[8] (Dkt. 101-13 (claim J).)  As a result, under AEDPA, the Court reviews the reasonableness of that decision by determining whether any arguments or theories under *Duren* and *Berghuis* could have supported the state court's decision.  *Richter*, 562 U.S. at 102.  Petitioner is not entitled to habeas relief.

Petitioner satisfies the first *Duren* requirement, as Hispanics are a "distinctive" group in the community.  *United States v. Hernandez-Estrada,* 749 F.3d 1154, 1159 (9th Cir. 2014); *Randolph*, 380 F.3d at 1140; *United States v. Nelson*, 137 F.3d 1094, 1101 (9th Cir. 1998) ("It is undisputed that Hispanics are a 'distinctive' group for purposes of" the *Duren* analysis).[9]

As for the second requirement, Petitioner's calculation regarding the makeup of his jury pool relies entirely on a tally of Hispanic surnames.  (SAP at 39 n.19.)  There is no clearly established Federal law providing that a petitioner can establish a *Duren* violation by broadly and stereotypically categorizing surnames.  The state court could reasonably have found that Petitioner failed to proffer reliable statistics establishing underrepresentation.  *Berghuis*, 559 U.S. at 332; *see also United States v. Gelb*, 881 F.2d 1155, 1161-62 (2d Cir. 1989) (second prong of *Duren* test failed in part because

---

[8]   The California Supreme Court alternatively denied this claim on procedural grounds.  This Court declines to address Respondent's related procedural default arguments.  (Answer Memorandum (dkt. 93-1) at 53); *cf. Franklin v. Johnson*, 290 F.3d 1223, 1232 (9th Cir. 2002) ("courts are empowered to, and in some cases should, reach the merits of habeas petitions if they are, on their face and without regard to any facts that could be developed below, clearly not meritorious despite an asserted procedural bar."); *cf. Flournoy v. Small*, 681 F.3d 1000, 1004 n.1 (9th Cir. 2012) ("While we ordinarily resolve the issue of procedural bar prior to any consideration of the merits on habeas review, we are not required to do so when a petition clearly fails on the merits.").

[9]   Petitioner has not satisfied *Duren*'s first requirement concerning any "other cognizable groups."

1    "[s]tereotypical ethnic or religious characterizations of surnames are unreliable and only

2    tenuous indicia of a jury's makeup.").

3         Petitioner's claim also falls short under *Duren*'s third prong. As discussed above,

4    Petitioner's argument that the exclusion of Hispanics was systematic relies on a superior

5    court order decided in another case prior to his trial, and an earlier study discussing

6    several flaws in with Riverside County's jury selection system. The order in *Neidiffer*

7    *& Cruz* – issued by a state court – is clearly not binding on this Court, let alone under

8    AEDPA. *See* 28 U.S.C. § 2254(a) (a prisoner may seek federal habeas relief "only on

9    the ground that he is in custody in violation of the Constitution or laws or treaties of the

10   United States."); *Van Patten*, 552 U.S. at 125-26 (only Supreme Court cases constitute

11   clearly established Federal law for relief under AEDPA). Moreover, as also discussed

12   above, in response to *Neidiffer & Cruz*, Riverside County implemented several remedial

13   measures. Petitioner's assertion that the conditions addressed by *Neidiffer & Cruz*

14   "were not corrected" before his trial is not based on any evidence other than his

15   unreliable calculations about the demographics of his jury pool. Further, assuming

16   Petitioner's trial commenced before the corrective measures were put in place, it

17   appears there were interim measures available that the defense did not use, such as

18   seeking additional peremptory challenges or requesting a new panel if his appeared to

19   be racially imbalanced. *See Jackson*, 13 Cal. 4th at 1193. The California Supreme

20   Court could reasonably have determined that Petitioner failed to show a relationship

21   between the allegedly low percentage of Hispanics in his venire and the juror-selection

22   system the County used at the time of his trial. Consequently, this Court "cannot

23   conclude that the underrepresentation of Hispanics is, as *Duren* requires, 'inherent in

24   the particular jury-selection process.'" *Randolph*, 380 F.3d at 1141-42 (*quoting Duren*,

25   439 U.S. at 366); *Berghuis*, 559 U.S. at 332.

26        Petitioner claims that he is not required to prove his *Duren* claim at this stage of

27   the federal habeas proceedings. Instead, to the extent his calculations or conclusions

28   about the jury selection system at the time of his trial are speculative, he presumes the

state court's denial of his claim relied on "evidentiary findings about the statistical composition of the venire . . . without giving Hart an opportunity to subpoena and present evidence."  Those hypothetical findings were ostensibly an unreasonable determination of the facts under AEDPA. (Traverse at 29-30.)  Petitioner's assertion invites the Court to follow him down a dubious path at odds with AEDPA's stringent standard: he essentially argues that the Court should construe *his* failure to clear AEDPA's high hurdle as instead the state court's "unreasonable" failure to develop evidence.  Sections 2254(d)(2) and (e)(1) do not provide such a convenient end-run around AEDPA's constraints on federal habeas relief.  Beyond that, the state court's silent denial of Petitioner's claim about the makeup of his jury pool could have been supported by *Duren*.  *Richter*, 562 U.S. at 101-02; *LeBlanc*, 137 S. Ct. at 1728.  The Court's analysis ends there.[10]

The California Supreme Court was not objectively unreasonable under *Duren* and its progeny in denying Petitioner's claim based on the demographics of Petitioner's jury pool.  Claim 2 is DENIED.

**C.  Juror Misconduct (Claim 3)**

Petitioner brings a jury misconduct claim based on comments allegedly made by juror Mike Venable during guilt-phase deliberations.  He also argues that an article in the local newspaper on the second day of trial constituted an improper, external influence on the jury's verdict.  (SAP at 41-43; Traverse at 30-33.)

**1.  Background Facts**

Petitioner points to a newspaper article that appeared in the Riverside Press-Enterprise newspaper on January 12, 1988, the day after opening statements began.

---

[10]/  Petitioner's perfunctory assertion that his *Duren* claim is bolstered by the prosecutor using peremptory challenges to dismiss four jurors with Hispanic surnames has no bearing on the Court's conclusion, and fails to articulate a separate cognizable federal claim. *See James v. Borg*, 24 F.3d 20, 26 (9th Cir. 1994) (conclusory allegations do not warrant federal habeas relief).

(Dkt. 12 at 299.)  The article was titled "Murder Trial Begins."  It showed a photograph of Petitioner in court.   The article discussed the estimated trial schedule and summarized the opening statements the day prior.  The article also summarized the charges, explained that Petitioner was potentially facing the death penalty, and stated that Petitioner "pleaded innocent." The piece explained that, if the jury found Petitioner guilty, there would be a separate penalty phase of the trial.  The article continued as follows:

> Hart was arrested May 8 by Riverside County sheriff's detectives while they were investigating the death of Shelah McMahan, an 11-year-old Mead Valley girl found fatally stabbed in a junkyard near her home. Authorities said she is Hart's niece. [¶]  Detectives discovered that Hart's car matched the vehicle description that was provided by the surviving victim in the Harper case.  That led to other evidence being developed in the Harper case with charges being filed.  [¶]  Hart has not been charged in connection with McMahan's death.  However, the district attorney's office has said that jurors in the current trial are expected to hear evidence of McMahan's slaying during the penalty phase, if one is held.   [¶] According to authorities, Hart spent 33 months in Patton State Hospital in San Bernardino as a mentally disordered sex offender during the late 1970s.  He went there after pleading guilty to attempted burglary with intent to commit rape in connection with alleged attacks on San Diego area women.  he was released from Patton in 1978 despite doctors' warnings that he still was dangerous.

(*Id.*)

On the morning the article appeared, Petitioner's attorney requested that the jury be polled to determine whether any jurors were aware of the article.  From there, counsel requested individual, closed hearings to determine whether any of those jurors actually read the article.  Counsel also sought a "gag order" from the court prohibiting

63

law enforcement officials from providing further information to the media about the case. Petitioner's lawyer expressed particular concern and frustration about "conjecture" regarding uncharged crimes that appeared in the article. The prosecutor argued against a gag order on the ground that both the court and the parties had already thoroughly admonished jurors, even as late as the prior evening, "that once the trial got under way that there might very well be articles in the newspaper and that they were to avoid those . . . ." (17RT at 2477-80.)

The trial court agreed to question the jurors and expressed disappointment at the content of the article. The court also noted that if any juror read the article, the court would have to replace that juror or declare a mistrial. The court denied the request for a gag order on the ground that enforcement was too difficult and the court did not anticipate that law enforcement would provide new information to the media. (17RT at 2480-83.)

The court inquired with the jury, and no jurors indicated that they had read the article. (17RT at 2484.) The court then gave an extended admonishment as follows:

> Okay, I'm very grateful that you did not read it. You'll have to be alert now and sometimes you'll start looking at the paper and not even realizing it is an article about this case[. A]s soon as you do, just put it aside. If it is important to you, you can have somebody in your family cut it out and save it, but please don't read the material in the newspaper.

> See, you were here and you got to see it yourself, so you don't have to go to the newspaper to get this kind of material because what you're doing is you're getting it from a reporter, through the editor, through the newspaper policy, and it finally comes out as to what is going to be presented in the newspaper, and between you and me, if I have seen it myself, I don't need somebody else telling me what I've just seen. That's why we don't like you to go to the newspaper.

64

1    Can you all – I just wanted to remind you that it's now started, the
2    first article is there, there'll probably be other articles, and just be alert to
3    it and not read the newspaper.  As to, I mean you can read the newspaper,
4    the sports page and everything else and have somebody look through that
5    part of it, read the rest of it, but just avoid sections about this case, and
6    there should be, you know, there probably won't be an article everyday
7    and only a small column, small part of it.

8    Everybody understand?

9    All right, thank you very much.

10   (17RT at 2484-85.)

11   In regard to juror Venable, Petitioner proffers a July 11, 2002 declaration by one

12   of the jurors on Petitioner's case.  (Dkt. 12 at 71-73, Decl. of George Gardner.)  In the

13   declaration, Gardner states that, during guilt-phase deliberations, an unidentified juror:

14   threatened to hang the jury by voting not guilty if we didn't hurry up and

15   agree on a guilty verdict.  He said he was losing money sitting there on

16   jury duty because he flew airplanes that were contracted with the

17   Department of Forestry/Fire Service and that they were extremely busy

18   due to the hot weather which was causing brush fires.  Therefore, he

19   demanded that we wrap it up or he would vote not guilty.

20   (*Id.* at ¶5.)  Petitioner argues that the juror Gardner refers to was Mike Venable.  He

21   claims Venable made the comment due to the time pressure from his crop dusting

22   business, discussed in detail above.  Petitioner reasons that Venable's alleged comments

23   deprived him of a fair and impartial jury by forcing other jurors who might have been

24   on the fence about a decision to quickly reach a guilty verdict.

25   The California Supreme Court denied this claim on state habeas review on the

26   merits but without substantive comment.

27   **2.    Analysis**

28

65

As already discussed, a defendant "is entitled to a jury that reaches a verdict on the basis of evidence produced at trial, exclusive of extrinsic evidence." *Grotemeyer*, 393 F.3d at 877 (internal quotation marks and citation omitted).  When faced with an allegation that the jury was exposed to extrinsic evidence, a trial court should hold a hearing with all interested parties to determine the circumstances and impact of the material on the jury.  *Remmer*, 347 U.S. at 229-30; *see also Phillips*, 455 U.S. at 215 ("This Court has long held that the remedy for allegations of juror partiality is a hearing in which the defendant has the opportunity to prove actual bias.").  "'[T]he extent, if at all, to which the jurors saw or discussed the extrinsic evidence,' is a question of historical fact as to which the state court's findings are entitled to a presumption of correctness."  *Burks v. Borg*, 27 F.3d 1424, 1432 (9th Cir. 1994) (*quoting Dickson v. Sullivan*, 849 F.2d 403, 406 (9th Cir. 1988)); *see also United States v. Bagnariol*, 665 F.2d 877, 885 (9th Cir. 1981) (the trial judge is uniquely qualified to appraise what effect information has on the jury, and that judge's conclusion deserves substantial weight).  Finally, a trial judge's curative admonishment is "generally deemed sufficient as curative of prejudicial impact," *United States v. Bagley*, 641 F.2d 1235, 1241 (9th Cir. 1981), and "[a] jury is presumed to follow its instructions." *Spencer v. Peters*, 857 F.3d 789, 803 (9th Cir. 2017) (*quoting Weeks v. Angelone*, 528 U.S. 225, 234 (2000)).

### a.   Newspaper Article

Here, on the morning that the article appeared in the newspaper, the trial judge held a hearing and heard arguments from both parties.  The court granted an unopposed defense request to bring in the jurors and ask them if they had read the article.  None of the jurors indicated that they read it.  The trial judge accepted the jury's answer, impliedly finding that jurors were not exposed to extrinsic evidence.  The court then gave an extended admonishment that the jurors were to decide the case based on the evidence presented in court, and not secondhand from the newspaper.  The trial court's implied factual finding that the jury was not exposed to the article is entitled to a presumption of correctness, which Petitioner has not rebutted.  *Burks*, 27 F.3d at 1432.

Petitioner has equally failed to rebut the presumption that jurors followed their repeated instructions to steer clear of newspaper accounts of the trial and consider only the trial evidence.  *Spencer*, 857 F.3d at 803.  Petitioner has otherwise cited no clearly established Federal law requiring the trial court here to presume jurors were untruthful in their answers and press them further.  The Supreme Court requires a trial court to *hold a hearing*, as was done here.  *Remmer*, 347 U.S. at 229-30; *see also Van Patten*, 552 U.S. at 125-26.

Because this Court presumes the correctness of the trial court's conclusion that "no prejudicial information was actually introduced," the Court finds "there was no constitutional error."  *Burks*, 27 F.3d at 1432 n.6; *see also Bell v. Soto*, Nos. EDCV 08-1913 JLS (SS), EDCV 10-14 JLS (SS), 2015 WL 2453512, at *29 (presuming correctness of state court's finding that the jury was not exposed to extrinsic information), *report and recommendation adopted*, 2015 WL 2453518 (C.D. Cal. May 20, 2015).

### b.    Alleged Comments By Juror Venable

Petitioner's juror misconduct claim based on Mike Venable also fails.  This subclaim relies entirely on the affidavit of a fellow juror about comments Venable allegedly made during guilt-phase deliberations.

Federal courts "flatly prohibit" the admission of juror testimony to impeach a verdict except where "an extraneous influence" affected the verdict.  *Tanner v. United States*, 483 U.S. 107, 117 (1987) (citations omitted); *Estrada v. Scribner*, 512 F.3d 1227, 1237 (9th Cir. 2008) (juror's declaration that he felt pressured to vote guilty inadmissible evidence of subjective mental process); *Traver v. Meshriy*, 627 F.2d 934, 941 (9th Cir. 1980) (once the verdict has been delivered and accepted in open court, and the jury is polled and discharged, jurors may not claim that their assent was mistaken or unwilling) (citation omitted).

The Federal Rules of Evidence provide that:

67

1    During an inquiry into the validity of a verdict or indictment, a juror
2    may not testify about **any statement made or incident that occurred**
3    **during the jury's deliberations**; the effect of anything on that juror's or
4    another juror's vote; or any juror's mental processes concerning the
5    verdict or indictment. **The court may not receive a juror's affidavit or**
6    **evidence of a juror's statement on these matters.**

7    Fed. R. Evid. 606(b) (emphasis added). A federal court may only receive such evidence

8    where "extraneous prejudicial information was improperly brought to the jury's

9    attention," an "outside influence was improperly brought to bear upon any juror," or

10   "there was a mistake in entering the verdict on the verdict form." *Id.* Consistent with

11   Rule 606(b), the Ninth Circuit has held that "intrinsic jury processes will not be

12   examined on appeal and cannot support reversal." *Bagnariol*, 665 F.2d at 887.

13   In this case, Petitioner seeks to have the Court receive the affidavit of a juror

14   about a "statement made . . . during the jury's deliberations," which the Court may not

15   do. Fed. R. Evid. 606(b); *Tanner*, 483 U.S. at 117; *Estrada*, 512 F.3d at 1237.

16   Petitioner claims that the affidavit at issue falls into an exception to Rule 606(b).

17   He argues that the Court may consider a juror's affidavit about deliberations where the

18   subject concerns exposure to extrinsic evidence or juror bias. (Traverse at 32.) Even

19   assuming that is true, neither situation is present here. Venable certainly did not expose

20   other jurors to extraneous information influencing their verdict. As the Court's

21   discussion above shows, the jury became very familiar with Venable's scheduling

22   issues due to his crop dusting business. It was discussed in court with the jury present

23   several times. There is nothing about that information which would have had any

24   bearing on the verdict. The alleged misconduct was, by Petitioner's own account, how

25   Venable acted on that information – pressuring other jurors to reach a verdict. In other

26   words, the offending act was, if anything, an *internal* influence on the verdict, and the

27   Court may not consider another juror's affidavit on such an issue. *Estrada*, 512 F.3d

28   at 1237; *see also Vasquez v. Walker*, 359 F. App'x. 758, 760 (9th Cir. 2009) ("internal

68

influences" are not admissible to impeach a verdict).  Petitioner's suggestion that Venable's alleged statements to the other jurors evidenced his bias is equally unavailing.  Petitioner's premise is that Venable was *rushed*, not biased in favor of the prosecution or the defense.  If Venable's motivation was to finish with the trial and get back to work, it follows that he would be impatient to reach any verdict, not a particular verdict.

Any other internal discussions among the jury do not warrant circumventing Rule 606(b).  *See United States v. Leung*, 796 F.3d 1032, 1036 (9th Cir. 2015) ("Juror testimony cannot be used to impeach a verdict even when a feckless jury decides the parties' fates through a coin flip or roll of the dice.") (*citing Warger v. Shauers*, 574 U.S. 40, 45 (2014)); *id.* at 1038 ("[J]uror testimony that other jurors engaged in premature deliberations or made up their minds about the case before deliberations began is inadmissible [under Rule 606(b)] to demonstrate that the jury engaged in flawed processing of the evidence."); *United States v. Rutherford*, 371 F.3d 634, 640 (9th Cir. 2004) (juror statements that they improperly considered the defendant's failure to testify during deliberations was inadmissible under Rule 606(b)); *Belmontes v. Brown*, 414 F.3d 1094, 1124 (9th Cir. 2005) (jury's improper speculation during death penalty deliberations as to whether sentence rendered would really be carried out is an issue that "concerns intrinsic jury processes" and cannot lead to habeas relief), *rev'd on other grounds*, *Ayers v. Belmontes*, 549 U.S. 7 (2006); *see also Tanner*, 483 U.S. at 121-22 (juror affidavits alleging that some jurors were under the influence of drugs and alcohol were inadmissible under Rule 606(b)); *id.* at 120-21 ("[F]ull and frank discussion in the jury room, jurors' willingness to return an unpopular verdict, and the community's trust in a system that relies on the decisions of laypeople would all be undermined by a barrage of postverdict scrutiny of juror conduct.").

The California Supreme Court's denial of Petitioner's juror misconduct claims on the merits was neither contrary to nor an unreasonable application of clearly established Federal law.  It also did not result in a decision that was based on an

unreasonable determination of the facts in the record. § 28 U.S.C. 2254(d). Petitioner's request for relief on Claim 3 is DENIED.

### D.    Denial of Change of Venue (Claim 4)

Petitioner's next claim again concerns juror bias. This time, however, he takes aim more squarely at the pretrial publicity. Petitioner contends that the nature and extent of the media coverage of his capital case rendered it impossible to fairly try the case before impartial jurors in a Riverside County courtroom. Petitioner argues that the local media coverage of his case was exceptionally heavy due to the nature of the crimes, the ages of the victims, and the capital charges. He contends that media reports included the circumstances surrounding Diane Harper's killing and details about psychological damage to Amy Ryan. The coverage also included facts about Petitioner's prior criminal record and mental history, including his treatment years earlier as a mentally disordered sexual offender. Petitioner emphasizes one article in particular that reported he was released despite doctors warning that he was dangerous. (SAP at 44-45; Traverse at 34.)

As to the effect on the jury, Petitioner points to the fact that six of the twelve jurors who heard the case had been exposed to pretrial publicity. Petitioner also largely repeats arguments he made previously about the effect that pretrial articles had on jurors Bantum and Pentz. (SAP at 46-47.) Based on all that, Petitioner concludes that the trial court violated his constitutional rights by rejecting a defense request for a change of venue. (SAP at 43-47; Traverse at 33-35.)

### 1.    Background Facts

Prior to jury selection, Petitioner's counsel made a written motion for a change of venue and attached three newspaper articles to illustrate the content being disseminated to the public. (1CT at 72-80.) The trial court denied the motion.

The California Supreme Court denied Petitioner's constitutional challenge to the ruling on direct appeal. Specifically, the court weighed several factors: the extent of media attention the case received in Riverside County, the size of the county, the

content and timing of the coverage, and whether Petitioner or the victims were prominent members of the local community.  *People v. Hart*, 20 Cal. 4th at 598-99. Based on those factors, the state high court agreed with the trial court's finding that the reporting was "'neutral,' not inflammatory, and insufficient to sway public opinion." *Id.* at 599.  The court concluded that the publicity surrounding Petitioner's trial "was insignificant in comparison with other cases in which a denial of a motion to change venue was upheld."  *Id.*  The court further found that there were no facts brought out during voir dire to indicate any juror was biased based on pretrial publicity.  The court reasoned that any prospective jurors exposed to publicity only had "a slight level of awareness" of the case, and none of them "recalled seeing or hearing any reports regarding defendant."  *Id.* at 600.  Based on all of its findings, the court concluded that Petitioner failed to show "error or prejudice in the denial of his motion for change of venue."  *Id.*

## 2.    **Legal Standard**

It is a "basic requirement of due process" that a trial court transfer a proceeding to a different venue at the defendant's request "if extraordinary local prejudice will prevent a fair trial."  *Skilling v. United States*, 561 U.S. 358, 378 (2010) (*quoting In re Murchison*, 349 U.S. 133, 136 (1955)); *Murray*, 882 F.3d at 802.  Consistent with that principle, the Supreme Court has presumed prejudice in and reversed state criminal trials that were "utterly corrupted by press coverage." *Skilling*, 561 U.S. at 380 (*quoting Murphy*, 421 U.S. at 798-99); *see also Sheppard v. Maxwell*, 384 U.S. 333, 353-55, 358 (1966) (although  "months [of] virulent publicity" about the defendant and the crime did not alone deny due process, the added "carnival atmosphere" of media coverage of the trial, in which "bedlam reigned at the courthouse during the trial and newsmen took over practically the entire courtroom" warranted reversal); *Estes v. Texas*, 381 U.S. 532, 536, 538 (1965) (heavy media presence in the courtroom "led to considerable disruption" of pretrial proceedings); *Rideau v. Louisiana*, 373 U.S. 723, 725-27 (1963) (local television stations broadcasted the defendant's filmed confession before trial).

Supreme Court precedent does not "stand for the proposition that juror exposure to information about a state defendant's prior convictions or to news accounts of the crime with which he is charged alone presumptively deprives the defendant of due process." *Murphy*, 421 U.S. at 799; *see also Skilling*, 561 U.S. at 381 ("Prominence does not necessarily produce prejudice, and juror impartiality, we have reiterated, does not require ignorance."). As discussed earlier, in any notable criminal case "scarcely any of those best qualified to serve as jurors will not have formed some impression or opinion as to the merits of the case." *Irvin*, 366 U.S. at 722-23. Therefore, it is only the "extreme case" that violates the Constitution, *Skilling*, 561 U.S. at 381; *Hayes v. Ayers*, 632 F.3d 500, 508 (9th Cir. 2011), and a federal court looks more broadly at "indications in the totality of circumstances that [the] petitioner's trial was not fundamentally fair." *Murphy*, 421 U.S. at 799; *Skilling*, 561 U.S. at 384 ("[P]retrial publicity – even pervasive, adverse publicity – does not inevitably lead to an unfair trial.") (citation omitted).

Alternatively, "a defendant may establish the existence of actual prejudice if, during voir dire, potential jurors who have been exposed to pretrial publicity express bias or hostility toward the defendant that cannot be cast aside." *Murray*, 882 F.3d at 802-03. That determination requires "deference to the trial court's assessment of the impartiality of potential jurors, since that assessment 'is ordinarily influenced by a host of facts impossible to fully capture in the record . . .'" *Id.* at 803 (*quoting Skilling*, 561 U.S. at 386); *see also Mu'Min*, 500 U.S. at 427 ("The judge of that court sits in the locale where the publicity is said to have had its effect and brings to his evaluation of any such claim his own perception of the depth and extent of news stories that might influence a juror. . . .").

### 3.    Analysis

Based upon the legal standard articulated above, Petitioner's constitutional claim concerning pretrial publicity – and the failure to move the location of his trial – does not entitle him to federal habeas relief. The decision and reasoning of the California

72

Supreme Court were consistent with clearly established Federal law.  Petitioner's allegations describe the type of pretrial publicity that does not lead to a presumption of prejudice requiring a change of venue: some level of understandably pervasive media attention that reported facts of the case and Petitioner's criminal history.  *Murphy*, 421 U.S. at 799; *Skilling*, 561 U.S. at 381.  The Court disagrees with Petitioner's assertion that the fact-based coverage Petitioner complains of "virtually assured" that he "would be found guilty and sentenced to death."  Further, the fact that some of the news coverage also discussed Petitioner's mental health history, as well as trauma to the surviving victim, did not render the trial "utterly corrupted by press coverage" in the totality of the circumstances.  *Skilling*, 561 U.S. at 380, 384; *see also id.* at 382 (distinguishing Supreme Court cases presuming prejudice in part because "although news stories about Skilling were not kind, they contained no confession or other blatantly prejudicial information of the type readers or viewers could not reasonably be expected to shut from sight."); *Murphy*, 421 U.S. at 799.

Petitioner also argues that his trial lawyer "failed to marshal all of the evidence supporting a change of venue, . . . ." (SAP at 45.) Petitioner points out that his attorney characterized the number of newspaper reports as "[n]umerous" and "extensive" despite attaching only three articles to the motion for change of venue. (SAP at 45; Traverse at 34.) Petitioner has attached several additional articles to illustrate his point. Most of them appeared early in the investigation in 1986.  Others reported Shelah McMahan's killing in May 1986. One article discussed a lawsuit filed by Amy Ryan's family based on her treatment by Riverside County authorities (discussed more fully in Claim 15).  After Petitioner's arrest, some articles profiled him and his history, one discussing Petitioner's prior treatment in Patton State Hospital as a mentally disordered sex offender.  That article stated that he had been released from the hospital despite doctors concluding that he was still dangerous.  Other articles gave accounts of the pretrial and trial proceedings. (Dkt. 16 at 220-23; Dkt. 16-1 at 1-23.)  It is unnecessary for this Court to determine the precise number of articles or radio broadcasts that

covered Petitioner's case prior to trial.  Petitioner has not sufficiently alleged that any of the coverage – even if it was repeated – was consistent with a case of the Supreme Court finding a presumption of prejudice.  *See Sheppard*, 384 U.S. at 353-55, 358; *Estes*, 381 U.S. at 536, 538; *Rideau*, 373 U.S. at 725-27.  As discussed above, "even pervasive, adverse [pretrial] publicity" cannot, on its own, violate due process. *Skilling*, 561 U.S. at 384.

In Claim 1, the Court has already discussed and rejected Petitioner's assertions of "actual prejudice" exposed during voir dire.  The court comes to the same conclusion as it concerns Petitioner's change-of-venue claim.  The record in this proceeding, specifically the juror questionnaires and voir dire questioning, paints a picture that does not support Petitioner's claims of pervasive and prejudicial media coverage.  As discussed above, none of the members of Petitioner's jury appeared biased or unable to hear the evidence based on exposure to pretrial media reports.  The California Supreme Court's consistent finding was not unreasonable under AEDPA. *Richter*, 562 U.S. at 101-02.

Moreover, out of 151 potential jurors on Petitioner's panel, he points to only one who "was so prejudiced by what he heard that he had to be excused." (SAP at 46-47.) And, even that contention is a misleading interpretation of the record.  The prospective juror at issue, Charles Mohn, stated that he had followed the case "closely" prior to being called as a juror.  But, he never referred to any media reports.  Instead, Mohn candidly stated that was a "native Riversider," an active member of the local community, and his brother-in-law was a local police officer. (11RT at 1343.) The trial judge even commented that Mohn was "familiar to me and I recognize that you are involved in a great number of civic events in this community and you are freely donating of your time and services of your agency." (11RT at 1343-44.)  In light of Mohn's very close ties to people in the local community, he believed that he had already heard too much about the case to base his opinion on the evidence presented. In fact, Mohn implied that what he heard about the case prior to trial came from law

1   enforcement, not media reports.  (11RT at 1343 ("My brother-in-law's a policeman.
2   I just – I feel like I know too much of one side of this particular case.").)  Petitioner fails
3   to point to any potential juror who was excused or even raised a red flag during voir
4   dire due to prejudicial media coverage.  *Murray*, 882 F.3d at 802-03.

5       The California Supreme Court's conclusion that Petitioner failed to show "error
6   or prejudice in the denial of his motion for change of venue" is consistent with clearly
7   established Supreme Court precedent, and was based upon a reasonable interpretation
8   of the facts in the record.  28 U.S.C. § 2254(d).

9       Petitioner's request for habeas relief on Claim 4 is DENIED.

10   **E.    Conflict of Interest Based on Defense Counsel's Fee Arrangement**
11   **(Claim 5)**

12       Petitioner next argues that the indigent representation contract signed by his guilt-
13   phase trial attorney and lead counsel on the entire case, William Barnett, created
14   unconstitutional conflicts of interest.  (SAP at 48-55; Traverse at 35-40.)

15       **1.    Relevant Terms of the Contract**

16       In the SAP and the Traverse, Petitioner correctly sets forth the terms of the
17   original and renewed agreements at issue, and the Court summarizes the pertinent
18   provisions here.[11/]   Barnett and his partners contracted with the Riverside County
19   Superior Court to provide representation for criminal cases in which the county public
20   defender had a conflict of interest (also known as a "conflict panel").  (Dkt. 9 at 28-29.)
21   Under the contract's terms, the county could assign Barnett up to four special
22   circumstance/capital cases during the course of one year.  In exchange, Barnett received
23   $620,000 in twelve monthly installments.  (*Id.* at 32-33, 36.)  Barnett and his partners
24   were not prohibited from taking other cases that posed no conflict.  The contract

25   _____

26   [11/]  Because the terms did not materially change from year to year, the Court cites to
27   the contract in effect from July 1, 1987 through June 30, 1988.  That period started
     several months before jury selection and ran approximately one month after the court
28   imposed Petitioner's sentence.

required Barnett to bear most costs beyond that sizable sum, including any additional lawyers and professional services that were not reimbursed under California law. (*Id.* at 29-30, 32-34.)   The contract allowed additional compensation in "an extreme circumstance." (*Id.* at 32-33.)

### 2.   Legal Standard

The Sixth Amendment's right to counsel includes "a correlative right to representation that is free from conflicts of interest." *Rowland v. Chappell*, 876 F.3d 1174, 1191 (9th Cir. 2017) (*quoting Wood v. Georgia*, 450 U.S. 261, 271 (1981)).   To demonstrate a Sixth Amendment violation based on a conflict of interest, "a defendant who raised no objection at trial must demonstrate that an actual conflict of interest adversely affected his lawyer's performance." *Id.* (*quoting Cuyler v. Sullivan*, 446 U.S. 335, 348 (1980)).   An "actual conflict" is a conflict that concretely and adversely makes a difference in the attorney's performance, not "a mere theoretical division of loyalties." *Id.*; *Mickens v. Taylor*, 535 U.S. 162, 171, 172 n.5 (2002).   More specifically, a petitioner must show "that some plausible alternative defense strategy or tactic might have been pursued but was not and that the alternative defense was inherently in conflict with or not undertaken due to the attorney's other loyalties or interests." *United States v. Walter-Eze*, 869 F.3d 891, 901 (9th Cir. 2017) (*quoting United States v. Wells*, 394 F.3d 725, 733 (9th Cir. 2005)).

### 3.   Analysis

Petitioner's claim fails.   Most notably, he cites no clearly established Supreme Court precedent holding that a constitutional conflict-of-interest arises from an indigent fee arrangement such as Barnett's. *Van Patten*, 552 U.S. at 125-26.   "That the Supreme Court has not announced such a holding is not surprising," *cf. Moses v. Payne*, 555 F.3d at 761, as rulings in this Circuit indicate a lean in the opposite direction. *See Williams v. Calderon*, 52 F.3d 1465, 1473 (9th Cir. 1995) (the "theoretical conflict that exists between an attorney's personal fisc and his client's interests in any pro bono or underfunded appointment case. . . without more, do[es] not require Sixth Amendment

scrutiny."); *see also Kaempf v. Yates*, CV 10-2633 PSG (VBK), 2013 WL 1858786, at *1 (C.D. Cal. Mar. 27, 2013), *report and recommendation accepted by* 2013 WL 185772 (C.D. Cal. Apr. 26, 2013) ("This Court is not aware of any Supreme Court case which holds that a flat-fee agreement for the services of a private criminal defense attorney, without more, represents a conflict of interest that entitles a petitioner to habeas relief. Public defenders, . . . handle enormous caseloads on fixed budgets and with limited investigative resources every day.").

There is also nothing to indicate that an actual conflict manifested in Petitioner's case. *Walter-Eze*, 869 F.3d at 901. Petitioner certainly posits *theories* as to why Barnett's fee arrangement might alter the lawyer's motivations. For example, Petitioner argues that Barnett had to share his flat fees with other lawyers brought into the case. From this, Petitioner assumes Barnett had a financial motive to preclude Steven Harmon (penalty-phase counsel) from all guilt-phase proceedings. There is nothing in the record to support that assertion. Indeed, the record supports a different conclusion. Per Harmon's own statement, Barnett kept him out of the courtroom as a matter of trial strategy. (*See* Dkt. 10 at 50 ("[Barnett] indicated that he wished to preserve [Harmon's] 'pristine credibility' before the members of the jury, thus encouraging them to approach the question of penalty as a fresh matter, unencumbered by any resentment or distrust of defense counsel which they might have built up during the guilt phase."[12]). Petitioner also asserts that Harmon himself "was dissuaded from conducting all appropriate investigation warranted by the facts" because Barnett complained about Harmon's investigative costs. (SAP at 53.) Yet, Harmon makes no such statement in his declaration. While Harmon *mentions* in a single sentence that Barnett complained about expenses, he does not state that the complaints motivated his actions. Harmon

---

[12] The fact that Harmon appears subtly critical of Barnett's strategy in his declaration does not lend credence to the assertion that Barnett acted due to an actual conflict of interest with Petitioner.

does, however, declare that his penalty-phase investigations included looking into the Shelah McMahan homicide and investigating other possible suspects, interviewing Petitioner's family members, visiting various physical locations, and retaining a psychiatrist to examine Petitioner.  As for any investigation that Harmon now claims he did not undertake, there is no indication that Barnett's fees or complaints about expenses had any bearing on that.[13/]  (Dkt. 10 at 48.)

Even more generally, Petitioner contends that Barnett's guaranteed flat-fee contract encouraged Barnett to devote disproportionate attention to his paying clients and cut costs by limiting investigations in Petitioner's case. But, again, there is nothing to show that Barnett had or acted on these motivations, or that his financial interests were "squarely" opposed to Petitioner such that he could not competently represent him.  *See Walter-Eze*, 869 F.3d at 902 ("As human beings, attorneys always have interests of their own independent of those of their clients.  Thus, courts have held that as a general matter, there is a presumption that the lawyer will subordinate his pecuniary interests and honor his primary professional responsibility to his clients in the matter

---

[13/] Petitioner suggests that his speculation gave rise to a "prima facie" case for relief in the California courts, rendering the state court's summary denial of the claim without factual development "objectively unreasonable" under AEDPA.  (Traverse at 38-39.) The "prima facie" language Petitioner references is found in the California Rules of Court.  *See* Cal. Ct. R. 4.551(c)(1) (providing that a state court must issue an order to show cause if a habeas petitioner makes a "prima facie showing" of entitlement to relief).  The Court finds this to be an issue of state law, as the California Supreme Court is the appropriate arbiter of what a "prima facie showing" means in that state.  *See Bradshaw v. Richey*, 546 U.S. 74, 76 (2005) (the United States Supreme Court has "repeatedly held that a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus."); *see also Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) ("[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions.").  Further, the Court notes that a similar claim in a different action, which Petitioner references to bolster his assertion, was dismissed on summary judgment.  *See Staten v. Woodford*, CV No. 01-9178 MWF (Dkt. 201); *see also Hibbler*, 693 F.3d at 1146; *Pinholster*, 563 U.S. at 180-81; *Murray*, 882 F.3d at 802.

at hand.") (citations and internal quotation marks omitted); *see also Williams v. Calderon*, 52 F.3d at 1473 ("[T]he fact that payment for any investigation or psychiatric services could have come from counsel's pocket forced counsel to choose between Williams' interests and his own" created "no conflict of constitutional dimension.").

Under AEDPA's highly deferential standard, the California Supreme Court reasonably rejected Petitioner's conflict of interest claim.  Claim 5 is DENIED.

### F.    Shackling/Unlawful Restraint (Claim 7)[14]

Petitioner argues that the jury's "repeated exposure" to him in shackles rendered his trial constitutionally unfair.  He also argues that his restraints inhibited his "emotional and psychological abilities to aid in his own defense and function properly," and that they even "contributed to his failure to testify."  Consistent with case law governing in-court shackling, Petitioner argues that he "need not demonstrate actual prejudice to make out a due process violation."  (SAP at 210-14; Traverse at 129-31.)

However, Petitioner *does not allege* that he was shackled in the courtroom.  Instead, he contends that he was "restrained by use of a waist chain and leg irons" as he "was transferred from the county jail to and from the courtroom by officers."  (SAP at 211-12; Traverse at 129.)  As discussed below, restraints imposed en route to court are governed by a different standard.

Visible shackling in court is forbidden in a capital case, even during the penalty phase (after the presumption of innocence no longer applies), unless there is a showing of a "special need." *Deck v. Missouri*, 544 U.S. 622, 626, 630 (2005).  However, visible shackling *outside* the courtroom violates due process only if the criminal defendant demonstrates actual prejudice. *Wharton v. Chappell*, 765 F.3d 953, 964 (9th Cir. 2014).  The reason for the distinction between shackling in open court and shackling during transportation is that "[e]ven the most unsophisticated juror knows that defendants may

---

[14]/ Claims 6, 13, 21, and 39 (and portions of claims 12 and 16) are addressed out of order for the sake of efficiency and to place them in the proper context.

1   have to post bail and that some lack the resources to do this." *Id.* at 965 (citation and
2   internal quotation marks omitted). "Under these circumstances we cannot think that the
3   emotional impact of seeing the defendant in custody is necessarily hostile – it may be
4   quite the reverse." *Id.* (citation omitted). Moreover, "[i]t is a normal and regular as
5   well as a highly desirable and necessary practice to handcuff prisoners when they are
6   being taken from one place to another, and the jury is aware of this." *Id.* (citation
7   omitted).

8          The Ninth Circuit's *Wharton* decision expressly found the distinction between
9   in-court and out-of-court shackling to be consistent with the Supreme Court's decision
10  in *Deck*. *Id.* at 965; *see also Maxwell v. Roe*, 606 F.3d 561, 567 (9th Cir. 2010) (under
11  AEDPA, "clearly established federal law consists of the holdings of the Supreme Court
12  at the time of the state court decision; however, circuit court precedent may be
13  persuasive in determining what law is clearly established and whether a state court
14  applied that law unreasonably.") (citation and internal quotation marks omitted); *see
15  also Williams v. Taylor*, 529 U.S. at 381-82 (while AEDPA "limits the source of
16  doctrine on which a federal court may rely," "[i]t does not, . . . purport to limit the
17  federal courts' independent interpretive authority with respect to federal questions.")
18  (citation omitted).

19         More specifically, in *Deck*, the Supreme Court's holding was motivated by three
20  main factors: the presumption of innocence, the fact that being physically restrained in
21  court diminishes a defendant's ability to participate in the case, and a "courtroom's
22  formal dignity, which includes the respectful treatment of defendants."[15] *Deck*, 544
23  U.S. at 630-32. From that, the Ninth Circuit in *Wharton* concluded:

24

25

26

_____

27  [15]   The Supreme Court noted that the penalty phase of a capital case only implicates
28  the latter two considerations. As to the first, "the defendant's conviction means that the
    presumption of innocence no longer applies." *Deck*, 544 U.S. at 632.

1    Unlike shackling in the courtroom, shackling during transport does not
2    affect the defendant's ability to assist counsel during trial." (Citation
3    omitted.)  Nor does it have any effect on the dignity of the courtroom;
4    indeed, it could be perceived as increasing the dignity of the courtroom
5    because a prisoner's shackles are removed for open-court proceedings."
6    (Citation omitted.)  Admittedly, visible shackling during transportation
7    might affect the jury's perception of the presumption of innocence,
8    (citation omitted), but that concern is mitigated greatly by the reasons
9    discussed above – jurors know that, as a matter of routine, some
10   defendants are in custody during trial and that security needs during
11   transport demand restraints.

12   *Wharton*, 765 F.3d at 965.

13   Under the appropriate standard – requiring actual prejudice – Petitioner's claim
14   fails. *Wharton*, 765 F.3d at 964.  Petitioner's sister declares that she saw him "brought
15   up a stairwell from the jail in shackles, both wrists and feet, and marched in front of the
16   jury. . . . at every break." (Dkt. 10 at 14.)  Petitioner claims that on numerous occasions
17   the restraints "caused him to rattle while passing before members of the jury."  He
18   posits that "[t]his constant image . . . was embedded into the collective subconscious of
19   the waiting jury members." (SAP at 211-12.)  Yet, the juror who provided a declaration
20   to Petitioner's habeas attorneys was apparently not so affected.  He states, "During the
21   trial, Joseph Hart always wore decent clothes and looked very proper with his hair
22   neatly cut."  At some point, the juror "observed that he was shackled," but recalls that
23   "they did a good job in trying to cover them up." (Dkt. 12 at 71.)

24   Additionally, contrary to Petitioner's assertion that the trial court gave no
25   admonition about Petitioner's restraints, the trial court said the following to the jury:

26   Mr. Hart is in custody which means that he has to be transported to
27   the court; and when anybody is transported, they are transported with
28   certain security precautions taken including being handcuffed.

1          Does everybody understand that's not evidence of guilt, that's just

2     a requirement here and the fact that a person cannot make bail is not

3     evidence of guilt.

4          Do you all understand that?

5          All right.

6          In a case where persons are charged with this kind of offense, the

7     law provides there's probably no bail going to be set anyway, so whether

8     the person is guilty or not guilty, they are going to be in custody in all

9     likelihood, so if you start inferring because a person has handcuffs on that

10    they're guilty, basically you've abdicated your jurors' duties, you have

11    allowed irrelevance to come into the case.

12         Do you all understand that?

13    (18RT at 2483-84.)

14         The jury was aware that Petitioner was transported to and from court in restraints.

15    If they were not already aware from seeing him pass by, the court informed them.  And,

16    consistent with *Wharton*, the court admonished jurors of the practical reality that, for

17    security purposes, transporting jail detainees to court requires restraints.  Also, the court

18    stated the obvious, that anyone accused of the unusually violent crimes alleged in

19    Petitioner's case was unlikely to be released before trial, so one would expect to see that

20    person in restraints on his way to court.  *Wharton*, 765 F.3d at 965.

21         There is no indication that jurors were unable to see reason here; indeed, one

22    juror casually mentions seeing the restraints and appears more interested in how well

23    authorities covered them up than how they affected the juror's impression of Petitioner.

24    Petitioner points to no facts supporting his assertion that prejudicial images were

25    "embedded into the collective subconscious" of the jurors.  Further, he fails to explain

26    how being transported to court in restraints inhibited his ability to participate in the case

27    or testify once he arrived.  The California Supreme Court's denial of Petitioner's

28

shackling claim was not objectively unreasonable under AEDPA. *Richter*, 562 U.S. at 101; *LeBlanc*, 137 S. Ct. at 1728. Claim 7 is DENIED.

### G. Claims Based on Mental Health (Claims 8 and 9)

Petitioner argues that he was mentally incompetent to stand trial and that he was deprived of the right to a psychiatric evaluation. (SAP at 214-20; Traverse at 131-40.) The California Supreme Court denied both claims on state habeas review without substantive comment. Because neither of Petitioner's assertions involving his mental health are colorable, these claims fail.

#### 1. Competency to Stand Trial

A defendant is mentally competent to stand trial if he "has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding and . . . has a rational as well as factual understanding of the proceedings against him." *Clark v. Arnold*, 769 F.3d 711, 729 (9th Cir. 2014) (*quoting Dusky v. United States*, 362 U.S. 402, 402 (1960)). A trial court has a sua sponte duty to inquire into the issue "if a reasonable judge would be expected to have a bona fide doubt as to the defendant's competence." *Id.* (citation omitted, italics in original). A bona fide doubt exists if there is substantial evidence of incompetence. *Id.*

Federal courts "have recognized a high bar for what constitutes a 'bona fide doubt' of competence." *Id.* Factors relevant to this determination include "evidence of a defendant's irrational behavior, his demeanor at trial, and any prior medical opinion on competence to stand trial." *Drope v. Missouri*, 420 U.S. 162, 180 (1975). Other evidence includes the observations provided by trial counsel. *Medina v. California*, 505 U.S. 437, 450 (1992) ("[D]efense counsel will often have the best-informed view of the defendant's ability to participate in his defense."). A bona fide doubt "relates not to mental illness in general but to the practical aspects of the defense of the action." *Bassett v. McCarthy*, 549 F.2d 616, 619 (9th Cir. 1977).

Although the Court, in evaluating a substantive due process claim of mental incompetency, "may consider facts and evidence that were not available to the state trial

court before and during trial," courts nevertheless "disfavor retrospective determinations of incompetence, and give considerable weight to the lack of contemporaneous evidence of a petitioner's incompetence to stand trial." *Williams v. Woodford*, 384 F.3d 567, 608 (9th Cir. 2004). In *Williams*, a capital habeas proceeding, the court gave "little weight to the declarations of the mental-health experts that Williams submitted in his habeas corpus proceedings." The court found that the declarations were "not entirely credible." The court determined that these "retrospective assessments" of the petitioner's mental health failed in a number of respects. They did not adequately tie the petitioner's mental defects to the facts of the case. They failed to describe how the mental impairments interfered with the petitioner's understanding of the proceedings against him or with his ability to assist counsel in presenting a defense. They also failed to point to "any manifestation of Williams's incompetence in the trial-court record," nor did they explain portions of the record in which the petitioner appeared to act rationally. *Id.* at 609. The *Williams* court also:

> accord[ed] little weight to the competency assessments of Williams's habeas corpus experts because they are based not upon medical reports contemporaneous to the time of the preliminary hearings or trial, but upon declarations submitted by Williams's friends and family and neuropsychological testing conducted more than ten years after trial. We have previously held that retrospective competency determinations, although disfavored, are permissible when it is possible to make an accurate retrospective evaluation, for example, by consulting contemporaneous medical reports. (Citation omitted.) Without the benefit of such contemporaneous reports, the passage of time and the difficulties inherent in evaluating the defendant's competence from a written record reduce the likelihood of an accurate retrospective determination.

*Id.* at 609-10; *see also Pate v. Robinson*, 383 U.S. 375, 387 (1966) (refusing to order a competency proceeding "six years after the fact" because that passage of time would only aggravate "the difficulty of retrospectively determining an accused's competence to stand trial.")  In light of the court's doubt about the accuracy of the retrospective reports, the court concluded that they were "not especially probative of whether Williams actually was incompetent at the time of his trial." *Williams v. Woodford*, 384 F.3d at 610.

Here, Petitioner fails to provide a persuasive reason that the trial court reasonably should have formed a bona fide doubt about his competency to stand trial.  The trial transcripts do not reveal any abnormal in-court behavior by Petitioner that would have raised a red flag for the court.  *Medina*, 505 U.S. at 450.  Further, the mental health evidence that Petitioner asserts was available at the time of trial – his prior commitment as a sexually violent sex offender, sinus problems and severe headaches, a history of head injuries, physical and emotional abuse by his father in childhood, a learning disability, psychoactive and mood-altering drugs, a prior suicide attempt – is insufficient to counter the record of Petitioner's rational participation in his trial. (*See* Dkt. 9-1 at 101-03; dkt. 16-1 at 34-41, 43; *see also* dkt. 96-5, 96-6, 97-32 (showing Petitioner's rational conduct and concern for his case in his *Marsden* hearings).) Without minimizing the seriousness of the information Petitioner puts forth, for purposes of the Court's analysis under the difficult standard for establishing mental incompetency, Petitioner's evidence appears scattershot and indiscriminate.  None of these facts rise to the level of warranting further evidentiary development, nor do they raise a red flag that Petitioner suffered from a concealed mental condition that prevented him from participating meaningfully in his trial.  The trial court clearly lacked substantial evidence to raise a bona fide doubt about Petitioner's mental competency to stand trial.  *Clark*, 769 F.3d at 729; *Drope*, 420 U.S. at 180; *see also Maxwell*, 606 F.3d at 569 (bona fide doubt existed where the defendant was unable to verbally or physically control himself in the courtroom; paranoid and psychotic behavior impaired

his communication with defense counsel; he attempted suicide during trial; and he spent a substantial portion of trial involuntarily committed to a psychiatric hospital).

Additionally, the evidence Petitioner proffers in support of his incompetency claim consists primarily of evaluations performed years after his trial.  The Court affords this evidence little weight.  *Williams v. Woodford*, 384 F.3d at 609-10; *Robinson*, 383 U.S. at 387.

Petitioner has not persuaded the Court that he had an inability to consult with his lawyers with a reasonable degree of rational understanding, or that he was unable to rationally understand his trial.  *Clark*, 769 F.3d at 729; *Dusky*, 362 U.S. at 402.  His claim based on mental incompetency is denied.

## 2.     Failure to Appoint Psychiatrist

Petitioner similarly contends he was deprived of his right to meaningful psychiatric assistance under *Ake v. Oklahoma*, 470 U.S. 68 (1985).

Under *Ake*, when a defendant demonstrates to the trial judge that his sanity at the time of the offense is to be a significant factor at trial, the State must, at a minimum, assure the defendant access to a competent psychiatrist who will conduct an appropriate examination and assist in evaluation, preparation, and presentation of the defense.  *Ake*, 470 U.S. at 83; *McWilliams v. Dunn*, ___ U.S. ___, 137 S. Ct. 1790, 1793-94 (2017). However, "*Ake* makes clear that psychiatric assistance is a contingent, not an absolute, right: it holds that when a defendant has made a preliminary showing that his sanity at the time of the offense is likely to be a significant factor at trial the state must provide psychiatric assistance." *Gretzler v. Stewart*, 112 F.3d 992, 1001 (9th Cir. 1997).

As the Court discusses further in this Order, Petitioner's defense strategy was not consistent with a theory based on mental impairment.  Petitioner's sanity was simply not a significant factor at trial.  *Gretzler*, 112 F.3d at 1001.  Beyond that, Petitioner's *Ake* claim fails for much the same reason that his mental incompetency claim failed. Petitioner did not make a factual showing sufficient to give the trial court any reason to doubt his sanity, either at trial or at the time of the offenses.  Petitioner has not shown

1  he was entitled to the assistance of a psychiatrist, let alone a certain level of professional

2  psychiatric assistance.  *Ake*, 470 U.S. at 83.

3       The Court also notes that the present case is readily distinguishable from *Ake*.

4  In that case, insanity was the only defense.  The defendant exhibited extremely bizarre

5  behavior at his arraignment, enough so that the court ordered a competency evaluation.

6  A psychiatrist subsequently found the defendant to be incompetent to stand trial, and

7  suggested that he be committed to a mental facility.  When the court eventually found

8  him competent to stand trial, it was with the caveat that he was heavily sedated.  *Ake*,

9  470 U.S. at 86.  All of those factors were absent from Petitioner's trial proceedings.

10  There is no indication in the record that Petitioner's behavior was bizarre before or

11  during his trial.

12       The evidence presented by Petitioner does not meet the showing found sufficient

13  by the Supreme Court in *Ake*.  The state court's denial of this claim was not an

14  unreasonable application of federal law.  28 U.S.C. § 2254(d).

15       All of Petitioner's claims based on mental impairments and drug abuse, including

16  Claims 8 and 9, are DENIED.

17       **H.    Failure to Preserve Evidence (Claim 10)**

18       Petitioner argues that the government violated due process by failing to preserve

19  blood evidence found on a pair of handcuffs and Amy Ryan's blouse.  (SAP at 220-23;

20  Traverse at 140-45.)  Petitioner raised this claim in his habeas petition before the

21  California Supreme Court.  The claim was denied without substantive comment on the

22  merits.  (Dkt. 101-2 at 111–16; dkt. 101-13.)  As a result, this Court must determine

23  whether any theories under clearly established federal law could have supported the

24  state court's denial of relief.  *Richter*, 562 U.S. at 102.  Specifically here, "[t]he clearly

25  established Supreme Court precedent governing this claim is *California v. Trombetta*,

26  467 U.S. 479 [] (1984), and *Arizona v. Youngblood*, 488 U.S. 51 [] (1988)."  *Sanders*

27  *v. Cullen*, 873 F.3d 778, 811 (9th Cir. 2017).

28

Under *Trombetta* and *Youngblood*, the government's failure to preserve evidence violates a criminal defendant's due process rights if that evidence (1) possessed an exculpatory value that was apparent before its destruction; (2) is unattainable through comparable evidence by other reasonably available means; and (3) was destroyed by the government in bad faith.  *Id.*; *see also Youngblood*, 488 U.S. at 57-58.

"The exculpatory value of an item of evidence is not 'apparent' when the evidence merely '*could have*' exculpated the defendant." *United States v. Drake*, 543 F.3d 1080, 1090 (9th Cir. 2008) (emphasis in original) (*citing Youngblood*, 488 U.S. at 56).  It is not enough to point to evidence that was "simply an avenue of investigation that might have led in any number of directions." *Youngblood*, 488 U.S. at 56 n.*.

Further, the bad faith requirement is intended to limit the police's obligation to preserve evidence "to reasonable bounds."  Bad faith arises only in "that class of cases where the interests of justice most clearly require it, i.e., those cases in which the police themselves by their conduct indicate that the evidence could form a basis for exonerating the defendant." *Id.* at 58.  "The presence or absence of bad faith turns on the government's knowledge of the apparent exculpatory value of the evidence at the time it was lost or destroyed." *Sanders*, 873 F.3d at 811 (citation omitted); *United States v. Robertson*, 895 F.3d 1206, 1211 (9th Cir. 2018) (citation omitted).

There is no clearly established Federal law requiring the police to collect or obtain evidence. *See Youngblood*, 488 U.S. at 59 ("[T]he police do not have a constitutional duty to perform any particular tests."); *see also District Attorney's Off. for Third Judicial Dist. v. Osborne*, 557 U.S. 52, 73-74 (2009) (dicta strongly implying that substantive due process does not currently impose a duty to gather evidence). Notably, *Trombetta* and *Youngblood* expressly impose a duty to *preserve* already-collected evidence. *Trombetta*, 467 U.S. at 481 ("[T]he question presented is whether the Due Process Clause requires law enforcement agencies to preserve breath samples of suspected drunken drivers."); *Youngblood*, 488 U.S. at 334 (due process challenge to the police's failure to preserve semen samples).

88

1    **1.     Failure To Preserve Blood on Handcuffs (Penalty Phase**
2    **Evidence)**

3    Petitioner alleges that the Riverside County Sheriff's Department destroyed blood
4    flakes found on a pair of handcuffs.  The handcuffs and the blood flakes were part of
5    the prosecution's penalty-phase case, specifically, the allegations that Petitioner killed
6    his niece days before his arrest on the capital charges.  The Court delves thoroughly into
7    that evidence in Claim 27.  Here, the Court only discusses the facts relevant to
8    Petitioner's *Trombetta/Youngblood* claim.

9    A detective found the handcuffs at issue buried in a shed on Petitioner's property.
10   (33RT at 4304.)  On those handcuffs, the detective found and collected minuscule
11   flakes.  (33RT at 4334, 4336-37, 4340.)  The detective who discovered the flakes
12   scraped them into a small envelope for testing.  (33RT at 4337-38.)  Forensic testing
13   determined that they were dried flakes of blood.  The flakes were consistent with the
14   blood type of the victim, Shelah McMahan.  (34RT at 4374.)  More specifically, the
15   flakes tested positive for a blood type characterized as "ABO type A, PGM type 2+ 1
16   +."  This was not Petitioner's blood type, but was the same as Shelah McMahan's.
17   (34RT at 4376; 35RT at 4506-08.)  Criminalist James Hall testified that approximately
18   eight in one thousand people (.8% of the population) shared that specific blood type.
19   (35RT at 4512, 4515.)

20   The forensic examiner who tested the flakes testified that, due to their minuscule
21   size, the samples were destroyed during the testing process, and there was nothing left
22   over.  (35RT at 4427-28, 4433, 4484-85.)

23   Petitioner argues that these facts show that law enforcement willingly destroyed
24   evidence before the defense could examine it.  He further claims that the exculpatory
25   value of the blood flakes on the handcuffs was "clearly apparent" because additional
26   testing by a defense expert might have revealed that they did not match Shelah
27   McMahan's blood type.  He also argues that, by destroying the blood samples, the
28

89

1  sheriff's department prevented any future DNA test that might have exonerated him.
2  (SAP at 221-22; Traverse at 141-44.)

3      Petitioner cannot receive federal habeas relief on these allegations.   What
4  Petitioner alleges as "clearly apparent" exculpatory evidence is actually the opposite.
5  The blood flakes on the handcuffs inculpated him.   Any exculpatory value is based on
6  speculation.    Such speculation that further testing could have contradicted the
7  criminalist's conclusions is squarely insufficient to qualify as "apparent" exculpatory
8  value. *Drake*, 543 F.3d at 1090; *Youngblood*, 488 U.S. at 56.

9      Petitioner has also made a speculative and inadequate showing of bad faith by
10  law enforcement.   *Sanders*, 873 F.3d at 811; *Youngblood*, 488 U.S. at 57-58.   He
11  assumes something nefarious happened based on the way the detective collected the
12  blood flakes, and the fact that the crime lab failed to preserve samples for the defense.
13  But, the prosecution's witnesses explained at trial the specific circumstances under
14  which the samples were destroyed, i.e., during the testing process they were used up.
15  This may not have been the best practice, but it also does not present a case "in which
16  the police themselves by their conduct indicate that the evidence could form a basis for
17  exonerating the defendant." *Youngblood*, 488 U.S. at 58.   There is no evidence from
18  which to conclude that any member of law enforcement knew of exculpatory value in
19  this evidence at the time of its destruction.   *Sanders*, 873 F.3d at 811; *Robertson*, 895
20  F.3d at 1211.

21          **2.     Destruction Of Blouse Blood Spatter (Guilt Phase Evidence)**
22      Petitioner's second *Trombetta/Youngblood* subclaim alleges that the Riverside
23  County Sheriffs failed to preserve blood spatter that was found on Amy Ryan's blouse.
24  (SAP at 222-23; Traverse at 142-44.)   This subclaimm also fails.

25      The sheriff's department found a smear and red spots on Amy Ryan's blouse that
26  appeared to be blood. (20RT at 2800.) However, criminalist James Hall stated that "the
27  amount of blood was very limited and the stain was quite light." (Dkt. 12-2 at 31.) Hall
28  testified that he was able to determine that the smear was blood, and was the same blood

1   type as Diane Harper.  (22RT at 3087-88; *see also* dkt. 12-1 at 35.)  However, the

2   blouse was too lightly stained from the smear to allow testing for any further

3   conclusions.  (Dkt. 12-1 at 36.)  The spatter marks were too light to be confirmed as

4   human blood.  (Dkt. 12-1 at 36.)  The blouse was turned over to the defense for testing,

5   and the laboratory used by the defense reached inconclusive results.  One stain was

6   confirmed to be blood, with no further conclusions, and other marks were not confirmed

7   to be blood.  (Dkt. 9 at 183.)

8        The essence of Petitioner's argument is not that law enforcement failed to

9   preserve blood evidence for defense testing.  The blouse was turned over to the defense

10  and tested.  Petitioner's complaint is that the sheriff's department failed to test the

11  blouse fast enough to get better samples.  (Traverse at 143-44.)  Aside from Petitioner's

12  speculation that time was of the essence in testing the blouse for blood, his claim does

13  not allege a violation of clearly established Supreme Court precedent.  There is no

14  clearly established Federal law requiring the police to collect evidence *at all*, let alone

15  within a certain time frame.  *See Youngblood*, 488 U.S. at 59 ("[T]he police do not have

16  a constitutional duty to perform any particular tests."); *see also Osborne*, 557 U.S. at

17  73-74; *Van Patten*, 552 U.S. at 125-26; *Lopez v. Smith*, 574 U.S. at 2.  Further,

18  Petitioner again fails to point to any apparent exculpatory value in this evidence.

19  *Drake*, 543 F.3d 1090; *Youngblood*, 488 U.S. at 56.  Finally, there is nothing to suggest

20  that any action or omission as it concerned the spatters on Amy Ryan's blouse occurred

21  in bad faith.  *Sanders*, 873 F.3d at 811; *Robertson*, 895 F.3d at 1211; *see also United*

22  *States v. Barton*, 995 F.2d 931, 936 (9th Cir. 1993) ("The Supreme Court has held that

23  the negligent destruction of evidence does not violate due process.") (*citing*

24  *Youngblood*, 488 U.S. at 58).

25       The California Supreme Court's denial of Petitioner's due process claims based

26  upon the destruction of evidence was reasonable under *Trombetta* and *Youngblood*.  *See*

27  *Richter*, 562 U.S. at 102.  Claim 10 is DENIED.

28       **I.   Evidentiary Challenge to Images of Victims (Claim 11)**

1      Petitioner complains that the trial court admitted inflammatory evidence.  At the
2   outset, Petitioner appears to challenge every photograph, slide and videotape admitted
3   at trial without a coherent legal theory.  (SAP at 224-27.)  The Court need not address
4   that.  Petitioner eventually hones in on more specific photographic evidence.  In the
5   guilt phase, Petitioner takes issue with photographs of Diane Harper's body.  He argues
6   that most or all of the photos were unduly gruesome and cumulative.  As to the penalty
7   phase, Petitioner argues that the court should not have allowed multiple photos of
8   Shelah McMahan's body because they were irrelevant, and that the court allowed an
9   excessive number of them.  Petitioner argues that all of the photographs were too
10  inflammatory to allow the jury to fairly consider the evidence.  (SAP at 223-28;
11  Traverse at 145-49.)

12      On direct appeal, the California Supreme Court denied Petitioner's challenges to
13  the photographs.  The court addressed the claims under state evidentiary rules, and
14  ultimately concluded in footnotes that there was no constitutional violation in light of
15  the fact the photographs were properly admitted into evidence.  The court thoroughly
16  discussed all the challenged photographs and concluded that they were relevant to
17  multiple issues in the case.  As for the guilt-phase photographs of Diane Harper's body,
18  the court found that they corroborated witness testimony about how events transpired,
19  Petitioner's presence at the scene, whether sexual assault occurred, how the victim
20  received various injuries to her body, and Petitioner's state of mind in committing the
21  killing, including planning and premeditation.  *People v. Hart*, 20 Cal. 4th at 616.  As
22  to the penalty-phase photographs of Shelah McMahan, the California Supreme Court
23  found that they were relevant to corroborate witness testimony about the vicious nature
24  of Shelah's killing, where she was killed, if her body was subsequently moved, how she
25  was bound, whether the killing was premeditated, and whether ligature marks matched
26  handcuffs and a cable tie found on Petitioner's property.  *Id.* at 644-46.

27      Although Petitioner purports to raise his evidentiary claims based on his federal
28  rights, he has not actually done so.  The premise of his constitutional claim is that the

evidence at issue was unduly prejudicial, which is governed by the California Evidence Code.  *See* Cal. Evid. Code § 352.  A federal court may entertain a habeas petition by a state prisoner "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a); *McGuire*, 502 U.S. at 67-68; *see also Windham v. Merkle*, 163 F.3d 1092, 1103 (9th Cir. 1998) (a federal habeas court has "no authority to review alleged violations of a state's evidentiary rules . . . ."). Moreover, a habeas petitioner cannot "transform a state law issue into a federal one merely by asserting a violation of due process," which is what Petitioner has attempted to do here. *Langford v. Day*, 110 F.3d 1380, 1389 (9th Cir. 1996); *see also Miller v. Stagner*, 757 F. 2d 988, 993-94 (9th Cir. 1985).  Petitioner's evidentiary claim is not cognizable in this Court.

Further, even assuming Petitioner had raised a cognizable federal issue, it would fall considerably short. "Under AEDPA, even clearly erroneous admissions of evidence that render a trial fundamentally unfair may not permit the grant of federal habeas corpus relief if not forbidden by 'clearly established Federal law,' as laid out by the Supreme Court." *Holley v. Yarborough*, 568 F.3d 1091, 1101 (9th Cir. 2009) (citation omitted).  And, as it concerns Petitioner's evidentiary claims:

> The Supreme Court has made very few rulings regarding the admission of evidence as a violation of due process.  Although the Court has been clear that a writ should be issued when constitutional errors have rendered the trial fundamentally unfair, (citation omitted), it has not yet made a clear ruling that admission of irrelevant or overtly prejudicial evidence constitutes a due process violation sufficient to warrant issuance of the writ.  Absent such "clearly established Federal law," we cannot conclude that the state court's ruling was an "unreasonable application."

*Id.*

Petitioner's evidentiary claims, even had they been cognizable, are without merit under AEDPA because there is no clearly established Supreme Court precedent

addressing the issue.  *Id.*; *see also Walker v. Davis*, 617 F. App'x 794, 795 (9th Cir. 2015) (finding that, based on *Holley*, there was no clearly established Federal law prohibiting "potentially irrelevant and prejudicial autopsy photographs" of a minor victim) (cited pursuant to 9th Cir. R. 36-3).

Even beyond the confines of AEDPA, the evidence at issue here would not lead to relief.  "The admission of evidence does not provide a basis for habeas relief unless it rendered the trial fundamentally unfair in violation of due process."  *Johnson v. Sublett*, 63 F.3d 926, 930 (9th Cir.1995) (*citing McGuire*, 502 U.S. at 67-68).  Such a due process violation may occur only "if there are *no* permissible inferences the jury may draw from" the evidence.  *Boyde v. Brown*, 404 F.3d 1159, 1172 (9th Cir. 2005) (emphasis in original, citation and internal quotation marks omitted).  As the state court thoroughly concluded, the photographs Petitioner complains of were separately relevant on multiple fronts: to show the manner of the killings, various marks on the victims, any planning involved, as well as Petitioner's connection to the crimes and crime scenes.  Petitioner does not convincingly explain why this evidence was irrelevant or unfair, but instead focuses on the possibility that it had an emotional impact on the jury.  The photographs were certainly unfavorable to him, but that is not sufficient to satisfy the due process standard.  The evidence at issue did not render Petitioner's trial fundamentally unfair.  *See Gerlaugh v. Stewart*, 129 F.3d 1027, 1032 (9th Cir. 1997) (admission of "admittedly gruesome photos of the decedent" was within the trial court's discretion and did not implicate federal due process rights); *see also Villafuerte v. Stewart*, 111 F.3d 616, 627 (9th Cir. 1997) (graphic photographs did not render trial fundamentally unfair where they were relevant to issues in the case); *Batchelor v. Cupp*, 693 F.2d 859, 865 (9th Cir. 1982) (several gruesome photographs of victim's body did not render the trial fundamentally unfair).

Petitioner's evidentiary claims in Claim 11 are DENIED.

94

1    **J.      Guilt Phase *Brady*[16]/ Claims (Claim 12)**

2         Petitioner argues that the government withheld several items of exculpatory

3    evidence that were material to both phases of the trial.  The Court addresses the two

4    *Brady* subclaims concerning the guilt phase here.  Petitioner raised his *Brady* claims in

5    his habeas petition before the California Supreme Court.  The claim was denied without

6    substantive comment on the merits.  This Court determines whether *Brady* could have

7    supported the state court's denial of relief.  *Richter*, 562 U.S. at 102.

8                    **1.     Legal Standard**

9         Under *Brady*, a prosecutor violates due process by suppressing evidence

10   favorable to an accused and material to either guilt or punishment.  *Sanders*, 873 F.3d

11   at 801; *Brady*, 373 U.S. at 87.  "Evidence favorable to the accused" includes evidence

12   that would help impeach a witness.  *Sanders*, 873 F.3d at 801-02 (*citing Giglio v.*

13   *United States*, 405 U.S. 150, 154-55 (1972)).

14        "Under *Brady*'s suppression prong, if 'the defendant is aware of the essential

15   facts enabling him to take advantage of any exculpatory evidence,' the government's

16   failure to bring the evidence to the direct attention of the defense does not constitute

17   'suppression.'"  *Cunningham v. Wong*, 704 F.3d 1143, 1154 (9th Cir. 2013) (*quoting*

18   *Raley v. Ylst*, 470 F.3d 792, 804 (9th Cir.2006)).  Put another way, if the defendant

19   "'possessed the salient facts regarding the existence of the records he claims were

20   withheld' such that defense counsel 'could have sought the documents through

21   discovery,' there was no suppression under *Brady*."  *Id.* (*quoting Raley*, 470 F.3d at

22   804).  The Ninth Circuit recently explained that, for *Brady* purposes, a defendant is

23   aware of the existence of the materials if he "either participated personally in the

24   creation of the records or the records were disputed in the case."  *Mellen v. Winn*, 900

25   F.3d 1085, 1100 (9th Cir. 2018).

26

27   _____

28        [16]/ *Brady v. Maryland*, 373 U.S. 83 (1963).

1       Evidence is "material" within the meaning of *Brady* "when there is a reasonable

2 probability that, had the evidence been disclosed, the result of the proceeding would

3 have been different." *Turner v. United States*, ___U.S. ___, 137 S. Ct. 1885, 1893

4 (2017) (citations omitted).  A "reasonable probability" of a different result means that

5 suppressed evidence "undermines confidence in the outcome of the trial." *Id.* (*quoting*

6 *Kyles v. Whitley*, 514 U.S. 419, 434 (1995)).  In making a materiality determination,

7 courts must evaluate the withheld evidence in the context of the entire record.  *Id.*

8 Further, "[t]he mere possibility that an item of undisclosed information might have

9 helped the defense, or might have affected the outcome of the trial, does not establish

10 'materiality' in the constitutional sense."  *United States v. Agurs*, 427 U.S. 97, 109-10

11 (1976); *Barker v. Fleming*, 423 F.3d 1085, 1099 (9th Cir. 2005).

12           **2.**     **Analysis**

13              **a.**     **Impeachment Evidence on Dr. DeWitt Hunter**

14       Petitioner first argues that the prosecution withheld substantial impeachment

15 material about a county pathologist who testified during the guilt phase of trial.  (SAP

16 at 229-31, Traverse at 150-56.)

17               **(1)**     **Background Facts**

18       Jury selection in Petitioner's case commenced in November 1987, and trial

19 proceedings were completed upon Petitioner's sentencing in May 1988.  (1RT at 1;

20 42RT at 5290, 5312-14.)   In January 1988, during the guilt phase of trial, the

21 prosecution called Dr. Dewitt Talmage Hunter to testify in its case-in-chief.  (23RT at

22 3142, 3189.)  Dr. Hunter was a Riverside County pathologist who had performed over

23 5,000 autopsies.  (23RT at 3190.)  Dr. Hunter performed the autopsy on Diane Harper.

24 A criminalist employed by the California Department of Justice, Faye Springer, was

25 also present during the autopsy.  (23RT at 3191-92; *see also* 21RT at 2982.)

26       Dr. Hunter concluded that Diane Harper died from "massive cerebral contusion

27 and hemorrhage" caused by the blows to the head.  (23RT at 3204.)  The doctor testified

28 that Diane Harper's autopsy revealed "essentially two categories·of significant findings,

one was that of major trauma to the head and to the back.  And, coincidentally, minor trauma in various sites over the body.  There was physical evidence consistent with possible sexual violation."  (23RT at 3192.)

More specifically, Dr. Hunter found seven "impact-type lacerations" on Harper's head, five on the back-right side of the head, one on the left side of the forehead, and one on the top of the head.  (23RT at 3193-95.)  Harper's skull also contained fractures caused by "a large amount of force."  (23RT at 3195-96.)  Dr. Hunter opined that "a rock or brick-like instrument" inflicted the head wounds.  (23RT at 3197-98.)  He characterized the injuries as "overkill."  (23RT at 3211.)  Dr. Hunter concluded that all five of the blows to the back of Harper's head would have knocked her unconscious, and three of the blows could have independently caused Harper's death.  Dr. Hunter also saw bruises and twenty to twenty-four scratches on Harper's face and forehead. (23RT at 3199, 3201.)  Dr. Hunter testified that the facial scratches could have been caused by Harper's face being driven into the dirt, which was consistent with her body being found face-down in the dirt.  (23RT at 3200.)  Harper also had minor injuries to her right ear, which Dr. Hunter opined could have been caused by a glancing blow while she was being struck in the back of the head.  (23RT at 3200-01.)

Dr. Hunter also found injuries consistent with a blow to Harper's lower neck/upper back area.  (23RT at 3202.)  Additionally, the doctor found bruises and a scratch on the front of Harper's pelvic bone, which were consistent with someone placing pressure on her back while she was face-down.  (23RT at 3203-04.)  Harper also had scratches on her knees, elbows, and buttocks, and bruises on her elbows.  (23RT at 3204, 3225.)

Dr. Hunter examined Harper's body for evidence of sexual assault.  The doctor "saw no physical evidence to indicate" forced penetration to Harper's vagina.  (23RT at 3207.)  However, the doctor did observe reddening in "the area surrounding the vaginal entrance," which he opined could be caused by "forceful massage."  (23RT at 3207-08.)  Dr. Hunter also found that "abrasions and ill-defined contusions were

present on both inner and upper thighs."  Additionally, the doctor found "a Vaseline-like substance" on the area surrounding the vaginal opening and on the inner thighs. (23RT at 3209.)  He opined that the injuries to the inner and upper thighs were consistent with someone trying to force Harper's legs apart.  (23RT at 3210.)  Dr. Hunter concluded that all of the above "changes seen in the perineal area" were "consistent with sexual violation."  (23RT at 3210-11.)  Dr. Hunter testified that his conclusion was uncertain, but that it was 90% accurate.  (23RT at 3211.)

In his guilt-phase rebuttal closing argument, the prosecutor referred to Dr. Hunter's testimony three times.  First, the prosecutor discussed Dr. Hunter's testimony that he found a Vaseline-type substance on Harper's upper, inner thigh.  The prosecutor also mentioned the criminalist's corroborating testimony that water beaded up on Harper's thighs when Dr. Hunter was washing off the body.  (*See* 21RT at 2984.)  The prosecutor argued that the location of the petroleum substance was more consistent with rape than sodomy.  (26RT at 3557.)  Second, the prosecutor reminded the jury that Dr. Hunter testified about injuries to Harper's inner thighs that were consistent with someone trying to force her legs apart.  (26RT at 3559.)  Third, the prosecutor argued that Harper was not putting up any resistance to Petitioner after the first blow, as evidenced by Dr. Hunter's testimony that she would have been knocked unconscious. (26RT at 3564.)

Petitioner argues that "[w]hile the state presented and relied upon Dr. Hunter's testimony in Petitioner's case, the District Attorney's Office was in possession of information showing it considered Dr. Hunter incompetent, sloppy and unreliable." (SAP at 229.)  In support for that proposition, Petitioner proffers the following:

• An undated internal memo drafted by Riverside Deputy District Attorney Randall White.  The memo included an attached declaration dated April 26, 1989, and was directed to Chief Deputy District Attorney Donald Inskeep.  White alleged that "a number of homicide cases" had been "hampered by gross errors committed by" Dr. Hunter.  The deputy then

cited two examples.  In one case, Dr. Hunter testified five times over the course of two separate trials.  In the first trial, Dr. Hunter testified unequivocally that the decedent had no skull fractures.  In the second, "the testimony changed dramatically – there were indeed several skull fractures . . . ."  The deputy stated that some of the discrepancies in the doctor's testimony "could have been avoided simply by a reading of [Dr. Hunter's] own autopsy protocol."  The doctor also gave "conflicting testimonies" as to the time of the decedent's death, forcing the deputy to find other witnesses and "nearly result[ing] in jury confusion to an irreparable degree."  The deputy found Dr. Hunter's "attempted explanations . . . totally unacceptable and implausible."  In the second example, the deputy stated that Dr. Hunter gave incorrect and equivocal opinion testimony as to the time and cause of the decedent's death.  In general, the deputy reported that Dr. Hunter's testimony came off as "rather timid, unsure and unclear.  It is replete with ambiguity, while at the same time bland and uninteresting.  In short, it is generally dull and confusing."  (Dkt. 9-1 at 27.)

- A letter dated March 10, 1989 from Deputy District Attorney Dan Lough, also to Inskeep.  This deputy called Dr. Hunter to testify in a death penalty case, *People v. Seaton* (discussed in detail below).  The deputy found that the doctor had a "careless approach to reports."  Specifically, the deputy reported that despite performing the autopsy on the victim in that case, Dr. Hunter "failed to obtain and read his notes prior to testifying."  Consequently, the doctor referred to "lacerations" as "incisions," and gave questionable testimony about blood clotting that was rebutted by the defendant's expert.  The deputy concluded that Dr. Hunter was "sloppy in procedure and careless in the preparation of reports."  (Dkt. 9-1 at 30.)

- An undated memo from Deputy District Attorney Wayne Astin to Inskeep. The deputy stated that, while testifying in a 1985 murder case, Dr. Hunter "reversed in his mind the location of the damage to the victim's skull," which caused the doctor to draw an erroneous conclusion as to which blow was the cause of death. The deputy was forced to correct the doctor by showing him autopsy photographs, after which the doctor corrected some of his testimony but not as to the cause of death. The deputy stated that "[f]ortunately, the cause of death was not a critical issue in the case. Although I did not interview the jurors after the verdict, I was told they more or less thought he was incompetent." (Dkt. 9-1 at 32.)

- A letter, dated December 18, 1988, drafted by a pathologist in competition with Dr. Hunter to provide the county's pathology and toxicology services (Dr. Rene Modglin). The letter contained a paragraph discussing Dr. Hunter:

> Dr. Hunter, the only other bidder, to my knowledge is not himself a Board Certified Forensic Pathologist. Additionally, I have recently heard, there have been several cases autopsied by Dr Hunter that have created some problems for the County. Apparently a woman's body had to be exhumed somewhere out of state and a second autopsy showed it was a homicide when Dr. Hunter indicated it vas not. I heard that the second pathologist noted that the first autopsy vas a "very sloppy job." Also apparently there were some tense courtroom moments in the low desert when Dr. Hunter testified that there were photos taken

100

1                            with probes on a homicide case that vas being

2                            prosecuted.  He allegedly wouldn't be swayed

3                            from his original testimony and only after a

4                            lengthy, behind-closed-door session did he

5                            admit that he had been incorrect, causing

6                            somewhat of a problem for the prosecutor.

7                            These are only two known problems – but over

8                            such a short period of time and on such

9                            important matters.  Credibility and reputation

10                         are so important.

11   (Dkt. 9-1 at 34-35.)

12        •     Two January 1989 Riverside Press-Enterprise news articles discussing an

13             internal dispute between Riverside authorities over who would conduct an

14             autopsy in a murder case.  The district attorney's office requested Dr.

15             Modglin, citing the fact that Dr. Hunter was not board-certified by the

16             American Board of Forensic Pathology.  The county coroner, Raymond

17             Carrillo, was quoted as saying that Dr. Hunter was "board qualified" and

18             would take the examination to be certified soon.  The coroner was angry

19             about the dispute, and was also quoted as saying, "All this concern is over

20             a couple of cases he's messed up" despite the fact that Dr. Hunter had

21             "conducted thousands of autopsies, including those on homicide victims."

22             Carrillo "talked to [Dr. Hunter] and was satisfied with his explanations"

23             about the mistakes.

24   (Dkt. 9-1 at 37-39.)

25        •     Another January 1989 article in the Riverside Press-Enterprise.  The

26             article discussed a decedent, Ella Payne, and her death by hanging.  Dr.

27             Hunter performed the autopsy.  Dr. Hunter had ruled the woman's death

28             a suicide, but the woman's husband was subsequently charged in a

military tribunal with killing her.  Testimony before that tribunal accused Dr. Hunter of "overlook[ing] so many details" that insurance officials questioned whether the autopsy was done on the right person.  The body was exhumed for a second autopsy by a military doctor.  The second autopsy "supported the theory the woman had been murdered."**17/**

(Dkt. 9-1 at 41.)

### (2)   *People v. Seaton*

The *Brady* issue Petitioner raises concerning information on Dr. Hunter was previously litigated in another capital case.  *See People v. Seaton*, 26 Cal. 4th 598, 646-50 (2001).  In *Seaton*, Dr. Hunter was the pathologist who conducted the autopsy and testified at trial.  Dr. Hunter's alleged mistakes and prior criticism eventually led to various claims on appeal, including a *Brady* claim nearly identical – and based on the same facts – as Petitioner's *Brady* claim.

Petitioner proffers a May 9, 1989 declaration from Stuart Sachs, the trial attorney who represented Ronald Harold Seaton.  Sachs's declaration was made in support of Seaton's motion for a new trial.  In the declaration, Sachs stated that Dr. Hunter testified in Seaton's case on November 9, 1988.**18/**  The attorney alleged that Doctor Hunter's testimony regarding the number of times the victim was attacked, whether there was

---

**17/** The Court takes judicial notice of subsequent news articles reporting that Payne's husband was cleared and the charge dismissed.  George Frank, *Marine Cleared in Hanging Death of His Wife*, Los Angeles Times (March 29, 1989), http://articles.latimes.com/1989-03-29/local/me-682_1_marine-corps; George Frank, *Marine Once Suspect in Death Angry at Police*, Los Angeles Times (March 31, 1989), http://articles.latimes.com/1989-03-31/local/me-816_1_marine-corps. The Court may not and does not judicially notice these articles for their truth, but to more thoroughly and accurately show the information which had a bearing on Dr. Hunter's reputation. *See Von Saher v. Norton Simon Museum of Art at Pasadena*, 592 F.3d 954, 960 (9th Cir. 2010) (federal courts may take judicial notice of newspaper articles and other publications to indicate what information was in the public realm at the time).

**18/** As discussed above, Petitioner's trial ran from January to March 1988.

pre-mortem bleeding, and certain conclusions based on blood spatter was inconsistent with his autopsy findings.  Sachs claimed that the doctor also failed to bring his notes from the autopsy to testify in court.  In response to "this surprising and somewhat illogical testimony," the defense hired its own pathologist.  The defense expert contradicted Dr. Hunter's conclusions.  Sachs contended that the prosecution's case in both phases relied heavily on Dr. Hunter's testimony that the victim was attacked two separate times.

Sachs then referenced the three articles from January 1989 in the Riverside Press-Enterprise.  According to Sachs, based on those articles county coroner Raymond Carrillo was subpoenaed, and gave testimony further clarifying his remarks to the media.  Carrillo testified that there was debate about whether to have Dr. Hunter continue with county autopsies.  Those conversations occurred between December 1988 and January 1989.  During that time, Dr. Hunter admitted to Carrillo that he had made "some mistakes in the past concerning certain diagnoses in autopsies."  Carrillo then provided Sachs with two internal memos from the district attorney's office referencing "a couple of cases."  After an additional discovery request, the prosecutor in Seaton's case furnished another internal memo discussing Dr. Hunter.

Sachs drew the conclusion that:

> [I]t seems safe to say that the various memos were written in December 1988 or early January, 1989 with the expressed intent of compiling negative information about Dr. Hunter that could be forwarded by both the District Attorney's Office and Damon Reference Laboratories to Mr. Carrillo in an effort to prevent Dr. Hunter from being awarded the County contract to perform autopsies, due to his apparent reputation for incompetence.

Sachs believed that he did not have any of this new information during Seaton's trial because it "probably didn't materialize until December 1988 . . . ."

103

Sachs argued in his declaration that "the jury was given a false sense of credibility and competency" with respect to Dr. Hunter. The lawyer contended that the court should reopen testimony by both Dr. Hunter and his supervisor to be impeached with the additional information and to determine Dr. Hunter's reputation within the district attorney's office.

Sachs referenced the cases discussed in the Randall White memo (summarized above). Sachs stated that in one case Dr. Hunter "testified to minimal skull fractures and acknowledged that previously he had indicated no skull fractures. This is a perfect example of how Dr. Hunter pays such little attention to details." Sachs sought to cross-examine Dr. Hunter about that case. Sachs also referenced the Payne case, and sought to cross-examine Dr. Hunter about the Payne autopsy. (Dkt. 9-1 at 43-52.)

The trial court ultimately denied Seaton's new trial motion, and Seaton raised several related appellate issues. One of those claims alleged, as Petitioner does here, that the prosecution's failure to disclose evidence about Dr. Hunter's errors and reputation within the district attorney's office violated *Brady*. *Seaton*, 26 Cal. 4th at 646-50. More specifically, Seaton argued that the internal memos that came to light were *Brady* material that the prosecution had a duty to disclose during trial. *Id.* at 648.

The California Supreme Court found that two of the memos (the White and Astin memos) were not material for *Brady* purposes. The court first questioned the admissibility of the memos without reaching a decision on that issue.[19] The court rested its holding on the reasoning that the memos "complained about discrepancies between what Dr. Hunter observed and recorded during autopsies and what he later testified to in court," and that "[t]he information in the prosecutors' memoranda would have shown Dr. Hunter to the jury as a careless and ill-prepared witness *when testifying to his*

---

[19] *See Wood v. Bartholomew*, 516 U.S. 1, 5-6 (1995) (evidence that is inadmissible under state law is not material for *Brady* purposes).

*recollection of factual observations he had made earlier.*"  The court explained that Seaton did not "dispute that Dr. Hunter accurately described his observation of clotted blood around the murder victim" but that Seaton instead objected "to the conclusions Dr. Hunter drew from those facts. . . . their portrayal, although unflattering, would have done little to impeach his scientific explanation of the causes of the clotted blood." *Id.* at 648-49 (emphasis in original).  In applying *Brady*, the state high court reasoned that the information contained in those memos did not give rise to a reasonable probability that the jury would have rejected Dr. Hunter's expert opinion, and would then have acquitted Seaton on that basis. *Id.* at 649.

As for the internal memo related directly to the *Seaton* case, the California Supreme Court found that the prosecutor was only "expressing his doubts" about Dr. Hunter's theory on blood clotting.  The court concluded that "such doubts are not a form of impeaching evidence that must be disclosed."  The material constituted an inadmissible and irrelevant lay opinion on expert testimony.  Further, "every lawyer presenting a case at trial makes an internal assessment of the strengths and weaknesses of the witnesses as the trial proceeds.  Such assessments need not be revealed to the opposing party." *Id.*

The court in *Seaton* also found that there was no evidence to suggest the prosecutor was aware, prior to trial, of any information casting doubt on the accuracy of Dr. Hunter's testimony.  "Rather, the prosecutor's doubts about the accuracy of Dr. Hunter's testimony were apparently based on the trial testimony of a defense witness, Dr. Root.  Both defendant and the jury, of course, learned of this evidence at the same time as the prosecutor, when Dr. Root testified." *Id.*

### (3)   Analysis

Petitioner is unable to establish that the California Supreme Court's summary denial of his *Brady* claim was objectively unreasonable under AEDPA. *Richter*, 562 U.S. at 101; *LeBlanc*, 137 S. Ct. at 1728.  At the outset, none of the material supporting Petitioner's claim would constitute *Brady* evidence.  All of the memos and articles he

proffers were created in December 1988 or later.  His trial was over and his sentence formally imposed by May 1988.  (*See* 42RT at 5290, 5312-13.)   Thus, *Brady*'s suppression prong is not satisfied here.  *See Strickler v. Greene*, 527 U.S. 263, 282 (1999) (under *Brady*, "evidence must have been suppressed by the State, either willfully or inadvertently."); *see also United States v. Price*, 566 F.3d 900, 910 n.11 (9th Cir. 2009) (the "government has no obligation to produce information which it does not possess or of which it is unaware.") (*quoting Sanchez v. United States*, 50 F.3d 1448, 1453 (9th Cir.1995)).

But, Petitioner is not specifically arguing that the memos and articles were *Brady* material.  He instead attempts to paint a picture demonstrating that problems with Dr. Hunter were so pervasive that the Riverside County District Attorney's office must have raised questions internally about him by the time of trial.  The Court is mindful of Ninth Circuit precedent holding that the suppression prong of *Brady* may be met without a conclusive record as to whether the government actually possessed *Brady* material. *Price*, 566 F.3d at 910 (*citing Carriger v. Stewart*, 132 F.3d 463, 479 (9th Cir. 1997)). Where the proponent of a *Brady* claim produces "some evidence to support an inference that the government possessed or knew about material favorable to the defense and failed to disclose it," the burden shifts to the government to show that all *Brady* material was turned over.  *Id.*; *see also Kyles*, 514 U.S. at 437 ("[T]he prosecution, which alone can know what is undisclosed, must be assigned the consequent responsibility to gauge the likely net effect of all such evidence and make disclosure when the point of 'reasonable probability' is reached.").

However, "some evidence" does not mean a defendant shifts the burden by simply alleging that where there's smoke, there's fire, without any showing that exculpatory evidence existed.  *See Price*, 566 F.3d at 902, 910-11 (prosecutor revealed that a detective may have known about undisclosed criminal history of a witness whose testimony "sealed [the defendant's] fate"); *see also Carriger*, 132 F.3d at 479-80 (prosecution failed to turn over criminal records of its "star witness").  Whereas an

inconclusive record might lead to further evidentiary development, a record based on speculation does not. *Woods v. Sinclair*, 764 F.3d 1109, 1128 n.10 (9th Cir. 2014) (federal habeas petitioner was not entitled to an evidentiary hearing to develop *Brady* claim where he alleged "no facts to support his claim beyond the suspicion that the prosecution's delay in obtaining and reporting DNA test results indicates the destruction and non-disclosure of exculpatory evidence. Bare allegations, speculation, and wishful suggestions do not entitle a petitioner to an evidentiary hearing.") (citation, internal quotation marks, and brackets omitted).

Here, the record actually supports the inference that no *Brady* material existed at the time of Petitioner's trial. As stated above, the material Petitioner proffers was dated after Petitioner's trial ended. Adding to that, though, Stuart Sachs, the attorney who represented Ronald Seaton in a capital trial that ran from approximately November 1988 to January 1989, declared that the controversy surrounding Dr. Hunter "came as a complete surprise to me." His surprise was apparently due to the fact that the memos complaining about Dr. Hunter "were written in December 1988 or early January, 1989," during Seaton's trial and several months after Petitioner's trial ended. And, Sachs stated that those memos were specifically drafted by prosecutors as part of a campaign to persuade officials to award another doctor with a county contract. That assertion is evidenced by additional documents proffered by Petitioner here. (Dkt. 9-1 at 34-35, 45, 47.) There is nothing to indicate or imply that any deputy district attorney complained about Dr. Hunter in writing prior to that campaign.

Moreover, in *Seaton*, discovery was allowed on this exact *Brady* issue. Yet, even after that discovery was conducted, the California Supreme Court still concluded that "there is nothing to suggest that, before trial [in November 1988], the prosecutor was aware of any such information." *Seaton*, 26 Cal. 4th at 649. To the extent Petitioner asserts that Dr. Hunter's reputation must have been tarnished by the time of his own trial in late 1987 and early 1988, there is nothing supporting the conclusion that there was *Brady* material to this effect. *Woods*, 764 F.3d at 1128 n.10. Petitioner fails to

convince the Court that any exculpatory evidence existed or was suppressed as it concerned Dr. Hunter during the relevant period.  *Sanders*, 873 F.3d at 802; *Price*, 566 F.3d at 910 n.11.

Petitioner also fails to establish materiality.  It is here where the context of Dr. Hunter's testimony is crucial.  The primary focus of that testimony was to establish Diane Harper's cause of death.  And, unlike allegations in another case that Dr. Hunter made errors involving critical and disputed evidence, in this case there was no serious dispute over the cause of Harper's death.[20]  The doctor's findings confirmed what was fairly obvious from other testimony and photographs, that Harper was killed by forceful blows to the head.  (23RT at 3193-99, 3201, 3204, 3211.)  Also, apparently quite different from Dr. Hunter's "sloppy" and ill-prepared testimony in some other cases, at Petitioner's trial he referred several times to his autopsy notes to ensure the accuracy of his testimony.  (23RT at 3191, 3200-01, 3209, 3225-26.)  At one point, Dr. Hunter expressly used his notes to correct an error in his testimony and commented that he should have referred to them in the first place.  (23RT at 3200.)

On these facts, the reasoning of the California Supreme Court in *Seaton* applies with equal force in Petitioner's case: to the extent internal memos, had they existed yet, would have shown that Dr. Hunter could be sloppy and made errors by failing to review his notes, the sting of that impeachment evidence would have been severely curtailed by the autopsy notes in the doctor's lap at Petitioner's trial.  There is little chance – let alone a reasonable probability – that the issues which eventually came to light about Dr. Hunter's mistakes would have caused the jury in Petitioner's case to reject his expert opinion and acquit Petitioner.  *Seaton*, 26 Cal. 4th at 649; *Turner*, 137 S. Ct. at 1893.

---

[20] The tangential nature of Dr. Hunter's testimony is also evidenced by the fact that it spans a mere thirty pages of the 5300-page Reporter's Transcript.  (23RT 3189-3211, 3223-29.)

Petitioner logically hones in on a portion of Dr. Hunter's testimony in which the doctor opined that Diane Harper's body showed evidence of sexual assault or attempted sexual assault. That issue was, of course, crucial to the defense case and the special circumstance findings. But, this aspect of Dr. Hunter's testimony was corroborated by other evidence. Criminologist Faye Springer noticed Vaseline on Diane Harper's inner thighs. Springer also removed and tested one of Harper's pubic hairs and determined that a petroleum wax product like Vaseline was on it. (21RT at 2993-98.) Coupled with testimony establishing that Petitioner had Vaseline and used it to sexually assault Amy Ryan, Dr. Hunter's corroborated conclusions were only a portion of the compelling evidence that Petitioner sexually assaulted the murder victim.

Still more important, though, and as the California Supreme Court concluded in *Seaton*, there is ultimately a disconnect between the impeachment material that eventually came to light and Dr. Hunter's straightforward testimony in Petitioner's case, which was carefully moored to his autopsy notes. There is little chance that attacking the doctor's sloppy or even incompetent practices in unrelated cases would have undermined confidence in the testimony the doctor gave here, let alone the outcome of the whole trial. *Turner*, 137 S. Ct. at 1893; *Agurs*, 427 U.S. at 109-10; *Barker*, 423 F.3d at 1099.

Petitioner is not entitled to federal habeas relief for his *Brady* claim concerning issues that arose months after his trial involving Dr. Hunter. The California Supreme Court's summary denial did not amount to an erroneous application of *Brady*, let alone one so erroneous as to exceed fairminded disagreement. *Richter*, 562 U.S. at 103; *Titlow*, 571 U.S. at 19-20.

### b.    Evidence of Third Party Culpability

Petitioner argues that the prosecution failed to turn over evidence that Amy Ryan received threatening phone calls after the crimes occurred that were determined not to be connected to Petitioner. The Court summarily denies this claim because the evidence

was patently immaterial. *Turner*, 137 S. Ct. at 1893. Even assuming the defense was truly unaware of the police reports at issue, this evidence had no bearing on the trial.

Throughout the SAP, Petitioner makes numerous attempts to take advantage of Amy Ryan's predictably erratic behavior, her treatment by the police, and phone calls she received in the period after Petitioner – by the defense's own admission – sexually assaulted her and murdered her friend. And, Petitioner seeks to draw inconsistent conclusions from this evidence. On one hand, Petitioner posits that Amy was Petitioner's accomplice to her friend's murder. Conversely, here, Petitioner apparently assumes that the phone call evidence would have persuaded the jury to believe the perpetrator was the caller, and that Petitioner was not even present at the crime scene. When these fantastical theories start to break down or run contrary to each other, Petitioner reverts to the more general contention that the evidence would have helped undermine Amy's credibility, but never in ways that are convincingly material to the outcome. Put simply, this line of attack is unpersuasive, as Petitioner's trial lawyers skillfully understood.

The evidence that Petitioner was at the crime scene and that he committed the violence was overwhelming. Amy positively identified Petitioner and testified in detail about her own protracted sexual assault by Petitioner, and his statements to her about killing Diane. There was physical evidence of sexual assault on Diane's body. Petitioner's fingerprint was recovered from a beer bottle found near Diane's body. Tire impressions found near the crime scene were consistent with the tires on Petitioner's car. The cause of Diane's death was external head trauma, and Petitioner subsequently had hand and right arm injuries consistent with striking hard blows. That compelling evidence is precisely why the defense conceded the basic facts and argued that Petitioner was only guilty of second degree felony murder. In short, Petitioner has not demonstrated that there is a reasonable probability this evidence, if disclosed, would have undermined confidence in the outcome of his trial. *Turner*, 137 S. Ct. at 1893.

110

The state court's denial of Petitioner's guilt-phase *Brady* claims was reasonable under AEDPA.  Claim 12 is DENIED as to those claims.

### K.     Breakdown of Relationship with Guilt Phase Counsel/Denial of *Marsden*[21/] Motions (Claim 14)

Petitioner contends his relationship with his guilt-phase lawyer, William Barnett, was irreparably broken, and that the trial court deprived him of his right to counsel when it rejected his attempts to remove Barnett.  (SAP at 247-65; Traverse at 172-190.) The record reveals a decidedly different picture, as discussed below.

### 1.     Legal Standard

"The Sixth Amendment guarantees criminal defendants the right to effective assistance of counsel at all critical stages of the proceeding."  *Carter v. Davis*, 946 F.3d 489, 507 (9th Cir. 2019) (*quoting Coleman v. Alabama*, 399 U.S. 1, 7 (1970)). However, under clearly established Federal law, that right only guarantees "an effective advocate" and does not mean that the defendant "will inexorably be represented by the lawyer whom he prefers."  *Id.* (*quoting Wheat v. United States*, 486 U.S. 153, 159 (1988)).

The Ninth Circuit has interpreted the relevant Supreme Court precedent to mean that an irreconcilable conflict only arises "where there is a complete breakdown in communication."  *Id.* at 507 (citation omitted); *see also Schell v. Witek*, 218 F.3d 1017, 1026 (9th Cir. 2000) (the Sixth Amendment is violated where there is a "total lack of communication or other significant impediment" between the lawyer and client). Further, "[d]isagreements over strategical or tactical decision[s] do not rise to level of a complete breakdown in communication."  *Carter*, 946 F.3d at 507-08 (citations

---

[21/] Under *People v. Marsden*, 2 Cal. 3d 118, 124-25 (1970), a criminal defendant in California must be given an opportunity to explain his or her reasons for moving to substitute appointed counsel.

omitted); *see also Morris v. Slappy*, 461 U.S. 1, 13-14 (1983) (the Sixth Amendment does not guarantee a "meaningful relationship" between a defendant and counsel).

When examining whether a Sixth Amendment violation occurred, "the appropriate inquiry focuses on the adversarial process, not on the accused's relationship with his lawyer as such." *United States v. Cronic*, 466 U.S. 648, 657 n.21 (1984).

### 2.    Background Facts

Petitioner requested – and the trial court held – three separate *Marsden* hearings before and during trial.

### a.    *Marsden* Hearing #1

The first hearing was held approximately two months before jury selection commenced, on September 28, 1987.  At that hearing, Petitioner complained that Barnett had only met with him once despite Petitioner making multiple requests to see him.  Barnett responded as follows:

> I have been on this case since before the preliminary hearing.  The case was prepared to go to trial on April 24th, and I announced ready.  At that time the penalty phase attorney was not ready and requested more time; and then Paul Zellerbach, the prosecutor, agreed that they needed some more time.  So, it has come on that way.
>
> There is nothing more on this case that can be done.  Everyone has been interviewed.  The forensic evidence has all been reviewed heavily and thoroughly.  [¶] Mr. Grossman and I at preliminary hearing time spent hours with Hr. Hart.
>
> We stopped trying to visit Mr. Hart.  The investigators stopped trying to visit Mr. Hart when[,] every time they would go up[,] there were penalty phase investigators spending hours up there.  They went over daily, I guess, over reports, et cetera, with Mr. Hart.
>
> I told Mr. Hart a long time back that I was not going to come up and babysit him, and I wasn't going to come up and visit and chat, that I was

hired and appointed to prepare his case, [and] that is what I would work on; but any time Mr. Hart had any new evidence or something to add to the case, to let me know either by collect phone call or – [but] Mr Hart would send a list of questions that all had to do with why haven't I been there.

When he says no one has been interviewed, this case has been prepared and ready for trial since April 24th – well, before that.   I announced ready on the 24th.

When Mr. Hart gives me a list of questions that [do not] require my presence, the next time I see him in court I tell him the answers.  He has hated the answers.

Mr. Grossman can verify how thoroughly we talked with Mr. Hart and discussed all of the evidence with Mr. Hart, and that part of the evidence that we had to overcome, or have problems with, and that part that needs explaining.

And when Mr. Hart said to me, "Listen, didn't Judy tell you I was mad at you?"  I said, "Yeah, she did," but I said, "I am not here to run a popularity contest.  I am here to be the best you can possibly have.  That is what you have got.  If you are mad at me, I am sorry; but I am busting my ass on the case.  That is what I will do, and not visit."

So, there isn't anything to do on this case that hasn't been done, except possibly be at Mr. Hart's beck when he wants us to come up there. He has free and total access to the telephone for collect calls any time he wants to call, and they accept the charges and relay messages.

There isn't any new evidence on the case, there hasn't been from the very beginning.  That is where we are at.

1          If Mr. Hart – well, you can tell from what he said.  There isn't

2    anything I haven't done on the case for the forensic part of the case and

3    legal part of the case.  I just haven't visited him.

4    (Dkt. 96-5 at 4-6.)

5        The court asked Barnett if, in his view, the working relationship with Petitioner

6    had materially deteriorated.  Barnett answered:

7          No.  I just think what happened, when a second set of investigators

8    and a second attorney entered the case, Mr. Hart began to get daily visits

9    and all kinds of – I think Mr. Hart then wanted everybody to do this; and

10   it isn't going to help Mr. Hart's case if I come up there and spend 24 hours

11   a day with him.  What is going to help his case is for me to get a chance

12   to try it.

13         I don't think, not on my end, it has deteriorated. We talk.  I don't

14   think he is angry at me.  I just think he wants me to come and visit him

15   more, and that isn't going to help anything.

16   (Dkt. 96-5 at 6-7.)

17       Petitioner subsequently confirmed that his only concern was that he felt he did

18   not "know what is going on.  I mean, I am sitting back, you know."  Barnett agreed to

19   visit Petitioner and discuss the case, adding that "the posture of the case has not

20   changed since the day . . . of the preliminary hearing."  The court denied Petitioner's

21   request to relieve Barnett.  (Dkt. 96-5 at 7-8.)

22           **b.**    *Marsden* **Hearing #2**

23       About a month later, on October 30, 1987, Petitioner made a new request to

24   relieve Barnett.  This time, Petitioner stated that he was worried the defense was not

25   ready to start trial because – again – Barnett was not keeping Petitioner apprised about

26   the progress of the lawyer's investigations.  Petitioner also claimed that Barnett was

27   intimidating when they met, and that Petitioner was afraid to bring up questions he had

28

about the case.  Petitioner stated that he lacked confidence in Barnett and did not want him to continue as Petitioner's attorney.  (Dkt. 96-6 at 3-5.)

As in the first *Marsden* hearing, Barnett explained in detail the work that was going into the case.  He first stated that the only significant witness to the guilt phase was Amy Ryan, and that she was refusing to meet with the defense.  Barnett also explained that the defense case hinged on forensic evidence, and that the defense hired a forensic expert who had thoroughly reviewed the case.  Barnett also stated that he had already explained to Petitioner "on every occasion that we have ever talked what the evidence is and what we have to overcome."  Additionally, Barnett discussed the fact that penalty-phase defense investigators were meeting with Petitioner more frequently due to the nature of the defense's penalty-phase case.  Barnett opined that those meetings were creating an unrealistic expectation on Petitioner's part that guilt-phase investigators (and Barnett) should meet more often with him.  Finally, Barnett stated that he was not providing copies of police reports to Petitioner due to confidentiality issues, i.e., for fear of other inmates seeing the information. (Dkt. 96-6 at 5-8.) Barnett added the following:

> On any kind of a case such as this, it probably would behoove the attorney that's in it to welcome an opportunity to get off the case because these are very difficult, but that isn't my attitude.  This Court has tried cases with me, and it makes no difference whether Mr. Hart likes me.  He needs me.  He needs my expertise.  He needs the defense that I would give him, and I would give as vigorous a defense to people who don't like me as who do like me because it has nothing to do with my professional pride nor my professional ethics.

(Dkt. 96-6 at 6.)

Petitioner expressed concern that he was not privy to some other inmates who were potential prosecution witnesses.  Barnett provided the court with the names of those possible witnesses, stated that he already told Petitioner who those witnesses

were, and explained that Petitioner said he had never met them.  However, Barnett also (correctly) predicted that none of those witnesses would testify for the prosecution in the guilt phase.  (Dkt. 96-6 at 9-10.)

The court told Petitioner that Barnett had "more experience in this county with capital litigation than any other attorney in the county," and that it is sometimes sound strategy in capital cases to keep a "low profile" in the guilt phase when the evidence is extremely damaging so as to retain credibility for the penalty phase.  Petitioner stated that he understood.  The court denied the request to relieve Barnett.  (Dkt. 96-6 at 10-13, 18.)

### c. *Marsden* Hearing #3

After the evidence was complete during the guilt phase of trial, on February 4, 1988, Petitioner made his last *Marsden* motion.  This time he raised complaints about Barnett's performance.  He argued that Barnett should have challenged a pretrial lineup based on his alleged mistreatment and compulsion to participate in it without a lawyer present.  (Dkt. 97-32 at 3-4.)  The court summarily rejected Petitioner's argument, finding that the only legal basis for challenging the pretrial lineup would be that it was unduly suggestive. (Dkt. 97-32 at 4-5.) The court then, having heard the trial evidence, spoke frankly to Petitioner:

> [T]he bottom line question, . . . [is] the underlying fairness of the lineup, and I would have to make those decisions based upon what I see in terms of the picture, and what I've seen from Amy Ryan[. A]nd based upon what she said in court and so forth, it strikes me that the lineup was still fair and in all likelihood allowed in[,] and that's beyond the point of saying . . . there's lots of evidence connecting you with this offense, Mr. Hart.

(Dkt. 97-32 at 6.)  Petitioner responded, "Right, I understand that."  (Dkt. 97-32 at 6.)

The court continued:

116

1    The fingerprint, the four different tires on the car, at some point in
2    time it gets to be, the lineup almost becomes icing on the cake.  She came
3    into court, she's identified you in court and I suspect if we didn't have any
4    evidence of the lineup at all, it would make no difference in this particular
5    case in terms of tying you to the offense.  What you're guilty of is a
6    different question, but tying you to being up there with the two girls, I
7    would – I've tried not to form conclusions, I have tried to act like a juror,
8    but I have heard the evidence, and I must say from my point of view the
9    evidence against you that you were up in that area is more than
10   overwhelming.

11  (Dkt. 97-32 at 6.)  Petitioner responded, "Yes, I mean we're not disputing the fact that
12  I was up there."  (Dkt. 97-32 at 6.)

13  Petitioner also faulted Barnett for failing to impeach Amy Ryan sufficiently on
14  various aspects of her testimony, such as which of the two girls approached his car first
15  and whether the girls were feuding.  (Dkt. 97-32 at 7-10.)  The court responded that
16  some of those issues were immaterial and others were more appropriately raised in
17  Barnett's closing argument.  (Dkt. 97-32 at 9-11.)  Barnett stated that he wrote an
18  outline of that argument for Petitioner's review, so Petitioner "knows the direction of
19  the argument."  (Dkt. 97-32 at 11.)

20  Petitioner more generally complained that Barnett had failed to present "any
21  other possibilities of what else could have happened," and the court responded, "He's
22  a lawyer[,] not a magician.  I mean, seriously, what could he say?"  (Dkt. 97-32 at 13.)
23  After additional discussion about why a diminished capacity defense was not
24  appropriate under the circumstances, Petitioner stated, "I've just been sitting here . . .
25  you know, my life is on the line and I'm just sitting here wanting questions asked, and
26  I don't feel they were being asked.  It's . . . very possible, he is a lawyer, he knows what
27  he's doing and he knows the strategy . . . ."  (Dkt. 97-32 at 15.)  Petitioner subsequently
28  added: "I know, I did everything except leave my driver's license [at the crime scene]."

(Dkt. 97-32 at 17.)  After further discussion about other concerns Petitioner had such as pretrial publicity (an issue that had already been thoroughly vetted during voir dire), Petitioner stated, "I'm just, you know, my life is on the line, I am scared to death, and I felt like I have been sitting here and not saying anything that's been on my mind and I wanted to get this off my mind, the questions that have been bothering me." (Dkt. 97-32 at 20.)

The court concluded as follows:

> I see no basis, no ruling has been asked for, we've had the talk.  For the record, it strikes me [from] what I've heard here, the investigation [by defense counsel was] perhaps even more extensive than I had anticipated[,] and I anticipated even an extensive investigation, so from what I've heard here, everything brought up, you have already looked [in]to, Mr. Barnett, so I commend you on that.

(Dkt. 97-32 at 21.)

### d.    State Court Decision

The California Supreme Court affirmed the trial court's refusals to relieve Barnett as follows:

> The record amply supports each one of the trial court's rulings denying defendant's *Marsden* motions.  At the first hearing, the trial court reasonably concluded that trial counsel was prepared for trial and therefore did not need to visit defendant on a regular basis.  "[T]he number of times one sees his attorney, and the way in which one relates with his attorney, does not sufficiently establish incompetence."  At the second hearing, the trial court reasonably concluded that trial counsel's decision not to provide defendant with copies of the police reports was a tactical decision made in defendant's best interests.  At the third hearing, the trial court recognized the tactical bases for trial counsel to refrain from challenging the testimony of victim Amy R. regarding minor details of her testimony, and

118

1    reiterated the view that trial counsel's investigation had been more than

2    adequate.

3         In sum, the record is clear that the trial court provided defendant

4    with repeated opportunities to voice his concerns, and upon considering

5    those concerns reasonably found them to be insufficient to warrant

6    relieving trial counsel.  We therefore find no basis for concluding that the

7    trial court either failed to conduct a proper *Marsden* inquiry or abused its

8    discretion in declining to substitute counsel.

9  *People v. Hart*, 20 Cal. 4th at 604 (citations omitted).

10                   **e.   Petitioner's Supplemental Authority**

11       After briefing was completed in this federal habeas action, Petitioner pointed the

12  Court to a subsequently-decided Supreme Court case, *McCoy v. Louisiana*, ___ U.S.

13  ___, 138 S. Ct. 1500 (2018).  In that case, the Supreme Court held that "a defendant has

14  the right to insist that counsel refrain from admitting guilt, even when counsel's

15  experienced-based view is that confessing guilt offers the defendant the best chance to

16  avoid the death penalty." *Id.* at 1505.  In *McCoy*, the High Court also held that such an

17  error is structural, and not subject to harmless error review. *Id.* at 1511-12.  If "a client

18  declines to participate in his defense, then an attorney may permissibly guide the

19  defense pursuant to the strategy she believes to be in the defendant's best interest.

20  Presented with express statements of the client's will to maintain innocence, however,

21  counsel may not steer the ship the other way." *Id.* at 1509.  Notably, in *McCoy*, the

22  defendant "vociferously insisted that he did not engage in the charged acts and

23  adamantly objected to any admission of guilt."  *Id.* at 1505.  The defendant was

24  "furious" when his counsel told him about the plan to concede guilt, and told counsel

25  not to make the concession. *Id.* at 1506.  The defendant also testified to his innocence

26  in contradiction of his attorney's theory of the case.  *Id.* at 1507.  In essence, the

27  defendant "opposed [his lawyer's] assertion of his guilt at every opportunity, before and

28  during trial, both in conference with his lawyer and in open court." *Id.* at 1509.

The Supreme Court specifically held that, once the defendant communicated his insistence that he was innocent "to court and counsel, strenuously objecting to [the lawyer's] proposed strategy, a concession of guilt should have been off the table," and that the trial court violated the Sixth Amendment by allowing counsel to concede guilt despite the defendant's "insistent objections." *Id.* at 1512.

In Petitioner's case, the defense conceded that Petitioner was the perpetrator, but proffered that the forensic evidence only proved, at most, second-degree murder. Petitioner claims he disagreed with that approach and that his case falls within the ambit of *McCoy*. (Dkt. 133.)

### 3.   Analysis

The conclusion of the California Supreme Court was not contrary to, or an unreasonable application of, clearly established Federal law. 28 U.S.C. § 2254(d). The trial record reveals that Petitioner received from Barnett what the Sixth Amendment guarantees: "an effective advocate." *Carter*, 946 F.3d at 507; *Wheat*, 486 U.S. at 159. Petitioner's *Marsden* hearings do not reveal a lawyer and client embroiled in any measurable conflict. Petitioner never objected to Barnett's vigorous efforts on his part. Nor did Petitioner ever articulate a legitimate basis for his dissatisfaction. Instead, the record reveals that Petitioner had anxiety about the damning evidence against him as his trial date approached. And, for his part, Barnett made his strategy and reasoning abundantly clear. He did not want to waste time meeting regularly with Petitioner to discuss the evidence, but instead focus his efforts on developing a trial strategy based on challenging the prosecution's forensic evidence.

As discussed later in this Order, there were sound strategic reasons for counsel's approach to choosing a defense theory, which included remaining circumspect about impeaching the credibility of the young, living victim. There is no indication that Petitioner failed to understand his lawyer's strategy, especially since Petitioner eventually admitted that the evidence identifying him as the perpetrator gave the attorney so little to work with. *Carter*, 946 F.3d at 507 (Sixth Amendment violation

120

only occurs where there is a "complete breakdown in communication"); *Schell*, 218 F.3d at 1026 (a Sixth Amendment violation means a "total lack of communication"). Moreover, even assuming Petitioner disagreed with his attorney's strategy, that alone would not constitute an irreconcilable conflict. *Carter*, 946 F.3d at 507-08 (citations omitted). Additionally, to the extent Petitioner claimed that Barnett was intimidating, there is nothing in the record to conclude that it materially affected the defense case. *Cronic*, 466 U.S. 648, 657 n.21 ("the appropriate inquiry focuses on the adversarial process, not on the accused's relationship with his lawyer as such."); *Morris*, 461 U.S. at 13-14 (the Sixth Amendment does not guarantee a "meaningful relationship" between a defendant and counsel).

Finally, as discussed above, Petitioner did not assert his innocence, let alone vociferously. His case is far and away distinguishable from *McCoy* despite his argument to the contrary. There is no reason to conclude that Barnett conceded any fact that was not abundantly clear from the evidence, or that he did so over Petitioner's objection. (*See* Dkt. 97-31 at 33-34 (Petitioner affirmatively agreeing with defense strategy).) The fact is that Petitioner's *Marsden* motions were indicative of general angst about the evidence against him in light of the stakes, not an irreconcilable conflict with his attorney, or because Petitioner was insistent about his innocence despite counsel's concessions to the contrary. *Carter*, 946 F.3d at 507; *McCoy*, 138 S. Ct. at 1512.

Claim 14 is DENIED.

## L.    Exclusion of Impeachment Evidence of Amy Ryan (Claim 15)

Petitioner argues that the trial court committed a number of constitutional violations by excluding evidence of a lawsuit the surviving victim filed against the Riverside County Sheriff's Department. (SAP at 265-72; Traverse at 190-95.)

On direct appeal, the California Supreme Court denied Petitioner's related claim based on the following findings of fact and legal conclusions:

121

1    Amy filed a civil suit alleging that the Riverside County Sheriff's

2    Department mistreated her and lied to her at the time she reported the

3    murder of her friend, Diane.  Prior to commencement of the parties'

4    opening statements (at a hearing conducted outside the jury's presence

5    pursuant to [California] Evidence Code section 402), the trial court ruled

6    that the allegations set forth in the civil suit would be inadmissible as

7    character evidence against sheriff's department officials, but might be

8    admissible as impeachment evidence if discrepancies appeared in the

9    testimony offered at trial by Amy and the officials.

10   During trial, defendant's counsel requested a second hearing on this

11   issue outside the jury's presence.  At that hearing, counsel contended that

12   evidence pertaining to Amy's civil suit was "relevant in that it might be

13   motivation for Amy to make a stronger statement for herself, and for the

14   officers to make a protective statement for themselves."  The prosecutor

15   contended that evidence of Amy's civil suit was irrelevant and, even if it

16   were relevant, should be excluded pursuant to [California] Evidence Code

17   section 352.  In support of his argument, the prosecutor observed that "90

18   percent of the investigative reports prepared by the detectives in this case

19   or – who are the subjects of the civil lawsuit, were prepared at sometime

20   prior to the lawsuit even being filed."

21   The trial court found: "Th[is] court's confident that within the

22   meaning of Evidence Code section 352, whatever probative value that

23   evidence would have, and I can't think of very much, is substantially

24   outweighed by the probability that it . . . will first of all necessitate undue

25   consumption of time and will create a substantial danger, undue prejudice,

26   of confusing the issues, and of misleading the jurors.  [¶]  I think that what

27   goes into filing a lawsuit [–] that motivation is really impossible for us to

28   know, and what [e]ffect that lawsuit has on people testifying, especially

when there are written police reports, especially when there are statements made before a lawsuit was even conceived as a possible way to go. [¶] It strikes me that there's just not probative value to that. So, for those reasons, the court will exclude that evidence."

On appeal, defendant contends the trial court prejudicially erred in excluding evidence of Amy's civil suit. In defendant's view, evidence of that lawsuit provided a "relevant basis upon which to attack [Amy's] credibility." ([Cal.] Evid Code[] § 780.) Defendant contends that he was entitled to expose the biases or motives to lie that may have been held by the witnesses who testified against him, and that the trial court's ruling infringed upon his rights to a fair trial, to counsel, to confront the witnesses against him, to due process of law, and to a reliable verdict under the United States and California Constitutions.

. . . .

[D]efendant's contentions do not withstand scrutiny. Assuming, without deciding, that evidence of Amy's civil suit satisfied the definition of relevancy set forth in [California] Evidence Code section 210, we conclude that the trial court did not abuse its discretion in excluding the proffered evidence pursuant to [California] Evidence Code section 352. In basing its ruling upon the principles set forth in the latter statute, the trial court accepted defendant's contention – at least, for purposes of argument – that the proffered evidence had some relevance. As noted, the trial court thereafter concluded that Amy's civil suit had only minimal probative value, and that such value was substantially outweighed by the probability that presentation of the evidence would require the undue consumption of time and would create a substantial risk of confusing the issues and misleading the jurors.

. . . .

123

Here, the trial court properly could conclude the circumstance that Amy filed a civil suit against the Riverside County Sheriff's Department was of attenuated significance to the issues contested at trial, particularly inasmuch as the observations of sheriff's deputies that were material to the present case were set forth to a great extent in reports prepared well before Amy filed her civil suit, and because the deputies' observations and recollections could be tested on cross-examination on the basis of those reports. Further, the trial court properly could determine that the admission of evidence of Amy's civil suit would have permitted the focus of the testimony to shift away from the events leading to and involving the charged offenses, to the conduct of law enforcement officers after those offenses had been committed. The trial court acted within its discretion in determining that such a shift presented a substantial risk of confusing or misleading the jury.

Nor do we find any constitutional infirmity in the trial court's ruling. The court merely exercised its discretionary power to preclude examination on collateral matters. (Citation omitted.)

Finally, even if we were to assume that the trial court erred in excluding this evidence, reversal would not be warranted. Defendant's involvement in the murder of Diane Harper and the sexual assault of Amy was firmly established. His defense focused upon the nature of the sexual misconduct committed at the crime scene. Hence, under any prejudicial error standard, the asserted error was harmless. (Citations omitted.)

*People v. Hart*, 20 Cal. 4th at 604-07 (footnotes omitted); (*see also* 17RT at 2326-34.)

As is made clear by the state court's decision, the issue Petitioner raises is fundamentally an evidentiary issue governed by state law. As a result, it is not cognizable here. 28 U.S.C. § 2254(a); *McGuire*, 502 U.S. at 67-68; *Windham*, 163 F.3d

124

1    at 1103.    Petitioner's attempts to shoehorn in constitutional arguments are not

2    successful.  *Langford*, 110 F.3d at 1389; *see also Miller*, 757 F. 2d at 993-94.

3            Further, even assuming there was a viable constitutional argument to be made

4    here, AEDPA places too high of a hurdle.  Petitioner's claim, had it implicated the

5    Constitution, would concern his constitutional right to present a complete defense.  *See*

6    *Crane v. Kentucky*, 476 U.S. 683, 690 (1986) ("[T]he Constitution guarantees criminal

7    defendants a meaningful opportunity to present a complete defense.") (internal

8    quotation marks omitted).  But, for relief under AEDPA, the governing law must be

9    clearly established, and the Supreme Court has only set forth clearly established

10   principles governing the right to present a defense "in cases where defendants have

11   argued that state evidentiary rules, by their own terms, impinge upon their constitutional

12   right to present a complete defense."  *Moses*, 555 F.3d at 757.  Petitioner's argument

13   "is best interpreted as challenging the trial court's exercise of discretion" to exclude the

14   evidence under California Evidence Code section 352, and there is no Supreme Court

15   precedent squarely addressing that issue.  *Id.* at 758.  Nor has the Supreme Court clearly

16   established "'a controlling legal standard' for evaluating discretionary decisions to

17   exclude the kind of evidence at issue here."  *Id.* at 758-59 (citation omitted); *see also*

18   *Holmes v. South Carolina*, 547 U.S. 319, 326 (2006) (trial judges may exclude evidence

19   if its probative value is outweighed by other factors such as unfair prejudice, confusion

20   of the issues, or potential to mislead the jury).  Consequently, the California Supreme

21   Court's decision affirming the trial court's ruling in this case "cannot be contrary to or

22   an unreasonable application of clearly established Supreme Court precedent."  *Moses*,

23   555 F.3d at 759.

24           Finally, even beyond the confines of AEDPA, Petitioner has not demonstrated

25   that the evidentiary ruling at issue implicates his constitutional rights.  "[A] defendant's

26   right to present relevant evidence is not unlimited, but rather is subject to reasonable

27   restrictions," such as evidentiary and procedural rules.  *Moses*, 555 F.3d at 757 (quoting

28   *United States v. Scheffer*, 523 U.S. 303, 308 (1998)).  The exclusion of evidence under

such well-established evidentiary rules is unconstitutional only where it "significantly undermine[s] fundamental elements of the accused's defense." *Scheffer*, 523 U.S. at 315.  Generally, without "unusually compelling circumstances" the right to present a defense is not outweighed by the strong state interest in administration of its trials. *Moses*, 555 F.3d at 757; *Perry v. Rushen*, 713 F.2d 1447, 1452 (9th Cir. 1983).  As discussed in other sections of this Order, Barnett reasonably focused his defense of Petitioner on forensic weaknesses in the prosecution's case in lieu of attempting to implicate Amy Ryan in the crimes.  Not only would the excluded evidence have played little role in the "fundamental elements" of Petitioner's defense, it would have opened the door to an unusually risky victim-blaming strategy.  *Scheffer*, 523 U.S. at 315.  Petitioner's right to present a defense was not violated here.

Petitioner is not entitled to federal habeas relief for his challenge to the state court's evidentiary ruling.  Claim 15 is DENIED.

## M.    Prosecutorial Misconduct (Claim 16)

Petitioner raises two constitutional claims aimed at the prosecutor's conduct in the penalty phase of trial.  The first concerns testimony the prosecutor elicited and related comments the prosecutor made in his closing argument.  The second alleges that the prosecutor knowingly presented false testimony by jailhouse informant Randall Gresham.  (SAP at 272-81; Traverse at 196-202.)  The Court addresses the former argument here.  The latter subclaim is addressed later in this Order.

Petitioner argues that the prosecutor made several improper references to his own presence during various parts of the murder investigation.  Notably, after asking several witnesses to confirm that he was present at crime scenes, autopsies, etc., the prosecutor later stated in the penalty-phase rebuttal closing argument that:

> I've been living with this case for almost two years, actually, over two
> years. From the date of March 24th when I was called out to the Badlands,
> I had the unfortunate opportunity of seeing Diane Harper's body. [¶]  I
> also had the unfortunate opportunity of seeing Shelah McMahan's body.

1    [¶]  Obviously, words are insufficient by me to relate to you the feelings

2    I experienced.

3  (41RT at 5240-41.)

4  Petitioner argues that the prosecutor's comments implied personal knowledge of the

5  legitimacy of the investigation.  (SAP at 272-79; Traverse at 196-98.)

6    A prosecutor has a duty to refrain from using improper methods to procure a

7  conviction. *United States v. Hill*, 953 F.2d 452, 458 (9th Cir. 1991).  However, a

8  prosecutor must have reasonable latitude to fashion closing arguments. *United States*

9  *v. Molina*, 934 F.2d 1440, 1445 (9th Cir. 1991).  Thus, while inappropriate comments

10  by the prosecutor in the presence of the jury may constitute prosecutorial misconduct,

11  it is not enough that the prosecutor's remarks were undesirable or even universally

12  condemned.  *Darden v. Wainwright*, 477 U.S. 168, 179-81, 106 S. Ct. 2464 (1986).

13  The determinative inquiry is whether the prosecutor's comments so infected the trial

14  with unfairness as to make the resulting conviction a denial of due process. *Id.* at 181;

15  *see also Duckett v. Godinez*, 67 F.3d 734, 743 (9th Cir. 1995). It is also incumbent upon

16  Petitioner to affirmatively demonstrate he was prejudiced, *Gallego v. McDaniel*, 124

17  F.3d 1065, 1079 (9th Cir. 1997), and the actions of the prosecutor must be considered

18  in the context of the entire trial. *United States v. Weitzenhoff*, 35 F.3d 1275, 1291 (9th

19  Cir. 1993).

20    On direct appeal, the California Supreme Court ruled that the issue was waived

21  because the defense made no objection at trial to the alleged misconduct.  However, the

22  court alternatively held that:

23    even if defendant had preserved his claim and we were to assume that the

24    challenged remarks of the prosecutor constituted misconduct, we would

25    conclude that in view of the overwhelming evidence against defendant and

26    the nature of the prosecutor's comments, there is no possibility that the

27    jury would have reached a verdict more favorable to defendant in the

28    absence of these comments.

*People v. Hart*, 20 Cal. 4th at 619-20.

Petitioner has provided the Court with no guidance to define "improper vouching" under clearly established Federal law. He cites only one Supreme Court case addressing vouching, *United States v. Young*, 470 U.S. 1 (1985), a decision in which the Federal Rules of Criminal Procedure, not the Constitution, provided the relevant legal standard. *See id.* at 15. Although not controlling here, the Ninth Circuit's definition of improper vouching provides some guidance. Circuit courts have recognized two types of improper vouching by a prosecutor: "The first type consists of placing the prestige of the government behind a witness through personal assurances of the witness's veracity. The second type consists of suggesting that information not presented to the jury supports the witness's testimony." *Draper v. Rosario*, 836 F.3d 1072, 1083 (9th Cir. 2016) (citations and internal quotation marks omitted). The prosecutor's actions here do not belong in either category.

In Petitioner's case, the prosecutor merely established through various witnesses his own presence at the scene of various portions of the investigation. Then, during argument, the prosecutor commented on his own emotional reaction to seeing the bodies of the young victims. This was hardly new information to jurors, who heard graphic testimony and were shown photographs of the victims. Petitioner has failed to establish "improper vouching" under any particular standard, let alone clearly-established Federal law. *Van Patten*, 552 U.S. at 125-26.

Petitioner also falls short of demonstrating that the prosecutor's comments, or the related testimony, was so egregious that they could have rendered his trial fundamentally unfair. *Darden*, 477 U.S. at 181. Whatever speculative inference a juror might have made about the evidence after learning the prosecutor was involved in the investigation, it would have been minuscule in the context of an entire trial in which the evidence of Petitioner's guilt was overwhelming. *See Hall v. Whitley*, 935 F.2d 164, 165-66 (9th Cir. 1991) (rejecting due process challenge to prosecutor's closing argument where "put in proper context, the comments were isolated moments in a three

day trial."); *see also Comer v. Schriro*, 463 F.3d 934, 961 (9th Cir. 2006) (comment by prosecutor could not violate due process in light of strength of evidence of petitioner's guilt).

Petitioner also complains that the state court, by concluding that there was "no possibility that the jury would have reached a verdict more favorable to defendant in the absence of these comments," employed the wrong standard for determining prosecutorial misconduct. Petitioner's argument is beside the point. Indeed, the state court's language refers to the harmless error standard for reversal on appeal under state law. *See People v. Watson*, 46 Cal. 2d 818, 836 (1956) (trial error requires reversal only where it is "reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error."). That the state court *also* found Petitioner's prosecutorial misconduct claim harmless under state law does not discount the fact that it rejected the claim on the merits for reasons entirely consistent with *Darden. Richter*, 562 U.S. at 98 ("[A]s this Court has observed, a state court need not cite or even be aware of our cases under § 2254(d).").

Petitioner is not entitled to federal habeas relief for his claim of prosecutorial misconduct based on improper vouching. *Darden*, 477 U.S. at 181.

The first subclaim in Ground 16 is DENIED.

## N.    Instructional Error: Destruction of Evidence (Claim 17)

Petitioner challenges the trial court's instruction regarding consciousness of guilt and the destruction of evidence. (SAP at 281-83; Traverse at 202-03.)

### 1.    Factual Background

#### a.    Relevant Trial Evidence

Amy Ryan testified that, on the day of the crimes, Petitioner drove a brown two-door Toyota. (18RT at 2526, 2529.) She saw an orange towel on the dashboard. (18RT at 2583.) The victim also testified that the back of the car had a license plate frame that read, "Have a Nice Day." The car had two rear bumper stickers; one said "Skiier" and the other said "State Farm." (18RT at 2553-55.)

Just over a month after the crimes, homicide investigators spotted Petitioner's brown Toyota Corolla parked at his residence.  Believing it matched the vehicle described by Amy Ryan, those investigators contacted the detectives conducting the Diane Harper murder investigation.  (20RT at 2852-55, 2859-60, 2892-93.)  Those detectives went the following day to Petitioner's residence.  Petitioner's wife gave them permission to inspect Petitioner's car. (20RT at 2893-95.)  The detectives compared the car to photos taken at the crime scene.  They found that the tires on Petitioner's car matched the tire prints at the crime scene.  (20RT at 2895-96.)  Amy Ryan told the detectives there were two screwdrivers in the car, and the detectives found them. (20RT at 2897.)  The car also had several other features that Amy Ryan described, including a license plate frame that read, "Have a Nice Day," a State Farm bumper sticker, and another bumper sticker "that was partially removed."  Detectives noticed "a couple marks from a bumper sticker that had been removed from on top of the" partially-removed sticker.  (20RT at 2896-97.)  On the ground in front of the car, a detective found "a torn portion of a bumper sticker which [had] the block letters I E R on it, as well as part of a mountain skiing type scene."  (20RT at 2897-98.)  The detective observed that the removed portion of the bumper sticker was "fairly fresh looking" and had recently been torn off.  (20RT at 2900.)

While searching Petitioner's property, detectives found an orange towel.  They also found several beer bottles and cigarette butts, which were the same brand and type found at the crime scene.  (20RT at 2899-2900.)

After the sheriff's forensic department found a match between Petitioner's fingerprints and a fingerprint lifted from a beer bottle at the crime scene, detectives obtained a search warrant for Petitioner's residence.  (20RT at 2900-02.)  That search turned up additional incriminating evidence, such as jars of Vaseline – Amy Ryan testified that Petitioner used Vaseline in assaulting her, and a petroleum jelly substance was discovered on Diane Harper's inner thighs – and a brand of cigarettes that the victim described Petitioner smoking.  (20RT at 2905.)  A search of the outside

130

perimeter of the residence turned up other portions of a torn bumper sticker "that had Skiier and the skiing design on it."  Those pieces were crumpled together into a ball. (20RT at 2907-08.)  Detectives also found a pair of partially-burned tennis shoes in a 55-gallon drum that had been used as an incinerator.  (19RT at 2764-65, 2772; 20RT at 2908.)  The tread on the shoes matched shoe prints found at the crime scene.  (20RT at 2909.)

Petitioner's father-in-law testified that, at some point prior to Petitioner's arrest, he noticed that Petitioner had used three pieces of plywood to conceal the brown Toyota on the property.  The father-in-law assumed Petitioner was hiding the car from a bill collector.  (22RT at 3037-38.)  He also noticed that a yellow sticker saying "Caution Child in Car" had been put on the rear window shortly before Petitioner's arrest.  (22RT at 3040.)  There was also testimony that Petitioner changed his hairstyle to some degree before he was put in a lineup and positively identified by Amy Ryan, and that he changed it back the next day.  (20RT at 2882-83.)

Finally, after the crimes were committed, Diane Harper's purse and belongings were found in a local reservoir.  (19RT at 2707-13.)

### b.    Proceedings Concerning the Jury Instruction

The prosecutor requested that the court include CALJIC No. 2.06 in the jury instructions, California's standard instruction concerning a defendant's attempts to suppress evidence and the jury's option to consider those attempts as consciousness of guilt. The court inquired whether the prosecutor requested the instruction based on "the shoes among other things and bumper sticker" as well as "hiding the car with the plywood and possibly changing appearance and so forth."  The prosecutor replied, "Yes, Your Honor."  The defense did not object and the court agreed to give the instruction.  (26RT at 3434.)  Neither this instruction nor the evidence supporting it played any part in closing arguments, as the defense theory of the case conceded that Petitioner killed one victim and sexually assaulted the other.

The trial court ultimately gave the jury CALJIC No. 2.06 as follows:

1    If you find that a defendant attempted to suppress evidence against
2    him in any manner, such as by destroying evidence or by concealing
3    evidence, such attempts may be considered by you as a circumstance
4    tending to show a consciousness of guilt.  However, such evidence is not
5    sufficient in itself to prove guilt and [its] weight and significance, if any,
6    are matters for your consideration.

7    (26RT at 3468); *see* CALJIC No. 2.06.

8                        **c.    State Court Decision**

9    On direct appeal, the California Supreme Court denied Petitioner's challenge to
10   CALJIC No. 2.06, in pertinent part, as follows:

11   In the present case, the record discloses evidence that, after Diane
12   was murdered, defendant disposed of her purse, including her
13   identification, at Lake Matthews, removed and replaced bumper stickers
14   on his car, burned a pair of tennis shoes, and used plywood to shield his
15   car from view.  Furthermore, when defendant was arrested, he wore his
16   hair parted in. the middle, wavy and fluffy, similar to the style Amy had
17   described, but at the in-person lineup, defendant wore his hair wet or oily,
18   and combed straight back.  The next day, defendant returned to his
19   previously preferred "dry look."

20   The jury reasonably could infer from the foregoing evidence that
21   defendant attempted to suppress evidence.  Actual destruction of that
22   evidence was not required.  The trial court therefore properly instructed
23   the jury pursuant to CALJIC No. 2.06.

24   *People v. Hart*, 20 Cal. 4th at 621.

25                        **2.    Legal Standard**

26   Generally, claims regarding improper jury instructions are not cognizable on
27   federal habeas review.  *McGuire*, 502 U.S. at 71-72 ("[T]he fact that an instruction was
28   allegedly incorrect under state law is not a basis for [federal] habeas relief").  Instead,

a petitioner must show that the challenged instruction "so infected the entire trial that the resulting conviction violates due process." *Henderson v. Kibbe*, 431 U.S. 145, 155 (1977); *see also McGuire*, 502 U.S. at 75 (noting that erroneous jury instructions may not serve as the basis for habeas relief unless they have "so infused the trial with unfairness as to deny due process of law.").

Thus, a federal court's inquiry on habeas review is not whether the challenged instruction "is undesirable, erroneous, or even 'universally condemned,' but [whether] it violated some right which was guaranteed to the defendant by the Fourteenth Amendment." *Cupp v. Naughten*, 414 U.S. 141, 146 (1973). "[N]ot every ambiguity, inconsistency, or deficiency in a jury instruction rises to the level of a due process violation." *Middleton v. McNeil*, 541 U.S. 433, 437 (2004). Moreover, "a single instruction to a jury may not be judged in artificial isolation, but must be viewed in the context of the overall charge." *Boyde v. California*, 494 U.S. 370, 378 (1990) (citation omitted). If a petitioner fails to demonstrate that the instructional error violated his right to due process, he fails to establish that the jury instructions were contrary to federal law and his claim must be denied. *See Henderson*, 431 U.S. at 155.

A "permissive inference" in a jury instruction "suggests to the jury a possible conclusion to be drawn if the State proves predicate facts, but does not require the jury to draw that conclusion." *Francis v. Franklin*, 471 U.S. 307, 314 (1985). "A permissive inference does not relieve the State of its burden of persuasion because it still requires the State to convince the jury that the suggested conclusion should be inferred based on the predicate facts proved." *Id.* Consequently, "[a] permissive inference violates the Due Process Clause only if the suggested conclusion is not one that reason and common sense justify in light of the proven facts before the jury." *Id.* at 314-15 (*citing Cty. Court of Ulster Cty. v. Allen*, 442 U.S. 140, 157-63 (1979)). "Ultimately, the seminal Supreme Court cases on this issue all say the same thing: a permissive inference violates due process when the presumed fact does not follow from the facts established." *Hall v. Haws*, 861 F.3d 977, 991 (9th Cir. 2017).

### 3.  Analysis

The California Supreme Court's conclusion was not contrary to, or an unreasonable application of, clearly established Federal law.  28 U.S.C. § 2254(d).

Petitioner's argument is that the evidence did not support giving CALJIC No. 2.06.  He claims the record is devoid of facts showing that any of the evidence at issue was actually destroyed or suppressed, let alone intentionally or due to a consciousness of guilt. (SAP at 282.) Petitioner's contention is unpersuasive.  The instruction at issue concerned attempts "to suppress evidence . . . in *any* manner."  (26RT at 3468 (emphasis added).)  A bumper sticker was partially scraped off of Petitioner's car.  A pair of shoes was partially burned.  Plywood was put over Petitioner's car in a way that concealed it.  A new sticker had been put on the car.  The victim's purse turned up in a reservoir.  Petitioner changed his hairstyle for a single day, when he was also appearing in a lineup.  All of these facts patently constitute evidence of attempts to suppress evidence.   Petitioner cannot plausibly claim that the instruction was unsupported by the evidence, or that the inference of evidence suppression did not follow from those facts. *Francis*, 471 U.S. at 314-15; *Hall*, 861 F.3d at 991.

Additionally, the jury was instructed that it *may* consider that evidence as consciousness of guilt.  Under the circumstances, CALJIC No. 2.06 was squarely a constitutional permissive inference instruction. *Francis*, 471 U.S. at 314.  That being the case, the prosecution was not required to definitively prove that the evidence at issue was suppressed, only that the suggested conclusion was "one that reason and common sense justify in light of the proven facts before the jury." *Id.* at 314-15; *Allen*, 442 U.S. at 157-63.  The Court concludes that the circumstances cited by the trial court in allowing the instruction, and the California Supreme Court in upholding it, certainly led to a common-sense conclusion that Petitioner made efforts to hide evidence of his crime and identity as the perpetrator.  Here, there is no due process violation. *Hall*, 861 F.3d at 991.

1      Petitioner has otherwise failed to show any constitutional infirmity in CALJIC

2 No. 2.06, particularly in light of the proceedings as a whole.  In the end, Petitioner's

3 consciousness of guilt was irrelevant; the evidence implicating Petitioner as the

4 perpetrator was overwhelming to the point that the defense reasonably chose not to

5 dispute it.[22]  Therefore, the challenged instruction could not have "so infected the entire

6 trial that the resulting conviction violates due process."  *Henderson*, 431 U.S. at 155;

7 *Boyde v. California*, 494 U.S. at 378.

8      Claim 17 is DENIED.

9      **O.**    **Instructional Error: Failure to Clarify Elements (Claim 18)**

10      Petitioner argues that the trial court violated various constitutional rights by

11 failing to clearly differentiate the consequences of sodomy and rape on the murder

12 charges and special circumstance findings.  (SAP at 283-88; Traverse at 203-04.)

13                **1.**    **Background Facts**

14                      **a.**    **The Defense Theory**

15      The prosecution tried Petitioner for murder under several alternate theories.  Two

16 of those were first degree murder theories.  The jury could find Petitioner guilty of first

17 degree murder in one of two ways: (1) willful, deliberate, and premeditated murder; or

18 (2) felony murder based on the allegation that Petitioner killed Diane Harper in the

19 commission or attempted commission of rape.  (*See* 26RT at 3479-81, 3511-14.)

20      At the time of Petitioner's trial, California Penal Code section 189 limited the

21 types of sex offenses that could support a conviction of first degree felony murder.

22 Although those enumerated offenses included rape, they did not include sodomy.[23]

23 _____

24    [22] The record reflects that the prosecutor requested this instruction before he learned

25 the defense's theory of the case.  (26RT at 3434, 3495-96.)

26    [23] The California Legislature later amended the statute pursuant to a voter initiative

27 known as the Crime Victims Justice Reform Act, approved by voters as Proposition

28 115, on June 5, 1990.  *See Raven v. Deukmejian*, 52 Cal. 3d 336, 340, 344 (1990).  State

                                      (continued...)

1  Hence, the prosecution's first degree felony murder allegation was limited to the

2  commission of rape as a predicate offense.

3      However, once the jury found Petitioner guilty of first degree murder, the special

4  circumstance allegations brought sodomy back into the jury's consideration – sodomy

5  is (and was) included on the list of enumerated special circumstances which, if found

6  true, support the imposition of the death penalty.  Cal. Penal Code § 190.2(a)(17)(D).

7  Petitioner's jury was instructed accordingly.  (26RT at 3482-84.)

8      Additionally, Petitioner's jury was given the option of convicting Petitioner of

9  *second* degree felony murder.  A killing that occurred during the commission of sodomy

10  *would* constitute second degree felony murder, and the jury was instructed accordingly.

11  *See* Cal. Penal Code §§ 187(a), 189(b); (26RT at 3478, 3481-82.)

12      Given the overwhelming evidence that Petitioner was the perpetrator of the

13  crimes against Amy Ryan and Diane Harper, these legal distinctions formed the basis

14  of Petitioner's guilt-phase defense.  Petitioner's lawyer argued to the jury that Petitioner

15  had only committed sodomy, not rape, and that Petitioner had not acted with

16  deliberation or premeditation in killing Diane Harper.  In other words, defense counsel

17  sought to persuade the jury that Petitioner was guilty of no more than second degree

18  felony murder in the hope of sparing Petitioner from a penalty phase and possible death

19  sentence.  (26RT at 3536-45.)

20              **b.    Relevant Jury Instructions**

21      The trial court read the murder charge and related allegations.  (26RT at 3475-

22  76.)  The court then summarized the elements of murder in general, providing that:

23          each of the following elements must be proved:  [¶]  Number One, that a

24          human being was killed,  [¶]  Number Two, that the killing was unlawful,

25

26  _____

27      [23]/(...continued)

28  law now includes sodomy among the enumerated crimes that may support a first degree
    felony murder conviction.  Cal. Penal Code §§ 189, 286.

and    [¶]    Number Three, that the killing was done with malice aforethought, or occurred during the commission or attempt to commit rape, or occurred during the commission or attempt to commit a felony inherently dangerous to human life.   Sodomy is a felony inherently dangerous to human life.

(26RT at 3478.)

Next, the court set forth the elements of each murder theory in detail.  The court started by introducing and defining one theory of first degree murder: a willful, deliberate and premeditated killing.  (26RT at 3479-80.)  Then, the court discussed and defined felony first degree murder.  Specifically, the court explained that first degree felony murder was an unlawful killing "which occurs as a result of the commission of or attempt to commit the crime of rape, . . . ."  (26RT at 3481.)  Next, the court moved to the various types of second degree murder.  The court instructed the jury that second degree felony murder was an unlawful killing "which occurs as a direct causal result . . . of the commission of or attempt to commit a felony inherently dangerous to human life, namely, the crime of sodomy, . . . ."  (26RT at 3481-82.)

After finishing the instructions addressing the murder charge, the court instructed the jury on the special circumstance allegations.  Specifically, the court provided that:

If you find the defendant in this case guilty of murder of the first degree, you must then determine . . . if the murder was committed under one or more of the following special circumstances:  [¶]  That the murder was committed while the defendant was engaged in the commission of, attempted commission of, or the immediate flight after committing or attempting to commit a *rape or sodomy*[.]

(26RT at 3482-83 (emphasis added).)  The court then more fully set forth the elements required to prove the special circumstance allegations:

To find that either of the special circumstances referred to in these instructions as murder in the commission of, attempted commission of, or

1   the immediate flight after committing or attempting to commit a rape or
2   sodomy, is true, it must be proved; [¶] Number One, that the murder was
3   committed while the defendant was engaged in the commission or
4   attempted commission or the immediate flight after committing or
5   attempting to commit a rape or sodomy. [¶] Number Two, that the
6   defendant intended to kill a human being. [¶] Number Three, that the
7   murder was committed in order to carry out or advance the commission or
8   attempted commission of the crime of rape or sodomy. In other words, the
9   special circumstance referred to in these instructions is not established if
10  the rape or sodomy or attempted rape or sodomy was merely incidental to
11  the commission of the murder.

12  (26RT at 3483-84.)

13      The trial court also expressly instructed jurors to consider the charges and special
14  circumstance allegations separately. (26RT at 3483, 3489-90.)

### c.      Prosecutor's Relevant Arguments

16      In his closing argument, the prosecutor read and discussed the jury's instructions.
17  In doing so, the prosecutor further clarified (and editorialized) the distinction between
18  the murder theories as it concerned the commission of rape or sodomy:

19      We have our standard murder theory, I guess as far as criminal law
20      is concerned, and the standard or customary murder legal theory is that
21      there must be malice aforethought for a murder. And to raise that murder
22      from second degree to first degree, there must be premeditation and
23      deliberation. That's one road to travel, one legal theory, and there's a
24      totally and separate distinct road that you can travel that's called the
25      Felony Murder Rule.

26          . . .

27
28

138

1       Now, we're going to go to the Felony Murder Rule and, again, the

2  law is going to appear to you possibly to be a little strange in this area with

3  respect to the crime or killing being a first degree murder[.]

4       . . .

5       What's interesting is that the law distinguishes a rape or attempt to

6  commit rape from a sodomy or attempt to commit sodomy.  I can't tell you

7  why, but I think – well, that's the law.  You have to live and abide by the

8  law.

9       If you believe, for the sake of argument, that the killing occurred

10  during a sodomy or attempt[ed] sodomy, then it's going to be a second

11  degree felony murder.  The law distinguishes between a rape and a

12  sodomy.  If someone is killed during the course of a rape or an attempt to

13  commit rape, the law says that's more serious than a sodomy[. ] I don't

14  know why, for the life of me, I couldn't figure that·one out, but

15  nonetheless that's the law.

16       If the killing occurred during a sodomy or attempt at sodomy, then

17  it's second degree [] felony murder[. ] [I]f it's a rape or attempt to commit

18  rape, it's a first degree felony murder.  As far as my thinking is concerned

19  there shouldn't be any distinction between the two, but I don't make the

20  laws, so that's just the situation we have.

21       It's kind of interesting that if a criminal, any criminal, decides to kill

22  somebody, let's say that he wants to sodomize this person rather than rape

23  him, the law is almost going to reward him because he chose one means

24  of sexual assault versus another.  Again, that's the law.

25  (26RT at 3511, 3513-14.)

26       As for the special circumstance allegations, the prosecutor emphasized to the jury

27  that those were distinct from the charged crimes:

28

1    But, again, you only consider the special circumstance allegations

2    if you have found Mr. Hart guilty of first degree murder, because that's

3    what's going to determine whether or not we go to the second phase of the

4    trial.  [¶]  If Mr. Hart is found guilty of second degree murder, that's it.

5    You don't have to worry about the special circumstance allegations, and

6    you don't have to worry about a second phase to this trial, we'll stop right

7    there, as far as a presentation of evidence is concerned.

8    (26RT at 3496-97.)

9    ### 2.    California Supreme Court Decision

10    The state high court denied Petitioner's related instructional error claim on direct

11    appeal as follows, in pertinent part:

12    At trial, the prosecution's theory of the case was that defendant's

13    effort to entice the girls into his vehicle and drive them to a remote area

14    was part of a premeditated plan to commit rape, and that the murder of

15    Diane was committed in the course of perpetrating rape.  As noted, the

16    defense did not deny that defendant was the man who took the girls to the

17    remote area and assaulted them, killing Diane; instead, defense counsel

18    argued to the jury that the evidence suggested Diane had been killed in the

19    course of defendant having committed, or having attempted to commit,

20    sodomy, and therefore supported no more than a verdict of second degree

21    felony murder.

22    The trial court instructed the jury on the law of murder (CALJIC

23    No. 8.10 (1983 rev.)), further explaining the elements of first and second

24    degree murder as well as felony murder.  With respect to the latter theory,

25    the trial court instructed the jury that under·the law applicable·at the time,

26    a killing committed during the course of a rape or attempt to commit rape

27    was first degree felony murder, and that a killing committed during the

28

140

1    course of a sodomy, or attempt to commit sodomy, was second degree

2    felony murder.  Defendant did not object to any of these instructions.

3         Defendant now contends that the jury instructions were

4    impermissibly ambiguous and that the trial court failed to fulfill its sua

5    sponte duty to offer clarifying instructions informing the jury that a first

6    degree murder *could not* be based upon the underlying felony of sodomy

7    or attempted sodomy, even though first degree murder committed in the

8    commission of such crimes *could* support a special circumstance finding.

9    . . .

10        [The] jury instructions were not ambiguous.  The jurors were

11   instructed that if they found defendant guilty of murder in the first degree,

12   then they were to determine whether either special circumstance was true.

13   The jurors also were instructed to decide each special circumstance

14   separately.  These instructions correctly stated the law; if defendant

15   wanted additional, clarifying instructions, he should have requested them.

16   No ambiguity appearing, the trial court complied with its duty to "fully

17   instruct the jury on the law applicable" and had no duty to further instruct

18   the jury.

19   *People v. Hart*, 20 Cal. 4th at 621-22 (citations and footnote omitted, emphasis in

20   original).

21              **3.    Analysis**

22        The California Supreme Court's reasoning was not contrary to, or an

23   unreasonable application of, clearly established Federal law. 28 U.S.C. § 2254(d). "An

24   omission, or an incomplete instruction, is less likely to be prejudicial than a

25   misstatement of the law." *Henderson*, 431 U.S. at 155. Petitioner fails to establish that

26   additional clarifying instructions were constitutionally required here. He does not argue

27   that the jury instructions misstated the law. His premise is that the *law* was confusing

28   and that the trial court either clumsily or inadequately attempted to untie the knots for

the jury.  It is certainly correct that the legal distinction between rape and sodomy required an explanation, and that it required jurors to separately consider the allegations without conflating them.  It was also essential that the jury consider the special circumstance allegations separately so as not to confuse them with elements of the charged crimes.  But, the jury was instructed accordingly.  Petitioner's contention that the jury was still confused in the absence of more instructions "is too speculative to justify the conclusion that constitutional error was committed."  *Henderson*, 431 U.S. at 157.

The Court's conclusion is bolstered when the instructions are considered in proper context.  *Boyde v. California*, 494 U.S. at 378.  The legal distinction between sodomy and rape as it concerned first and second degree murder was *central* to the closing arguments.  The prosecutor explained it in detail, and the defense rested its entire case on it.  Jurors were not left to wade through a thicket of confusing jury instructions; they were correctly instructed on the law, and then the attorneys focused them on the central issue.  Petitioner is unable to rebut the presumption that the jury followed its instructions, *Spencer*, 857 F.3d at 803; *Weeks*, 528 U.S. at 234, and he has not shown that lack of further clarity "so infected the entire trial that the resulting conviction violates due process."  *Cupp*, 414 U.S. at 147; *Henderson*, 431 U.S. at 154; *McGuire*, 502 U.S. at 75.

Petitioner fails to establish an extreme malfunction in California's criminal justice system based on the failure to give clarifying instructions here.  *Richter*, 562 U.S. at 102.  Claim 18 is DENIED.

## P.    Insufficient Evidence of Guilt (Claim 19)

Petitioner contends the evidence was insufficient to prove he committed any of the offenses, or to find the special circumstances true.  As to Diane Harper's death, Petitioner argues that there were no eyewitnesses and there was no evidence to prove his mental state.  He also contends there was no physical evidence to prove the sex crimes committed against Harper.  As to Amy Ryan, Petitioner again points to a lack

1  of physical evidence to prove that he sexually assaulted her, and he asserts that she was

2  not a credible witness.  (SAP at 288-93; Traverse at 205-07.)  None of Petitioner's

3  arguments pass muster under the long-established constitutional standard governing

4  insufficient evidence claims.

### 1. Legal Standard

6  The United States Supreme Court has "made clear that [insufficient evidence]

7  claims face a high bar in federal habeas proceedings because they are subject to two

8  layers of judicial deference." *Coleman v. Johnson*, 566 U.S. 650, 651 (2012) (per

9  curiam).

10  The first layer is the standard of review for insufficient evidence claims, which

11  has long been "whether, after viewing the evidence in the light most favorable to the

12  prosecution, *any* rational trier of fact could have found the essential elements of the

13  crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)

14  (italics in original); *Lucero v. Holland*, 902 F.3d 979, 990 (9th Cir. 2018).  Under this

15  standard, "it is the responsibility of the jury – not the court – to decide what conclusions

16  should be drawn from evidence admitted at trial." *Cavazos v. Smith*, 565 U.S. 1, 2

17  (2011) (per curiam).  Consequently, "[a] reviewing court may set aside the jury's

18  verdict on the ground of insufficient evidence only if no rational trier of fact could have

19  agreed with the jury." *Id.*; *see also Johnson*, 566 U.S. at 656 ("[T]he only question

20  under *Jackson* is whether [the jury's] finding was so insupportable as to fall below the

21  threshold of bare rationality.").

22  The *Jackson* standard "gives full play to the responsibility of the trier of fact

23  fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw

24  reasonable inferences from basic facts to ultimate facts." *Jackson*, 443 U.S. at 319.

25  Consequently, a reviewing court "faced with a record of historical facts that supports

26  conflicting inferences must presume – even if it does not affirmatively appear in the

27  record – that the trier of fact resolved any such conflicts in favor of the prosecution, and

28  must defer to that resolution." *Id.* at 326; *McDaniel v. Brown*, 558 U.S. 120, 133

143

1  (2010).  A jury's credibility determinations receive "near-total deference under
2  *Jackson*."  *Bruce v. Terhune*, 376 F.3d 950, 957 (9th Cir. 2004); *see also Schlup v.*
3  *Delo*, 513 U.S. 298, 330 (1995) ("[U]nder *Jackson*, the assessment of the credibility of
4  witnesses is generally beyond the scope of review.").

5        The second layer is the "additional layer of deference" under AEDPA.  A
6  petitioner must also establish that the state court unreasonably applied the *Jackson*
7  standard to the facts of the case.  *Emery v. Clark*, 604 F.3d 1102, 1111 n.7 (9th Cir.
8  2010); *Juan H. v. Allen*, 408 F.3d 1262, 1274-75 (9th Cir. 2005).  More specifically, "a
9  federal court may not overturn a state court decision rejecting a sufficiency of the
10  evidence challenge simply because the federal court disagrees with the state court.  The
11  federal court instead may do so only if the state court decision was 'objectively
12  unreasonable.'"  *Cavazos v. Smith*, 565 U.S. at 2 (*quoting Renico v. Lett*, 559 U.S. 766,
13  773 (2010)); *Lucero*, 902 F.3d at 991.

14                    **2.      Crimes Against Diane Harper**

15        "Insufficient evidence claims are reviewed by looking at the elements of the
16  offense under state law."  *Maquiz*, 907 F.3d at 1218 (citation omitted)).  In its opinion
17  on direct appeal, the California Supreme Court set forth the relevant elements of the
18  challenged offenses under state law.  Since "a state court's interpretation of state law,
19  including one announced on direct appeal of the challenged conviction, binds a federal
20  court sitting in habeas corpus," *Richey*, 546 U.S. at 76, this Court defers to the state's
21  supreme court's recitation of those elements:

22        Murder is the unlawful killing of a human being with malice aforethought.
23        As pertinent here, all murder which is perpetrated by any kind of willful,
24        deliberate, and premeditated killing is murder of the first degree.  The
25        mental state required is, of course, a deliberate and premeditated intent to
26        kill with malice aforethought.  Similarly, all murder which is committed
27        in the perpetration of, or attempt to perpetrate certain enumerated felonies,
28        including rape, is murder of the first degree.  The mental state required is

1    simply the specific intent to commit the underlying felony; neither intent

2    to kill, deliberation, premeditation, nor malice aforethought is needed.

3    There is no requirement of a strict causal or temporal relationship between

4    the felony and the murder.  All that is demanded is that the two are parts

5    of one continuous transaction.  There is, however, a requirement of proof

6    beyond a reasonable doubt of the underlying felony.

7  *People v. Hart*, 20 Cal. 4th at 608-09 (citations, brackets, and internal quotation marks

8  omitted).)

9        The Court's task is not to determine whether the state court's analysis was wrong,

10 but whether it was so lacking in justification that there is no possibility for fairminded

11 disagreement.  *Richter*, 562 U.S. at 103.  Here, the state court reasonably pointed to the

12 manifest evidence that satisfied *Jackson*: Dr. Hunter's autopsy revealed that at least five

13 forceful blows – likely with the use of a rock or a brick – were inflicted to the back of

14 Diane Harper's head, fracturing her skull and driving her face six inches into the

15 ground.  Petitioner's shoe print was found next to Harper's body.  Amy Ryan testified

16 that Petitioner told her that Harper called him names and, as a result, was likely dead.

17 *People v. Hart*, 20 Cal. 4th at 609.  It was objectively reasonable for the state court to

18 conclude that this evidence was constitutionally sufficient to prove deliberate and

19 premeditated murder.  *Cavazos v. Smith*, 565 U.S. at 2; *Lucero*, 902 F.3d at 990-91.

20       Similarly, the state court reasonably concluded that the evidence was

21 constitutionally sufficient to find Petitioner guilty under a felony murder theory, i.e.,

22 that Petitioner killed Diane Harper while he was engaged in raping her or attempting

23 to rape her.  Again, the state court pointed to the evidence showing guilt: Harper's body

24 was found naked from the waist down with her underwear wrapped around one leg.

25 Her thighs had scrapes, bruises, and the presence of a foreign pubic hair.  Her vagina

26 showed reddening, and a Vaseline-like substance  – the same one used to rape Amy –

27 was found on her upper, inner thighs.  Moreover, Amy Ryan testified that, while

28 Petitioner attempted to sodomize her, he explained that his difficulty obtaining an

145

erection was because he "just got it on with your friend." *People v. Hart*, 20 Cal. 4th at 609-10.  Petitioner's attempts to attack the credibility of this evidence does nothing to satisfy the double deference required here.  It was not objectively unreasonable for the state court to conclude that a rational jury could find Petitioner guilty of first degree murder under a felony murder theory based on this evidence. *Jackson*, 443 U.S. at 319; *Cavazos v. Smith*, 565 U.S. at 2.

The same goes for the state court's conclusion regarding the rape and sodomy special circumstances.  Petitioner attempts to focus on gray areas in the evidence such as the lack of vaginal injuries to Harper and the lack of proof that she was alive when she was assaulted.  These assertions again ignore the legal standard governing this Court's review.  Viewing the evidence, as this Court must, in the light most favorable to the prosecution, *Jackson*, 443 U.S. at 319, a rational jury could certainly infer from the evidence – a body found naked from the waist down, underwear wrapped around one leg, scrapes, bruises, a foreign pubic hair on the thigh, vaginal reddening and the presence of a lubricant – that Petitioner killed Diane in the course of forcibly raping or trying to rape her.  Adding to that, Petitioner's statements that Diane was calling him names and that he "just got it on with" her, while not conclusive proof of when he raped or attempted to rape her, certainly adds to the reasonable inference that Petitioner committed the acts while Diane was still alive. *Cavazos v. Smith*, 565 U.S. at 2; *Lucero*, 902 F.3d at 990-91.  It was reasonable for the California Supreme Court to conclude that the evidence was sufficient under *Jackson* to support the jury's special circumstance findings.

### 3.    Crimes Against Amy Ryan

Perhaps Petitioner's emptiest argument is that there was insufficient evidence that he raped or sodomized Amy despite her pointed testimony to the contrary.  The California Supreme Court denied this claim as follows:

> Defendant contends that the evidence relating to the sexual offenses committed against Amy was insufficient.  In fact, however, the evidence

146

was abundant.  Amy's own testimony, which provided graphic detail of the attack, would have been sufficient by itself.  That testimony was corroborated by physical evidence: seminal fluid was found on Amy's slip, bruises and abrasions were found on her body, her perineum was injured and there was much sand in this area, and sand-type particles also were found inside her vagina.  In addition to the emergency room physician's testimony voicing the opinion that Amy had been sexually assaulted, and Amy's own testimony to the same effect, the physical evidence clearly was sufficient to support defendant's conviction of the sexual offenses committed against her.

*People v. Hart*, 20 Cal. 4th at 611-12.  It is unnecessary to retread the principles articulated above.  Suffice it to say that the state court's analysis and conclusion as it concerned the crimes against Amy Ryan were not remotely contrary to, or unreasonable applications of, clearly established Federal law, and were based upon a reasonable interpretation of the trial facts.  28 U.S.C. § 2254(d).  To the extent Petitioner argues that Amy was simply not to be believed, that is not for this Court to decide.  *Walters v. Maass*, 45 F.3d 1355, 1358 (9th Cir. 1995) (on federal habeas review, "[t]he reviewing court must respect the province of the jury to determine the credibility of witnesses, resolve evidentiary conflicts, and draw reasonable inferences from proven facts by assuming that the jury resolved all conflicts in a manner that supports the verdict."); *Jackson*, 443 U.S. at 326 (" a federal habeas corpus court faced with a record of historical facts that supports conflicting inferences must presume – even if it does not affirmatively appear in the record – that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution.").

The lynchpin of all of Petitioner's arguments is that various charges were not conclusively proven with direct, physical and indisputable evidence, or that alternative scenarios were possible.  However, Petitioner did not dispute that he drove both teenage victims to a remote area, and that one of them was killed.  Amy Ryan testified that

147

Petitioner and Harper walked away together, and Petitioner came back alone.  Petitioner then hit Amy Ryan on the back of the head with a rock, beat her, sodomized her, forced her to orally copulate him, and raped her using a lubricant.  Later, the police found Harper's body naked from the waist down, head brutally beaten into the ground, with scratches, bruises, and lubricant on her thighs.  One might imagine any number of scenarios that are theoretically possible – including Petitioner's assertion that Amy Ryan participated in her friend's murder.  However, it is clearly established that a jury may draw *reasonable* inferences from trial facts.  *Jackson*, 443 U.S. at 319.  The jury made a reasonable inference that Petitioner killed Harper, that he either did so with premeditation or during the course of rape, and that he committed the charged sexual offenses against Amy Ryan.  The California Supreme Court did not offend *Jackson* by affirming the jury's patently reasonable conclusions.  *Cavazos v. Smith*, 565 U.S. at 2.

### 4. Deference to State Law

Finally, Petitioner's assertion that the state court "articulated the wrong standard regarding felony murder" invites a federal court down a prohibited road.  It is not for this Court to question the California Supreme Court's interpretation of California's felony murder principles.  *Richey*, 546 U.S. at 76; *McGuire*, 502 U.S. at 67-68.  Petitioner attempts to circumvent this principle by citing to *Boyer v. Belleque*, 659 F.3d 957 (9th Cir. 2011).  (Traverse at 207.)  Specifically, Petitioner refers to *Boyer*'s statement that, in assessing insufficient evidence claims, federal courts look to state law only to establish the elements of the crime.  *See Boyer*, 659 F.3d at 965 (*quoting Juan H.*, 408 F.3d at 1278 n.14).  Petitioner takes this passage out of context.  *Boyer* was addressing an argument brought by the Oregon Attorney General that the *entire analysis* under *Jackson* was a state law issue.  *Id.* ("The State argues that the state courts' determination that the evidence was sufficient to prove the crime of attempted aggravated murder under Oregon law is a state-law issue that is not reviewable in a federal habeas proceeding.").  The court in *Boyer* was simply explaining that there is a federal component to an insufficient evidence claim; that the state court's legal

analysis under *Jackson* is not entitled to total deference.  *Id.* ("To accept the State's argument that sufficiency of the evidence is entirely a state law issue would nullify the federal constitutional prohibition against convicting persons absent proof of guilt beyond a reasonable doubt, a principle firmly established by the United States Supreme Court's precedent.").   *Boyer* did not hold that once a federal court extracts the substantive elements of the crimes from state law, the federal court may then question the state court on other issues of state law.

Regardless, Petitioner's argument under state law appears to be incorrect.  He claims that the California Supreme Court wrongly articulated the felony murder rule because he committed his crimes during the "*Carlos* window" – the period between the California Supreme Court's decision in *Carlos v. Superior Court*, 35 Cal. 3d 131 (1983), and the court overruling that decision in *People v. Anderson*, 43 Cal. 3d 1104 (1987).  (Traverse at 205-06.)  During the *Carlos* window, the intent to kill was an element of felony murder special circumstance allegations.  *See People v. Friend*, 47 Cal. 4th 1, 57 n.30 (2009); *see also Carlos*, 35 Cal. 3d at 153-54 ("[W]e construe the word 'intentionally' in subdivision (b) of section 190.2 to apply to all defendants – actual killers and accomplices alike – and to require an intent to kill before a defendant is subject to a special circumstance finding under paragraph 17 of that section.").  In arguing that the California Supreme Court erred, Petitioner erroneously conflates the elements of the *crime* of felony murder with felony murder special circumstances.  Petitioner's jury was instructed correctly, pursuant to *Carlos*, that an element of the felony murder special circumstance allegations was the intent to kill.  (26RT at 3484.) But, also consistent with established California law at the time of Petitioner's trial, the trial court instructed the jury that the *crime* of felony murder only required the specific intent to commit the underlying felony.  (26RT at 3480-82); *see also People v. Bryant*, 56 Cal. 4th 959, 965 (2013) ("Felony-murder liability does not require an intent to kill, or even implied malice, but merely an intent to commit the underlying felony."); *People v. Cain*, 10 Cal. 4th 1, 36 (1995) (finding that the trial court "correctly instructed the

149

jury that the intent necessary to find defendant guilty of first degree murder under the felony-murder theory was a specific intent to commit one or more of the felonies underlying the charge" in a case where the crimes were committed in 1986, during the *Carlos* window). The California Supreme Court's decision on direct appeal appears consistent with those instructions and the law.

Claim 19 is DENIED.

## Q.     Factual Innocence (Claim 20)

Petitioner raises a standalone claim of actual innocence, presumably as to all the charges. In support, he alleges various claims of ineffective assistance of counsel ("IAC"), conflict of interest, prosecutorial misconduct, and trial court error – issues that the Court separately addresses elsewhere in this Order. Petitioner appears to be arguing that the cumulative effect of all those alleged errors was compounded by the insufficiency of evidence, resulting in a miscarriage of justice. (SAP at 293-95; Traverse at 207-09.) The California Supreme Court denied Petitioner's actual innocence claim on state habeas review without substantive comment.

The United States Supreme Court has "not resolved whether a prisoner may be entitled to habeas relief based on a freestanding claim of actual innocence." *McQuiggin v. Perkins*, 569 U.S. 383, 392 (2013); *see also Herrera*, 506 U.S. at 400 (actual innocence claims "have never been held to state a Claim for federal habeas relief absent an independent constitutional violation occurring in the underlying state criminal proceeding. . . . This rule is grounded in the principle that federal habeas courts sit to ensure that individuals are not imprisoned in violation of the Constitution - not to correct errors of fact."); *Gimenez v. Ochoa*, 821 F.3d 1136, 1145 (9th Cir. 2016) (the Ninth Circuit has "only assumed, but ha[s] not held, that petitioners may bring [] a freestanding innocence claim.") (citation omitted). As a result, there is no clearly established Federal law supporting Petitioner's claim; Claim 20 fails under AEDPA on that basis alone. *Van Patten*, 552 U.S. at 125-26.

150

In *Herrera*, the Supreme Court assumed "for the sake of argument . . . that in a capital case a truly persuasive demonstration of 'actual innocence' made after trial would render the execution of a defendant unconstitutional, and warrant federal habeas relief if there were no state avenue open to process such a claim." *Herrera*, 506 U.S. at 417. However, "the threshold showing for such an assumed right would necessarily be extraordinarily high." *Id.* The Court did not discuss the parameters of that showing.

Ensuing Ninth Circuit decisions that have "assumed" the viability of a freestanding actual innocence claim have used the "fundamental miscarriage of justice" standard, also known as the *Schlup*[24] "gateway" showing.[25] *Jones v. Taylor*, 763 F.3d 1242, 1246-47 (9th Cir. 2014). Under *Schlup*, a petitioner must proffer new evidence, based on which "it is more likely than not that no reasonable juror would have found [the] petitioner guilty beyond a reasonable doubt." *Id.* at 1247; *House v. Bell*, 547 U.S. 518, 537 (2006); *Schlup*, 513 U.S. at 327. The new evidence must be reliable, and a reviewing court "may consider how the timing of the submission and the likely credibility of the affiants bear on the probable reliability of that evidence." *Schlup*, 513 U.S. at 332; *Lee v. Lampert*, 653 F.3d 929, 937-38 (9th Cir. 2011) ("*Schlup* requires a petitioner 'to support his allegations of constitutional error with new reliable evidence – whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence – that was not presented at trial.'") (*quoting Schlup*, 513 U.S. at 324). "The habeas court then considers all the evidence, old and new, incriminating and exculpatory, admissible at trial or not. . . . On this complete record, the court makes

---

[24] *Schlup v. Delo*, 513 U.S. 298 (1995).

[25] That standard is normally intended for situations where a strong showing of innocence may overcome certain procedural barriers to have a constitutional claim considered on the merits. *See McQuiggin*, 569 U.S. at 392-94; *see also Herrera*, 506 U.S. at 404 ("The fundamental miscarriage of justice exception is available only where the prisoner *supplements* his constitutional claim with a colorable showing of factual innocence.") (emphasis in original) (citation and internal quotation marks omitted).

a probabilistic determination about what reasonable, properly instructed jurors would do." *Lee*, 653 F.3d at 938 (citations, brackets, and internal quotation marks omitted).

Ultimately, the evidence of innocence must be "so strong that a court cannot have confidence in the outcome of the trial unless the court is also satisfied that the trial was free of nonharmless constitutional error." *Schlup*, 513 U.S. at 316. "At a minimum, the petitioner must 'go beyond demonstrating doubt about his guilt, and must affirmatively prove that he is probably innocent.'" *Jones*, 763 F.3d at 1246 (*quoting Carriger*, 132 F.3d at 476).

Petitioner does not make a proffer of new evidence in Claim 20. Instead, he refers to his *Brady* and *Youngblood/Trombetta* claims, and essentially argues that the government is holding his new, verdict-altering evidence. (Traverse at 208.) Petitioner cites no precedent providing habeas relief on a claim of actual innocence where, instead of proffering newly-discovered evidence, the petitioner merely makes reference to evidence he believes was withheld. Petitioner's claim is not in accord with the relevant legal standard. *House*, 547 U.S. at 537; *Schlup*, 513 U.S. at 327.

Furthermore, to the extent Petitioner argues that he never received the opportunity in the state courts to develop his *Brady* and *Youngblood/Trombetta* clams, that is not an issue to be taken up in the analysis of an actual innocence claim. Petitioner otherwise seems to be raising a quasi-cumulative error claim, which the Court also addresses in other sections of this Order.

Based upon the foregoing, Petitioner has fallen far short of demonstrating that "it is more likely than not that no reasonable juror would have found [him] guilty beyond a reasonable doubt." *Schlup*, 513 U.S. at 327; *House*, 547 U.S. at 537. Put another way, particularly in light of the Court's analysis under *Jackson* in Claim 19, Petitioner has not affirmatively proven that he is probably innocent. *Jones*, 763 F.3d at 1246.

The California Supreme Court's denial of Petitioner's actual innocence claim was reasonable under AEDPA, and Claim 20 is DENIED.

**R.     Deficient Statutory Notice of Evidence in Aggravation (Claim 22)**

Petitioner claims the trial court committed constitutional error by allowing the prosecution to proceed with a statutorily-required "notice of aggravation" that lacked sufficient detail.  (SAP at 296-300; Traverse at 209-11.)  This claim is not cognizable on federal habeas review.  Citing very general due process and right-to-confrontation principles, Petitioner takes issue with the way the California Supreme Court construed a California statute, a matter that is not for this Court to decide.

California Penal Code section 190.3 provides that:

> Except for evidence in proof of the offense or special circumstances which subject a defendant to the death penalty, no evidence may be presented by the prosecution in aggravation unless notice of the evidence to be introduced has been given to the defendant within a reasonable period of time as determined by the court, prior to trial.

Before Petitioner's trial, the prosecution provided such a notice to comply with section 190.3.  That document generally reflected the prosecution's intention to present evidence at the penalty phase regarding the circumstances of crimes Petitioner committed against eight victims: (1) Diane Harper and Amy Ryan; (2) Shelah McMahan; (3) Debra B.; (4) Valerie T.; (5) Priscilla N.; (6) Marilyn S.; (7) Deborah T.; and (8) an unnamed victim whose alleged sexual assault was not ultimately presented.  (SAP at 297); *People v. Hart*, 20 Cal. 4th at 638.  The defense challenged the document as incomplete because it did not list all of the specific evidence the prosecutor intended to present.  The trial court denied the defense motion.  *People v. Hart*, 20 Cal. 4th at 638-39.

Petitioner's direct appeal included a challenge to the trial court's ruling.  The California Supreme Court denied the claim.  The court first noted that it had already repeatedly rejected similar arguments.  The court then explained that the purpose of the notice required by section 190.3 "is to advise the accused of the evidence against him so that he may have a reasonable opportunity to prepare a defense at the penalty phase." However, the court clarified that "the prosecutor is not prevented from introducing all

the circumstances of a duly noticed incident or transaction simply because each and every circumstantial fact was not recited therein." Instead, "[t]he notice is sufficient if it gives defendant a reasonable opportunity to prepare a defense to the allegations." Turning to the notice provided by the prosecution in Petitioner's case, the court found that it:

> informed the defense of the names of each one of the women who had been victimized by defendant's sexual assaults, the specific dates on·which those assaults took place, and the counties in which the crimes occurred. The notice was filed well before the commencement of the guilt phase proceedings.

The court concluded that the information provided was adequate to satisfy the notice requirement of section 190.3.

*Id.* at 639 (citations and internal quotation marks omitted).

Petitioner argues that the California Supreme Court's analysis was an arbitrary application of state procedure in violation of his right to due process. The basis of his claim is that *evidence* means *evidence*, and the state high court's "absurd" interpretation of the statutory language stripped away the statute's procedural protections. (Traverse at 210-11); *see also Hicks v. Oklahoma*, 447 U.S. 343, 346-47 (1980).

As the Court has already explained in detail, "a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus." *Richey*, 546 U.S. at 76; *McGuire*, 502 U.S. at 67-68 ("[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions."). This principle could not apply with more force than it does here; the Court is not deferring to just any state court's interpretation of state law, but the state's high court, the ultimate arbiter of what California statutory law means. *McClung v. Emp. Dev. Dep't*, 34 Cal. 4th 467, 472 (2004) (it is the duty of the California Supreme Court "to state the true meaning of [a] statute finally and

1   conclusively."); *see also People v. Johnson*, 53 Cal. 4th 519, 527-28 (2012) (decisions

2   of the California Supreme Court are binding upon all California courts).

3       Petitioner has otherwise not alleged or shown that any decision of the United

4   States Supreme Court confers a right to notice of evidence.  *Van Patten*, 552 U.S. at

5   125-26; *Moses*, 555 F.3d at 754, 758-60; *Turner v. Calderon*, 281 F.3d 851, 867-68 (9th

6   Cir. 2002) (finding no constitutional right to a list of possible prosecution witnesses in

7   penalty phase); *Gray v. Netherland*, 518 U.S. 152, 167-68 ("A defendant's right to

8   notice of the charges against which he must defend is well established.   But a

9   defendant's claim that he has a right to notice of the *evidence* that the state plans to use

10  to prove the charges stands on quite a different footing.   We have said that the Due

11  Process Clause has little to say regarding the amount of discovery which the parties

12  must be afforded.") (italics in original) (citations and internal quotation marks omitted).

13  Petitioner's claim is not cognizable, and his references to broad constitutional principles

14  do not change that conclusion.  *Langford*, 110 F.3d at 1389.  Claim 22 is DENIED.

15      **S.      Denial of Request for Limited Voir Dire (Claim 23)**

16      Petitioner claims the trial court violated due process by denying a defense request

17  to conduct limited voir dire before the penalty phase of trial.  The defense sought to

18  question the jury to ensure that none of the jurors had become biased.  The defense's

19  concerns focused on Petitioner's absence when the guilt-phase verdicts were read (he

20  requested not to be present), and his having a new attorney represent him in the penalty

21  phase.  The trial court denied Petitioner's request for voir dire under state statutory law,

22  finding that he did not show good cause to open questioning of the jurors.(Traverse at

23  211-14; *see also* 1CT at 167-73; 27RT at 3605-05.)

24      This claim is also not cognizable on federal habeas review.  28 U.S.C. § 2254(a);

25  *McGuire*, 502 U.S. at 67-68. Petitioner's appeal to general due process principles such

26  as the prohibition against arbitrary or fundamentally unfair proceedings is insufficient

27  to "transform a state law issue into a federal one . . . ." *Langford*, 110 F.3d at 1389; *see*

28  *also Miller*, 757 F. 2d at 993-94.

The Court otherwise finds that the state court's denial of Petitioner's related claim on direct appeal was not contrary to, or an unreasonable application of, clearly established Supreme Court precedent.  28 U.S.C. § 2254(d).

Claim 23 is DENIED.

**T.    Challenge to Admission of Facts and Circumstances of Prior Convictions in Penalty Phase (Claim 24)**

Petitioner argues that the trial court violated several constitutional principles by allowing victim testimony during the penalty phase of his trial.

### 1.    Background Facts

As evidence in aggravation in the penalty phase, the prosecution first presented the testimony of witnesses Debra B. and Deborah T.  Debra B. testified about the details of a 1973 assault and burglary, during which Petitioner broke into her residence and choked her.  (30RT at 3832-48.)  Deborah T. testified about an instance in 1975 when Petitioner poked his head through a window in her apartment.  After the police arrived, the victim discovered that a bedroom window had also been partially opened.  (30RT at 3913-19.)  Petitioner had been arrested and ultimately pleaded guilty to crimes in both instances.  *People v. Hart*, 20 Cal. 4th at 641.  The prosecution offered the testimony of Debra B. pursuant to California Penal Code section 190.3(b), which provides that in determining penalty, a jury may consider "[t]he presence or absence of criminal activity by the defendant which involved the use or attempted use of force or violence or the express or implied threat to use force or violence."  Deborah T.'s testimony was offered pursuant to the subsequent section, 190.3(c), which provides that in determining penalty, the jury may consider "[t]he presence or absence of any prior felony conviction."  *Id.*

### 2.    Analysis

#### a.    Due Process

Petitioner's principal contention is that allowing these victims to testify amounted to re-adjudicating the original cases.  He argues that both women testified to facts that

were not part of his plea deals.  Petitioner claims that the testimony violated due process, double jeopardy, equal protection, speedy trial rights, and state statutory law. (SAP at 303-13; Traverse at 214-17.)  As with some of his previous claims, Petitioner's due process challenge hinges upon his own interpretation of the relevant state statute. Petitioner contends that the statutory aggravating factors in contention here are restricted to "*the fact of the conviction itself*."  (Traverse at 215 (emphasis in original).) Therefore, he argues that presenting testimony which included details of the offenses violated the statutory language, added prejudicial and inflammatory facts precluded by the statute, and arbitrarily deprived Petitioner of important state law protections.  *See Hicks*, 447 U.S. at 346 ("[A]n arbitrary disregard of the petitioner's right to liberty is a denial of due process of law.").  But, the California Supreme Court construed its own statute differently.

On direct appeal, the California Supreme Court denied Petitioner's claim by referencing its prior precedent denying similar claims.  *People v. Hart*, 20 Cal. 4th at 641.  Although not controlling, that precedent is significant here.  The state high court has held that section 190.3(b) allows "[t]he details and circumstances" of qualifying prior crimes as evidence in aggravation, not merely the fact that those convictions occurred.  *People v. Cain*, 10 Cal. 4th 1, 71 (1995).  That evidence is admissible "even if the defendant was previously prosecuted for the same conduct, so long as the defendant was not acquitted of the offense."  *Id.*  As for section 190.3(c), the California Supreme Court specifically found in Petitioner's case that the evidence of the crime against Deborah T. "fell squarely within the meaning" of that provision.  *People v. Hart*, 20 Cal. 4th at 642.

As before, this Court defers to the California Supreme Court's interpretation of its own state's laws.  *Richey*, 546 U.S. at 76; *McGuire*, 502 U.S. at 67-68; *McClung*, 34 Cal. 4th at 472.  Further, the state court's interpretation of its statute to include the facts and circumstances of Petitioner's prior crimes in the penalty phase appears consistent with clearly established Federal law.  *See Jurek v. Texas*, 428 U.S. 262, 276 (1976)

157

("What is essential [for a capital sentencing scheme] is that the jury have before it all possible relevant information about the individual defendant whose fate it must determine."); *California v. Ramos*, 463 U.S. 992, 1006 (1983) (holding that California's capital sentencing system "ensures that the jury will have before it information regarding the individual characteristics of the defendant and his offense, including the nature and circumstances of the crime and the defendant's character, background, history, mental condition, and physical condition.") (*citing* Cal. Penal Code § 190.3). In fact, in rejecting constitutional challenges to California's capital sentencing scheme, the United States Supreme Court has explained that section 190.3(b) "is phrased in conventional and understandable terms and rests in large part on a determination whether *certain events occurred*, thus asking the jury to consider matters of historical fact." *Tuilaepa v. California*, 512 U.S. 967, 976 (1994) (emphasis added). There was no violation of clearly established Federal law. Petitioner's due process challenge fails.

### b.    Double Jeopardy

Petitioner's double jeopardy claim is similarly flawed. It rests on the assumption that Petitioner's guilt of the prior offenses was re-litigated during the penalty phase of his capital trial. Notably, in denying a double jeopardy challenge like the one Petitioner makes here, the California Supreme Court made a significant distinction as it concerns evidence proffered in aggravation. "The defendant is not being tried again, or made subject to punishment or conviction, for the same offense; instead, the evidence is admitted to assist the jury in its determination of the appropriate sentence on the current charge." *Cain*, 10 Cal. 4th at 71. Petitioner fails to cite any Supreme Court cases rebutting the California Supreme Court's conclusion. Penalty phase proceedings are not a retrial on criminal charges. *See Deck*, 544 U.S. at 632 (the presumption of innocence no longer applies in the penalty phase of a bifurcated trial); *see also Betterman v. Montana*, ___ U.S. ___, 136 S. Ct. 1609, 1616 (2016) ("[F]actual disputes, if any there be, at sentencing, do not go to the question of guilt; they are geared, instead,

to ascertaining the proper sentence . . . ."). Petitioner fails to show an entitlement to relief under AEDPA based on his double jeopardy claim.

### c.   Equal Protection

Petitioner's equal protection claim also fails. The Equal Protection Clause of the Fourteenth Amendment commands that no "State shall 'deny to any person within its jurisdiction the equal protection of the laws,' which is essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Center*, 473 U.S. 432, 439 (1985) (quoting *Plyler v. Doe*, 457 U.S. 202, 216 (1982)). However, mere allegations of different treatment do not establish an equal protection violation. *See McQueary v. Blodgett*, 924 F.2d 829, 835 (9th Cir. 1991) ("[T]he Constitution does not require *identical* treatment. There must be an allegation of invidiousness or illegitimacy in the statutory scheme before a cognizable claim arises: it is a 'settled rule that the Fourteenth Amendment guarantees equal laws, not equal results.'") (emphasis in original) (*quoting Personnel Adm'r v. Feeney*, 442 U.S. 256, 273 (1979)). Additionally, only if the statute at issue affects a "suspect class" or "burdens the exercise of a constitutional right, then courts must apply [a] strict scrutiny" analysis. *Ball v. Massanari*, 254 F.3d 817, 823 (9th Cir. 2001). Otherwise, rational basis review applies. *Id.*

> To survive rational basis review, a statute must be rationally related to a legitimate government purpose. Using such rational-basis review, a statute is presumed constitutional, and the burden is on the one attacking the legislative arrangement to negative every conceivable basis which might support it. We are compelled under rational-basis review to accept a legislature's generalizations even when there is an imperfect fit between means and ends.

*Dent v. Sessions*, 900 F.3d 1075, 1082 (9th Cir. 2018) (citations and internal quotation marks omitted).

Petitioner argues that interpreting section 190.3 so broadly, as to include the facts and circumstances of the crimes proffered in aggravation, subjects capital defendants as a class to different treatment from non-capital defendants. He cites to *People v. Guerrero*, 44 Cal. 3d 343, 355 (1988), for the proposition that in non-capital cases, courts are confined "to the record of the conviction – but no further" in using prior convictions to enhance a sentence. (Traverse at 216.)

Petitioner has not alleged "invidiousness or illegitimacy" in the capital statutory scheme. He certainly points out a hypothetical difference: California does have recidivist provisions that allow for enhanced sentences based solely on the fact that certain qualifying prior felonies were committed or prison terms served. *See* Cal Penal Code §§ 667, 667.5, 1170.12. However, these provisions serve different purposes than California's capital sentencing scheme. For example, the purpose behind California's Three Strikes law is "to ensure longer prison sentences and greater punishment for those who commit a felony and have been previously convicted of serious and/or violent felony offenses." Cal. Penal Code § 667(b). It is precisely the *fact* of certain prior felony offenses that the California legislature sought to trigger a harsher punishment. *See Ewing v. California*, 538 U.S. 11, 28 (2003)("[T]he State of California has a reasonable basis for believing that dramatically enhanced sentences for habitual felons advances the goals of its criminal justice system in [a] substantial way."). That legislative goal is quite different from the aim of constitutionally valid capital sentencing proceedings, for which the evidence seeks to ensure that "the jury ha[s] before it all possible relevant information about the individual defendant whose fate it must determine." *Jurek*, 428 U.S. at 276. The different treatment Petitioner points to here is not invidious or illegitimate, but rationally serves very different goals. *McQueary*, 924 F.2d at 835. Thus, Petitioner fails to set forth a cognizable equal protection claim. Further, even if he did get past that initial hurdle, Petitioner does not allege that death penalty defendants as a class are subject to a heightened level of scrutiny under equal protection principles. For the same reasons articulated above, the

Court also finds that the alleged difference in treatment between capital and noncapital defendants here – even assuming an imperfect fit between means and ends – is certainly rationally related to legitimate government purposes. *Dent*, 900 F.3d at 1082.

### d.      Speedy Trial Rights

Petitioner's allegation that his right to a speedy trial was violated fails for slightly different reasons.  To the extent Petitioner argues that certain facts surrounding his prior crimes were being litigated for the first time during the penalty phase of his capital trial, he had no speedy trial right. *Betterman*, 136 S. Ct. at 1618 ("The Sixth Amendment speedy trial right, . . . does not extend beyond conviction, which terminates the presumption of innocence.").  Moreover, to the extent he somehow traces the speedy trial issue back to the convictions in the original cases, his claim is foreclosed by *Lackawanna County Dist. Attorney v. Coss*, 532 U.S. 394 (2001).  In *Coss*, the Supreme Court held that "once a state conviction is no longer open to direct or collateral attack in its own right because the defendant failed to pursue those remedies while they were available (or because the defendant did so unsuccessfully), the conviction may be regarded as conclusively valid," and that "[i]f that conviction is later used to enhance a criminal sentence, the defendant generally may not challenge the enhanced sentence through a petition under § 2254 on the ground that the prior conviction was unconstitutionally obtained." *Id.* at 403-04.  Petitioner has no speedy trial right available in this proceeding as it concerns the crimes used in aggravation at the penalty phase of his capital trial.

Based upon the foregoing, Claim 24 is DENIED.

### U.      Improper Admission of Unadjudicated Offenses in Penalty Phase (Claim 25)

Petitioner next claims that the trial court committed constitutional error by allowing the prosecution to present four unadjudicated offenses in aggravation during the penalty phase.  (SAP at 313-15; Traverse at 218.)

The Supreme Court has expressly found it constitutional when "[s]entencing courts have not only taken into consideration a defendant's prior convictions, but have also considered a defendant's past criminal behavior, even if no conviction resulted from that behavior." *Nichols v. United States*, 511 U.S. 738, 747 (1994). California's capital sentencing scheme affirmatively allows the presentation of unadjudicated prior offenses involving the use or attempted use of force or violence. *See* Cal. Penal Code § 190.3 ("As used in this section, criminal activity does not require a conviction."). Petitioner, however, argues that the unadjudicated offenses proffered in the penalty phase of his trial were allegedly committed too long ago and that the statute of limitations had run on them. He contends it is "unconstitutional for a state to use prior crimes as aggravation evidence for which the statute of limitations has passed." Petitioner relies on *Dickey v. Florida*, 398 U.S. 30 (1972), for his proposition. Petitioner also claims generally that the remoteness of the prior unadjudicated offenses rendered the evidence about them too unreliable for a capital penalty proceeding. (SAP at 313-15; Traverse at 218.)

The California Supreme Court denied Petitioner's challenge on direct appeal, citing to state law which provided that neither the expiration of the statute of limitations nor remoteness in time was a basis for excluding evidence in aggravation. *People v. Hart*, 20 Cal. 4th at 642. The state court decision does not run afoul of any clearly established Federal law.

In *Dickey*, the prosecution failed to bring a criminal defendant to trial for nearly eight years. The prosecution cited no reason for the delay aside from convenience. During the delay two witnesses died, another became unavailable, and police records were lost. The Court found a violation of the defendant's right to a speedy trial. *Dickey*, 398 U.S. at 37-38. As this Court discussed above, Petitioner's penalty phase was not a retrial on any of the circumstances in aggravation; all related evidence was admitted solely to "assist the jury in its determination of the appropriate sentence on the current charge." *Cain*, 10 Cal. 4th at 71. As the presumption of innocence had

162

terminated upon Petitioner's convictions in the guilt phase, Petitioner had no constitutional speedy trial right in the penalty phase. *Betterman*, 136 S. Ct. at 1618.

Petitioner has otherwise not pointed to anything in the record indicating that the passage of time rendered the evidence of his unadjudicated offenses inherently unreliable, or that the presentation of that evidence during the penalty phase rendered his sentencing proceeding fundamentally unfair. *See Ford v. Wainwright*, 477 U.S. 399, 411 (1986); *see also Betterman*, 136 S. Ct. at 1617.

Claim 25 is DENIED.

## V.  *Miranda* Issue in Penalty Phase (Claim 26)

Next, Petitioner argues that his confessions to four prior crimes proffered in aggravation during the penalty phase were obtained in violation of his *Miranda* rights. (SAP at 315-19; Traverse at 219-24.) The California Supreme Court denied this claim in a reasoned decision on direct review. *People v. Hart*, 20 Cal. 4th at 642-43.

As the facts giving rise to Petitioner's *Miranda* claim are not in dispute, this Court quotes the California Supreme Court's recitation of the facts as follows:

> On March 5, 1975, as part of the investigation into the incident involving Deborah T., Imperial Beach Police Officer Charles Hamilton informed defendant of his rights under *Miranda v. Arizona*, [384 U.S. 436 (1966)], and upon obtaining defendant's waiver, proceeded to ask defendant certain questions involving the matter. Defendant denied having been near the victim's window. After the interview concluded, Hamilton learned that a fingerprint expert had matched defendant's fingerprints to those found on Deborah T.'s window.
>
> The following morning, Hamilton visited defendant at Ream Field, the naval facility where defendant was stationed, and reread defendant his *Miranda* rights. Defendant said that he understood those rights, and asked: "I have the right to an attorney?" Hamilton responded affirmatively. When defendant asked, "What if I can't afford one?,"

1    Hamilton replied, "Then the court will appoint you one."  Defendant

2    thereafter asked whether the legal officer of the naval base could serve as

3    his attorney.  A naval investigator informed defendant that such an officer

4    could not represent defendant in a civilian court of law.  Defendant asked

5    Hamilton whether he was going to be arrested.  Hamilton responded

6    affirmatively, informing defendant that approximately four hours would

7    be required to obtain an arrest warrant.  Defendant responded: "Okay, I'll

8    talk to you, what do you want to talk about?"  He thereafter described his

9    involvement in other attacks upon women.

10        At trial, defendant objected to the introduction of evidence

11    pertaining to his confession to the unadjudicated offenses, on the ground

12    that the foregoing colloquy evidenced defendant's invocation of his right

13    not to speak with Hamilton.  The trial court denied the challenge.

14   *People v. Hart*, 20 Cal. 4th at 642-43; (*see also* RT at 3709-21; SAP at 316-18).

15        It is clearly established that, in the context of *Miranda* warnings, both the right

16   to remain silent and to counsel must be invoked unambiguously.  *Berghuis v.*

17   *Thompkins*, 560 U.S. 370, 381-82 (2010) (right to silence); *Davis v. United States*, 512

18   U.S. 452, 459 (1994) (right to counsel).  "An invocation is unambiguous if the accused

19   'articulate[s] his desire to have counsel present sufficiently clearly that a reasonable

20   police officer in the circumstances would understand the statement to be a request for

21   an attorney.'"  *Petrocelli v. Baker*, 869 F.3d 710, 723 (9th Cir. 2017) (quoting *Davis*,

22   512 U.S. at 459).  An ambiguous or equivocal reference to an attorney does not invoke

23   the right to counsel.  *See Davis*, 512 U.S. at 459-62 ("Maybe I should talk to a lawyer"

24   was not a request for counsel requiring that police questioning cease); *Petrocelli*, 869

25   F.3d at 723 ("I'd sort of like to know what my . . . lawyer wants me to do" was not a

26   request for counsel requiring immediate cessation of questioning).

27        The lynchpin of Petitioner's *Miranda* claim – in the state courts and now here

28   – is that his inquiry about whether a naval officer could represent him functioned to

164

invoke his right to an attorney.  The state court concluded otherwise.  *People v. Hart*, 20 Cal. 4th at 643.  As this Court has made clear, its review of the state court's decision is stringently limited to determining whether that court drew an objectively unreasonable conclusion under *Miranda* and its progeny.  *Richter*, 562 U.S. at 101; *LeBlanc*, 137 S. Ct. at 1728.  It is clear the state court did not act so irrationally.  Petitioner, of course, has his own interpretation of what his words meant, but that is not this Court's concern.  It is patently reasonable to conclude that, at the time of questioning, Petitioner was merely inquiring as to whether he could be represented by a military lawyer.  The police officer expressly informed Petitioner that he had the right to have a lawyer, and that an attorney would be appointed for him if he could not afford to hire one.  Petitioner expressed no desire for that alternative, but instead communicated his desire to cooperate and answer questions after learning that a naval base lawyer was not available to him.  On these facts, it was reasonable for the state court to conclude that there was no invocation of the right to counsel.  *Davis*, 512 U.S. at 459; *Petrocelli*, 869 F.3d at 723; *see also Thompkins*, 560 U.S. at 386 (answering questions is a "course of conduct indicating waiver" of the right to remain silent).

Claim 26 is DENIED.

**W.    Claims Involving Shelah McMahan's Murder (Claim 27)**

Petitioner makes several challenges to the penalty-phase evidence presented in aggravation involving the uncharged murder of his niece, Shelah McMahan.

**1.    Background Facts**

At the penalty phase of Petitioner's trial, the prosecution presented several witnesses and other evidence to prove that Petitioner committed the grisly murder of his eleven-year-old niece less than a week before his arrest in the capital case.  That evidence is discussed in detail below.

**a.    Prosecution Evidence**

Petitioner's mother-in-law, Carol Widney, testified about the family's living arrangements at the time that her granddaughter, Shelah McMahan, was killed.

1  Specifically, Widney and her husband lived in a house.  Shelah's mother, boyfriend,
2  and younger siblings lived in a trailer located in the backyard.  Shelah occupied two
3  rooms in her grandparents' house, but she occasionally slept in her family's trailer with
4  her siblings.  Petitioner and his wife lived in a mobile home located on a property two
5  doors down. (32RT at 4062-65.)  The couple did not have a phone so it was customary
6  for them to come over to Widney's house to make calls. (32RT at 4068.)

7      Carol Widney was very close with her granddaughter. (32RT at 4066, 4087-88.)
8   Widney viewed Shelah as a responsible child who never left suddenly or without
9  notice. (32RT at 4075, 4086.)  On May 2, 1986 (a Friday), Shelah missed school due
10  to a cold.  She spent the day in and around the house, doing laundry, watching
11  television, and occasionally checking in on her grandmother, who had minor surgery
12  that morning. (32RT at 4072-75.)  That night, Shelah went to bed on a sofa in the
13  family room of the house, which she often did on Friday nights.  After midnight, just
14  before Carol Widney went to bed, she saw Shelah lying on the sofa watching
15  television. (32RT at 4076-78.)  Shelah was wearing a t-shirt and sweat pants. (32RT
16  at 4078-79.)

17      The next morning at 7 a.m., Carol Widney found Shelah's pillow and blankets
18  on the floor, but Shelah was gone. (32RT at 4081-82, 4086.)  Carol Widney testified
19  that the front door to the residence was locked overnight, but sliding glass doors in the
20  back of the house were left unlocked so family members living on the property could
21  get in and out. (32RT at 4084-85.)  Carol Widney and her husband had a dog that
22  barked only at strangers to the household. (32RT at 4091-92.)  The dog was hostile
23  enough to strangers that Kenneth Widney, Carol's husband, testified that he was
24  "positive that no one would come in our yard with the dog there" without permission.
25  (33RT at 4281.)  There was also a shed on the property.  A police officer previously
26  lived on the property and still had police gear stored in that shed. (32RT at 4094-95.)

27      Debora Carco, a family friend who lived with the Widneys, testified that she also
28  saw Shelah on the family room sofa.  Carco was up very late, and saw Shelah asleep.

166

1  Carco turned off the television.  Carco woke up between 6:30 and 7:00 a.m. the next
2  morning and Shelah was gone.  (32RT at 4160.)

3       A police report reflected that Petitioner told Carol Widney that he entered the
4  house early in the morning on May 3, 1986, and saw Shelah sleeping on the family
5  room sofa.  (32RT at 4153.)  Another family member, Roy Widney, recalled Petitioner
6  saying that he entered the house around 4:00 a.m., and that he did not notice one way
7  or another whether Shelah was there.  (33RT at 4350.)  Roy Widney also testified that,
8  in the days following Shelah's murder, he saw Petitioner using a small tractor on his
9  property "doing some grading."  Roy asked Petitioner what he was doing, and
10  Petitioner responded that he "was just doing some landscaping grading work."  (33RT
11  at 4351.)

12      Shelah's body was discovered on the late morning of May 3, 1986,
13  approximately one to two miles away from the Widney residence.  (32RT at 4173,
14  4176.)  The body was in a vacant road area filled with trash and old mattresses.  (32RT
15  at 4177, 4189.)  Shelah's body was face down under a rock, partially covered with a
16  brown trash bag.  (32RT at 4178-79, 4200.)  A mattress had been wedged between the
17  rock and the body to cover it up.  (32RT at 4198.)  Other trash bags full of debris and
18  pieces of trash had been placed adjacent to the body to keep it hidden.  (32RT at 4199,
19  4217.)  Shelah's shirt was torn and pulled down below her breast area.  (32RT at 4200,
20  4203.)  Her hands were tied behind her back with a black plastic cable tie.  (32RT at
21  4200-02; 33RT at 4258; 36RT at 4639.)  A strip of grey molding from a window
22  screen was wrapped around her neck.  (35RT at 4480-81.)  She was wearing grey sweat
23  pants.  (32RT at 4204.)  Carpet fibers were found in one of Shelah's hands, which were
24  never matched to any other evidence.  (32RT at 4222-25; 37RT at 4698-99.)  The
25  pillow she had been sleeping on was also found with her body.  (32RT at 4077-78;
26  33RT at 4261-62.)  Shelah's autopsy revealed multiple stab wounds to her neck, one
27  of which was fatal.  (32RT at 4209-10; 36RT at 4638, 4641-43.)

28

In June 1986, Kenneth Widney found handcuffs in a makeshift shed on Petitioner's property.  (33RT at 4262-63, 4276-77.)  During an earlier search of Petitioner's property, a detective found a key to the handcuffs and a key holder near the partially-burnt shoes that were admitted during the guilt phase. (33RT at 4300-02.) The handcuffs contained small flakes of blood which were consistent with Shelah's blood type. (35RT at 4506-08.)  A police officer positively identified the handcuffs as a pair he had given or sold to the officer who once lived on the Widney property and still had items stored there.  (35RT at 4517.)  In a corner of Petitioner's bedroom, a detective also found a plastic bag.  Inside the bag they found a black plastic cable tie. (33RT at 4303, 4309.)  More cable ties were found outside on Petitioner's property. (33RT at 4321-22.)  A detective also found additional handcuffs buried in freshly-turned soil inside Petitioner's shed.  (33RT at 4304-05, 4307-08.)

A forensic analysis concluded that two fibers found on Shelah McMahan's t-shirt were similar to rug fibers found inside Petitioner's Mustang. (34RT at 4383; 35RT at 4463-64.) Dog hair found on Shelah's clothing was similar to dog hair found in Petitioner's Mustang, as well as the hair type of Petitioner's dog. (35RT at 4488.) One pair of handcuffs found on Petitioner's property also contained a fiber that was similar to the fibers that composed Shelah's t-shirt.  (34RT at 4384.)  Through experimentation, a criminalist determined that indentations made by the handcuffs were similar to indentations shown on Shelah's wrist in autopsy photographs.  (34RT at 4392-94.)  The criminalist also compared the black cable tie found in Petitioner's bedroom with the cable ties that bound Shelah's wrists, and determined that they were the same length, same width, were made by the same manufacturer, and were the same line of cable ties made by that manufacturer.  (34RT at 4397-99, 4403-04.)  An unidentified seminal stain was found on the back of Shelah's sweat pants. (34RT at 4404, 4406; 35RT at 4477.)

Randall Gresham, a state prisoner, testified for the prosecution in the penalty phase of trial.  (36RT at 4531-32.)  In May 1986, Gresham was placed in a segregation

168

cell with Petitioner and one other person, Kevin Warp, in the Riverside County Jail. (36RT at 4532-33.)  Gresham shared a cell with Petitioner for approximately one month.  (36RT at 4533.)  During that time, Gresham and Petitioner "had many conversations" about their criminal cases. (36RT at 4534-35, 4545.)  Petitioner told Gresham that he killed his eleven-year-old niece. (36RT at 4535.)  He claimed to have done so because he had told her about his prior crimes and had sexual conversations with her.  He was afraid she would tell family members about that.  He regretted killing her because he liked her.  (36RT at 4546-48.)  Petitioner told Gresham that killing was "easier after you'd done it."  (36RT at 4549.)

Petitioner said that his niece was physically more developed than an eleven-year-old and "built a lot sexier." (36RT at 4535.)  Petitioner told Gresham that he lived near his niece and had access to her house.  He said that he entered the house while she was sleeping and told her he wanted to go outside to talk to her.  (36RT at 4536-37.)  Petitioner never told Gresham how he killed Shelah, but he did occasionally make stabbing motions acting the killing out, at times when joking about it with Warp. (36RT at 4537-39.)  Petitioner told Gresham that he did not admit the murder to his family.  (36RT at 4539.)  When watching television in the cell, Petitioner would compare the bodies of females on the screen with his niece's body.  (36RT at 4540.)  Petitioner expressed concerns after getting off the phone with his wife that the police were searching his backyard.  He was particularly worried that they might find a steak knife and a piece of carpet with blood on it that he left there.  (36RT at 4540-41.)  Petitioner told Gresham that prior to his arrest he used his father-in-law's small tractor to move soil around in his backyard.  (36RT at 4541-42.)  Petitioner also told Gresham that he had three sets of handcuffs and had lost a handcuff key in his back yard.  (36RT at 4542.)  Additionally, Petitioner told Gresham he dropped Shelah McMahan's body off "at a dumping area."  (36RT at 4545.)  Petitioner mulled the idea of blaming a "guy named Andy that was a speed head out there that was always going crazy" on Shelah's murder.  (36RT at 4545-46.)

169

### b.    Defense Evidence

A coworker of Petitioner's testified that he worked late into the night with Petitioner at a job site on a Friday night.  Petitioner also called the coworker early the next morning before 8 a.m.  The coworker did not recall the date that these events occurred.  (38RT at 4752-54, 4756-57, 4758-59.)  However, the defense put into evidence a phone bill for the Widney residence that showed a phone call to Petitioner's coworker at approximately 6:55 a.m. on May 3, 1986.  (38RT at 4762-64; 41RT at 5179, 5226.)

Although the coworker could not specifically remember during his testimony what time he and Petitioner finished and left the job site, he had previously told detectives that they finished by 1:30 a.m.  (38RT at 4758.)  Petitioner rejoined the coworker at the job site the next morning around 10 or 11 a.m.  Petitioner was there with his wife and children, and "they were planning on going to the lake" after the men finished moving some sprinklers at the job site.  (38RT at 4760.)

Carol Widney and a detective were also called by the defense.  They testified that Widney was shown a photograph of a bed sheet that was bunched up over the lower portion of Shelah's body when it was found.  Widney did not recognize that bed sheet as one that had come from her house.  (38RT at 4766-67, 4770-73.)  The detective also testified that other cable ties were found at the location where Shelah's body was discovered.  He additionally testified that a search of the area where Petitioner had been turning over soil with a tractor revealed no evidence relevant to the McMahan homicide.  Lastly, the detective testified that the travel time between Petitioner's residence and his job site was approximately forty to forty-seven minutes.  (38RT at 4774-78.)

Petitioner's wife, Linda Hart, testified that she usually drove their brown Toyota and Petitioner drove the Mustang.  But, the couple occasionally traded off, and whenever the family went somewhere together they drove the Mustang.  (38RT at 4790.)  Linda Hart also testified that Petitioner had a daughter from a previous

170

marriage, and that his daughter was close friends with Shelah and spent a lot of time with her.  (38RT at 4790-92.)  As a result of that friendship, Shelah accompanied the Hart family on various outings in the Mustang.  (38RT at 4792-93.)  Linda Hart testified that the Widney family and her family often gathered in the family room of the Widney house.  Both the Harts's and Widney's dogs were often present with them.  (38RT at 4793-96.)

Linda also corroborated the coworker's testimony that Petitioner went to a job site at night on Friday, May 2, 1986.  (38RT at 4796-98.)  Linda did not recall what time Petitioner left for work, but she remembered going to bed and waking up at 2:30 a.m.  Petitioner was not home.  (38RT at 4798-4800.)  At approximately 4 a.m., Petitioner woke Linda up and said he was home.  (38RT at 4800.)  Petitioner was wearing the same clothes he wore to work, and Linda did not see anything like blood on them.  (38RT at 4802-03.)  After some time passed, Linda fell asleep again.  At some point after it was light out, Petitioner woke her up again.  He was then with her and their children the entire day, traveling to his job site and then to Lake Perris.  (38RT at 4804-06.)  At some point after Shelah went missing, Petitioner and Linda joined the entire Widney family at the Widney residence.  Linda heard Petitioner say that he got home from work at 4 a.m., had not seen anything strange on the streets, and that he went over to the Widney house at 7 a.m. to make a phone call.  (38RT at 4810.)  Linda also testified that her husband had been working on a long-term grading project in their back yard.  (38RT at 4811.)

The defense also called Shelah's mother (and Linda Hart's sister), Paula McMahan, to testify.  Paula testified that many people came and went from the Widney property; mostly friends of her brother's and another man living there at the time, Bobby Asendorf.  (39RT at 4859-60.)  The Widney residence was not usually locked at night.  (39RT at 4861.)  Paula had seen cable ties around the Widney property.  (39RT at 4861-62.)  Paula testified that Shelah had a fairly normal niece-uncle relationship with Petitioner.  Shelah was not extremely close to Petitioner, but mostly

171

liked him except when he would argue with her mother. (39RT at 4864.) Shelah did not appear fearful of Petitioner, and she spent a lot of time at the Hart residence playing with Petitioner's daughters. (39RT at 4865-67.) Petitioner's dog came over to the Widney property often, including into the trailer where Paula stayed with her boyfriend. Shelah played with the Harts' dog often. (39RT at 4867.) Paula also testified that, contrary to Carol Widney's account, on the Friday evening before Shelah went missing, Shelah was in the trailer for an extended period and only left to sleep inside the residence when it became too cold. (39RT at 4868.) Additionally, Paula testified that two days before Shelah died, Petitioner had given Shelah and a friend a ride to the store in his Mustang. (39RT at 4871.)

Lastly, the defense called Steven Widney, Paula and Linda'a brother. Steven testified that he lived on the Widney property for a period of time, worked with black cable ties, and brought many of them home. They were left around the property. (39RT at 4990-96.)

In the prosecution's rebuttal case, an officer testified that Linda told him Petitioner's primary car was the Mustang, and that she never drove the vehicle. (40RT at 5080.)

## 2. Claims and Analysis

### a. Admissibility of McMahan Evidence

Petitioner first argues that evidence of Shelah McMahan's murder was inadmissible in the penalty phase. The prosecution offered the evidence under California Penal Code section 190.3(b), criminal activity involving the use or attempted use of force or violence. Petitioner argues that state law prohibits the admission of felony convictions in the penalty phase unless those crimes *preceded* the commission of the capital crimes. By admitting the McMahan evidence in the penalty phase without first trying Petitioner for McMahan's murder, the prosecution ostensibly made an improper end-run around California law. (SAP at 320-21; Traverse at 232-33.) Petitioner's overriding concern seems to be that the prosecutor was essentially

1    permitted to mount a separate murder prosecution in the penalty phase.  (*See* SAP at

2    321 ("Here, the jury heard a murder trial within a murder trial . . . Mr. Hart was an

3    accused standing trial for a separate murder before a jury that had already found him

4    guilty of a first degree murder, but with none of the safeguards to which an accused is

5    entitled.").)

6         The California Supreme Court had a different interpretation of state law.  On

7    direct appeal, the state high court rejected Petitioner's statutory claim by referring to

8    its prior precedent.  *People v. Hart*, 20 Cal. 4th at 648-49.  In that prior precedent, the

9    California Supreme Court found "no legislative intent to limit the penalty phase

10   evidence to forceful or violent criminal activity which preceded the charged offense."

11   *People v. Hovey*, 44 Cal. 3d 543, 578 (1988); *see also People v. Balderas*, 41 Cal. 3d

12   144, 202 (1985) ("Subdivision (b) allows in *all* evidence of *violent* criminality to show

13   defendant's propensity for violence.") (italics in original).  As with Petitioner's other

14   non-cognizable claims, he has again taken issue with an interpretation by the state's

15   highest court on an issue of state law.  That is not for this Court to decide.  *Richey*, 546

16   U.S. at 76; *McGuire*, 502 U.S. at 67-68.

17        Petitioner attempts to federalize this claim by arguing that allowing the

18   prosecutor to subvert a subsection of the capital sentencing scheme renders the statute

19   arbitrary.  *See Gregg v. Georgia*, 428 U.S. 153, 189 (1976) ("[W]here discretion is

20   afforded a sentencing body on a matter so grave as the determination of whether a

21   human life should be taken or spared, that discretion must be suitably directed and

22   limited so as to minimize the risk of wholly arbitrary and capricious action.").  The

23   Court disagrees.  The state supreme court merely construed the statute's meaning

24   differently than Petitioner did.  The court did not permit the prosecutor to bypass any

25   part of the statute.  As to the "murder trial within a murder trial," Petitioner only

26   establishes that his penalty phase was unconventional.  Petitioner fails to show that the

27   admission of the McMahan evidence rendered the capital punishment statute overly

28

broad or applied it arbitrarily in violation of due process. Petitioner's subclaim fails here.

### b.  Sufficiency of McMahan Evidence

The Court has already discussed in detail the *Jackson* standard, and AEDPA's doubly-deferential review of a state court's application of that standard. There is no need to reiterate it at length here, particularly in light of the detailed penalty-phase evidence articulated above. The prosecution presented ample evidence linking Petitioner to Shelah McMahan's murder. Petitioner was the girl's uncle, lived two lots away, and had convenient access to the girl's sleeping area. There was no evidence of a struggle and no one heard the Widney's dog bark, a persuasive indication that the perpetrator was familiar and lured Shelah out of bed. Petitioner admitted to being in the house during the early morning hours when the girl went missing.

A sheriff's detective found a cable tie identical to the ties used to bind the victim's wrists, not only on Petitioner's property, but inside a shopping bag in his bedroom. Handcuffs found on Petitioner's property matched markings on the victim's wrist, contained blood flakes consistent with the victim's blood type, and had a fiber on them that was similar to the fibers that composed the victim's t-shirt. A handcuff key and holder were also found in the area where it appeared Petitioner was trying to incinerate evidence. Fibers found on the victim's shirt were similar to fibers found in Petitioner's Mustang. A cell mate of Petitioner's testified not only that Petitioner confessed to killing Shelah, but that Petitioner also told him other facts connecting Petitioner to Shelah's murder: the victim's age and physical build; Petitioner's sexual attraction to her; Petitioner's motive for killing her; Petitioner's easy access to her sleeping area; Petitioner luring her out of bed; Petitioner stabbing her; Petitioner leaving her body "at a dumping area"; Petitioner mulling the idea of blaming a third party for the killing. Petitioner unquestionably takes issue with the value and legitimacy of much of this evidence, and his lawyer did an exceptional job of challenging it on cross-examination. But, that is not relevant to the Court's analysis

here.   As to whether all of this evidence was minimally *sufficient* under the Constitution – that is, whether any rational jury could have concluded that Petitioner was the perpetrator – it is clear that it was.  *Jackson*, 443 U.S. at 319; *Lucero*, 902 F.3d at 990; *Johnson*, 566 U.S. at 656 ("[T]he only question under *Jackson* is whether [the jury's] finding was so insupportable as to fall below the threshold of bare rationality.").

Petitioner also complains that "the [California Supreme Court] never mentioned any evidence establishing the requisite intent to kill." (Traverse at 231.)  Petitioner's contention ignores the powerful circumstantial evidence, which certainly was discussed by the California Supreme Court, that the victim was woken up by her killer, lured to another location, and brutally and repeatedly stabbed.  Petitioner also admitted to a cell mate that he killed Shelah to keep her from telling her family about his other crimes.  *See People v. Stitely*, 35 Cal. 4th 514, 543 (2005) (in California, reviewing courts look to circumstantial evidence showing motive, planning activity, and manner of killing to determine the sufficiency of evidence of premeditation).  Petitioner otherwise seeks to re-examine the credibility of the evidence against him and cast a different narrative as to what conclusions should be drawn from it.  (SAP at 321-25.)  That is not a component of the *Jackson* analysis.  *Jackson*, 443 U.S. at 319, 326; *Cavazos v. Smith*, 565 U.S. at 2; *McDaniel*, 558 U.S. at 133; *Bruce*, 376 F.3d at 957; *Schlup*, 513 U.S. at 330.   The California Supreme Court did not unreasonably apply *Jackson* in determining that the evidence was sufficient here.  *People v. Hart*, 20 Cal. 4th at 649-50; *Johnson*, 566 U.S. at 651; *Emery*, 604 F.3d at 1111 n.7; *Juan H.*, 408 F.3d at 1274-75.

### c.   Admission of McMahan Evidence Without a Hearing

Petitioner argues very generally that the evidence of Shelah McMahan's murder was so unreliable that the trial court should have granted a defense motion for a pretrial hearing, either before an advisory jury or the court, before admitting it.  (SAP at 325-29; Traverse at 225-28.)  Petitioner does not make more than a drive-by mention of federal law.  (SAP at 327-29; Traverse at 225.)  While Petitioner does a thorough job

of summarizing his trial attorney's exceptional advocacy in arguing this issue, Petitioner fails to articulate a federal claim. The state court's denial of this claim under state law did not unreasonably apply any clearly-established Supreme Court precedent, as AEDPA requires. 28 U.S.C. § 2254(d)(1); *Richey*, 546 U.S. at 76; *McGuire*, 502 U.S. at 67-68.

### d. Failure To Require Jury Unanimity on McMahan Evidence

Petitioner also claims his constitutional rights were violated because the trial court failed to instruct the jury that they were specifically and unanimously required to find that Petitioner was guilty of murdering Shelah McMahan before imposing the death penalty. (Traverse at 228-30.) Petitioner's claim essentially criticizes the state court's conclusion that "the jury need not have unanimously agreed that the prosecution met its burden of proof as to the 'other crimes' evidence before a single juror could consider that evidence." *People v. Hart*, 20 Cal. 4th at 649. Petitioner's argument lacks merit.

Petitioner's jury was instructed with former CALJIC No. 8.84.1 (1986 rev.) (renumbered as CALJIC No. 8.85), which provided that "[i]n determining which penalty is to be imposed on defendant, you shall consider all of the evidence which has been received during any part of the trial in this case, except as you may be hereafter instructed." The instruction then listed the enumerated aggravating and mitigating factors provided in California Penal Code section 190.3, and directed jurors to "consider, take into account and be guided by the following factors, if applicable." (41RT at 5266-68.)

176

The jury was also given California's then-standard concluding instruction in death penalty cases (former CALJIC No. 8.84.2 (1986 rev.)).[26]   That instruction discussed the jury's weighing of aggravating and mitigating factors as follows:

> It is now your duty to determine which of the two penalties, death or confinement in the state prison for life without possibility of parole, shall be imposed on defendant.
>
> After having heard all the evidence, and after having heard and considered the arguments of counsel, you shall consider, take into account and be guided by the applicable factors of aggravating and mitigating circumstances upon which you have been instructed.
>
> The weighing of aggravating and mitigating . . . circumstances does not mean a mere mechanical counting of factors on each side of an imaginary scale, or the arbitrary assignments of weights to any of them. You are free to assign whatever moral or sympathetic value you deem appropriate to each and all of the various factors you are permitted to consider.
>
> In weighing the various circumstances you simply determine under the relevant evidence which penalty is justified and appropriate by considering the totality . . . of the aggravating circumstances with the totality of the mitigating circumstances.
>
> To return a judgment of death, each of you must be persuaded that the aggravating circumstances are so substantial in comparison with the mitigating circumstances that it warrants death instead of life without parole.

(41RT at 5269-70.)

---

[26]   The current version of the instruction (CALJIC No. 8.88) uses substantially similar language despite various revisions in the years since Petitioner's trial.

177

1   Additionally, Petitioner's jury was instructed as follows regarding the
2   consideration of other criminal acts:

3   Evidence has been introduced for the purpose of showing that the
4   defendant has committed criminal acts which involved the express or
5   implied use of force or violence or the threat of force or violence.  Before
6   you may consider any of such criminal acts as an aggravating
7   circumstance in this case, you must first be satisfied beyond a reasonable
8   doubt that the defendant did in fact commit such acts.

9   (41RT at 5268.)

10   Finally, Petitioner's jury was given a general unanimity instruction.  (41RT at
11   5270) ("In order to make a determination as to penalty, all 12 jurors must agree.").

12   Petitioner fails to show that the instructions as given were constitutionally
13   inadequate.  *See Smith v. Spisak*, 558 U.S. 139, 148 (2010) (state court reasonably
14   upheld under AEDPA penalty phase jury instructions that "focused only on the overall
15   balancing question" of aggravating and mitigating factors); *see also Boyde v.*
16   *California*, 494 U.S. at 386 (rejecting Eighth and Fourteenth Amendment challenges
17   to former CALJIC Nos. 8.84.1 and 8.84.2); *Clemons v. Mississippi*, 494 U.S. 738, 746
18   (1990) ("[T]he Sixth Amendment does not require that a jury specify the aggravating
19   factors that permit the imposition of capital punishment.").  Petitioner has not cited any
20   clearly established Supreme Court precedent requiring the additional instructions he
21   sets forth here, and the Court is unaware of any.  *See Van Patten*, 552 U.S. at 125-26.
22   This subclaim also fails.

23                    **e.       Failure to Grant Immunity to Testify**

24   Petitioner challenges the trial court's denial of his motion for use immunity.  The
25   defense requested that Petitioner be permitted to testify in response to the McMahan
26   evidence without that testimony later being used against him.  (SAP at 329-30;
27   Traverse at 233.)  Petitioner reasons that he "faced a dubious choice" because he was
28

178

forced to choose between two constitutional rights: the right to testify, and the right to remain silent if he was later tried for the murder of his niece.  (SAP at 329.)

The California Supreme Court denied Petitioner's claim by citing prior state and federal precedent.  *People v. Hart*, 20 Cal. 4th at 650.  Notably, the state court cited *McGautha v. California*, 402 U.S. 183 (1971), *vacated on other grounds*, 408 U.S. 941 (1972).  In that case, the United States Supreme Court denied an identical claim as it concerned unitary capital trials.  The High Court concluded that:

> [t]he criminal process, like the rest of the legal system, is replete with situations requiring the making of difficult judgments as to which course to follow.  Although a defendant may have a right, even of constitutional dimensions, to follow whichever course he chooses, the Constitution does not by that token always forbid requiring him to choose.

*Id.* at 213 (citation and internal quotation marks omitted).

Petitioner criticizes the California Supreme Court for relying on *McGautha* because the United States Supreme Court later vacated that decision in part.  However, "the Supreme Court and [the Ninth Circuit] have continued to rely on the quoted passage above." *Stuard v. Stewart*, 401 F.3d 1064, 1068 n.17 (9th Cir. 2005); *see also Bonin v. Calderon*, 59 F.3d 815, 839-40 (9th Cir. 1995).

Beyond that, Petitioner has pitted an actual constitutional right against a hypothetical one, without any legal support for doing so.  Specifically, he certainly had a right to testify in his capital trial.  But, Petitioner then asserts only a hypothetical right to silence in a hypothetical trial that never occurred.  Petitioner cites no clearly established Supreme Court precedent that would require a trial court to grant immunity under the circumstances presented here.  *See United States v. Yarbrough*, 852 F.2d 1522, 1529 (9th Cir. 1988) (no Fifth Amendment violation where defendants in a federal trial could "only speculatively point to some future state court homicide prosecution" in which their right to silence would be implicated).  This subclaim also fails under AEDPA.

1            **f.      *Brady* Claims Related to Shelah McMahan Evidence**

2                   **(1)      Randall Gresham Impeachment Evidence**

3       As discussed in detail above, jailhouse informant Randall Gresham testified for

4  the prosecution in the penalty phase of trial.  (36RT at 4531-32.)  Gresham testified

5  that Petitioner confessed to murdering his niece, and made several other inculpatory

6  statements involving her homicide, during a month-long period while Gresham was

7  housed with Petitioner in a segregation cell in the Riverside County Jail.  (36RT at

8  4532-42.)  Petitioner claims Gresham received a much more favorable sentence

9  reduction than the prosecutor disclosed in exchange for his testimony.  (Traverse at

10 156-64.)

11                           **(a)      Background Facts**

12      The jury heard evidence that Gresham was convicted in 1986 of two counts of

13 robbery, and one count each of assault on a police officer, auto theft, and for being an

14 ex-felon in possession of a firearm.  (36RT at 4534.)  According to the testimony,

15 Gresham received a ten-year sentence on all of those charges in exchange for his

16 testimony at Petitioner's trial.  (36RT at 4544.)  Gresham testified that, had he not

17 made the deal, he believed he was facing fifteen years in prison if convicted of his

18 charges.  (36RT at 4582.)  The jury also heard evidence that, at the time that Gresham

19 asked his lawyer to contact the district attorney about Petitioner's case, he had been

20 arrested for the attempted murder of a police officer.  (36RT at 4561-66.)

21      In 2006, in preparation to file a state habeas petition, Petitioner's lawyer sought

22 and received various documents from the Riverside District Attorney in discovery.

23 (SAP at 235; Traverse at 165; dkt. 99-14 at 78-80.)  Among those documents was

24 evidence, ostensibly not provided to the defense at trial, that Gresham was facing

25 significantly more prison time when he made his deal.  Specifically, the transcript of

26 Gresham's plea proceeding (which was apparently not ordered or prepared until after

27 Petitioner's trial) reflects that "[a]ll other charges which the People presently have any

28 information regarding will not be filed," and that a "five year prior" sentence

                                    180

1   enhancement would also not be filed against him.  (Dkt. 39 at 251; *see also* dkt. 40-1

2   at 51-58 (referring to "other counts" that were not yet filed to be included in Gresham's

3   ten-year deal).)   As to those "other charges," Petitioner offers criminal history

4   documents for Gresham that appear to show the sheriff's department suspected

5   Gresham in a multitude of other robberies.  (Dkt. 55–56-6 at 34.)  Gresham, in a

6   declaration, states that his lawyer showed him:

> a computer printout which he said the cops had given him.  On the
> printout, it had page after page of 211's – robbery charges – that I was
> suspected of.  [] I didn't do the robberies on the sheet, there must have
> been over 30 of them, but I was scared that I would go away to prison for
> the rest of my life if I were charged and convicted of them.

12  (Dkt. 40-1 at 29-30.)

13        Based on that, Gresham "was scared as hell, and knew I needed to make a deal."

14  Gresham states that "the decision not to investigate the other crimes was a critical part

15  of the deal I made.  I would not have made it otherwise."  Gresham also declares that

16  before he testified in Petitioner's case, his attorney and the prosecutor directed him not

17  to offer details of his plea deal unless asked. (Dkt. 40-1 at 30-31.)  During Gresham's

18  trial testimony, Petitioner's attorney asked him whether he became "aware that other

19  charges had been filed or pressed" against him.  Gresham discussed only the charged

20  crimes and stated, "That's all I can think of . . . ."  (36RT at 4563.)

21                    **(b)    Procedural Default**

22        Before discussing the merits of this *Brady* claim, the Court addresses procedural

23  bar.  Respondent timely asserted procedural default as a defense to this subclaim in the

24  Answer.  (Dkt. 93-1 at 35-36, 147-48.)  The Court subsequently ordered the parties to

25  brief procedural default on this issue.  (Dkt. 134.)  After considering the parties'

26  submissions and the governing law, the Court finds this subclaim is procedurally

27  barred.

28

1        The procedural default doctrine bars review of a petitioner's federal habeas

2    claim when the claim was rejected in state court based on an adequate and independent

3    state procedural rule.  *Davila v. Davis*, ___ U.S. ___, 137 S. Ct. 2058, 2064 (2017);

4    *Coleman v. Thompson*, 501 U.S. 722, 729-30 (1991).  California law provides that

5    claims in a state habeas petition which are "substantially delayed without justification

6    may be denied as untimely."  *Walker v. Martin*, 562 U.S. 307, 310 (2011).  The United

7    States Supreme Court has conclusively held that California's timeliness rule is both an

8    adequate and independent state rule.  *Id.* at 315, 321-22; *see also Bennett v. Mueller*,

9    322 F.3d 573, 582-83 (9th Cir.), cert. denied, 540 U.S. 938 (2003) (holding that

10   California's timeliness rule is independent; cited in *Martin* to show that the rule's

11   independence was no longer in dispute).

12       Petitioner raised his *Brady* claim in three state habeas petitions.  In all three, the

13   California Supreme Court expressly denied the claim on the merits.  However, in all

14   three, the *Brady* claim was alternatively denied as untimely, with citations to the

15   seminal state cases governing this issue, *In re Clark*, 5 Cal. 4th 750 (1993); and *In re*

16   *Robbins*, 18 Cal. 4th 770 (1998).[27]/  (Dkt. 101-2 at 126-31; dkt. 101-13; dkt. 102-2 at

17   115-21; dkt. 98-12 at 2; dkt. 98-13 at 18-45; dkt. 99-21.)

18       "California courts signal that a habeas petition is denied as untimely by citing

19   the controlling decisions, i.e., *Clark* and *Robbins*."  *Martin*, 562 U.S. at 310.  Here, the

20   state court did just that.  Consequently, the state court denied Petitioner's *Brady* claim

21   based on an adequate and independent state ground, and the claim is therefore

22   procedurally defaulted in this Court.  *Davila*, 137 S. Ct. at 2064; *Coleman*, 501 U.S.

23   at 729-30; *Martin*, 562 U.S. 307, 315, 321-22.   Nothing in Petitioner's papers

24   persuades the Court to the contrary.

25       An otherwise defaulted claim may be heard on the merits where "the prisoner

26   can demonstrate cause for the procedural default and actual prejudice, or demonstrate

27   _____

28   [27]/  The state court also invoked other procedural bars that are not relevant here.

that the failure to consider the claim[] will result in a fundamental miscarriage of justice." *Bennett*, 322 F.3d at 580.  In light of those exceptions to procedural bar, the Court specifically provided Petitioner with an opportunity to establish cause and prejudice, or a miscarriage of justice. (Dkt. 134 at 2.)  However, his arguments were again not persuasive.  The Court finds that Petitioner's *Brady* subclaim is procedurally barred.

### (c)   Merits

Even assuming Petitioner's *Brady* claim as it concerns Gresham had not been defaulted, the claim would still not entitle him to federal habeas relief.  As discussed above, the state court denied this *Brady* subclaim expressly on the merits (in the alternative to procedural default), so AEDPA applies. 28 U.S.C. § 2254(d).  Under that difficult standard, the claim fails.  As discussed in reference to Petitioner's earlier *Brady* allegations, evidence is only "material" within the meaning of *Brady* "when there is a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different." *Turner*, 137 S. Ct. at 1893.

Petitioner's materiality argument focuses on the multiple ways his defense counsel might have attacked Gresham's credibility had he been properly armed with all the information about the alleged deal.  Petitioner's penalty-phase attorney declares that, had he been in possession of this evidence, he would have "made every attempt" on cross-examination to uncover Gresham's desperation and fear of being imprisoned for life. (Dkt. 40-1 at 41.)  However, even assuming Gresham had been *entirely discredited* by the jury, the Court cannot conclude there was a reasonable probability of a different result without ignoring the other, powerful evidence implicating Petitioner in his niece's murder. *Turner*, 137 S. Ct. at 1893.

As discussed in detail above, ample evidence connected Petitioner to his niece's killing: The Court reiterates that evidence an additional time here for emphasis.  He lived on an adjacent property and had access to the room where she was sleeping.  He regularly came in and made phone calls from that room.  He admitted that he actually

did go into the room at some point during the time she disappeared. Shelah's grandmother testified that Shelah was a responsible child who never left suddenly or without notice. It did not appear that Shelah was forcibly taken from where she had been sleeping, leading to the inference that she was lured away by someone she trusted. That inference was further supported by the fact Shelah disappeared from the house in the middle of the night, and the Widneys had a dog on the property that barked at strangers to the household. Handcuffs were later discovered on Petitioners property containing blood flakes that were consistent with Shelah's blood type, and a fiber that was similar to the fibers that composed Shelah's t-shirt. Through experimentation, a criminalist also determined that indentations made by the handcuffs were similar to indentations shown on Shelah's wrist in autopsy photographs. When Shelah's body was discovered on a vacant lot, her hands were tied behind her back with a black plastic cable tie. Black plastic cable ties were found by the police in Petitioner's bedroom and around his property. A criminalist compared the black cable tie found in Petitioner's bedroom with the cable ties that bound Shelah's wrists, and determined that they were the same length, same width, were made by the same manufacturer, and were the same line of cable ties made by that manufacturer. Forensic analyses concluded that fibers and dog hair found on Shelah's clothing were similar to fibers found inside Petitioner's Mustang and Petitioner's dog' hair.

Based upon the foregoing, Petitioner is unable to point to material *Brady* evidence involving Gresham. The Court is mindful of the added impact Petitioner's confession to the murder of his niece might have had. However, in this case, in light of all the evidence pointing to Petitioner's guilt as the perpetrator in his niece's murder, there is not a reasonable probability of a different result. *Turner*, 137 S. Ct. at 1893; *Kyles*, 514 U.S. at 434. Notably, the evidence at issue was presented in the penalty phase, so the jury was ultimately deciding whether to impose the death penalty (not whether Petitioner was guilty of this crime). The penalty phase evidence also included Petitioner's brutal crimes against Amy Ryan and Diane Harper, as well as his history

of sexual crimes.  The jury could have considered the brutal murder of an eleven-year-old to be the ugliest of Petitioner's crimes, and yet *still* have imposed the death penalty based solely on the other evidence.  *See Agurs*, 427 U.S. at 109-10; *see also Barker*, 423 F.3d at 1099 (the mere possibility that undisclosed information might have helped the defense or affected the outcome of the trial does not establish materiality).  Because the alleged withholding of impeachment evidence as to witness Gresham was immaterial for *Brady* purposes, the second *Brady* subclaim in Claim 12 is DENIED.

### (d)    Knowingly Presenting False Evidence

Finally, the Court addresses the remaining subclaim in Claim 16, in which Petitioner similarly complains that Gresham lied on the stand and prosecutors knowingly allowed that to happen.  (SAP at 279-81; Traverse at 199-202.)

"The Supreme Court has long recognized that '[t]he principle that a State may not knowingly use false evidence . . . to obtain a tainted conviction [is] implicit in any concept of ordered liberty,' and a violation of due process." *Lanuza v. Love*, 899 F.3d 1019, 1025 (9th Cir. 2018) (*quoting Napue v. Illinois*, 360 U.S. 264, 269 (1959) (brackets in original)).  It is therefore unconstitutional for a prosecutor to knowingly introduce, solicit, or allow false testimony.  *Mendez v. Swarthout*, 734 F. App'x. 421, 424 (9th Cir. 2018) (*citing Napue*, 360 U.S. at 269) (cited pursuant to 9th Cir. R. 36-3).

To prevail on a constitutional false testimony claim, a petitioner must show "(1) the testimony . . . was actually false, (2) the prosecution knew or should have known that the testimony was actually false, and (3) the false testimony was material." *Sanders*, 873 F.3d at 794 (*quoting Reis-Campos v. Biter*, 832 F.3d 968, 976 (9th Cir. 2016)); *see also Hein v. Sullivan*, 601 F.3d 897, 908 (9th Cir. 2010) (same).

Speculation that the prosecutor knew or should have known that a witness's testimony was false is insufficient under *Napue*.  *Skains v. California*, 386 F. App'x 620, 621-22 (9th Cir. 2010) (cited pursuant to 9th Cir. R. 36-3).  However, materiality under *Napue* is less demanding than *Brady*.  "Under *Napue*, a conviction must be set aside whenever there is *any* reasonable likelihood that the false testimony could have

affected the judgment of the jury." *Reis-Campos*, 832 F.3d at 976 (emphasis in original, citations and internal quotation marks omitted); *see also Dow v. Virga*, 729 F.3d 1041, 1048 (9th Cir. 2013) (same).

The California Supreme Court rejected Petitioner's *Napue* claim without substantive comment on state habeas review. Consequently, this Court must determine whether any arguments or theories under *Napue* could have supported the state court's decision. *Richter*, 562 U.S. at 102.

The Court has already discussed the issues surrounding Gresham's testimony in detail in addressing the related *Brady* claim. It is unnecessary to retread the same information here. Suffice it to say that, even in light of *Napue*'s lowered materiality standard, it was objectively reasonable for the California Supreme Court to reject Petitioner's claim because the testimony was not material to the outcome. *Reis-Campos*, 832 F.3d at 976; *Dow*, 729 F.3d at 1048; *Richter*, 562 U.S. at 102. As the Court explained above, Gresham's testimony was unnecessary to persuade the jury that Petitioner killed his niece, or to persuade jurors to sentence Petitioner to death. There is not a reasonable likelihood that the testimony at issue – even assuming without finding that it was false – changed the jury's decision. *Reis-Campos*, 832 F.3d at 976; *Dow*, 729 F.3d at 1048.

The second prosecutorial misconduct subclaim in Claim 16 is DENIED.

**(2)     Third Party Culpability Evidence**

Petitioner complains that the prosecution failed to turn over several items of evidence ostensibly pointing to other suspects in his niece's murder: carpet fibers, a bus and a trailer on the Widney property, Shelah's diary, and two police reports referencing different individuals who were under investigation at some point. (Traverse at 165; dkt. 39 at 110, 113-32, 135, 138.) It is unnecessary for the Court to

delve into each of Petitioner's failed arguments.[28]   Aside from the fact that the exculpatory value in any of these items of evidence is patently unconvincing, this *Brady* claim fails for the same fundamental reason as the previous one.   Whether Petitioner focuses on the government's alleged failure to turn over this evidence or his penalty-phase attorney's failure to more vigorously pursue these avenues of strategy, he reaches the same obstacle.   The penalty phase evidence implicating Petitioner in his niece's murder was strong enough that efforts to deflect blame were futile at best, and would have appeared desperate and dishonest at worst.   Further, the jury heard ample additional evidence even beyond Shelah's killing from which to impose the death penalty.   Because the alleged withholding of this evidence was immaterial to the outcome, the state court's denial of this claim was reasonable.   *Richter*, 562 U.S. at 101; *Turner*, 137 S. Ct. at 1893; *Kyles*, 514 U.S. at 434; *Agurs*, 427 U.S. at 109-10; *Barker*, 423 F.3d at 1099.

As Petitioner has not shown an entitlement to federal habeas relief on any of his penalty-phase claims involving the Shelah McMahan homicide, Claim 27 is DENIED.

## X.   Improper Admission of Cindy Widney's Testimony in Penalty Phase (Claim 28)

Petitioner complains that the prosecution's rebuttal evidence in the penalty phase was improperly admitted in violation of due process. (SAP at 331-35; Traverse at 234-37.) This claim is not cognizable in a federal habeas petition.

### 1.   Background Facts

Petitioner's penalty-phase evidence was initially focused on rebutting the prosecution's evidence that he murdered his niece. (38RT at 4745-56, 4760-67, 4770-78, 4782-84, 4786-4807, 4810-11, 4839-40; 39RT at 4856-72; 4990-96.) However, the defense also presented testimony in mitigation from multiple witnesses, including

---

[28] Petitioner's tortured interpretation of the young girl's diary entries is particularly unpersuasive.

Petitioner's parents, wife, mother-in-law, sister-in-law, ex-wife, and ex-sister-in-law. The testimony painted a picture of Petitioner as a good husband, excellent father, active churchgoing citizen, hardworking employee, and an honest, reliable person.  Both his wife and ex-wife testified to separate incidents in which Petitioner literally saved someone's life.  Witnesses also explained that Petitioner was damaged by triggering life events such as a serious auto accident as a young child, and later, his ex-spouse's infidelity. (39RT at 4887-4906, 4916-31, 4933-42, 4946-47, 4950-61, 4964-76, 4984-86, 4998-5008; 40RT at 5019-23, 5028.)

In rebuttal, the prosecutor first proffered the testimony of Petitioner's other sister-in-law, Cindy Widney.  In an admissibility hearing, the prosecutor argued that Cindy would testify about unwelcome sexual advances that Petitioner made to her. The prosecutor cntended that the testimony was relevant rebuttal evidence because "the defense has portrayed Mr. Hart as a very caring and loving husband and father to his children, and that is not quite the case." (40RT at 5038.)  Defense counsel objected to the testimony on the basis that the defense was not timely notified about it, and because it did not rebut evidence that Petitioner was a good father.  (40RT at 5040-41.)  The court allowed the testimony.  As to its relevance as rebuttal evidence, the court found:

> It strikes me that one of the strengths that I have heard or I perceived was presented to me is that he had a good family relationship and was thought of highly by [his in-laws], by his parents, by Linda Hart, and so forth.  And it would strike me that him making advances to another person of this nature would be in direct contradiction to what's been presented, [and] I would think this is as direct [a] contradiction of that as I could imagine.

(40RT at 5041-42.)  The court further (subsequently) found that:

> As to [California Evidence Code section] 352, as I interpret the language, evidence that is prejudicial is evidence that might be considered

188

1    by the jury in an improper fashion, and it strikes me that that's not really
2    the case here.

3         If this is true, and obviously I'll have to wait and hear the witness,
4    if it strikes me this is true, it does indicate that there was something going
5    on with Mr. Hart and even among the relatives, it indicates that the
6    picture of, you know, of rather pleasant, relaxed, caring family life was
7    not completely true.

8    (40RT at 5043-44.)

9         Cindy Widney testified about four incidents.  In one, Petitioner kissed her
10   without her consent and she told him no.  He answered, "You can't hurt a guy for
11   trying."  In the second, Petitioner came to Widney's residence when her husband was
12   out and she was sunbathing in her yard.  Petitioner told Widney he had been dreaming
13   about her.  When she asked him to leave, he said, "I can't help what I'm dreaming."
14   On a third occasion, Petitioner joked that maybe he should marry Widney.  On the
15   fourth occasion, Petitioner again came to Widney's home while she was alone and she
16   was too afraid to answer the door.  Widney closed her blinds and turned on the shower
17   so Petitioner would think she was busy and leave.  Widney then called her neighbor
18   and asked her to watch Petitioner's movements.  The neighbor told Cindy that he was
19   entering the residence through a side gate.  Cindy grabbed a baseball bat and closed
20   herself in her bedroom.  Petitioner then came to the door and opened it.  Widney asked,
21   "[W]hat are you doing in my house?"  Petitioner responded that he "didn't know if you
22   were raped, hurt or what."  Petitioner apparently left when Widney threatened to call
23   the police.  (40RT at 5047-58, 5073-75.)

24        **2.   Analysis**

25        Petitioner claims Widney's testimony violated due process because it violated
26   California law.  Specifically, he argues that none of the incidents she testified to
27   amounted to criminal activity, so the testimony was not admissible under California
28

Penal Code section 190.3(b).  He also claims the testimony was irrelevant and not proper rebuttal evidence.

On direct appeal, the California Supreme Court again disagreed with Petitioner's interpretation of state law.  The state high court found that section 190.3(b) was inapplicable, and that Widney's testimony was admissible as rebuttal to Petitioner's evidence of his character, background, and history.  (*See* Cal. Penal Code § 190.3 ("In the proceedings on the question of penalty, evidence may be presented by both the people and the defendant as to any matter relevant to aggravation, mitigation, and sentence including, but not limited to, . . . the defendant's character, background, history, mental condition and physical condition.").  The court further found that any alleged error was not prejudicial to Petitioner, as Widney's testimony stood against the backdrop of Petitioner's conviction of one brutal murder, multiple sexual assaults, and overwhelming penalty-phase evidence that Petitioner murdered his eleven-year-old niece and assaulted other women.  *People v. Hart*, 20 Cal. 4th at 652-53.

As was the case with several other claims, Petitioner makes this claim solely under state law.  He again only purports to make a federal argument for what is in fact a state evidentiary claim.  The premise of his constitutional claim is that the evidence at issue was irrelevant and unduly prejudicial, which is governed by California law.  *See* Cal. Penal Code § 190.3.  This is another claim that follows squarely under *Holley*, *McGuire*, *Richey*, and *Windham* – cases holding that a federal court holds no authority to review alleged violations of a state's laws or evidentiary rules.  *Holley*, 568 F.3d at 1101; *McGuire*, 502 U.S. at 67-68; *Richey*, 546 U.S. at 76; *Windham*, 163 F.3d at 1103.  Also, as already stated, a habeas petitioner cannot "transform a state law issue into a federal one merely by asserting a violation of due process," which is what Petitioner has attempted to do here.  *Langford*, 110 F.3d at 1389.  As a federal court may entertain a habeas petition by a state prisoner "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States," 28 U.S.C. § 2254(a), Petitioner's claim is not cognizable here.

1       Lastly, for precisely the same reasons given by the California Supreme Court,

2  even if Petitioner had shown that the state courts violated clearly established Federal

3  law here, the alleged evidentiary error was harmless for the reasons articulated by the

4  California Supreme Court. *See Brecht v. Abrahamson*, 507 U.S. 619, 623, 637 (1993)

5  (a habeas petitioner is entitled to relief only if an alleged error had a "substantial and

6  injurious effect or influence in determining the jury's verdict," and only if he can

7  establish actual prejudice).

8       Claim 28 is DENIED.

9       **Y.**    **Instructional Error: Failure to Instruct on Elements of Other**

10            **Criminal Acts Presented in Penalty Phase (Claim 29)**

11       Petitioner argues that it was unconstitutional for the trial court not to instruct the

12  jury on the elements of every crime proffered in aggravation in the penalty phase of

13  trial. (SAP at 335-37; Traverse at 237-43.) Petitioner's argument misconstrues the

14  jury's responsibility in weighing aggravating and mitigating evidence.

15       In California, a death sentence is authorized by statute when the jury finds

16  special circumstance allegations true beyond a reasonable doubt at the guilt phase. *See*

17  Cal. Penal Code § 190.2; *Pensinger v. Chappell*, 787 F.3d 1014, 1025 (9th Cir. 2015)

18  ("California's death penalty statute requires the jury to find the existence of special

19  circumstances to distinguish between defendants who are eligible for the death penalty

20  and those who are not."). Special circumstance findings at the guilt phase alternatively

21  give the option of imposing life in prison without the possibility of parole. *See* Cal.

22  Penal Code § 190.2(a).

23       Thus, the penalty phase is not a proceeding in which a defendant's maximum

24  punishment is determined or increased. *See Noguera v. Davis*, 290 F. Supp. 3d 974,

25  1092 (C.D. Cal. 2017) ("[O]nce the jury has found a special circumstances to be true,

26  unanimously and beyond reasonable doubt, death is an authorized punishment.").

27  Instead, it is a sentencing proceeding in which the jury decides based upon various

28  factors which eligible penalty to impose, life without parole or death. *See* Cal. Penal

Code §190.3.  Unlike the guilt phase, the California Supreme Court describes the penalty phase in a California trial as "a moral and normative process" in which "it is not necessary to give instructions associated with the usual factfinding process." *People v. Carter*, 30 Cal. 4th 1166, 1220 (2003) (*quoting People v. Holt*, 15 Cal. 4th 619, 684 (1997)); *see also* Cal. Penal Code § 190.3(k) (the jury in the penalty phase must consider and "be guided by" the aggravating and mitigating circumstances); *California v. Ramos*, 463 U.S. at 1008 n.22 ("[T]he constitutional prohibition on arbitrary and capricious capital sentencing determinations is not violated by a capital sentencing scheme that permits the jury to exercise unbridled discretion in determining whether the death penalty should be imposed after it has found that the defendant is a member of the class made eligible for that penalty by statute.") (citation and internal quotation marks omitted).

Consistent with this principle, "a trial court has no sua sponte duty" under state law "to instruct the jury as to the elements of all of the other crimes that have been introduced at the penalty phase." *People v. Davenport*, 41 Cal. 3d 247, 281 (1985). California courts do permit such instructions where a party requests them or the trial court deems them "vital to a proper consideration of the evidence."  But, the California Supreme Court also recognizes the potential prejudice to the defendant if given as a matter of course. *Id.* at 281-82 ("[A] defendant, for tactical reasons, may not want the penalty phase instructions overloaded with a series of lengthy instructions on the elements of alleged other crimes because he may fear that such instructions could lead the jury to place undue emphasis on the other crimes rather than on the central question of whether he should live or die.").  Petitioner points to no clearly established Federal law invalidating the state's law or its reasoning. *Van Patten*, 552 U.S. at 126.

Petitioner's case, in fact, highlights the soundness of the state's approach.  At his penalty phase, the prosecution presented evidence of five prior criminal acts and the uncharged murder of Petitioner's niece.  All of the criminal acts alleged by the prosecution boiled down to what *facts* the jury believed, not whether elements of the

corresponding crimes were satisfied.  Debra B. testified that Petitioner attacked and choked her in her apartment in 1973.  Priscilla N. and the police testified that in 1973 she was attacked her in her apartment and Petitioner confessed that he was the perpetrator (and that his intent was to rape her).  Valerie T. testified that in 1975 Petitioner grabbed her from behind, pulled her into an alley, placed a knife to her throat, pulled down her jeans, and attempted to penetrate her with his penis.  Marilyn S. testified (and there was evidence of Petitioner's confession) that in 1975 Petitioner broke into her apartment and forced her to orally copulate him at knife point.  Deborah T. testified that in 1975 Petitioner poked his head into her apartment window and he confessed that he was there to sexually assault her.  Similarly, the jury either believed Petitioner was the perpetrator of the gruesome killing of his niece, or they did not. While the criminal nature of each of these acts might have had a bearing on their *admissibility* under state law (*see People v. Phillips*, 41 Cal. 3d 29, 72 (1985)), Petitioner fails to credibly explain how the legal implications of those acts – namely, the elements of any resulting crimes – would have any bearing on the jury's "moral and normative process" of weighing all the factors to determine Petitioner's fate.  *Carter*, 30 Cal. 4th at 1220.

Further, Petitioner's case presents a strong example of why California trial courts have discretion on whether to instruct on the elements of the prior criminal acts. *Davenport*, 41 Cal. 3d at 281.  For example, it was not clear from the evidence whether or how much Petitioner penetrated Valerie T. when he assaulted her.  Petitioner might well have been prejudiced by the trial court instructing on the elements of rape as to Valerie T., and focusing the jury on the specifics of that violent attack to determine whether there was adequate penetration.  The omission of the elements of the crimes presented in aggravation was arguably favorable to Petitioner.  *Henderson*, 431 U.S. at 155 (instructional error does not rise to a constitutional level unless it "so infected the entire trial that the resulting conviction violates due process" and an omission is less likely to be prejudicial than a misstatement of the law.").

Lastly, Petitioner argues that it was particularly harmful not to provide the elements of these crimes to the jury since the trial court instructed them that "[b]efore you may consider any of such criminal acts as an aggravating circumstance in this case, you must first be satisfied beyond a reasonable doubt that the defendant did in fact commit such acts." (41RT at 5268). The Court concludes there was no reasonable likelihood that any alleged ambiguity in this instruction changed the jury's verdict or caused the jury to apply the instruction in an unconstitutional manner. *McGuire*, 502 U.S. at 72; *Boyde v. California*, 494 U.S. at 380.

In denying this instructional error claim on direct appeal, the California Supreme Court concluded that there was "convincing·evidence of criminal activity properly admitted under section 190, subdivision (b). There is no indication that an instruction on the specific crimes and elements would have changed the jury's assessment of the evidence or would have affected the outcome of the trial." *People v. Hart*, 20 Cal. 4th at 652. The state court's reasoning and conclusion were not objectively unreasonable under AEDPA.

Claim 29 is DENIED.

## Z.    Instructional Error: Mention of Governor's Power to Commute Sentences in Penalty Phase (Claim 30)

Petitioner takes issue with the way the trial court answered a question posed by a juror during the penalty phase. The court's answer touched on the power of California's governor to commute a death sentence. Petitioner argues that by raising the possibility of commutation, the trial court lowered the stakes in the minds of jurors, making it impermissibly easier to impose the death penalty. (SAP at 338-42; Traverse at 243-56.)

### 1.    Factual Background

During the penalty phase of trial, a juror submitted a note to the judge. The note asked two questions, the first of which is relevant to Claim 30: "Does life in prison

without the possibility of parole mean that [Petitioner] will never get out under any circumstances?"  (41RT at 5160.)

After conferring with both attorneys and considering a proposed instruction from defense counsel, the court addressed the jury as follows:

> That question causes the Court a great deal of concern and it's caused other courts a great deal of concern, and the reason why, it has an element of speculation in it, it shows that people are worrying about what's going to happen after the decision in this particular case.
>
> It really is inappropriate for the – for jurors or for me to rely or to even think about that kind of material, because I don't know what's going to happen because it's speculation, number one, and, secondly, to the extent that people are worrying about someone else doing something, they may take their present job less seriously.
>
> Let me just say, the law does have a provision in the California Constitution that the Governor does have the power to commute both sentences, both the death sentence and the life without possibility of parole sentence to something less than that, if the Governor sees fit.
>
> Now, I've been in the criminal justice system for 13 years and I've never seen the commutation power used.  Given the way things are now, I can't imagine in this particular case that power applying.
>
> I think if you approach this case from any other perspective other than death means death or life without possibility of parole means exactly that, you would be deluding yourself.  I think you've got to resign yourself that the two choices that you're going to make here are the two sentences that are going to be carried out in this particular case.
>
> Is everybody clear as to what my feelings are?  And I think for you to speculate [on] anything else would be inappropriate.

(41RT at 5161-62.)

195

On direct appeal, the California Supreme Court rejected Petitioner's challenges to the instruction.  The state's high court found that, in view of its prior decisions:

we believe that once a juror inquired as to the actual meaning of a sentence of life without possibility of parole, the trial court did not err in explaining that although the Governor has the power to commute both a sentence of death and a sentence of life without possibility of parole, it would be inappropriate for the jury to approach the case from any other perspective other than death means death and life without possibility of parole means exactly that.  (Citations and quotation marks omitted.)

Further, although the trial court's comments would have been more complete and fully accurate had they noted that, in the case of a "twice-convicted" felon such as defendant, (footnote omitted) the Governor may not grant clemency without the favorable recommendation of four or more justices of this court, we do not believe that this omission rendered the trial court's comments so incomplete or misleading as to be constitutionally deficient under the federal constitutional standard established in [*California v. Ramos*, 463 U.S. at 1010-12] or that the omission, even if error, was prejudicial under [*Chapman v. California*, 386 U.S. 18, 24 (1967)].  (Footnote omitted.)

The crucial point and overall thrust of the trial court's comments was to inform the jurors that any speculation on the part of a juror that life without the possibility of parole meant anything other than precisely that would be inappropriate, and thus the comments properly informed the jurors that they were not to consider the commutation power at all in arriving at their sentencing determination.  In light of this message, the circumstance that the trial court's comments did not explain the existence of a limitation on the Governor's commutation power is insignificant. The comments were sufficient to advise the jurors not to consider the

1  speculative possibility of commutation.   The specific details of the
2  commutation process (that the jurors were not to consider) bore no
3  relevance to the jury's task.   Under these circumstances, we conclude
4  there is no reasonable possibility that the incompleteness of the trial
5  court's comments affected the result.

6  *People v. Hart*, 20 Cal. 4th at 656-57.

7  ## 2.   Analysis

8  "[A] capital sentencing jury's consideration of the Governor's power to
9  commute a life sentence is not prohibited by the Federal Constitution, . . . ." *California*
10  *v. Ramos*, 463 U.S. at 1010.   Bringing to the jury's attention the possibility that
11  someone may be returned to society allows the jury to include future dangerousness
12  in its capital sentencing decision, a factor that the Constitution allows. *Id.* at 1001-03;
13  *see also Jurek*, 428 U.S. at 275-76 ("[A]ny sentencing authority must predict a
14  convicted person's probable future conduct when it engages in the process of
15  determining what punishment to impose. . . . What is essential is that the jury have
16  before it all possible relevant information about the individual defendant whose fate
17  it must determine.").

18  Petitioner, however, does not merely take issue with the fact that the trial court
19  mentioned the governor's commutation power.  Petitioner more specifically claims the
20  court erroneously told the jury that a life sentence may be commuted "if the Governor
21  sees fit," leaving jurors with an inflated view of the governor's actual power.
22  Petitioner was convicted of multiple felonies at trial, and the California Constitution
23  provides that "[t]he Governor may not grant a pardon or commutation to a person twice
24  convicted of a felony except on recommendation of the Supreme Court, 4 judges
25  concurring."  Cal. Const. art. 5, § 8.  In addition to the requirement that four justices
26  concur in the decision, there are different procedural hurdles for prisoners with
27  multiple felonies, such as a requirement that they apply for commutation directly to the
28  governor, and that the Board of Parole Hearings investigates and makes a

197

1 | recommendation to the governor. *Coleman v. Calderon*, 210 F.3d 1047, 1050 (9th Cir.
2 | 2000) (*citing* Cal. Penal Code §§ 4802, 4813). In Petitioner's view, by omitting the
3 | additional information about the commutation power, the trial court "diminished the
4 | jury's sense of responsibility for the sentencing determination" and misled them to
5 | believe that if they did not impose the death penalty, Petitioner could be released "by
6 | the singular feat of the Governor." (SAP at 340-41 (citation omitted).)

7 |      Petitioner's claim fails under AEDPA. The most analogous Supreme Court case
8 | Petitioner cites is *Caldwell v. Mississippi*, 472 U.S. 320, 329 (1985). In that case, the
9 | Supreme Court found a constitutional violation where a prosecutor led the jury to
10 | believe that the ultimate responsibility for determining the appropriateness of a death
11 | sentence rested with an appellate court's later review of the case. *Id.* at 323, 328-29.
12 | That is precisely the *opposite* of what happened here. In this case, a juror raised the
13 | issue of whether Petitioner could ever be released if the jury imposed life without
14 | parole. In response, the trial judge expressed "a great deal of concern" that the juror
15 | would be speculating about such an "inappropriate" matter. The judge then briefly
16 | acknowledged the governor's commutation power, but added that the court had "never
17 | seen the commutation power used." The court then went so far as to tell the jury he
18 | could not "imagine in this particular case that power applying," and that jurors "would
19 | be deluding" themselves if they thought their sentence would not be carried out.
20 | (41RT at 5161-62.) Contrary to the constitutional problem presented in *Caldwell*, the
21 | trial court here adamantly advised Petitioner's jury that the ultimate responsibility for
22 | determining the appropriateness of a death sentence rested with them alone – to the
23 | point of saying they were delusional if they thought otherwise. Consequently, the
24 | conclusion of the California Supreme Court was not contrary to, or an unreasonable
25 | application of, any governing clearly established Federal law. 28 U.S.C. § 2254(d).

26 |      Petitioner relies primarily on *Coleman*, the Ninth Circuit case cited above. In
27 | that case, the trial court gave California's now-defunct standard "Briggs instruction"
28 | at the close of the penalty phase. That instruction, pursuant to California law,

deliberately informed the jury of the governor's power to commute a life sentence. *See People v. Ramos*, 30 Cal. 3d 553, 590 (1982).[29/]  The defendant in *Coleman* had two prior felony convictions, and the court's Briggs instruction did not include the information discussed above regarding limitations on the commutation power as it concerned prisoners with multiple felonies. *Coleman*, 210 F.3d at 1050.  Further, in *Coleman*, the trial court instructed the jury without further explanation that they "may not speculate as to if or when a governor would commute the sentence to a lesser one which includes the possibility of parole."[30/]  *Id.*  The Ninth Circuit concluded, "Not only was the instruction misleading, it was constitutionally infirm because it discouraged the jury from giving due weight to Coleman's mitigating evidence." *Id.* The court also found that, as phrased, the instruction invited the jury to assume that the case would automatically be put before the governor.  *Id.*  Ultimately, the court found "the jury was diverted from its task by having its attention focused on the Governor's ill-defined commutation power rather than the mitigation evidence introduced during

---

[29/]  The United States Supreme Court upheld the Briggs instruction under the federal Constitution, *California v. Ramos*, 463 U.S. at 1013, but the California Supreme Court subsequently ruled that the instruction violated the state's constitution and it was discontinued before Petitioner's trial. *See People v. Ramos*, 37 Cal. 3d 136, 159 (1984).

[30/]  The full text of the instruction given in *Coleman* read as follows: "You are instructed that under the State Constitution, a Governor is empowered to grant a reprieve, pardon or commutation of a sentence following conviction of the crime.  [¶] Under this power, a Governor may in the future commute or modify a sentence of life imprisonment without the possibility of parole to a lesser sentence that would include the possibility of parole.  [¶]  So that you will have no misunderstandings relating to a sentence of life without the possibility of parole, you have been informed generally as to the Governor's commutation modification power.  You are now instructed, however, that the matter of a Governor's commutation power is not to be considered by you in determining the punishment for this defendant.  [¶]  You may not speculate as to if or when a governor would commute the sentence to a lesser one which includes the possibility of parole." *Coleman*, 210 F.3d at 1050.

the penalty phase." *Id.* at 1050-51. The court also went on to find that the instructional error was not harmless. *Id.* at 1051.

Petitioner's reliance on *Coleman* is not successful here. First, *Coleman* is obviously not "clearly established Federal law" as determined by the Supreme Court. 28 U.S.C. § 2254(d); *Van Patten*, 552 U.S. at 126. Second, even assuming that *Coleman* controlled here, the same facts discussed above materially distinguish Petitioner's case from *Coleman*. The Briggs instruction given in *Coleman* was specifically intended to draw attention to the governor's commutation power. *See People v. Ramos*, 30 Cal. 3d at 590. The instruction was given as a matter of course, unprompted by curiosity on the part of any jurors. To the extent that instruction was incomplete as it concerned defendants with multiple felonies, the Ninth Circuit concluded on several occasions that the Briggs instruction affirmatively and inappropriately *invited* jurors to consider erroneous information. *See Coleman*, 210 F.3d at 1050-51; *McLain v. Calderon*, 134 F.3d 1383, 1386 (9th Cir. 1998); *Hamilton v. Vasquez*, 17 F.3d 1149, 1162 (9th Cir. 1994). Here, to the contrary, no Briggs instruction was given, and no instructions were intended to inform jurors about the governor's commutation power. It was a juror who raised the issue, and the trial court made efforts to provide an answer without drawing attention to the issue. The court acknowledged the governor's commutation power, but strongly advised jurors not to speculate about it, and even told them quite frankly that commutation was highly unlikely in Petitioner's case. The California Supreme Court – the same court that found the Briggs instruction misleading and unconstitutional – concluded here that, under the circumstances, the court's omission of additional information about limits on the commutation power did not "render[] the trial court's comments so incomplete or misleading as to be constitutionally deficient . . . ." In light of the stark contrast between the Briggs instruction and the trial judge's advisement here, the conclusion of the California Supreme Court was well within reason under AEDPA. *Richter*, 562 U.S. at 101; *LeBlanc*, 137 S. Ct. at 1728.

The Court also disagrees with Petitioner's argument that *accuracy* was the lynchpin of the Briggs instruction's constitutionality in *California v. Ramos*. (Traverse at 246.)  The Supreme Court upheld the Briggs instruction as constitutional because it did "not preclude individualized sentencing determinations or consideration of mitigating factors, nor [did] it impermissibly inject an element too speculative for the jury's deliberation." *California v. Ramos*, 463 U.S. at 1013.  The admonition at issue was valid for the same reasons.  The speculative element here was raised in a juror's question.  The trial court's response specifically sought to *eliminate*, not impermissibly inject, that speculative element from the jury's deliberation. *Id.*; *see also Caldwell*, 472 U.S. at 329 (the capital "sentencing process should facilitate the responsible and reliable exercise of sentencing discretion.").

The California Supreme Court's denial of Petitioner's instructional error claim involving the governor's commutation power was reasonable under AEDPA.

Claim 30 is DENIED.

**AA.   Trial Court's Review of Probation Report (Claim 31)**

Petitioner takes issue with the fact that the trial judge reviewed his probation report before denying his motion to modify the death sentence.  He claims that the California Supreme Court's denial of relief on this issue on state habeas review was unreasonable under *Booth v. Maryland*, 482 U.S. 496, 508-09 (1987). (SAP at 342-45; Traverse at 257-59.)

**1.    Factual and Legal Background**

The Eighth Amendment prohibits a capital sentencing jury from considering "a victim's family members' characterizations and opinions about the crime, the defendant, and the appropriate sentence . . . ." *Bosse v. Oklahoma*, ___ U.S. ___, 137 S. Ct. 1, 1-2 (2016) (per curiam).  Such evidence is considered "irrelevant to a capital sentencing decision," and "its admission creates a constitutionally unacceptable risk that the jury may impose the death penalty in an arbitrary and capricious manner."

*Booth v. Maryland*, 482 U.S. 496, 503 (1987), *overruled in part by Payne v. Tennessee*, 501 U.S. 808, 828-30, 830 n.2 (1991).

Pursuant to California statute, Petitioner's death sentence triggered an automatic motion to modify that verdict. Cal. Penal Code § 190.4(e); *People v. Landry*, 2 Cal. 5th 52, 123 (2016) ("Every death verdict triggers an automatic application for modification of the sentence.") (citation omitted). In ruling on such a motion, the trial court "reweighs the evidence, considers the aggravating and mitigating circumstances, and determines whether, in its independent judgment, the weight of the evidence supports the jury's verdict." *People v. Mungia*, 44 Cal. 4th 1101, 1139 (2008). The court must articulate the reasons for its findings to assure meaningful appellate review. *Id.*; Cal. Penal Code § 190.4(e).

The California Supreme Court has also held that in ruling on such a motion, "the trial court may only rely on evidence that was before the jury," and therefore, "the better procedure is to rule on the application for modification before reading the probation report." *People v. Williams*, 40 Cal. 4th 287, 337 (2006) (citation omitted). However, under state law, "reading the probation report before ruling on the section 190.4 motion is not prejudicial error when nothing in the record suggests the court considered or relied on the probation report . . . when ruling on the application for modification." *Id.* (citation omitted).

Petitioner's probation report was not admitted into evidence for the jury's consideration. However, at the start of the hearing on Petitioner's automatic motion to modify his death sentence, the trial court perfunctorily stated that it reviewed Petitioner's written motion and his probation report. (42RT at 5292.) The court did not discuss the contents of the report or mention the report again until sentencing.

The probation report contained a section entitled "victim information," which included the following passage:

> William Harper, the father of the deceased victim, Diane Harper, was contacted and made the following comments concerning this matter.

202

He said that he wished to compliment [] Deputy District Attorney Zellerbach and the law enforcement officers involved in the prosecution of this case.  He said that they did their jobs well and justice was served by the jury's verdict, with which he totally agrees.  He said that William Hart deserves to be put to death for what he did to his daughter, Amy Ryan and the other women he has victimized throughout the years.  He said that the prosecution of this case has been extremely difficult for everyone concerned and that he is glad it is over.  Mr. Harper commented that he was present in Court [every day] during the trial, with the exception of the days where the jury was required to view pictures of his daughter.  He said that he would be present on the day of sentencing.  He hopes that the judge will not commute the defendant's sentence or in any way modify the penalty fixed by the jury for the murder of his daughter.

(3CT at 659-60.)

In denying Petitioner's motion to modify the verdict, the trial court thoroughly set forth the factors forming the basis of its decision.  Specifically, the court considered: (1) the evidence presented in both phases of trial; (2) the aggravating and mitigating circumstances set forth in California Penal Code section 190.3; and (3) decisional law of the California Supreme Court "expanding the types of mitigating evidence that should be considered in determining the appropriate penalty." (42RT at 5297.)  The court then found that the jury's verdicts on all counts and special circumstance allegations were supported by the weight of the evidence.  (42RT at 5297-99.)

Next, the court expressly denied the arguments made in Petitioner's written motion to modify the verdict, finding that the prosecution's penalty-phase evidence was properly admitted.  (42RT at 5299-300.)  The trial court then individually discussed each of the enumerated statutory aggravating and mitigating circumstances, and applied each to the facts of the case.  (42RT at 5300-07.)  In doing so, the court

1    recited the details of Petitioner's crimes against Diane Harper and Amy Ryan, and

2    concluded that "most things being relative, the Court finds the circumstances of this

3    case to be far more aggravating than would even be expected in a case as serious as a

4    capital case." (42RT at 5301.) The court further found that all of the prior crimes

5    presented in the penalty phase were proven beyond a reasonable doubt, and that they

6    evidenced "a long and disturbing history of sexually assaulting defenseless women."

7    (42RT at 5301-03.) The trial court was also "satisfied beyond a reasonable doubt" that

8    Petitioner killed his eleven-year-old niece, Shelah McMahan, and the court discussed

9    the evidence of guilt in detail. (42RT at 5303-05.) The court described Petitioner's

10   conduct in the killing of his niece as "extremely aggravating" and "the stuff of which

11   nightmares are made." (42RT at 5305.)

12       Ultimately, the trial court found beyond a reasonable doubt that "the aggravating

13   circumstances were substantial in comparison with the . . . mitigating circumstances,

14   . . . ." (42RT at 5307.) The court noted that it "would find this to be true even without

15   any evidence relating to the murder of Shelah McMahan." (42RT at 5307-08.) The

16   court denied the motion to reduce the death verdict and formally imposed sentence.

17   (42RT at 5308-09.)

18           **2.    Analysis**

19       The Court finds that Claim 31 is not cognizable on federal habeas review. 28

20   U.S.C. § 2254(a); *McGuire*, 502 U.S. at 67-68. Petitioner fails to point to clearly

21   established Federal law prohibiting the trial court from reviewing the material at issue.

22   Petitioner attempts to analogize the facts at issue with the Supreme Court's Eighth

23   Amendment jurisprudence under *Booth*, which prohibits capital juries from considering

24   various victim and family impact information. *Booth*, 482 U.S. at 503. But, there are

25   marked, obvious differences here: this matter involves a judge's post-verdict

26   consideration of whether to modify a sentence already decided by a jury. The

27   objectionable statement by the victim's father was not admitted into evidence as an

28

204

1  aggravating factor, it simply appeared in a probation report that the judge reviewed at
2  the post-trial hearing.

3         Moreover, under state law, the judge had a statutory duty to articulate the
4  circumstances he relied on in denying Petitioner's application.  As set forth above, the
5  trial judge did just that, making a thorough record discussing the aggravating and
6  mitigating factors that went into his denial of the motion.  The court independently
7  reviewed the evidence that was before the jury, and discussed in detail the facts of the
8  capital crimes.  Notably, in the twelve pages of the trial transcript in which the court
9  set forth its reasoning, the probation report was never mentioned.  (42RT at 5297-
10 5308.)  The court also did not discuss any of the contents of that report in making its
11 ruling.  The fact that the court made no mention of the probation report or the victim's
12 father's statements while setting forth its findings further supports the already solid
13 conclusion that the information played no factor.

14        In any event, Petitioner's task here is to articulate a violation of clearly
15 established Federal law.  He has failed to do so.  *McGuire*, 502 U.S. at 67-68.  Claim
16 31 is not cognizable and is DENIED.

17        **BB.   Death Penalty Improperly Imposed Because it Was Repealed By**
18              **California's Three Strikes Statute (Claim 32)**

19        Petitioner argues that California's death penalty statute was repealed in 1994
20 when California passed its "Three Strikes" law.  Petitioner theorizes that the language
21 of the Three Strikes law is all-encompassing, so it applies to Petitioner's crimes and
22 supersedes the death penalty scheme.  (SAP at 345-46 ("The [Three Strikes] statutory
23 scheme by its own terms applies to all felony cases 'notwithstanding any other law.'");
24 Traverse at 259.)  Petitioner asserts that the United States Constitution prohibits his
25 sentence under a repealed statute.  (*Id.*); *see also Bell v. Maryland*, 378 U.S. 226, 231
26 n.2 (1964).

27
28

On Petitioner's direct appeal, the California Supreme Court denied Petitioner's contention by referring to prior cases in which that court held the Three Strikes law did not repeal the death penalty. *People v. Hart*, 20 Cal. 4th at 658.

Claim 32 is also not cognizable on federal habeas review. Petitioner's constitutional claim – that his rights were violated when he was sentenced under a repealed statute – places the cart before the horse. The first determination is whether the death penalty scheme in California was, in fact, repealed by another intervening state law. That is purely an issue of statutory construction. As discussed multiple times already in this Order, the United States Supreme Court has "repeatedly held that a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus." *Richey*, 546 U.S. at 76; *McGuire*, 502 U.S. at 67-68 ("[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions.").

Here, the California Supreme Court clearly differs with Petitioner on this crucial point of state law. *People v. Hart*, 20 Cal. 4th at 658; *People v. Alvarez*, 14 Cal. 4th 155, 246-47 (1996); *People v. Samayoa*, 15 Cal. 4th 795, 861-62 (1997); *see also People v. Lucero*, 23 Cal. 4th 692, 738-39 (2000). This Court will not second-guess the state court's conclusion on an issue of state law. *Richey*, 546 U.S. at 76; *McGuire*, 502 U.S. at 67-68.

Claim 32 is not cognizable, and is therefore DENIED.

**CC.   Unconstitutional Sentencing Scheme (Claim 33)**

Petitioner makes several arguments challenging the constitutionality of California's death penalty statute and jury instructions authorized by it. The California Supreme Court denied these claims on habeas review without comment. This Court touches on these patently meritless contentions only briefly, below.

**1.       Failure To Narrow Death-Eligible Defendants/Vagueness**

Petitioner argues that California's death penalty statute violates the Eighth Amendment and due process. He claims the law is too broad and vague because it fails

206

1    to narrow the class of death-eligible defendants, and the death penalty is therefore
2    imposed arbitrarily.  In a similar argument, he claims that the statute's aggravating
3    factors are so vague that prosecutors are essentially left with unfettered discretion to
4    use numerous unrelated facts in aggravation.  (SAP at 347-51; Traverse at 259-61.)

5         Petitioner is unable to show that the California Supreme Court's denial of these
6    claims was contrary to, or an unreasonable application of, clearly established Federal
7    law.  The United States Supreme Court has held that a state's capital sentencing
8    scheme must "genuinely narrow the class of persons eligible for the death penalty and
9    must reasonably justify the imposition of a more severe sentence on the defendant
10   compared to others found guilty of murder." *Lowenfield v. Phelps*, 484 U.S. 231, 244
11   (1988) (citation omitted).  "This narrowing requirement is usually met when the trier
12   of fact finds at least one statutorily defined eligibility factor at either the guilt or
13   penalty phase." *Brown v. Sanders*, 546 U.S. 212, 216 (2006).  The jury certainly did
14   that here; Petitioner fails to show that the constitutional "narrowing requirement" was
15   not fulfilled.

16        Further, Petitioner fails to cite any clearly established law that would render
17   California's death penalty statute unconstitutional on the vagueness arguments made
18   here.  This is "not surprising" because the related Supreme Court authority that does
19   exist runs contrary to Petitioner's assertions.  *Cf. Moses*, 555 F.3d at 761; *see also*
20   *Brown*, 546 U.S. at 223-24; *Belmontes*, 549 U.S. at 13; *Kansas v. Marsh*, 548 U.S. 163,
21   177 (2006); *Tuilaepa*, 512 U.S. at 975-80; *Boyde v. California*, 494 U.S. at 377.
22   Notably, the Supreme Court made clear in *Tuilaepa* that "vagueness review is quite
23   deferential," and "a factor is not unconstitutional if it has some common-sense core of
24   meaning . . . that criminal juries should be capable of understanding." *Tuilaepa*, 512
25   U.S. at 973 (citation and internal quotation marks omitted).  Petitioner has not pointed
26   to any failure of "common-sense core of meaning" in the statutory scheme at issue.
27   His constitutional challenges based on the alleged failure to narrow the class of death-
28   eligible defendants and vagueness do not survive AEDPA review.

207

1

### 2.     Failure to Require Written Findings

2          Petitioner contends that his death verdict violated the Eighth and Fourteenth

3    Amendments because it is essentially unreviewable.  He reasons that without a written

4    statement by the jury indicating which aggravating factors informed its penalty verdict,

5    there is no way to review that verdict meaningfully.  (SAP at 351-52.)

6          Petitioner's claim is again not supported by any clearly established Supreme

7    Court precedent.  Further, while the Supreme Court has not squarely addressed the

8    issue, the Ninth Circuit and the California Supreme Court have ruled contrary to

9    Petitioner's position. *See Williams v. Calderon*, 52 F.3d at 1484-85 (California's death

10   penalty statute "need not require written jury findings in order to be constitutional.")

11   (citation omitted); *see also People v. Powell*, 5 Cal. 5th 921, 1003 (2018) ("The jury

12   need not make written findings regarding the existence of aggravating factors."); *see*

13   *also Clemons*, 494 U.S. at 750 ("Nor are we impressed with the claim that without

14   written jury findings concerning mitigating circumstances, appellate courts cannot

15   perform their proper role.").

16         The California Supreme Court's denial of Petitioner's claim based on the failure

17   of the jury to provide written reasons for imposing the death penalty was not contrary

18   to, or an unreasonable application of, clearly established Federal law.  28 U.S.C. §

19   2254(d); *Van Patten*, 552 U.S. at 125-26.

20

### 3.     Unfettered Prosecutorial Discretion

21         Petitioner alleges that California's death penalty statute arms prosecutors with

22   excessive authority for choosing which cases and crimes are death-eligible.  Petitioner

23   argus that federal law requires "principled decision-making" in prosecutions and the

24   avoidance of "arbitrary and wanton" discretion for juries.  (SAP at 352.)  Petitioner

25   makes no allegation that either of these principles are, empirically, being violated by

26   California prosecutors.  He only claims that the allegedly open-ended authority enjoyed

27   by prosecutors creates a risk that these principles will be violated.  As Petitioner has

28   not alleged a violation of clearly established Federal law, this portion of his challenge

1  to California's death penalty statute summarily fails under AEDPA.  28 U.S.C. §
2  2254(d).

### 4.  Failure to Require Jury to Find Aggravating Circumstances True Unanimously and Beyond a Reasonable Doubt

Petitioner argues that the penalty-phase jury instructions authorized under California's death penalty statute were inadequate in such a way that they steered the jury improperly toward choosing the penalty of death.  Specifically, he complains that the instructions should have admonished the jury that they must unanimously agree on the truth of the aggravating circumstances, and that they must find those circumstances true beyond a reasonable doubt.  (SAP at 353-54.)

The Court denies this claim primarily for the reasons already discussed in addressing Claim 27, above.  The penalty-phase instructions clearly and adequately admonished the jury of its responsibility, and did so in accordance with the Constitution.  Among those instructions, Petitioner's jury was given a unanimity instruction.  (41RT at 5270 ("In order to make a determination as to penalty, all 12 jurors must agree.").)  Further, "the Sixth Amendment does not require that a jury specify the aggravating factors that permit the imposition of capital punishment." *Clemons*, 494 U.S. at 746.  Petitioner fails to show that the instructions as given were constitutionally inadequate.  *Spisak*, 558 U.S. at 148; *Boyde v. California*, 494 U.S. at 386; *id.* at 377; *Van Patten*, 552 U.S. at 125-26.

Petitioner is also unable to establish that the instructions as given so infected the entire trial that the resulting conviction violated due process.  *Cupp*, 414 U.S. at 147.  In light of other material factors such as the powerful evidence of guilt, Petitioner's proposed jury instructions would not have brought about a different result or changed the proceedings.  Petitioner has not established a constitutional violation.  *Cupp*, 414 U.S. at 147; *McNeil*, 541 U.S. at 437; *Henderson*, 431 U.S. at 155.

Petitioner's challenge to the constitutionality of California's death penalty statute, including its application in his case, is unsupported by clearly established Supreme Court precedent.  28 U.S.C. § 2254(d).  Claim 33 is DENIED.

**DD.   Eighth Amendment Claim Based on Disproportionality (Claim 34)**

The Supreme Court has held, concerning "the imposition of capital punishment for the crime of murder," that "when a life has been taken deliberately by the offender, we cannot say that the punishment is invariably disproportionate to the crime.  It is an extreme sanction, suitable to the most extreme of crimes." *Gregg*, 428 U.S. at 187 (footnote omitted).

Petitioner claims his death sentence is unconstitutionally disproportionate based upon his particular circumstances.  (SAP at 354-56; Traverse at 261-62.)  But, the circumstances to which he refers are merely rehashes of prior arguments.  He argues that his mental deficits and Amy Ryan's alleged participation in the murder diminished his culpability and rendered his extreme punishment cruel and unusual.  Petitioner is essentially basing an Eighth Amendment cruel and unusual punishment claim on the crime he feels he *should have* been convicted of, not the one he was actually convicted of.  Petitioner points to no Supreme Court cases establishing that his sentence is disproportionate to the crime here. *Gregg*, 428 U.S. at 187.  To the extent Petitioner's mention of mental deficits is meant to suggest that his execution would violate the Eighth Amendment, the Court directs him to its ripeness analysis of Claim 41.  Any claim Petitioner wishes to raise based on his mental state or fitness at the time of execution should be brought at the appropriate time.

Petitioner has shown no violation of clearly established Federal law based on his Eighth Amendment claim.  Claim 34 is DENIED.

**EE.   Death Sentence Is Based on Inaccurate and Unreliable Evidence (Claim 35)**

In Claim 35, Petitioner largely repeats allegations already addressed in this Order.  The Court will not address those individual issues again.  The crux of

210

Petitioner's argument seems to be that his penalty was based upon "materially inaccurate" evidence that falls short of the "heightened reliability" required from capital cases. In short, he claims that the cumulative effect of several alleged errors left the jury with a skewed picture of the facts. (SAP at 356-58; Traverse at 262-63.) Petitioner fails to distinguish Claim 35 from his cumulative error claims, which the Court addresses in the appropriate section of this Order. This claim otherwise does not articulate any independent, cognizable ground for relief. Claim 35 is DENIED.

### FF.    Improper Use of Unitary Jury (Claim 36)

Petitioner argues that he was deprived of the right to an impartial jury and a reliable verdict because "the same jury that had only a few days earlier found him guilty of murder and rape" sentenced him to death. (SAP at 358-60; Traverse at 263.) Petitioner's claim patently fails under AEDPA. There is no clearly established Federal law prohibiting a unitary jury in death penalty cases, and the only Supreme Court cases to (generally) address the issue have ruled unfavorably to Petitioner's arguments. *See Lockhart v. McCree*, 476 U.S. 162, 175-76 (1986) (a state has a legitimate interest "in obtaining a single jury that can properly and impartially apply the law to the facts of the case at both the guilt and sentencing phases of a capital trial."); *Gregg*, 428 U.S. at 158 (opinion of Stewart, Powell, and Stevens, JJ.) (upholding Georgia capital sentencing scheme requiring unitary jury in capital cases). Petitioner has offered no legal authority explaining why *McCree* is no longer valid Supreme Court precedent. Claim 36 is DENIED.

### GG.    Lethal Injection Protocol Is Cruel and Unusual (Claim 37)

Petitioner alleges that California's administration of the death penalty by lethal injection violates the Eighth Amendment. (SAP at 360-64.) However, Petitioner acknowledges in the Traverse that this claim is unripe because "California presently does not have a lethal injection protocol." In lieu of immediate habeas relief, Petitioner "reserves the right to brief this claim in light of the new protocol if it goes into effect." (Traverse at 264.) The Court agrees that Claim 37 is unripe.

Courts have invalidated California's previous lethal injection protocols.  *See Payton v. Cullen*, 658 F.3d 890, 893 (9th Cir. 2011); *see also Sims v. Dep't of Corrections and Rehabilitation*, 216 Cal. App. 4th 1059, 1084 (2013); *Morales v. Cal. Dep't of Corrs. & Rehab.*, 168 Cal. App. 4th 729 (2008).

California enacted a new lethal injection protocol in 2018 following California's adoption of Proposition 66, The Death Penalty Reform and Savings Act of 2016 approved by the voters on November 8, 2016.  *See Lewis v. Davis*, No. CV 03-6775-LJO-SAB, 2018 WL 4024811, at *167 (E.D. Cal. Aug. 20, 2018) (*citing* Cal. Code Regs. tit. 15 § 3349.1(i) (2018)).  However, the constitutionality of the new protocol "is the subject of ongoing litigation in the Northern District of California and a stay upon execution of defendants therein is in effect pending conclusion of the litigation." *Id.* (*citing Morales v. Kernan*, No. 06-CV-0219 RS, 2017 WL 8785130, at *3 (N.D. Cal. Dec. 4, 2017).

Because the method that might be used in Petitioner's case cannot presently be determined, the claim is not ripe.  This claim must therefore be denied without prejudice to it being renewed at the appropriate time.  *See Payton v. Cullen*, 658 F.3d at 893.  Respondent may assert his arguments in response then, too.

Claim 37 is DISMISSED WITHOUT PREJUDICE.

## HH.   Unconstitutional Imposition of the Death Penalty without a Legitimate Governmental Purpose or Adequate Due Process Protections (Claim 38)

In Claim 38, Petitioner makes broad and conclusory constitutional allegations. His principal theme is that California's death penalty statute violates due process and the Eighth Amendment because it is arbitrarily applied, fails to adequately protect innocent people, and because the death penalty is antiquated (SAP at 364-69; Traverse at 264-65).  *See Moore v. Texas*, ___ U.S. ___, 137 S. Ct. 1039, 1048 (2017) (in assessing whether a punishment is cruel and unusual under the Eighth Amendment, courts consider "the evolving standards of decency that mark the progress of a

maturing society.") (citation omitted).   The California Supreme Court denied Petitioner's analogous claim on state habeas review.

Perhaps an indication of "evolving standards," capital punishment has recently been the subject of greater scrutiny nationwide, not the least of which in California. *See People v. Potts*, 6 Cal. 5th 1012, 1062-67 (2019) (Liu, J., concurring) (criticizing California's death penalty scheme and discussing California Governor Newsom's executive order placing a moratorium on capital punishment).   However, Petitioner's claim is governed by clearly-established Supreme Court precedent.   Petitioner has pointed to no Supreme Court case invalidating the death penalty in California on any of the constitutional bases mentioned in Claim 38.   *Van Patten*, 552 U.S. at 125-26. And, as already discussed in Claim 33, above, the Supreme Court has entertained and rejected similar constitutional challenges to California's death penalty statute.   Because Petitioner's allegations patently fail under AEDPA, Claim 38 is DENIED.

## II.   Denial of Meaningful Appellate Review/IAC of Appellate and Habeas Counsel (Claim 40)

Claim 40 is presented in three-parts.   First, Petitioner argues that delays in his appellate review process denied various constitutional rights.   Second, he makes a conclusory and generalized allegation of ineffective assistance of appellate counsel. Third, he argues that the state habeas proceedings were constitutionally deficient to protect his rights.   (SAP at 371-73; Traverse at 269-70.)

Petitioner's allegations were reasonably rejected by the California Supreme Court on state habeas review.   It is true that the U.S. Supreme Court "has repeatedly emphasized that meaningful appellate review of death sentences promotes reliability and consistency."   *Campbell v. Ohio*, ___ U.S. ___, 138 S. Ct. 1059, 1060 (2018) (Sotomayor, J., respecting the denial of certiorari) (*quoting Clemons*, 494 U.S. at 749); *see also Parker v. Dugger*, 498 U.S. 308, 321 (1991).   However, Petitioner makes only general allegations here that do not adequately support his assertions.   As to his first allegation, he had no clearly established constitutional right to a speedy appeal.   *Hayes*

*v. Ayers*, 632 F.3d 500, 523 (9th Cir. 2011).   As for the remaining allegations, Petitioner's conclusory statements alleging flawed post-conviction proceedings and deficient appellate counsel fail to articulate a constitutional claim for relief.   *See Blackledge v. Allison*,431 U.S. 63, 74, 76 n.7 (1977) ("[C]onclusory allegations unsupported by specifics [are] subject to summary dismissal, as are contentions that in the face of the record are wholly incredible," and a federal habeas petition "is expected to state facts that point to a real possibility of constitutional error") (internal quotation marks omitted).

For the foregoing reasons, Claim 40 is DENIED.

## JJ.    Mental Incompetency at Time of Execution (Claim 41)

Petitioner alleges that he is mentally incompetent to be executed, a claim brought under *Ford*, 477 U.S. at 410 ("The Eighth Amendment prohibits the State from inflicting the penalty of death upon a prisoner who is insane.").   (SAP at 373-74; Traverse at 271.)   However, as both parties agree, with no execution date set or currently in sight, the claim is not yet ripe.   *Stewart v. Martinez-Villareal*, 523 U.S. 637, 644-45 (1998); *Panetti v. Quarterman*, 551 U.S. 930, 943 (2007) ("*Ford*-based incompetency claims, as a general matter, are not ripe until after the time has run to file a first federal habeas petition.").   Since Petitioner's execution is "not imminent and therefore his competency to be executed [cannot] be determined at [this] time," dismissal means that Petitioner "does not receive an adjudication of his claim." *Martinez-Villareal*, 523 U.S. at 644-45.   As a result, under express Supreme Court precedent, Petitioner may raise the claim in this Court again when it is ripe.   *Id.*

Further, dismissing Claim 41 as premature would appear to benefit Petitioner, or at least not be detrimental to his claim.   *See Panetti*, 551 U.S. at 943 (concluding that forcing petitioners to file *Ford* claims prematurely could be detrimental to those with no early sign of mental illness, and finding that "[a]ll prisoners are at risk of deteriorations in their mental state.").   For now, Petitioner's claim can only be supported with current medical records and speculation about the future.   *See id.*

214

1   (characterizing premature *Ford* claims as "unripe and, often, factually unsupported.")

2   (parenthesis omitted).  Petitioner should raise this claim at the appropriate time.

3      On the ground of unripeness, Claim 41 is DISMISSED WITHOUT

4   PREJUDICE.

5      **KK.  IAC Claims (Claim 6)**

6      Petitioner raises twenty-three IAC subclaims alleging deficient performance by

7   both his guilt-phase and penalty-phase attorneys.  The Court addresses the merits of

8   these subclaims below.  As most of the subclaims fail for the same reasons, the Court

9   finds it unnecessary to address them all separately.

10          **1.    Legal Standard**

11      A Sixth Amendment IAC claim has two components.  "First, the defendant must

12   show that counsel's performance was deficient."  This requires showing that counsel

13   made errors so serious that counsel was not functioning as the 'counsel' guaranteed the

14   defendant by the Sixth Amendment."  *Strickland v. Washington*, 466 U.S. 668, 687

15   (1984).  Significantly, because "[i]t is all too tempting for a defendant to second-guess

16   counsel's assistance after conviction or adverse sentence, and it is all too easy for a

17   court, examining counsel's defense after it has proved unsuccessful, to conclude that

18   a particular act or omission of counsel was unreasonable," judicial scrutiny of an

19   attorney's performance "must be highly deferential."  *Id.* at 689.

20          There are, . . . "countless ways to provide effective assistance in

21          any given case.  Even the best criminal defense attorneys would not

22          defend a particular client in the same way."  (Citation omitted.)  Rare are

23          the situations in which the "wide latitude counsel must have in making

24          tactical decisions" will be limited to any one technique or approach.

25          (Citation omitted.)

26   *Richter*, 562 U.S. at 106 (*quoting Strickland*, 466 U.S. at 689).

27      A reviewing court "must indulge a strong presumption that counsel's conduct

28   falls within the wide range of reasonable professional assistance; that is, the defendant

must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Strickland*, 466 U.S. at 689 (internal quotation marks and citation omitted). Federal courts are required not merely to give trial counsel the benefit of the doubt, but to affirmatively entertain the range of possible reasons for counsel having proceeded as they did. *Pinholster*, 563 U.S. at 196. Notably, when formulating a defense strategy, "sometimes is better to try to cast pervasive suspicion of doubt than to strive to prove a certainty that exonerates." *Richter*, 562 U.S. at 109.

In the context of investigating possible defenses, a lawyer is under a duty to make reasonable investigations. *Strickland*, 466 U.S. at 691. For example, the lawyer has a duty to investigate the defendant's "most important defense." *Bragg v. Galaza*, 242 F.3d 1082, 1088 (9th Cir. 2001) (*quoting Sanders v. Ratelle*, 21 F.3d 1446, 1457 (9th Cir. 1994)). An attorney must also adequately "investigate and introduce into evidence records that demonstrate factual innocence, or that raise sufficient doubt on that question to undermine confidence in the verdict." *Id.* (*quoting Hart v. Gomez*, 174 F.3d 1067, 1070 (9th Cir. 1999)).

However, the duty to investigate and prepare a defense is not limitless. *Id.*; *Hendricks v. Calderon*, 70 F.3d 1032, 1040 (9th Cir. 1995). A lawyer must also be capable of making "a reasonable decision that makes particular investigations unnecessary." *Strickland*, 466 U.S. at 691. Thus, an attorney may avoid activities that appear "distractive from more important duties." *Richter*, 562 U.S. at 107. The lawyer is "entitled to formulate a strategy that [is] reasonable at the time and to balance limited resources in accord with effective trial tactics and strategies." *Id.* An attorney also "need not pursue an investigation that would be fruitless, much less one that might be harmful to the defense." *Id.* at 108 (*citing Strickland*, 466 U.S. at 691); *Bragg*, 242 F.3d at 1088 (a defense attorney is not required to interview every conceivable witness). "There is a strong presumption that counsel's attention to certain issues to the exclusion of others reflects trial tactics rather than sheer neglect." *Richter*, 562

U.S. at 109 (citation and internal quotation marks omitted); *see also Strickland*, 466 U.S. at 691 (to determine the reasonableness of a decision not to investigate, the court must apply "a heavy measure of deference to counsel's judgments.").

It is difficult to establish ineffective assistance based on the failure to investigate "when counsel's overall performance indicates active and capable advocacy." *Richter*, 562 U.S. at 111; *see also Bragg*, 242 F.3d at 1088 (*citing Eggleston v. United States*, 798 F.2d 374, 376 (9th Cir.1986)) ("When the record clearly shows that the lawyer was well-informed, and the defendant fails to state what additional information would be gained by the discovery she or he now claims was necessary, an ineffective assistance claim fails.").

"Second, the defendant must show that the deficient performance prejudiced the defense. This requires demonstrating that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Strickland*, 466 U.S. at 687. Specifically, a petitioner must "affirmatively prove prejudice," and "[i]t is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding." *Id.* at 693. Instead, the petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694.

Additionally, "[u]nless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable." *Id.* at 687. Therefore, "a court need not determine whether counsel's performance was deficient before examining the prejudice," and "[i]f it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed." *Id.* at 697.

Finally, while "[s]urmounting *Strickland*'s high bar" alone "is never an easy task," the additional task of "[e]stablishing that a state court's application of *Strickland*

217

1   was unreasonable under § 2254(d) is all the more difficult." *Richter*, 562 U.S. at 105
2   (citations omitted).  Both standards are "highly deferential," so "when the two apply
3   in tandem, review is 'doubly' so . . . ." *Id.* (*citing Knowles v. Mirzayance*, 556 U.S.
4   111, 123 (2009)).  Specifically, "[w]hen § 2254(d) applies, the question is not whether
5   counsel's actions were reasonable.  The question is whether there is any reasonable
6   argument that counsel satisfied *Strickland*'s deferential standard." *Id.* "The *Strickland*
7   standard is a general one, so the range of reasonable application is substantial." *Id.*
8   "Reliance on 'the harsh light of hindsight' to cast doubt on a trial that took place now
9   more than 15 years ago is precisely what *Strickland* and AEDPA seek to prevent." *Id.*
10  at 107 (citations omitted).

### 2.  Background Facts

12      In denying Petitioner's IAC claims on direct appeal, the California Supreme
13  Court made notable findings about the defense attorneys' options and possible
14  strategies, consistent with this Court's conclusions about the strength of the
15  prosecution's evidence.  For example, as to the guilt phase, the court noted that, "in
16  view of the physical evidence that linked defendant to the crimes, and the extended
17  period of time during which Amy had an opportunity to observe defendant on the day
18  the crimes were committed," defense counsel reasonably avoided challenging a pretrial
19  lineup consistent with an "overall trial strategy not to challenge defendant's presence
20  at the crime scene, but instead to claim that the killing of Diane did not constitute first
21  degree murder." *People v. Hart*, 20 Cal. 4th at 625.  The state court further found that:

> trial counsel was confronted with overwhelming evidence that defendant
> killed Diane in the course of a sexual assault, and the manner of killing
> (repeated powerful blows to the back of the head with a rock), combined
> with defendant's statement to Amy that "your friend was an asshole, she
> called me a few names, and I think she's dead," strongly suggested that
> he acted with the intent to kill.  In view of these circumstances, trial
> counsel could have had a reasonable tactical basis for deciding to forego

218

the presentation of a mental state defense in favor of a defense challenging the prosecution's forensic evidence.  Counsel's strategy conceivably could have persuaded the jury to acquit defendant of the charge that he raped Diane and to convict him only of second degree murder.

*Id.* at 627-28.

Subsequently, the California Supreme Court again found that:

the overwhelming nature of the evidence against defendant left counsel with little opportunity to mount a persuasive summation.  The surviving victim had testified in graphic detail regarding defendant's involvement in the charged offenses.  Defendant's fingerprint was found on a beer bottle recovered from the remote crime scene.  Other physical and circumstantial evidence linked defendant to the crimes.  In view of the evidence presented against defendant, trial counsel reasonably could have concluded that challenging the evidence more vigorously in his argument risked alienating the jury and perhaps lessening his odds of success at the penalty phase.  Counsel's decision to acknowledge defendant's culpability – but to a lesser extent than that urged by the prosecution, in an effort to spare his client from a penalty phase – was not a tactical choice that could not be satisfactorily explained.

*Id.* at 631-32 (citations omitted).

As to Petitioner's penalty-phase lawyer, the California Supreme Court found:

defense counsel at the penalty phase vigorously cross-examined key prosecution witnesses, sought to cast doubt on the case against defendant involving Shelah, and presented a thorough case in mitigation.  During the penalty phase, defendant expressed his high regard for defense counsel, informing the court: "As for phase two, I am totally pleased with both my counsel."

219

1    *Id.* at 633-34.

2         The California Supreme Court additionally found that:

3         although trial counsel did not present the mental health defense that

4         defendant now contends was necessary, counsel did present considerable

5         evidence that sought to portray defendant as a victim of numerous

6         unfortunate circumstances.  For example, the defense presented evidence

7         of defendant's childhood head injury, his father's alcoholism and

8         detachment from the family, and defendant's first wife's extramarital

9         affair and his ensuing use of drugs.  Although such matters did not

10        comprise a "mental health" defense based upon the testimony of various

11        mental health experts, they did provide the jury with the opportunity to

12        consider certain factors in mitigation – without exposing the jury to

13        potentially damaging rebuttal evidence regarding defendant's mental

14        health.  In view of defendant's lengthy history of behaving violently

15        toward women, and the interest of the defense in portraying defendant as

16        favorably as possible, we cannot say on this record that there could not be

17        a reasonable tactical basis for trial counsel's decision to rely solely upon

18        mitigating evidence that showed defendant to be the victim of numerous

19        unfortunate circumstances, in an effort to generate sympathy, and perhaps

20        leniency, from the jury at the penalty phase.

21   *Id.* at 637-38.

22              **3.    Analysis**

23                   **a.    Alleged Pretrial Deficiencies by Barnett**

24        This Court's task is to determine whether any theory under *Strickland* could

25   have supported the state court's denial of relief.  *Richter*, 562 U.S. at 102.  Petitioner's

26   first IAC subclaim faults his guilt-phase trial attorney for failing to adequately prepare

27   the case.  Petitioner's primary complaints are that the lawyer failed to meet with him

28

often enough or investigate important leads for a complete defense.  (SAP at 58-68; Traverse at 43-45, 50-53.)

The California Supreme Court denied this subclaim on direct appeal, finding it "unpersuasive, because the record before us does not disclose that trial counsel lacked a tactical basis" for his actions or inactions, and "counsel's performance was not of the sort for which there could be no satisfactory explanation."  *People v. Hart*, 20 Cal. 4th at 627.  After addressing a number of specific claims pertaining to counsel's trial performance, the court more generally concluded that "the record on appeal does not support defendant's claim that his counsel performed deficiently in preparing or presenting a defense."  *Id.* at 628.  The state court's decision was consistent with *Strickland*.  28 U.S.C. § 2254(d).

The record in this case shows that Petitioner received the representation required by the Sixth Amendment at the pretrial stage.  His lawyer made competent investigations and efforts to put together a strategy for trial.  *Strickland*, 466 U.S. at 691.  Petitioner highlights Barnett's failure to personally meet with him often enough or devote more time to his mental state and depression.  Petitioner's generalized attacks on his attorney's efforts in this regard fail to overcome the "strong presumption" that the lawyer's conduct fell within the wide range of reasonable professional assistance.  *Id.* at 689.  Petitioner also fails to convincingly establish how any of Barnett's alleged failings to spend more time with him affected the outcome of the trial.  *Id.* at 693-94.

Petitioner also contends that Barnett failed to make key investigations.  More specifically, Petitioner complains that Barnett failed to create a meaningful investigation plan, failed to hire competent investigators, and failed to interview enough witnesses.  (SAP at 60-68.)  Petitioner also claims the defense should have proffered other cellmates to rebut Gresham's penalty-phase testimony about his confession to killing his niece.  He also theorizes that more witnesses who knew and spoke to the victims would have undermined Amy Ryan's credibility.  Petitioner, in fact, places emphasis throughout his papers on his attorney's failures to attack Amy

Ryan's credibility at trial.  These arguments ignore the obvious, and patently reasonable, strategy of choosing not to attack the young victim who lived to tell the horrors she endured in great detail.  It was, at the very least, reasonable for the California Supreme Court to assume Barnett avoided raising conspiracy theories about Petitioner and his rape victim as a matter of sound trial strategy.  *Strickland*, 466 U.S. at 687; *Richter*, 562 U.S. at 105.  As to all of these complaints about the defense attorneys, they amount to quintessential examples of the "all too tempting" resort "to second-guess[ing] counsel's assistance after conviction or adverse sentence."  *Strickland*, 466 U.S. at 687; *Richter*, 562 U.S. at 105.  The subclaim fails.

### b.    IAC Subclaims Based on Rejected Arguments

Petitioner raises multiple IAC claims that hinge on the underlying merits of other claims raised in his SAP.  In other words, he argues that several errors, to the extent they were not the fault of the trial court, resulted from his lawyers' failure to properly present the issue.  Specifically, Petitioner contends that his attorneys: (1) failed to conduct more thorough voir dire to root out juror bias; (2) failed to fully investigate and present evidence to impeach Amy Ryan's testimony; (3) failed to make a competent motion to change venue; (4) failed to object to the expert testimony of Dr. Hunter; (5) failed to adequately investigate, rebut, and mitigate the penalty-phase testimony of jailhouse informant Randall Gresham; (6) failed to object to shackling; (7) failed to object to the alleged prosecutorial misconduct; and (8) failed to move to exclude all penalty-phase evidence of the Shelah McMahan homicide.

In light of this Court's extensive analysis above rejecting the underlying foundation of these IAC claims, the Court finds that the California Supreme Court reasonably denied these related IAC claims.  Petitioner's lawyers made reasonable decisions to the extent they elected not to pursue meritless, futile issues.  *Gonzalez v. Knowles*, 515 F.3d 1006, 1017 (9th Cir. 2008) (a defense attorney "cannot be deemed ineffective for failing to raise [a] meritless claim."); *Rupe v. Wood*, 93 F.3d 1434, 1445 (9th Cir. 1996) (an attorney's "failure to take a futile action can never be deficient

performance."). Moreover, for the same reasons as their counterpart claims, even assuming deficient performance, these IAC issues did not change the outcome of Petitioner's trial. *Strickland*, 466 U.S. at 693-94.

### c.    Failure to Challenge Prosecution's Scientific Evidence

Petitioner also complains that his lawyers performed deficiently in failing to adequately test and investigate the prosecution's scientific evidence and expert testimony during both phases of trial. He places emphasis on the electrophoresis testing done on blood and seminal fluid. The California Supreme Court denied this claim in part as follows:

> James Hall, the prosecution's criminalist, testified that a stain found on Amy's slip tested positive for both blood and seminal fluid, although neither substance could be typed using electrophoresis. Thus, the testimony did not establish whether it was defendant who deposited the stain. . . . .
>
> [The] record on appeal fails to disclose that trial counsel lacked a tactical basis for declining to challenge the electrophoresis evidence, and counsel's decision was not one for which there could be no satisfactory explanation. Although the criminalist testified that the contributor of the stain might have been a nonsecretor (as was defendant), the criminalist also testified that the inability to type the stain could have been due to the insufficient strength of the stain, or due to degradation attributable to the passage of time. Thus, as noted, the evidence did not identify defendant as the contributor. Trial counsel therefore reasonably may have concluded that the evidence was not particularly prejudicial, and on that basis reasonably could have made a tactical decision not to challenge the admissibility of this evidence, or the reliability of the electrophoresis testing. During cross-examination, trial counsel exploited the weakness of this evidence, asking questions that emphasized its inconclusive nature.

1    Defendant's assertion of ineffective assistance of counsel based
2    upon trial counsel's failure to request a *Kelly-Frye* hearing similarly is
3    unpersuasive.   Again, the record before us fails to disclose that trial
4    counsel lacked a tactical basis for declining to request such a hearing, nor
5    was counsel's decision to refrain from doing so one for which there could
6    be no satisfactory explanation.   At the time of defendant's trial,
7    electrophoretic typing of dried bloodstains had gained general acceptance
8    in the scientific community.   Trial counsel was under no obligation to
9    interpose a meritless challenge to a generally accepted scientific
10   technique.  We therefore reject defendant's contention that trial counsel
11   performed deficiently regarding this issue, and find no basis for his
12   related contention that counsel's performance deprived defendant of his
13   constitutional rights.

14   *People v. Hart*, 20 Cal. 4th at 628-29 (citations omitted).

15   The state court also concluded:

16   At the penalty phase, the prosecution introduced evidence of
17   electrophoretic testing of dried blood that had been found on handcuffs
18   recovered from a shed located behind defendant's residence. . . . The
19   blood was similar in type to Shelah's.  The prosecution also introduced
20   evidence related to electrophoretic testing of a semen stain found on
21   Shelah's sweatpants; on cross-examination, the prosecution's expert
22   acknowledged that no conclusion could be drawn as to typing the semen
23   donor, or as to the age of the stain.

24   Defendant contends that, at the time of his trial, there was
25   considerable debate regarding the admissibility of electrophoretic
26   evidence, . . . .  Defendant contends that trial counsel's failure to object
27   to the admission of the electrophoretic evidence, and counsel's failure to
28

224

1    request a foundational hearing pursuant to Evidence Code section 402,

2    constituted ineffective assistance of counsel.

3        Defendant's position is unpersuasive, because the record on appeal

4    fails to reflect that trial counsel lacked a tactical basis for declining to

5    challenge the electrophoresis evidence or request a foundational hearing,

6    and counsel's decisions regarding those matters were not ones for which

7    there could be no satisfactory explanation.

8        [Moreover], . . . , we held that admission of electrophoresis testing

9    was generally accepted in the scientific community in 1987 – a date prior

10   to its introduction at the penalty phase in defendant's trial.   Defense

11   counsel was not required to mount a meritless challenge to the acceptance

12   of such evidence.

13   *Id.* at 634-35 (citations omitted).

14       The state court decision was not contrary to, or an unreasonable application of,

15   *Strickland*.   Notably, Petitioner's allegations as to every scientific aspect of the

16   prosecution's case – electrophoresis testing, the autopsy, gynecology, blood spatter

17   evidence – only speculate as to whether his lawyers would have garnered a competent

18   scientific rebuttal.  He merely hypothesizes that more effort on the part of the lawyers

19   would have led to favorable evidence.   That does not meet the standard of

20   demonstrating a "reasonable probability" that outcome-altering evidence would have

21   emerged from further investigation.  *Strickland*, 466 U.S. at 694; *Richter*, 562 U.S. at

22   111; *Bragg*, 242 F.3d at 1088.  Additionally, considering how damning the evidence

23   was implicating Petitioner in both the guilt-phase and penalty-phase crimes, there was

24   certainly a reasonable strategy to the extent Petitioner's attorneys focused their efforts

25   on more priority arguments.  *Strickland*, 466 U.S. at 689; *Pinholster*, 563 U.S. at 196.

26   Petitioner has not established an unreasonable application of *Strickland* here.

27                    **d.     Failure to Object to Dr. Rath's Testimony**

28

225

Petitioner argues that his lawyers failed to mount an admissibility challenge to "binge rapist" testimony offered by Dr. Craig Rath.  The California Supreme Court denied this claim based on the following findings of fact and conclusions of law:

> The prosecution called Dr. Craig Rath, a licensed clinical psychologist at Patton State Hospital, to testify as an expert witness regarding two principal matters: (1) memory repression by someone who has experienced a traumatic event, and (2) an emotional "about-face" and showing of remorse on the part of someone who has just committed a sexual assault.  Rath's testimony apparently was intended to assist the jury in understanding certain aspects of Amy's testimony.  On cross-examination, Rath acknowledged that he was unfamiliar with defendant or the surviving victim, not having interviewed either individual.

> On appeal, defendant contends that trial counsel performed deficiently in failing to challenge Rath's qualifications or competence to testify as an expert regarding the matters about which he testified, particularly his testimony concerning the common conduct of "binge rapists."  Defendant's claim cannot be sustained on appeal.  The record on appeal fails to disclose that trial counsel lacked a tactical basis for declining to challenge Dr. Rath's qualifications or competence to testify as an expert, and counsel's decision to refrain from doing so was not one for which there could be no satisfactory explanation.  At the time of defendant's trial, Rath had performed more than 2,000 court-directed psychological evaluations and had testified "a couple of hundred times in nine counties in California and four other states," and there is no indication in the record that he did not have expertise with regard to the matters to which he testified.  Thus, on the record before us, we perceive

1    no deficiency on counsel's part in failing to challenge Dr. Rath's
2    qualifications.

3   *People v. Hart*, 20 Cal. 4th at 629-30 (citations omitted).

4        Again, the state court decision was not contrary to, or an unreasonable
5   application of, *Strickland*.  As above, Petitioner fails on two crucial fronts.  He
6   speculates that his lawyers could have mustered any viable argument to disqualify Dr.
7   Rath's testimony.  *Strickland*, 466 U.S. at 694.  Additionally, he fails to explain how
8   this evidence was so important or persuasive in the grand scheme of the trial that a
9   reasonably competent attorney should have expended time and resources on it.  *Id.* at
10  689; *Pinholster*, 563 U.S. at 196.  Petitioner has again not established an unreasonable
11  application of *Strickland*.

12              **e.      Failure to Present an Adequate Mitigating Case**

13       Petitioner raises additional claims targeting his lawyers' performance in the
14  penalty phase.  He argues that they failed to present aspects of his social history, retain
15  mental health experts to testify, or mount an adequate third-party culpability defense
16  as to the murder of his niece.  The California Supreme Court reasonably denied these
17  IAC allegations.

18       As stated above, a defense lawyer is "entitled to formulate a strategy that [is]
19  reasonable at the time and to balance limited resources in accord with effective trial
20  tactics and strategies."  *Richter*, 562 U.S. at 107-08.  A defense lawyer "need not
21  pursue an investigation that would be fruitless, much less one that might be harmful
22  to the defense."  *Id.*  Moreover, Petitioner's attorneys were entitled to a strong
23  presumption that they made rational choices based on what defense theories they
24  decided would be most likely to persuade the jury.  *Richter*, 562 U.S. at 109 (counsel
25  is entitled to a strong presumption that his or her attention to certain issues to the
26  exclusion of others reflects trial tactics); *Strickland*, 466 U.S. at 691 (the court must
27  apply "a heavy measure of deference to counsel's judgments.").  For reasons already
28  discussed in detail – in particular the powerful penalty-phase evidence in aggravation

1    – Petitioner fails to show that his lawyers had any non-frivolous action to take that

2    would have changed the outcome of the penalty phase of his trial. *Gonzalez*, 515 F.3d

3    at 1017; *Rupe*, 93 F.3d at 1445 (9th Cir. 1996). Petitioner's claim is another example

4    of the "all too tempting" resort "to second-guess[ing] counsel's assistance after

5    conviction or adverse sentence." *Strickland*, 466 U.S. at 687; *Richter*, 562 U.S. at 105.

6    　　　Petitioner's arguments are also based largely on speculation as to what evidence

7    additional witness interviews would have garnered. *See Djerf v. Ryan*, 931 F.3d 870,

8    883 (9th Cir. 2019) (no *Strickland* prejudice where the prosecution's aggravating

9    evidence was strong and it was unclear whether additional defense investigation would

10   have led to an expert diagnosis of mental illness).

11   　　　This subclaim also fails.

12   　　　　　　**f.　　Claims That Patently Fail *Strickland* Prejudice**

13   　　　The remaining IAC subclaims – that Petitioner's lawyers failed to ensure his

14   presence at all critical stages of trial, failed to move to have the prosecutor recused,

15   failed to challenge an unfair pretrial lineup, failed to request a different jury for the

16   penalty phase, failed to cooperate with each other, failed to adequately challenge the

17   special circumstance allegations based on lack of intent, came to court intoxicated and

18   completely abandoned their role as advocates – plainly fail *Strickland*'s prejudice

19   prong. For reasons already discussed regarding the strength of the prosecution's

20   evidence, none of these claims, even assuming deficient performance, establish a

21   reasonable probability of a different result. *Strickland*, 466 U.S. at 694. Thus, these

22   assertions fail to "affirmatively prove prejudice." *Id.* at 693 ("It is not enough for the

23   defendant to show that the errors had some conceivable effect on the outcome of the

24   proceeding.")

25   　　　The California Supreme Court's denial of Petitioner's IAC claims was not

26   contrary to, or an unreasonable application of, clearly established United States

27   Supreme Court precedent. 28 U.S.C. § 2254(d). Claim 6 is DENIED.

28   　　**LL.　Defense Investigator's Conflict of Interest (Claim 13)**

228

1    Petitioner's next claim is both factually and legally speculative.  He raises IAC
2    and a conflict-of-interest claim based on his concerns about the background of an
3    investigator hired by the defense.  The investigator at issue, Carl Smith, was previously
4    employed as the chief deputy coroner in the Riverside County Coroner's Office.
5    Petitioner points to Smith's prior convictions of perjury and conspiracy to obstruct
6    justice based on acts that occurred while he was employed by the coroner.  Petitioner
7    argues that Smith was on probation in that case at the time of Petitioner's trial, and
8    "needed the Riverside District Attorney's approval for dismissal of the charges against
9    him."   From that, Petitioner concludes that Smith was "beholden to the county
10   prosecutor's office" and made sub-par investigative efforts on Petitioner's case due to
11   the investigator's divided loyalties.  Aside from generally referring to the investigative
12   inadequacies Petitioner alleged in his related IAC claim in Claim 6, he emphasizes that
13   Smith could not have thoroughly investigated the work and character of his former
14   colleagues in the county coroner's office.  (SAP at 240-47; Traverse at 168-71.)

15   The California Supreme Court's summary denial of Petitioner's claim was not
16   objectively unreasonable under AEDPA.  The Court has already addressed and rejected
17   Petitioner's IAC claims based on allegedly inadequate investigations.  Petitioner's
18   renewed attempt to restate these claims by assigning the assumed conflicts of an
19   investigator to the attorney who hired him is not supported by clearly established
20   Federal law.  It was the lawyer who owed Petitioner a Sixth Amendment duty to
21   adequate and conflict-free representation.  It was also the lawyer who was responsible
22   for the mistakes of those he hired.  Setting aside Petitioner's unsupported cynicism –
23   he argues that Smith likely acted as a double agent for the district attorney's office,
24   sabotaging defense cases and helping his former colleagues in the county coroner's
25   office cover up their misdeeds – he fails to show that any part of this alleged
26   conspiracy affected the performance of his trial attorney or actually inhibited the
27   defense case in a material way.  *See Rowland*, 876 F.3d at 1191 (to demonstrate a Sixth
28   Amendment violation based on a conflict of interest, "a defendant who raised no

1    objection at trial must demonstrate that an actual conflict of interest adversely affected
2    *his lawyer's* performance.") (emphasis added, citation omitted); *id.* (establishing an
3    "actual conflict" requires more than showing "a mere theoretical division of
4    loyalties."); *Strickland*, 466 U.S. at 693 (a petitioner must "affirmatively prove
5    prejudice," and "[i]t is not enough for the defendant to show that the errors had some
6    conceivable effect on the outcome of the proceeding.").

7           Claim 13 is DENIED.

8           **MM.  Cumulative Error (Claims 21 and 39)**

9           Petitioner argues that the cumulative effect of all the alleged guilt-phase (Claim
10   21) and penalty-phase (Claim 39) errors – including his IAC claims – violated the
11   Constitution.  (SAP at 295-96, 369-71; Traverse at 265-68.)  The Supreme Court has
12   never expressly held that either cumulative error or cumulative *Strickland* prejudice are
13   bases on which habeas relief may be granted.  Consequently, Petitioner cannot show
14   a violation of clearly established Federal law, and these claims fail.  28 U.S.C. §
15   2254(d); *Van Patten*, 552 U.S. at 126.

16          Ninth Circuit courts have held that the "cumulative effect of multiple errors can
17   violate due process even where no single error rises to the level of a constitutional
18   violation or would independently warrant reversal."  *Ybarra v. McDaniel*, 656 F.3d
19   984, 1001 (9th Cir. 2011) (*quoting Parle v. Runnels*, 505 F.3d 922, 927 (9th Cir.
20   2007)); *see also Harris v. Wood*, 64 F.3d 1432, 1438-39 (9th Cir. 1995) (applying the
21   same principal to the "cumulative prejudice" of several IAC claims).   Such a
22   cumulative effect exists where there is a "unique symmetry" of otherwise harmless
23   errors that "amplify each other in relation to a key contested issue in the case" and
24   render the proceeding "fundamentally unfair."  *Ybarra*, 656 F.3d at 1001 (citations
25   omitted).  But, when there is no single constitutional error, there is "nothing to
26   accumulate to a level of a constitutional violation."  *Mancuso v. Olivarez*, 292 F.3d
27   939, 957 (9th Cir. 2002).  Since the Court finds that none of Petitioner's claims

28

1 amounts to constitutional error, Petitioner's cumulative error claim would fail under
2 this Circuit's precedent, as well.

3       Regardless, in the absence of clearly established Federal law articulating
4 cumulative error or cumulative *Strickland* prejudice as bases for habeas relief, both
5 claims fail under AEDPA.  See *Lopez v. Smith*, 574 U.S. at 2 (AEDPA prohibits circuit
6 courts from relying on their own precedent to conclude that a particular constitutional
7 principle is clearly established); *see also Dodson v. Stephens*, 611 F. App'x. 168, 179
8 n.3 (5th Cir. 2015) (discussing circuit split of authority as to whether *Strickland* calls
9 for a cumulative prejudice analysis) (cited pursuant to Fed. R. App. P. 32.1(a) and 5th
10 Cir. R. 28.7).

11       Claims 21 and 39 are DENIED.

12 **VI.   CONCLUSION**

13       The Court finds that Claims 37 and 41 are not yet ripe for review.  The Court
14 dismisses those claims without prejudice so that Petitioner may raise them at the
15 appropriate time.  As to all other claims raised in the SAP, Petitioner has not cleared
16 "AEDPA's high bar for habeas relief."  *LeBlanc*, 137 S. Ct. at 1729; *see also Richter*,
17 562 U.S. at 102 ("It bears repeating that even a strong case for relief does not mean the
18 state court's contrary conclusion was unreasonable. (Citation omitted.) If this standard
19 is difficult to meet, that is because it was meant to be.").  Those claims are denied and
20 dismissed with prejudice.

21       IT IS SO ORDERED.

22 Dated: August 5, 2020

23                                     DALE S. FISCHER
                                  UNITED STATES DISTRICT JUDGE

24
25
26
27
28